# EXHIBIT H

REDACTED

---------- Forwarded message ----------
From: **Danielle Sinowitz** <dsinowitz@jacksontwpnj.net>
Date: Tue, Mar 26, 2019 at 10:20 AM
Subject: OPRA Response
To: rise up <riseupocean@gmail.com>


Dear Rise Up:

Please accept this as my official response to your OPRA (copy attached). Your records requested have been destroyed under general correspondence as per approval from the NJDARM. Attached please the Authorization from Records Disposal approved on 3/6/19(2009-2016) for Administration. Also Please find Authorization from Records Disposal approved on 1/31/18(2014), 5/15/19(2015) for Council.

Thank you!


# Danielle Sinowitz

Clerk I
Jackson Township
95 West Veterans Highway
Jackson, NJ 08527
Tel: 732-928-1200 ext. 1203
Email: Dsinowitz@jacksontwpnj.net

1



# Fw: Information request

## Janice Kisty

Tue 2/26/2019 9:20 AM

To:Danielle Sinowitz <dsinowitz@jacksontwpnj.net>;

Danielle,
Please process.
Thank you.

*Janice Kisty*
*Township Clerk/Registrar*
Jackson Township
95 W. Veterans Highway
Jackson, NJ   08527
732-928-1200 x1200
fax 732-928-4377

**From:** rise up ocean <riseupocean@gmail.com>
**Sent:** Monday, February 25, 2019 6:52 AM
**To:** Ann Marie Eden; Janice Kisty
**Subject:** Information request

Dear Clerk,
Under OPRA please send me all emails and letters to and from Mike Reina, Rob Nixon , Barry Calogero , Scott Marin, Ann Updegrave and Ken Bressi with regards to Oros Bais Yaakov , girls schools, and schools between 01/01/14 thru 01/01/15

NJDARM - Division of Archives and Records Management

Jackson Twp. - Records Information Management System

**REQUEST AND AUTHORIZATION FOR RECORDS DISPOSAL**

**Instructions:**

Please type or print. This request must be submitted prior to the disposition of any public records. State agencies must complete Items 1. through 14., county and municipal must also complete Items 15.A and 15. B, if fiscal records are listed. Return intact form (all four parts) to: DISPOSAL REQUESTS, Department of State, Division of Archives and Records Management (DARM), 2300 Stuyvesant Avenue, P.O. Box 307, Trenton, N.J. 08625. For questions or assistance, call (609) 530-3208. Please include self addressed envelope for expedited service.

**1. Requesting Agency Name**

Administration
95 West Veteran's Highway, Jackson, NJ 08527

**1.A Agency Retention Schedule Number**

M100000 - 013

| 2. Request Id/Date | 3. Requested By (Electronically Signed by) | 4. Request Approved By (Electronically Signed by) | 5. Records Manager (Electronically Signed by) |
|---|---|---|---|
| 1191 3/5/2019 | Samantha Novak 03/06/2019 | Janice Kisty 03/06/2019 | |

| 6. Archival Review | 7. Premature Records Disposal | 8. Comments |
|---|---|---|
| Not Required | Microfilm / Digital Image / Damaged Records Certificate | This includes all paper and electronic correspondence/ email. |

Authorization is here by requested for the disposal of the following public records in accordance with New Jersey P.L. 1953, c. 410 as amended. It is further certified that the record series listed herein have exceeded their respective retention periods and are not involved in litigation and are not required for present or future audit. NOTE: Items 9.,10., and 11. must be completed as they appear on an approved records retention schedule.

| # | 9. Series # | 10. Record Series Title | 11. Retention Period | 12. Inclusive Dates From (MM/YYYY) | 12. Inclusive Dates To (MM/YYYY) | 13. Dispose After | 14. Volume (in Cubic Feet) |
|---|---|---|---|---|---|---|---|
| 1 | 0503-0001 | Correspondence - General External | 3 Years | 01/2009 | 01/2016 | | 10.00 |

**Total Volume :** 10.00

**For Division Use Only :**

| 15. Audit Verification | 16. Authorization | 17. Disposition |
|---|---|---|

| 15.A Auditor (Electronically Signed by) | 16.A Authorization Date | 16.B Authorization Number | |
|---|---|---|---|
| Jerry Conaty 03/06/2019 | 3/6/2019 | 553741 | |

| 15.B Date | 16.C Director's Signature, Division of Archives & Records Management | 17.A Verification Signature | 17.B Date |
|---|---|---|---|

NJDARM - Division of Archives and Records Management

**REQUEST AND AUTHORIZATION FOR RECORDS DISPOSAL**

**Instructions:**

Please type or print. This request must be submitted prior to the disposition of any public records. State agencies must complete items 1, through 14., county and municipal must also complete items 15.A and 15. B. if fiscal records are listed. Return intact form (all four parts) to: DISPOSAL REQUESTS, Department of State, Division of Archives and Records Management (DARM), 2300 Stuyvesant Avenue. P.O. Box 307, Trenton, N.J. 08625. For questions or assistance, call (609) 530-3208. Please include self addressed envelope for expedited service.

**1.Requesting Agency Name**

Municipal Clerk
95 W. Veterans Highway, Jackson, NJ 08527
(732) 928-1200 Extn: 200

**1.A Agency Retention Schedule Number**

M100000 - 009

| 2. Request Id/Date | 3. Requested By (Electronically Signed by) | 4. Request Approved By (Electronically Signed by) | 5. Records Manager (Electronically Signed by) |
|---|---|---|---|
| 781 1/14/2016 | Diane Festino 01/29/2016 | Ann Marie Eden 01/29/2016 | |

| 6. Archival Review | 7. Premature Records Disposal | 8. Comments |
|---|---|---|
| Not Required | Microfilm | Digital Image | Damaged Records Certificate | Incl 1584=1585,1587=1588,1595=1600,1603=1604,1606,1611=1612,1614=1616,1620,1621a-1623,1627,1630=1631 |

Authorization is here by requested for the disposal of the following public records in accordance with New Jersey P.L. 1953, c. 410 as amended. It is further certified that the record series listed herein have exceeded their respective retention periods and are not involved in litigation and are not required for present or future audit. NOTE: Items 9.,10., and 11. must be completed as they appear on an approved records retention schedule.

| # | 9.Series # | 10. Record Series Title | 11.Retention Period | 12.Inclusive Dates From (MM/YYYY) | 12.Inclusive Dates To (MM/YYYY) | 13.Dispose After | 14.Volume (in Cubic Feet) |
|---|---|---|---|---|---|---|---|
| 7 | 0304-0002 | Purchase Order File (Copy) * Auditor Verification Required | 3 Years | 01/2012 | 12/2012 | | 0.25 |
| 8 | 0322-0002 | Telephone File - Telephone Bills (Copy) * Auditor Verification Required | 3 Years | 01/2012 | 12/2012 | | 0.25 |
| 9 | 0503-0001 | Correspondence - General External | 3 Years | 01/2012 | 12/2012 | | 2.00 |
| 10 | 0517-0001 | Open Public Records Act (OPRA) File - Request Form With Fee * Auditor Verification Required | 6 Years | 01/2009 | 12/2009 | | 6.00 |

**For Division Use Only :**

**Total Volume :** 8.50

| 15. Audit Verification | 16. Authorization | 17. Disposition |
|---|---|---|
| 15.A Auditor (Electronically Signed by) Rodney Haines 02/01/2016 | 16.A Authorization Date 2/4/2016 | 16.B Authorization Number 524688 | Shred |
| 15.B Date | 16.C Director's Signature, Division of Archives & Records Management | 17.A Verification Signature | 17.B Date |

3/29/2016

NJDARM - Division of Archives and Records Management

1. Requesting Agency Name

**REQUEST AND AUTHORIZATION FOR RECORDS DISPOSAL**

**Instructions:**

Please type or print. This request must be submitted prior to the disposition of any public records. State agencies must complete items 1 through 14, county and municipal must also complete items 15, A and 15, B. If fiscal records are listed, Return intact form (all four parts) to: DISPOSAL REQUESTS, Department of State, Division of Archives and Records Management (DARM), 2300 Stuyvesant Avenue, P.O. Box 307, Trenton, N.J. 08625. For questions or assistance, call (609) 530-3208. Please include self addressed envelope for expedited service.

1. Requesting Agency Name

Jackson Twp. - Records Information Management System

Municipal Clerk
95 W. Veterans Highway, Jackson, NJ 08527
(732) 928-1200 Extn: 200

1.A Agency Retention Schedule Number

M100000 - 012

| 2. Request Id/Date | 3. Requested By (Electronically Signed by) | 4. Request Approved By (Electronically Signed by) | 5. Records Manager (Electronically Signed by) |
|---|---|---|---|
| 858<br>10/5/2016 | Diana Festino<br>02/07/2017 | Ann Marie Eden<br>02/07/2017 | |

6. Archival Review
Not Required

7. Premature Records Disposal
Microfilm   Digital Image   Damaged Records Certificate

8. Comments
not:1725,1751,1753,1759,1762-1763,1772,1781-1782,1786-1788,1791-1792,1795-1797,1800-1802,1804A

Authorization is here by requested for the disposal of the following public records in accordance with New Jersey P.L. 1953, c. 410 as amended. It is further certified that the record series listed herein have exceeded their respective retention periods and are not required for present or future audit. NOTE: Items 9, 10, and 11, must be completed as they appear on an approved records retention schedule.

| # | 9.Series # | 10. Record Series Title | 11.Retention Period | 12.Inclusive Dates From (MM/YYYY) | 12.Inclusive Dates To (MM/YYYY) | 13.Dispose After | 14.Volume (in Cubic Feet) |
|---|---|---|---|---|---|---|---|
| 7 | 0304-0002 | Purchase Order, Invoice, Voucher/Warrant And Requisition File (Copy)<br>* Auditor Verification Required | 3 Years | 01/2013 | 12/2013 | | 0.50 |
| 8 | 0322-0002 | Telephone File - Telephone Bills (Copy)<br>* Auditor Verification Required | 3 Years | 01/2013 | 12/2013 | | 0.25 |
| 9 | 0503-0001 | Correspondence – General External | 3 Years | 01/2013 | 12/2013 | | 1.00 |
| 10 | 0517-0001 | Open Public Records Act (OPRA) File - Request Form With Fee<br>* Auditor Verification Required | 6 Years | 01/2010 | 12/2010 | | 3.00 |

For Division Use Only:

Total Volume : 4.75

| 15. Audit Verification | | 16. Authorization | | 17. Disposition |
|---|---|---|---|---|
| 15.A Auditor   (Electronically Signed by)<br>Rodney Haines<br>02/07/2017 | 16.A Authorization By (Electronically Signed by) | 16.B Authorization Number<br>533695 | Shred |
| 15.B Date | 16.A Authorization Date<br>2/7/2017 | | |
| | 16.C Director's Signature, Division of Archives & Records Management | | 17.A Verification Signature | 17.B Date<br>3/7/2017 |

Page 3 of 4
Run Date: 3/8/2017 11:15:41 AM

157-1733     MUNICIPAL PROSECUTOR – ED GLASNER, ESQ.

Archives and Records Management

Jackson Twp. - Records Information Management

| | |
|---|---|
| **REQUEST AND AUTHORIZATION FOR RECORDS DISPOSAL** | **Instructions:** Please type or print. This request must be submitted prior to the disposition of any public records. State agencies must complete items 1, through 14., county and municipal must also complete items 15.A and 15. B, if fiscal records are listed. Return intact form (all four parts) to: DISPOSAL REQUESTS, Department of State, Division of Archives and Records Management (DARM), 2300 Stuyvesant Avenue, P.O. Box 307, Trenton, N.J. 08625, For questions or assistance, call (609) 530-3208. Please include self addressed envelope for expedited service. |

**1.Requesting Agency Name**
Municipal Clerk
95 W. Veterans Highway, Jackson, NJ 08527
(732) 928-1200 Extn: 200

**1.A Agency Retention Schedule Number**
M100000 - 013

| 2. Request Id/Date | 3. Requested By (Electronically Signed by) | 4. Request Approved By (Electronically Signed by) | 5. Records Manager (Electronically Signed by) |
|---|---|---|---|
| 1034 1/31/2018 | Diane Festino 02/01/2018 | Ann Marie Eden 02/05/2018 | |

| 6. Archival Review | | | 7. Premature Records Disposal | | 8. Comments |
|---|---|---|---|---|---|
| Not Required | Microfilm | Digital Image | Damaged Records Certificate | | corres incl. emails/bill list, contracts not:1824,1826-27,1834-35,1838-39,1840,1855,1860,1862-64, |

Authorization is here by requested for the disposal of the following public records in accordance with New Jersey P.L. 1953, c. 410 as amended. It is further certified that the record series listed herein hav exceeded their respective retention periods and are not involved in litigation and are not required for present or future audit. NOTE: Items 9.,10., and 11. must be completed as they appear on an approve records retention schedule.

| # | 9.Series # | 10. Record Series Title | 11.Retention Period | 12.Inclusive Dates | | 13.Dispose After | 14.Volume (in Cubic Feet) |
|---|---|---|---|---|---|---|---|
| | | | | From (MM/YYYY) | To (MM/YYYY) | | |
| 7 | 0304-0002 | Purchase Order, Invoice, Voucher/Warrant And Requisition File (Copy) | 3 Years | 01/2014 | 12/2014 | | |
| | | * Auditor Verification Required | | | | | |
| 8 | 0322-0002 | Telephone File - Telephone Bills (Copy) | 3 Years | 01/2014 | 12/2014 | | |
| | | * Auditor Verification Required | | | | | |
| 9 | 0503-0001 | Correspondence - General External | 3 Years | 01/2014 | 12/2014 | | |
| 10 | 0517-0001 | Open Public Records Act (OPRA) File - Request Form With Fee | 6 Years | 01/2011 | 12/2011 | | |
| | | * Auditor Verification Required | | | | | |

**For Division Use Only :**

| | | | | | | | Total Volume : |
|---|---|---|---|---|---|---|---|

| 15. Audit Verification | | 16. Authorization | | | 17. Disposition |
|---|---|---|---|---|---|
| 15.A Auditor (Electronically Signed by) Rodney Haines 02/06/2018 | | 16.A Authorization Date | 16.B Authorization Number | | Shred |
| 15.B Date | | 2/7/2018 | 543360 | | |
| | | 16.C Director's Signature, Division of Archives & Records Management | | | 17.A Verification Signature | 17.B Date |

Page 3

Jackson Twp. - Records Information Management System

...chives and Records Management

**...EQUEST AND ...THORIZATION FOR ...ECORDS DISPOSAL**

| Instructions: | 1. Requesting Agency Name |
|---|---|
| Please type or print. This request must be submitted prior to the disposition of any public records. State agencies must complete items 1, through 14, county and municipal must also complete items 15, A and 15. B, If fiscal records are listed. Return intact form (all four parts) to: DISPOSAL REQUESTS, Department of State, Division of Archives and Records Management (DARM), 2300 Stuyvesant Avenue, P.O. Box 307, Trenton, N.J. 08625. For questions or assistance, call (609) 530-3208. Please include self addressed envelope for expedited service. | Municipal Clerk<br>95 W. Veterans Highway, Jackson, NJ 08527<br>(732) 928-1200 Extn: 200 |

**1.A Agency Retention Schedule Number**

M100000 - 013

| 2. Request Id/Date | 3. Requested By (Electronically Signed by) | 4. Request Approved By (Electronically Signed by) | 5. Records Manager (Electronically Signed by) |
|---|---|---|---|
| 1170<br>2/15/2019 | Diane Festino<br>02/15/2019 | Janice Kisty<br>02/20/2019 | |

| 6. Archival Review | 7. Premature Records Disposal | 8. Comments |
|---|---|---|
| Not Required | Digital Image | Damaged Records Certificate | contacts-not-2266,2270-71,2274-75,2280,2286,2292-94,2320-21,2328,2335,2341,2345-46, |
| Microfilm | | |

Authorization is here by requested for the disposal of the following public records in accordance with New Jersey P.L. 1953, c. 410 as amended. It is further certified that the record series listed herein have exceeded their respective retention periods and are not involved in litigation and are not required for present or future audit. NOTE: Items 9, 10, and 11, must be completed as they appear on an approved records retention schedule.

| # | 9.Series # | 10. Record Series Title | 11.Retention Period | 12.Inclusive Dates From (MM/YYYY) | 12.Inclusive Dates To (MM/YYYY) | 13.Dispose After | 14.Volume (in Cubic Feet) |
|---|---|---|---|---|---|---|---|
| 4 | 0303-0001 | Contracts/Agreements and Amendments - General (Original)<br>* Auditor Verification Required | 6 Years After completion of contract | 01/2011 | 12/2012 | | 3.00 |
| 5 | 0302-0005 | Bond File - Performance Bonds<br>* Auditor Verification Required | 6 Years After termination of contract | 01/2006 | 12/2012 | | 6.00 |
| 6 | 0304-0002 | Purchase Order, Invoice, Voucher/Warrant And Requisition File (Copy)<br>* Auditor Verification Required | 3 Years | 01/2015 | 12/2015 | | 0.25 |
| 7 | 0503-0001 | Correspondence - General External | 3 Years | 01/2015 | 12/2015 | | 1.00 |

**For Division Use Only :**

**Total Volume :** 10.25

| 15. Audit Verification | | 16. Authorization | | 17. Disposition |
|---|---|---|---|---|
| 15.A Auditor<br>Jerry Conaty<br>02/25/2019 | (Electronically Signed by) | 16.A Authorization Date<br>2/25/2019 | 16.B Authorization Number<br>553410 | |
| 15.B Date | | 16.C Director's Signature, Division of Archives & Records Management | | 17.A Verification Signature     17.B Date |

# EXHIBIT I

NJDARM - Division of Archives and Records Management

Jackson Twp. - Records Information Management System

## REQUEST AND AUTHORIZATION FOR RECORDS DISPOSAL

**Instructions:**
Please type or print. This request must be submitted prior to the disposition of any public records. State agencies must complete items 1. through 14., county and municipal must also complete items 15. A and 15. B, if fiscal records are listed. Return intact form (all four parts) to: DISPOSAL REQUESTS, Department of State, Division of Archives and Records Management (DARM), 2300 Stuyvesant Avenue, P.O. Box 307, Trenton, N.J. 08625. For questions or assistance, call (609) 530-3208. Please include self addressed envelope for expedited service.

**1. Requesting Agency Name**
Administration
95 West Veteran's Highway, Jackson, NJ 08527

**1.A Agency Retention Schedule Number**
M100000 - 013

| 2. Request Id/Date | 3. Requested By (Electronically Signed by) | 4. Request Approved By (Electronically Signed by) | 5. Records Manager (Electronically Signed by) |
|---|---|---|---|
| 1191 3/5/2019 | Samantha Novak 03/06/2019 | Janice Kisty 03/06/2019 | |

| 6. Archival Review | 7. Premature Records Disposal | 8. Comments |
|---|---|---|
| Not Required | Microfilm | Digital Image | Damaged Records Certificate | This includes all paper and electronic correspondence/ email. |

Authorization is here by requested for the disposal of the following public records in accordance with New Jersey P.L. 1953, c. 410 as amended. It is further certified that the record series listed herein have exceeded their respective retention periods and are not involved in litigation and are not required for present or future audit. NOTE: Items 9,10., and 11. must be completed as they appear on an approved records retention schedule.

| # | 9.Series # | 10. Record Series Title | 11.Retention Period | 12.Inclusive Dates From (MM/YYYY) | To (MM/YYYY) | 13.Dispose After | 14.Volume (in Cubic Feet) |
|---|---|---|---|---|---|---|---|
| 1 | 0503-0001 | Correspondence - General External | 3 Years | 01/2009 | 01/2016 | | 10.00 |

**For Division Use Only :**

| | Total Volume : | 10.00 |
|---|---|---|

| 15. Audit Verification | 16. Authorization | 17. Disposition |
|---|---|---|

| 15.A Auditor (Electronically Signed by) | 16.A Authorization Date | 16.B Authorization Number | 17.A Verification Signature | |
|---|---|---|---|---|
| Jerry Conaty 03/06/2019 | 3/6/2019 | 553741 | | 17.B Date |
| 15.B Date | 16.C Director's Signature, Division of Archives & Records Management | | | |

# EXHIBIT J

Archives and Records Manangement

Jackson Twp. - Records Information Management

# REQUEST AND AUTHORIZATION FOR RECORDS DISPOSAL

**Instructions:**
Please type or print. This request must be submitted prior to the disposition of any public records. State agencies must complete items 1 through 14, county and municipal must also complete items 15.A and 15. B, if fiscal records are listed. Return intact form (all four parts) to: DISPOSAL REQUESTS, Department of State, Division of Archives and Records Management (DARM), 2300 Stuyvesant Avenue, P.O. Box 307, Trenton, N.J. 08625. For questions or assistance, call (609) 530-3208. Please include self addressed envelope for expedited service.

**1. Requesting Agency Name**
Municipal Clerk
95 W. Veterans Highway, Jackson, NJ 08527
(732) 928-1200 Extn: 200

**1.A Agency Retention Schedule Number**
M100000 - 013

| 2. Request Id/Date | 3. Requested By (Electronically Signed by) | 4. Request Approved By (Electronically Signed by) | 5. Records Manager (Electronically Signed) |
|---|---|---|---|
| 1034 1/31/2018 | Diane Festino 02/01/2018 | Ann Marie Eden 02/05/2018 | |

**6. Archival Review**
Not Required

**7. Premature Records Disposal**
Microfilm   Digital Image   Damaged Records Certificate

**8. Comments**
corres incl. emails/bill list. contracts not:1824,1826-27,1834-35,1838-39,1840,1856,1860,1862-64,

Authorization is here by requested for the disposal of the following public records in accordance with New Jersey P.L. 1953, c. 410 as amended. It is further certified that the record series listed herein have exceeded their respective retention periods and are not involved in litigation and are not required for present or future audit. NOTE: Items 9, 10, and 11, must be completed as they appear on an approved records retention schedule.

| # | 9.Series # | 10. Record Series Title | 11.Retention Period | 12.Inclusive Dates From (MM/YYYY) | 12.Inclusive Dates To (MM/YYYY) | 13.Dispose After | 14.Volume (in Cubic Feet) |
|---|---|---|---|---|---|---|---|
| 7 | 0304-0002 | Purchase Order, Invoice, Voucher/Warrant And Requisition File (Copy) | 3 Years | 01/2014 | 12/2014 | | |
| | | * Auditor Verification Required | | | | | |
| 8 | 0322-0002 | Telephone File - Telephone Bills (Copy) | 3 Years | 01/2014 | 12/2014 | | |
| | | * Auditor Verification Required | | | | | |
| 9 | 0503-0001 | Correspondence - General External | 3 Years | 01/2014 | 12/2014 | | |
| 10 | 0517-0001 | Open Public Records Act (OPRA) File - Request Form With Fee | 6 Years | 01/2011 | 12/2011 | | |
| | | * Auditor Verification Required | | | | | |

**For Division Use Only :**

Total Volume :

| 15. Audit Verification (Electronically Signed by) | 16. Authorization | | | | 17. Disposition |
|---|---|---|---|---|---|
| 15.A Auditor Rodney Haines 02/06/2018 | 16.A Authorization Date 2/7/2018 | 16.B Authorization Number | | 543360 | Shred |
| 15.B Date | 16.C Director's Signature, Division of Archives & Records Management | | 17.A Verification Signature | | 17.B Date |

3/6/

# EXHIBIT K

Archives and Records Management

Jackson Twp. - Records Information Management System

# REQUEST AND AUTHORIZATION FOR RECORDS DISPOSAL

**Instructions:**

Please type or print. This request must be submitted prior to the disposition of any public records. State agencies must complete Items 1. through 14., county and municipal must also complete items 15.A and 15. B. If fiscal records are listed. Return intact form (all four parts) to: DISPOSAL REQUESTS, Department of State, Division of Archives and Records Management (DARM), 2300 Stuyvesant Avenue. P.O. Box 307, Trenton, N.J. 08625. For questions or assistance, call (609) 530-3208. Please include self addressed envelope for expedited service.

| 2. Request Id/Date | | 1. Requesting Agency Name |
|---|---|---|
| 1170 | 2/15/2019 | Municipal Clerk<br>95 W. Veterans Highway, Jackson, NJ 08527<br>(732) 928-1200 Extn: 200 |

**1.A Agency Retention Schedule Number**

M100000 - 013

| 3. Requested By (Electronically Signed by) | 4. Request Approved By (Electronically Signed by) | 5. Records Manager (Electronically Signed by) |
|---|---|---|
| Diane Festino<br>02/15/2019 | Janice Kisty<br>02/20/2019 | |

| 6. Archival Review | 7. Premature Records Disposal | | | 8. Comments |
|---|---|---|---|---|
| Not Required | Microfilm | Digital Image | Damaged Records Certificate | contacts-not-2266,2270-71,2274-75,2280,2288,2292-94,2320-21,2328,2335,2341,2345-46, |

Authorization is here by requested for the disposal of the following public records in accordance with New Jersey P.L. 1953, c. 410 as amended. It is further certified that the record series listed herein have exceeded their respective retention periods and are not involved in litigation and are not required for present or future audit. NOTE: Items 9,.10,. and 11. must be completed as they appear on an approved records retention schedule.

| # | 9.Series # | 10. Record Series Title | 11.Retention Period | 12.Inclusive Dates From (MM/YYYY) | To (MM/YYYY) | 13.Dispose After | 14.Volume (in Cubic Feet) |
|---|---|---|---|---|---|---|---|
| 4 | 0303-0001 | Contracts/Agreements and Amendments - General (Original)<br><br>* Auditor Verification Required | 6 Years After completion of contract | 01/2011 | 12/2012 | | 3.00 |
| 5 | 0302-0005 | Bond File - Performance Bonds<br><br>* Auditor Verification Required | 6 Years After termination of contract | 01/2006 | 12/2012 | | 6.00 |
| 6 | 0304-0002 | Purchase Order, Invoice, Voucher/Warrant And Requisition File (Copy)<br><br>* Auditor Verification Required | 3 Years | 01/2015 | 12/2015 | | 0.25 |
| 7 | 0503-0001 | Correspondence - General External | 3 Years | 01/2015 | 12/2015 | | 1.00 |

Total Volume : 10.25

| 15. Audit Verification | | 16. Authorization | 17. Disposition |
|---|---|---|---|
| **15.A Auditor** (Electronically Signed by)<br>Jerry Conaty<br>02/25/2019 | | **16.A Authorization Date**<br>2/25/2019 | **17.A Verification Signature** |
| **15.B Date** | | **16.B Authorization Number**<br>553410 | **17.B Date** |
| | | **16.C Director's Signature, Division of Archives & Records Management** | |

For Division Use Only :

# EXHIBIT L

REDACTED

---------- Forwarded message ---------
From: **Danielle Sinowitz** <dsinowitz@jacksontwpnj.net>
Date: Tue, Mar 26, 2019 at 12:30 PM
Subject: Re: OPRA Response
To: rise up <riseupocean@gmail.com>

Please be advised I will gladly send you the redacted emails that were previously sent to other parties. As for this being handled as a new request which would require a new search, the searchable emails have been destroyed.

Note: You will not be receiving anything UN-redacted as the email conversation between the Mayor and the Administrator was redacted under NJSA 47:1A-1.1, advisory, consultative, deliberative process privilege, and NJSA 47:1A-9b, executive privilege.

Please advise if you would like me to send you what has previously been released.

**From:** riseupocean <riseupocean@gmail.com>
**Sent:** Tuesday, March 26, 2019 10:54:42 AM
**To:** Danielle Sinowitz
**Subject:** Re: OPRA Response

As of last week you had the emails as you sent many to others...deleating matters pertaining to litigation is illegal...please send me under Opra all emails previously requested and please di not redact emails between Mike Reina and Helene Schlegel which are not redactable information

-------- Original message --------
From: Danielle Sinowitz <dsinowitz@jacksontwpnj.net>
Date: 3/26/19 10:20 AM (GMT-05:00)
To: rise up <riseupocean@gmail.com>
Subject: OPRA Response

Dear Rise Up:

Please accept this as my official response to your OPRA (copy attached). Your records requested have been destroyed under general correspondence as per approval from the NJDARM. Attached please the Authorization from Records Disposal approved on 3/6/19(2009-2016) for Administration. Also Please find Authorization from Records Disposal approved on 1/31/18(2014), 5/15/19(2015) for Council.

Thank you!

## Danielle Sinowitz

Clerk I
Jackson Township
95 West Veterans Highway
Jackson, NJ 08527
Tel: 732-928-1200 ext. 1203
Email: Dsinowitz@jacksontwpnj.net

# EXHIBIT M

REDACTED

---------- Forwarded message ---------
From: **Danielle Sinowitz** <dsinowitz@jacksontwpnj.net>
Date: Tue, Mar 26, 2019 at 8:44 AM
Subject: Re: OPRA Response
To: letsoprababy@gmail.com <letsoprababy@gmail.com>

It has been destroyed. You were provided all that is available which was redacted by our legal team. If you would like me to re-send what you've already been provided please advise.

**From:** Opra Baby <letsoprababy@gmail.com>
**Sent:** Monday, March 25, 2019 9:49:19 PM
**To:** Danielle Sinowitz
**Subject:** Re: OPRA Response

If it wasn't destroyed yet you are obligated to provide it based on the advice of my legal team .

On Mon, Mar 25, 2019 at 2:59 PM Danielle Sinowitz <dsinowitz@jacksontwpnj.net> wrote:

Dear OPRA Baby:

Please accept this as my official response to your OPRA (copy attached). Your records requested have been destroyed under general correspondence as per approval from the NJDARM. Attached please the Authorization from Records Disposal approved on 3/6/19.

Thank you.

# Danielle Sinowitz

Clerk I
Jackson Township
95 West Veterans Highway
Jackson, NJ 08527
Tel: 732-928-1200 ext. 1203
Email: Dsinowitz@jacksontwpnj.net

1



# EXHIBIT N

Page 1

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - OCEAN COUNTY
DOCKET NO. OCN-L-2981-14

- - -

OROS BAIS YAAKOV HIGH SCHOOL, a :
nonprofit corporation of the State :
of New Jersey,
            Plaintiffs,  :
    vs.                  :
TOWNSHIP OF JACKSON, N.J. and    :
JACKSON TOWNSHIP ZONING BOARD OF  :
ADJUSTMENT,              :
            Defendants. :

- - -

AUGUST 28, 2018

- - -

Oral deposition of JANICE KISTY, taken
pursuant to notice, was held at the Offices of
GILMORE & MONAHAN, 10 Allen Street, Toms River, New
Jersey 08753 commencing at 9:00 a.m., on the above
date, before Catherine Golembeski, a Certified
Court Reporter and Registered Professional Reporter
and Notary Public in and for the State of New
Jersey.

HUDSON REPORTING & VIDEO        1-800-310-1769

---

Page 2

1   APPEARANCES:
2
3   WILENTZ, GOLDMAN & SPITZER, P.A.
    BY:  RISA M. CHALFIN, ESQ.
4   90 Woodbridge Center Drive
    Suite 900
5   Woodbridge, New Jersey 07095
    (732) 855-6120
6   rchalfin@wilentz.com
    Representing the Plaintiff
7
8
9   MARSHALL DENNEHEY
    BY:  PAULINE F. TUTELO, ESQ.
10  425 Eagle Rock Avenue, Suite 302
    Roseland, New Jersey 07068
11  (973) 618-4146
    PFTUTELO@MDWCG.COM
12  Representing the Defendant
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1              - - -
2            I N D E X
             - - -
3   Testimony of:  JANICE KISTY
4     By:  MS. CHALFIN              4
5
             - - -
6         E X H I B I T S
             - - -
7
    NO.     DESCRIPTION        PAGE
8
    P-42   Subpoena Ad Testificandum    22
9
    P-43   Resolution NO. 2014-35       62
10
    P-44   Zoning Board of Adjustment
11         Meeting Minutes 10/2/13      74
12  P-45   Zoning Board of Adjustment
           Meeting Minutes 11/20/13     74
13
    P-46   Zoning Board of Adjustment
14         Meeting Minutes 2/5/14       74
15  P-47   Zoning Board of Adjustment
           Meeting Minutes 6/18/14      74
16
    P-48   Board of Adjustment Agenda 4/2/14   84
17
    P-49   Resolution NO. 2014-16       86
18
    P-50   Group of Documents           87
19
20
21
22
23
24
25

---

Page 4

1        JANICE KISTY, 649 Timberline Lane,
2   Manchester, New Jersey, after having been duly
3   sworn, was examined and testified as follows:
4   EXAMINATION BY MS. CHALFIN:
5     Q.  Good morning, Miss Kisty.
6     A.  Good morning.
7     Q.  My name is Risa Chalfin.  We met
8   earlier off the record.  I represent the Plaintiff,
9   Oros Bais Yaakov High School, in a matter versus
10  the Township of Jackson and Jackson Township Zoning
11  Board of Adjustment.
12    A.  Yes.
13    Q.  Have you ever been deposed before?
14    A.  No.
15    Q.  No.  This is your first time?
16    A.  First time.
17    Q.  Have you ever given testimony in a
18  court?
19    A.  No.
20    Q.  Okay.  I'm going to give you some
21  instructions just so we're on the same page before
22  we start, if that's okay with you?
23    A.  Yes.
24    Q.  The court reporter sitting to my right
25  and to your left here is taking down every word

---

1  (Pages 1 to 4)

New York                 Hudson Reporting and Video          New Jersey
Connecticut                Nationwide 1-800-310-1769        Pennsylvania

Page 89

1 Can you look at this document and let me know if
2 you've seen it before?
3      A.  I know what it is, but I would not have
4 been in receipt of it.
5      Q.  What is this document?
6      A.  Okay.  So this is a copy of a letter
7 from Ray Shea's office showing a list of the
8 property owners.  There's 200 foot list that's
9 created to advertise the date of the hearings.
10 Copies of the list people within 200 feet.  Copies
11 of their certified mailing receipts.  The notice of
12 the hearing to be held on the application.  The
13 copy of the affidavit of publication, which is a
14 certification that the public notice did indeed
15 appear in the newspaper.  This is a copy of the
16 transmittal of the application to the
17 professionals, which I'm not familiar with, that's
18 done in the zoning office.  And a copy of the
19 application.  The zoning officer has to refuse the
20 permit because it's not a permitted use and they
21 need a variance.  Copy of the variance application.
22 Copy of the site plan part of the application.  The
23 checklist.  Oh, it -- it was a contract purchaser,
24 so a copy of the contract of sale, which is a
25 requirement for the application.  A buy/sell

Page 90

1 letter.  All of these documents are part of the
2 requirements to apply for a use variance, depending
3 on what the use variance is within the planning and
4 zoning department.
5      Q.  So is it fair to say this is the
6 application that was submitted for the Oros Bais
7 Yaakov High School?
8      A.  It appears to be.  I couldn't answer
9 that affirmatively because I didn't take the
10 application in.  And I haven't been in that
11 department for 10 years, so I don't know, but
12 that's what it looks like.
13      Q.  All right.  You can put that aside.
14      A.  All right.
15      Q.  Have you heard comments about the
16 Orthodox Jewish community from any of the zoning
17 board members?
18      A.  No.
19      Q.  Have you heard comments about the
20 Lakewood community from the zoning board members?
21      A.  No.
22      Q.  Have you heard comments about the
23 Orthodox Jewish community from the planning board
24 members?
25      A.  No.

Page 91

1      Q.  Have you heard comments about the
2 Lakewood community from the planning board members?
3      A.  No.
4      Q.  Have you heard comments about the
5 Orthodox Jewish community from any of the board
6 professionals?
7      A.  No.
8      Q.  Have you heard comments about the
9 Lakewood community from any of the board
10 professionals?
11      A.  No.
12           MS. CHALFIN:  I have no further
13 questions.  Thank you very much for your time, Miss
14 Kisty?
15           THE WITNESS:  Okay.
16           MS. TUTELO:  I have no questions.
17           (Deposition was concluded at 11:21
18 a.m.)
19
20
21
22
23
24
25

Page 92

1           C E R T I F I C A T E
2
3      I, CATHERINE GOLEMBESKI, a Certified Court
4 Reporter and Notary Public of the State of New
5 Jersey and a Registered Professional Reporter do
6 hereby certify that prior to the commencement of
7 the examination the witness was sworn by me to
8 testify the truth, the whole truth and nothing but
9 the truth.
10      I DO FURTHER CERTIFY that the foregoing is a
11 true and accurate transcript of the testimony as
12 taken stenographically by and before me at the
13 time, place, and on the date hereinbefore set
14 forth.
15      I DO FURTHER CERTIFY that I am neither a
16 relative nor employee nor attorney nor counsel of
17 any party in this action and that I am neither a
18 relative nor employee of such attorney or counsel,
19 and that I am not financially interested in the
20 event nor outcome of this action.
21
22
                                    _____
23                                  Notary Public of the State of New Jersey
                                    Certificate No. XI01288
24
25

23  (Pages 89 to 92)

# EXHIBIT O



# WILENTZ
## —ATTORNEYS AT LAW—

**DONNA M. JENNINGS, ESQ.**

T:  732.855.6039
F:  732.726.6560
djennings@wilentz.com

90 Woodbridge Center Drive
Suite 900 Box 10
Woodbridge, NJ 07095-0958
732.636.8000

February 27, 2019

**VIA EMAIL**
Honorable Douglas E. Arpert
United States Magistrate Judge
United States District Court, District of New Jersey
Clarkson S. Fisher Building and U.S. Courthouse
402 East State Street, Courtroom 6W
Trenton, NJ 08608

> Re:   **Agudath Israel of America, et al. v. Township of Jackson, New Jersey**
> **Case No. 3-17-CV-03226**

Dear Judge Arpert:

The undersigned represents the Plaintiff, Agudath Israel of America, and is co-counsel for Plaintiff, WR Property LLC, in the above referenced matter.  The Complaint was filed on May 8, 2017 and subsequently amended on November 15, 2017.  The parties were referred to mediation with the Honorable Alexander Carver and agreed to engage in the joint preparation of Ordinances or remedial legislation to address the issues in dispute.  For well over a year, the parties and their planners have attended many meetings in an effort to finalize this remedial legislation.  When the parties were unable to reach agreement as to the form of Ordinances this past Summer, Your Honor brought the parties in for a Settlement Conference on July 26, 2018.

Following the Settlement Conference, Plaintiffs continued to, in good faith, negotiate the form of the Ordinances.  Reports were made to the Court that the parties were close to concluding negotiations.  In December 2018, the parties finalized the remedial legislation in the form of two draft Ordinances.  Both parties represented that they were satisfied with same and the Ordinances were to be placed on the Agenda for the Township of Jackson after January 1, 2019 with a timetable to have adoption concluded by February 2019.

The Ordinances have yet to be placed on the Township's Agenda and Plaintiffs, upon information and belief, contend that this is due to the fact that the Council will not support them.  Plaintiffs specifically requested that the Ordinances be placed on the Agenda for the Township's

February 27, 2019
Page 2

February 13, 2019 meeting.  In response, Plaintiffs have been advised that the Township now wants to modify the negotiated remedial legislation and the Ordinances were not placed on the Agenda for that meeting nor were they considered at the Township's meeting of February 26, 2019.

This disappointing series of events have led the Plaintiffs to not believe that Defendant, Township of Jackson, is acting in good faith at this juncture and that the entire last year of negotiation has been in bad faith and used to delay the resolution of Plaintiffs' claims.  Plaintiffs are requesting an in-person status and scheduling conference with the Court at which time the Court can prepare the appropriate Order to move this case forward.

Thank you for your attention to this matter.

Respectfully submitted,

DONNA M. JENNINGS

DMJ:mb

cc:     via email:
        Howard B. Mankoff, Esq.
        Pauline F. Tutelo, Esq.
        Sieglinde K. Rath, Esq.

#10447482.1(166002.001)

# EXHIBIT P

Donna M. Jennings, Esq. (Atty. ID #017281995)
WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys at Law
90 Woodbridge Center Drive
Post office Box 10
Woodbridge, N.J. 07095
732.855.6039

Robert L. Greene, Esq. (*admitted pro hac vice*)
Storzer and Associates, P.C.
1025 Connecticut Ave, NW
Suite 1000
Washington, D.C. 20036
202.857.9766

*Attorneys for Plaintiff Oros Bais Yaakov High School*

| | |
|---|---|
| OROS BAIS YAAKOV HIGH SCHOOL, a nonprofit corporation of the State of New Jersey | SUPERIOR COURT OF NEW JERSEY LAW DIVISION OCEAN COUNTY |
| Plaintiff, | |
| v. | Civil Action Docket No. PW-L-2981-14 |
| TOWNSHIP OF JACKSON, N.J., and JACKSON TOWNSHIP ZONING BOARD OF ADJUSTMENT, | **AMENDED COMPLAINT** |
| Defendants. | **(In Lieu of Prerogative Writ)** |

## <u>AMENDED COMPLAINT</u>

Plaintiff, Oros Bais Yaakov High School, an Orthodox Jewish girls' high school with

offices located at 1995 Rutgers Boulevard, Lakewood, New Jersey, by way of Complaint in lieu

1

#8901236.1

of prerogative writ against defendants Zoning Board of Adjustment for the Township of Jackson and the Township of Jackson, New Jersey, says:

## NATURE OF ACTION

1. Plaintiff files this action to redress violations of its civil rights caused by the Defendants' discriminatory and intentional conduct that have prohibited and continue to prohibit Plaintiff, Oros Bais Yaakov High School ("Plaintiff" or the "School"), from building and operating a high school for girls on real property located in Jackson Township, New Jersey in violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc *et seq.* ("RLUIPA") and the First and Fourteenth Amendments to the United States Constitution.

2. The Defendants have prohibited Plaintiff's land use based on its religious nature. Furthermore, such decisions were motivated by animus toward the Orthodox Jewish community, and were directly responsive to significant community hostility toward the Orthodox Jewish community.

3. The Defendants' laws and actions have wrongfully prohibited Plaintiff's religious land use in the R-1 residential zone, treated Plaintiff's religious educational facility on less than equal terms as other secular assembly and institutional uses, and discriminated against the Plaintiff based on their religious denomination.

4. Further, the Defendant Township's land use regulations treat religious schools on less than equal terms as various nonreligious assembly and institutional uses in the NC

2

Neighborhood Commercial zoning district, where Plaintiff's adjacent property is located and upon which a parochial school is also prohibited but public schools, libraries, and museums, among other uses are permitted by right.

## PARTIES

5.  Plaintiff Oros Bais Yaakov High School is an Orthodox Jewish girls' high school with administrative offices are located at 1995 Rutgers Boulevard, Lakewood, New Jersey.

6.  Defendant Zoning Board of Adjustment for the Township of Jackson (the "Board") is a municipal agency organized pursuant to N.J.S.A. 40:55-69 with its principal place of business at 95 West Veterans Highway, in the Township of Jackson, in the State of New Jersey.

7.  Defendant Township of Jackson is a municipal corporation located in Ocean County, New Jersey, with an address of 95 West Veterans Highway, in the Township of Jackson, in the State of New Jersey.

## FACTUAL ALLEGATIONS

### Oros Bais Yaakov High School

8.  The Plaintiff presently owns and operates a high school with offices at 1995 Rutgers Boulevard in Lakewood Township, New Jersey.

9.  Approximately 340 girls attend the School at present.

10. The School has operated since September 2008.

3

11.   The Plaintiff School is presently located in Lakewood Township.

12.   The School began a search for property in 2012 in the area near its location upon which it could construct a new high school.

13.   On or about June 26, 2013, the School identified and became the contract purchaser of property located at 38 Cross Street, an approximately 7.5 acre parcel identified as Block 21401, Lot 6, Jackson Township, New Jersey (the "Property").

14.   Plaintiff is also the contract purchaser of adjacent property located at 28 Cross Street, an approximately 7.5-acre parcel identified as Block 21401, Lot 5, Jackson Township, New Jersey (the "NC-zoned Property").

15.   Ultimately, the only properties suitable for the School's use were the subject Property and the NC-zoned Property.

<u>The Subject Properties and the Land Use Code of Jackson Township</u>

16.   The Property was previously improved with four structures; a one story single family residence, a small detached garage to its rear and two chicken coops. The residence was occupied and the former chicken coop was being used as a repair shop for lawn and construction equipment. These improvements have since been removed.

17.   The Property contained vehicles, construction equipment, paint cans, construction debris and other refuse that has been dumped throughout the site, which have since been removed.

18.   The Property is located in the "R-1" residential zoning district.

4

19.   The Property had formerly been located in the "R-3" residential zoning district until October 2010 as discussed below.

20.   The NC-zoned Property is located in the "Neighborhood Commercial" zoning district.

21.   The NC-zoned Property is currently improved with two homes.

22.   The Property is suited for use as an Orthodox Jewish high school for girls.

23.   The NC-zoned Property would also be suited for use as an Orthodox Jewish high school for girls.

24.   The Plaintiff proposes to construct a two-story, 35,000 square foot high school at the Property.

25.   The Plaintiff's proposed building would be a substantial improvement to the neighborhood with an attractive design.

26.   The high school, which would be set back from the road, would be in character with the surrounding neighborhood which consists of residential, institutional and nearby commercial land uses.

27.   Immediately adjacent to the subject property, on its northern border, is a parcel zoned "Neighborhood Commercial."

28.   Public schools are a permitted use in the Neighborhood Commercial zoning district.

29.   There are three private high schools in the nearby area and five future private high schools proposed near the site.

30.   Cross Street is a heavily used county road with traffic signals which traverses both Jackson and Lakewood Townships.

5

31.     Located within a few hundred feet of the Property are various institutional and commercial land uses, including the Jackson Moose Lodge, Beis Medrash Lutzk, the Lakewood Estonian House, a strip mall with restaurants, the Jackson Dance Center, the Kiddie Academy of Jackson, a Wawa station, a bank, and a fitness studio, the Christa McAuliffe Middle School, and others.

32.     The School would have a maximum of 400 students in grades nine through twelve.

33.     Ninety-seven percent of students from the School have gone on to higher education and the graduation rate for the School's last graduating class was 100% (67 out of 67 students).

34.     Students at the School study subjects that allow them to go into a range of professional fields including medicine, law, business administration, accounting, and therapy.  In doing so, they benefit not only the local community of Jackson, but more broadly Ocean County, the state of New Jersey, and the United States of America.

35.     Students who are of an age where they can obtain a driver's license are not permitted to drive to the School, as doing so would violate the School's rules.

36.     All students would be required to arrive to School by bus, the provision of which is guaranteed by state law.

37.     The School would be open from 8:30 a.m. to 5:00 p.m., Monday through Friday, and the lighting within the parking area would be turned off after 8:00 p.m.  The school year would run from September until June.

6

#8901236.1

38.  The Property would not be used for any catering events, music concerts, art shows or similar activities. The only additional event to be held on the Property would be parent-teacher conferences which would occur no more than twice each year and would be scheduled over a four-hour time period to stagger the arrival and exit of attendees. Furthermore, outside of the school year there would be no events, summer camps or activities of any kind.

39.  The School would have 16 classrooms and 25 employees, including 20 teachers.

40.  There would be no commercial cooking facility at the School; only a warming kitchen.

41.  Lunch would be provided by the School and brought in by an outside caterer.

42.  The use of the Property is subject to the laws and regulations of Jackson Township and the State of New Jersey.

43.  Jackson Township regulates zoning within its borders through the Land Use and Development Regulations codified at Chapter 244 of the Township Code (hereinafter the "Land Use Code").

44.  Section 244-3 of the Land Use Code, entitled "Intent; purpose" provides in pertinent part, that "It is the intent and purpose of this chapter to establish a pattern for the uses of land and of buildings and structures thereon based on the land use element of the Master Plan."

45.  The Township's Land Use Code contains three different "school" uses: "Public schools," "Private schools," and "Parochial schools."

46.  "Parochial schools" are a religious land use.

7

#8901236.1

47. The Township of Jackson adopted a Master Plan in 2009.

48. Based upon the 2009 Master Plan, upon information and belief, schools then existing within Jackson Township were moved to a newly created zoning district, the Public Facilities and Education Zone, regardless of where they were located in the Township.

49. There was no indication in the 2009 Master Plan as to how future schools in the Township would be zoned.

50. Upon information and belief, there are no empty parcels of land in the Public Facilities and Education Zone in Jackson Township.

51. Prior to placing schools within the Township into the PFE zone, private and parochial schools were permitted in most of Jackson Township.

52. In New Jersey, Master Plans include a "Land Use Plan" element.

53. As part of the Jackson Township Master Plan, recommendations were included for its Land Use Plan element.

54. One of the Master Plan recommendations was the creation of a new "R-1" Residential Zone within the Township.

55. In furtherance of the Master Plan recommendations, the Township adopted Ordinance No. 30-10 on or about October 26, 2010 which created a new "R-1" Residential Zone within the Township.

56. Pursuant to the Master Plan, the "R-1" residential zone was characterized as:

> Low Density Residential. (R-1). Planning district established to replace R-3 zoning district within proposed sewer service area; one acre density selected to reflect prior development pattern and to ensure the efficient use of

8

infrastructure; clustering recommended for larger tracts without density incentive; . . . .

57.    Permitted principal uses in the "R-1" residential zone include community residences for the developmentally disabled, community shelters for victims of domestic violence and detached single-family dwelling units.

58.    Conditional uses in the "R-1" zone include child care centers, nursery schools and daycare centers; churches and place of worship, home occupations, home professional offices and public utilities.

59.    Parochial schools are prohibited in the R-1 zoning district.

60.    Prior to adoption of Ordinance No. 30-10, the Property was located in the "R-3" residential zone.

61.    The R-3 zoning district permits one unit per three acres.

62.    The R-2 zoning district permits one unit per two acres.

63.    The R-5 zoning district permits one unit per five acres.

64.    The R-3 zone, as well as the R-2 and R-5 Residential Zones, provide for the same permitted principal uses as the R-1 zone, but also permit municipal parks, playgrounds and other such municipal buildings and uses as are deemed appropriate by the Township Committee; federal, state, county and other public buildings and grounds, including public schools, parks, playgrounds or other public recreational uses or areas.

65.    The R-2, R-3 and R-5 zoning districts also permit "Private or parochial schools not operated for profit; except, however, that public and private colleges or universities shall not be permitted."

9

66.  Conditional uses permitted in the R-2, R-3 and R-5 zoning districts include the same as the R-1 zone, but also include cemeteries and mausoleums, farmers markets, health care facilities, hospitals, life care facilities, public utilities, quasi-public and private club recreational areas and veterinary clinics and hospitals.

67.  The Township's other Residential zones include the R-20, R-15, R-9 and R-30 zoning districts.

68.  The R-20, R-15 and R-9 zoning districts provide for the same permitted principal uses as the R-1 zone, but in addition permit municipal parks, playgrounds and other such municipal buildings and uses as are deemed appropriate by the Township Committee; federal, state, county and other public buildings and grounds, including public schools, parks, playgrounds or other public recreational uses or areas; essential services and family daycares, mirroring the permitted uses of the R-3, R-2 and R-5 zones with the exception of family daycares in lieu of farming activities.

69.  Conditional uses permitted in the R-20, R-15 and R-9 zones include the same as the R-1 zone, but in addition include quasi-public and private club recreation areas.

70.  The R-20, R-15 and R-9 zoning districts permit "Private or parochial schools not operated for profit; except, however, that public and private colleges or universities shall not be permitted."

71.  The R-20 zoning district permits one unit per 20,000 square feet.

72.  The R-15 zoning district permits one unit per 15,000 square feet.

73.  The R-9 zoning district permits one unit per 9,000 square feet.

10

74.     The R-30 zoning district permits one unit per 30,000 square feet and does not permit schools.

75.     All residential zoning districts (except for the R-30 district), including both lower density and higher density zoning districts than the R-1 district, permitted schools as a principal permitted use prior to the creation of the R-1 zoning district.

76.     All residential zoning districts (except for the R-30 district), including both lower density and higher density zoning districts than the R-1 district, currently continue to permit schools as a principal permitted use.

77.     The R-1 zoning district in which the Property is located was created as a "low density" zoning district.

78.     The R-3 zone, where the Property had been previously located prior to the 2010 Land Use Code amendment, permitted only one unit on three acres, and was thus a lower density district than the R-1 zone.

79.     The 2010 amendment increased the permitted density of the Property.

80.     No downzoning occurred from the 2010 rezoning.

81.     At least three zones, the R-9, R-15 and R-20 zones in the Township, permit parochial schools on much smaller parcels than the Property.

82.     The rezoning of property within the Township to the R-1 zoning district occurred predominantly near the Township's border with Lakewood Township.

83.     Many Orthodox Jews live in Lakewood Township.

11

84. Many Orthodox Jews live in Jackson Township near the border of Lakewood Township; in and around the areas rezoned to R-1.

85. A large development called West Gate was developed in the late 1990s on the western edge of Lakewood Township, adjacent to the area in Jackson Township where the Property is located and where much of the R-3 zoned property was rezoned R-1 in 2010.

86. Nearly all of the residents of the West Gate development are Orthodox Jews.

87. Orthodox Jews generally seek religious schooling for their children, which requires the development of private schools.

88. The exclusion of "private or parochial schools" in the R-1 zone has a discriminatory impact on Orthodox Jewish religious education land uses.

89. The rezoning of property in Jackson Township to R-1 has a discriminatory impact upon Orthodox Jews by preventing religious education land uses near their community, which is predominantly centered in Lakewood Township.

90. Upon information and belief, Defendants were not previously concerned about schools existing in the R-1 zoning district (or its predecessor zoning district(s)) prior to 2009-2010.

91. Defendants were not previously concerned about schools existing in the vicinity of the Property.

92. Two of the most recently developed public schools in the Township are the Elms Elementary School located on Goetz Lane and the Jackson Liberty High School located on North Hope Chapel Road.

12

93. Elms Elementary was completed in 2004 and houses over 830 students and 55 full-time teaching staff.

94. Elms Elementary is a nonreligious assembly and institutional land use.

95. Liberty High was completed in 2007 and has approximately 1,400 students and 90 full-time teaching staff.

96. Liberty High is a nonreligious assembly and institutional land use.

97. Both Elms Elementary and Liberty High impose a significantly more intense use of land than the Plaintiff's proposed facility.

98. Liberty High's property is located approximately 1500 feet from the Property.

99. At the time of their construction, both schools were in the R-1 zoning district and they are now classified as in the PFE zoning district.

100. Upon information and belief, Liberty High and Elms Elementary did not experience the level of public hostility that resulted from the Plaintiff's use variance application, as described below.

101. Upon information and belief, the Defendants did not oppose the construction and use of Liberty High and Elms Elementary.

102. Similarly, there are two religious private schools that were located in the R-1 Zone (or its equivalent at the time) at the time of their construction.

103. St. Aloysius School is located on Aldrich Road in Jackson Township.

104. Jesus Harvest Time Academy is located on Freehold Road in Jackson Township.

105. Both St. Aloysuis School and Jesus Harvest Time Academy are Christian schools.

13

106.   Both St. Aloysuis School and Jesus Harvest Time Academy were granted significant zoning relief to build in the R-1 Zone.

107.   Upon information and belief, St. Aloysuis and Jesus Harvest Time Academy did not experience the level of public hostility that resulted from the Plaintiff's use variance application, as described below.

108.   Upon information and belief, the Defendants did not oppose the construction and use of St. Aloysuis and Jesus Harvest Time Academy.

109.   St Aloysius opened in 1994 and now contains 300 students in grades kindergarten through 8.

110.   The Jesus Harvest Time Academy contains Kindergarten through the twelfth grade and was constructed circa 1990.

111.   The Neighborhood Commercial zone permits various land uses, including several nonreligious assembly and institutional land uses.

112.   Permitted principal uses in the Neighborhood Commercial zone are:

> Antique shop.
> Appliance store.
> Art/graphic/photo supply store.
> Artist/photo studio.
> Bakery.
> Bank and financial institution.
> Barbershop or beauty/hair salon.
> Bookstore.
> Business office.
> Candy store.
> Clothing/dry goods store.
> Convenience store.
> Delicatessen.
> Dry cleaners.

14

Municipal parks, playgrounds and other such municipal buildings and uses as are deemed appropriate and necessary by the Township Committee.

Federal, state, county and other public buildings and grounds, including public schools, parks, playgrounds or other public recreational uses or areas.

Florist shop.

Gift shop.

Hardware, paint or wallpaper store.

Household supply store.

Ice cream store.

Jewelry store.

Liquor store.

Luncheonette.

Pharmacy.

Professional office.

Repair/service shop for household or personal goods.

Restaurants; however drive-through restaurants and drive-in restaurants are not permitted.

Self-service laundry.

Shoe repair shop.

Stationery, tobacco, newspaper or periodical store.

Tailor/dressmaking shop.

Variety/notion store.

Combination of two or more of the above permitted uses in one principal building.

Other uses similar to those listed above.

Raising of horses and other livestock.

Essential services.

Art gallery.

Library.

Museum.

113.   "Public schools" are a permitted use in the NC zoning district.

114.   "Public schools" are a nonreligious assembly and institutional use.

115.   Art galleries, Libraries and Museums, all nonreligious assembly and institutional uses, were added as principal permitted uses to the NC zoning district on May 27, 2003 by Ordinance No. 12-03.

15

#8901236.1

116.  "Child-care centers, nursery schools and day-care centers" are conditional uses permitted in the NC zoning district.

117.  Parochial schools are prohibited in the NC zoning district.

118.  The School's proposed use is prohibited on its NC-zoned property.

119.  Under § 244-197(N)(l) of the Code of the Township of Jackson (the "Code"), the required number of parking spaces for a high school is "1 for each 3 students based on design capacity."

### The School's Land Use Application

120.  On August 16, 2013, Plaintiff applied to the Board to permit the construction of its high school on the Property.

121.  An applicant seeking to use property for a use not permitted within that zoning district may apply to the municipality's zoning board of adjustment for a "D-1" use variance pursuant to the Municipal Land Use Law ("MLUL"), N.J.S.A. 40:55D-70d.

122.  The School's application was for a use variance pursuant to N.J.S.A. 40:55D-70(d)(l) to allow it to construct a two-story new high school building of approximately 35,000 square feet that would cover less than six percent of the Property, and relocate there. The Plaintiff also sought a design waiver for the proposed number of parking spaces at the Property (together, the "Application").

123.  Under New Jersey law, the applicant must demonstrate that the proposed use meets the "positive" and "negative" criteria to support the variance request.

16

124. A "D" variance requires a supermajority or five affirmative votes for approval.

125. The only other variances sought were for a ground sign for the high school as they are not permitted in the R-1 residential zone and for the number of parking spaces provided.

126. For a planned student population at the School of 400 students, this equates to 133 spaces.

127. Due to the uncontroverted evidence before the Board that no students would be allowed to drive to school and all students would be required to travel to school by bus, the Plaintiff sought a design waiver under N.J.S.A. 40:55D-5l(b) to provide fewer parking spaces than required.

128. Specifically, the School sought approval for 51 parking spaces where 133 are required.

129. In all other respects, the Application complied with the bulk requirements for the R-1 residential zone.

130. Five hearings were held on OBY's application before the Board on October 2, 2013, November 20, 2013, February 5, 2014, April 2, 2014 and June 18, 2014.

131. Over the course of the hearings on the Application, the Plaintiff's witnesses gave extensive testimony as to the mechanics of its proposal, the inherent benefits of the School, and the steps that had been taken to obviate any potential detriment to the surrounding community.

132. Rabbi Ephraim Birnbaum, the School's principal, testified on numerous occasions during the hearings that no more than four hundred girls would attend the high school and that such a cap on enrollment could be made a condition of the Board's approval.

#8901236.1

133.   Despite the minimal impact and inherently beneficial nature of the School's proposed use, there was a huge outcry from local residents against the possibility of the School locating in Jackson Township.

134.   The residents' opposition to the School's proposed use was a substantial motivating factor for the Board's decision.

135.   Such opposition did not occur with respect to Liberty High, Elms Elementary, or the two private Christian schools described above.

136.   Upon information and belief, the primary motivation of those objecting to the School's proposed use was animus directed against the ultra-Orthodox Jewish population centered in Lakewood Township.

137.   An objector, Barbara Orsini, founded an organization named the "Jackson Citizens Defense Fund," and was represented by counsel, Ron Gasiorowski, at the hearings.

138.   Several other Township residents who objected to the School's use testified during the Board hearings.

139.   Hostility of Township residents toward the ultra-Orthodox Jewish community was demonstrated during the hearings themselves, and by Jackson Township residents, including those who participated in the hearings, on social media.

140.   For example, social media statements made by Jackson Township residents who had themselves testified at hearings on the School's Application include:

a. "The Hasidim totally control Lakewood and have no other culture in mind but their own. They only care about themselves."

18

b. "Let's face this thought, they will possibly claim discrimination!! Bottom ,line here jackson - it is not an inherent use, that will benefit the community.   The community of Jackson non religious if not orthodox will not be. Able to attend the school. The benefit the school?will get is tax exempt, your tax dollars paying for books, possibly busing,of some orthodox girls from Jackson , nurse,possible crossing guards, and the pool, it will be a mitvah [sic],where the married orthodox women will go, to be cleansed between their ovulation time frame. cycle,,now down the road, and they will of course. Purchase your home, !"

c. "the ORTHODOX WILL NOT ASSIMILATE INTO A. COMMUNITY, OTHER THAN THEIR OWN. THIS IS ACCEPTED BY MANY RESIDENTS IN LAKEWOOD WHO UNDERSTAND THEIR RELIGION. IN LAKEWOOD, MANY OF THE HOMES WERE PURCHASED FOR A PRICE, ONE BY ONE UNTIL THE NEIGHBORHOOD, WAS FOR THE ORTHODOX TO BUILD ,-A NEWER   COMMUNITY,-TO   ESTABLISH   SHULS,   -SCHOOL   AND BUSINESSES,"

d. "And bringing up the other 'private schools' that students attend; he failed to mention they all follow the NJCCS and get a real diploma when they graduate. We need ratables, not non-profit schools who will drain us of our tax money. I agree with Middletown....I hope they win!"

19

e. "I don't see any houses in Jackson turned into a religious schools. They talk about us being against them because of religion ... Lakewood needs to look at themselves, they are the ones segregating themselves from everyone else ....."

f. "Estee ,is a biggie in real estate!if you build it,they will come!this is what Lakewood is all about."

g. "THAT'S WHY Lakewood is going BROKE - because NO TAXES are being paid on each and every one of those homes that are either religious schools or yeshivas."

h. "There is a big difference between Hasidic Jews of Lakewood and as an examples myself."

i. And too, it is our tax dollars that pay for the upkeep of the school facilities. Perhaps if Lakewood upgraded & actually cared for ALL children in Lakewood, they would have a nice track to walk on. Again, take take take and not give back"

j. "We here in Jackson must keep very diligent to what could happen in Jackson. For we do NOT want Jackson to turn into another Lakewood."

k. "Personally, the Lakewood Orthodox Jewish Community has NO business at a Jackson Zoning Board Meeting. This is OUR Town's Meeting Not Theirs."

l. "On Sunday's I am Christian I celebrate sabath and do not work. But I turn on lights and drive . I classify work differently then Jews people ..."

m. "Look at what has happened in Lakewood: a culturally diverse town that has been taken over by a group of people that have intentionally driven out any citizens or

20

businesses that are different than them. They do not respect the laws of that town, and have created and live by their own set of laws and justice. Is it really anti-Semitic of me to not want that in Jackson? . . . Have we gone so far PC that we can't even speak out against this without being called racist/anti-Semitic?"

n. "On Cross Street between all the building on the Lakewood side and what the hope is to build the proposed buildings almost the entire way of Cross Street would be filled with Synagogues or Day Schools for Jewish Children."

141. Such statements demonstrate that Jackson Township residents testifying at Board hearings were motivated by factors other than legitimate land use concerns, namely, hostility toward the ultra-Orthodox Jewish community.

142. Other examples of statements made by Jackson Township residents on the "Jackson Township Zoning Board Watchdog" and "Jackson Community Watchdog News" include:

a. "Hasidim and the UltraOrthodox (as opposed to New or Modern Orthodox) are fundamentalists. As such, they are a 'cancer' on secular society."

b. "They are a cancer. Look at Lakewood."

c. "This is about a cult that somehow has bought our government! You can't even begin to fathom to what degree!!!! This is corruption at its worst! And it unfortunately has alot [sic] to do with this specific sect of Jews. The ultra orthodox community as a whole are extremely dangerous because they do not

21

care about any other community or what happens to anyone else. I don't call them 'Jewish'."

d.   "NOTHING that is going on in these communities is beneficial to anyone other than the hasidic community."

e.   "Ifs not a community divided. The Hasidim choose to have their own isolationist community separate from the goyim"

f.   "Orthodox/Hasidic are taught to procreate and that there way is the chosen way by God - ifs a fanaticism that ruined Lakewood (thank you Sen. Singer) and is coming here quite quickly."

g.   "There are thousands of Hasidic young men and women bound by the chains of Hasidim."

h.   "We've watched them take over Lakewood, what's to stop them from taking over Jackson .. they give little to no regard to us non Hasidics and they wont stop making babies they've out grown Lakewood where do you propose they branch out to??"

i.   "They are a God forbidden cult not religious at all just want to take over USA at our expense. Did you read the scoop today how they praise christy"

j.   "Don't they understand they're being anti Christian (if that's a thing) by not wanting to assimilate."

143.   Such statements demonstrate substantial bias and hostility toward ultra-Orthodox Jews in Jackson Township.

22

144. These individuals were part of an organized effort to prevent the School from locating in Jackson Township, with coordinated funding, planning and strategy.

145. Thousands of people "follow" the "Jackson Township Zoning Board Watchdog" and "Jackson Community Watchdog News" Facebook groups.

146. The examples of comments listed above are the less hostile statements made by Jackson Township residents, as editors of the Jackson Township Zoning Board Watchdog Facebook page have stated:

    a. "The blatantly hateful comments are deleted from this page, but people do need a place to usefully vent, . . . ."

    b. "Please, please remember to keep the comments free from ' them versus us ' content!! It can't be emphasized too often. This page is monitored by many people. Some of them are looking for reasons to sue us in an appeal.. . .it would be so disheartening for this page to be used as fodder! Thanks, and don't get mad if we scrub the page of comments. We still love you all …"

    c. "okay … cool it with the comments ~ that are just plain anti semitic. not helpful at all"

147. There was a concerted effort by Jackson Township residents to not discuss their hostility toward the ultra-Orthodox Jewish population at the Board's hearings, but to focus on "zoning" issues. Statements published by Jackson Township residents include:

    a. "I agree that we as a town should show solidarity but caution that we not give the impression of be antisemitic."

23

b. "my suggestion is to speak on facts and zoning related items and don't give Ray Shea anymore ammunition to use in an inevitable lawsuit against the township for denying this application, claiming religious persecution. Be smart and stick to the problem ..."

c. "They would know that this surely would be used against Jackson in court."

148. Upon information and belief, a group calling itself the Coalition of Jackson Americans distributed an eight-page publication consisting of anti-Semitic statements and placing them in residents' mailboxes.

149. An ongoing theme described in the statements of Jackson Township residents is fear of the Lakewood Township Orthodox Jewish community encroaching into Jackson. Examples of such statements include:

a. "Watch out Jackson. Stand tall, dont sell, or we will be living in the next lakewood."

b. "this is awful .... I really can't stand living in Jackson anymore because they are starting to take over this town ...... They are going to ruin Jackson just like Lakewood !!!!!!

c. "Look at what has happened to Lakewood in the last 25-30 years! The new school is just the beginning! After that individual neighborhoods will be targeted for hostile take-overs! One or two houses will be bought, those homes will be filled with multiple immigrant families, illegals, sec 8 housing exct. Anything to make the rest of the neighborhood owners to sell/run-out of the neighborhood! The

24

public school system of Jackson will become over-run with the children of these

above mentioned new residents."

    d.  "We've watched them take over Lakewood, whats to stop them from taking over

        Jackson .. they give little to no regard to us non Hasidics and they wont stop

        making babies they've out grown Lakewood where do you propose they branch

        out to??"

    e.  "They have already destroyed one once great town. Would hate to see them

        destroy another"

150.    A Change.org Petition entitled "Deny Zoning Variance proposed by Oros Bais Yaakov

      High School" was started three years ago and was signed by 1,862 supporters and was

      started by "Citizens of Jackson."

151.    Statements from the Change.org petition included:

    a.  "Building this school opens the flood gates for the Lakewood Orthodox to move

        into and ultimately make Jackson their own town."

    b.  "Because I am a Jackson resident. have been my whole life and I feel that the

        Jewish population has already taken over the entire town of Lakewood."

    c.  "because of the 100+ Hasidic schools that overcrowd Lakewoods 24 SQ. mi.and

        serve only the Hasidic community and heavily impact the financial budgets of

        Lakewood. they plan on doing the same to Jackson."

    d.  "Because I seen how they destroyed Lakewood NJ"

#8901236.1

e. "we dont need another scholl also one we wouldnt attend just cause lakewood is going bankrupt and to the dogs doesnt mean Jackson should"

152. During the course of the hearings, the Plaintiff presented four expert witnesses, a planner, a traffic engineer, an architect and an engineer, as well as one lay witness, Rabbi Ephraim Birnbaum.

153. The first Board hearing on the Application was held on October 2, 2013. The hearing room was completely full and could not accommodate the public in attendance for the application. Individuals had to stand in the hallway.

154. A parochial school is recognized in New Jersey as an inherently beneficial use.

155. Board members were directly responsive to the questions and statements made by Jackson residents hostile toward to the School.

156. In addition to adopting and being responsive to the hostility of local Jackson Township residents, Board members personally demonstrated hostility toward the School and its religious characteristics from the outset of the Board hearings.

157. During Plaintiff's counsel Ray Shea's opening statement, Board Member Carl F. Book, Jr. questioned whether the school proposed was an inherently beneficial use, stating: "I have not seen that in brief form before us, and I don't believe counsel is directing us that we have to take it that way."

158. When the Board attorney, Sean Gertner, responded "correct" to Board Member Book, the audience burst into applause and had to be "admonished" by Mr. Gertner who stated: "[Y]ou can't have outbursts."

26

159.   Beginning in the first hearing on the School's Application, Board members engaged in questioning that was irrelevant to the Application, including the issue of financing of student transportation.

160.   The following statements were made at the first hearing on the Application:

> BOARD MEMBER SCHULMAN:  I notice there was an article today that the Lakewood transportation system is broke.
>
> CHAIRMAN:  Joe, I am going to have to ask you to retract that question.  I am not going to allow that question.

161.   This statement reflected similar statements made by Jackson Township residents at the hearings, for example the following:

a.   "According to the Asbury Park Press today, Lakewood has no money, Lakewood has no money for busing. Lakewood Board of Education, they do not have the money."

b.   "[G]iven the tenuous circumstances in Lakewood right now with funding of busing, can you guarantee they are going to deliver to you five buses only and not one full size bus, two minivans, a couple of cars?"

c.   "Lakewood is already bankrupt in their school system and busing."

162.   In response to a statement made by the School's counsel Mr. Shea regarding local schools, an unidentified audience member yelled out "Build it in Lakewood."

163.   Board Member Burrows asked "[W]ould you say its proximity to Lakewood is a unique feature of this piece of property?"  This statement demonstrated responsiveness to Jackson residents' concern about the Lakewood community.

27

164. Board members also applied heightened scrutiny to the School's Application.

165. For example, Board Member Schulman stated in response to the Plaintiff's planner's trip generation numbers "[T]hat is hypothetical. Reality is going to be totally different. I know it and you know it."

166. Upon information and belief, the Board has not treated other applicants in a similar manner but has accepted generally accepted traffic study methodologies.

167. Board Member Cook questioned why the Board could not consider the tax-exempt status of the applicant as a factor and whether non-Jewish girls would be permitted to attend the school.

168. Again, Cook's statement was directly responsive to statements by Jackson Township residents at the hearings, for example the following:

   a. "This would take a currently revenue-developing property and burden us with tax exempt."

   b. "Quite frankly, I resent the fact that you can claim a 501C-3 tax exempt status, and therefore paying no ratables whatsoever, . . . ."

   c. "What's the tax burden for the taxpayers of Jackson?"

169. Board Member Book also questioned why the Board could not consider whether non-Jewish girls would be permitted to attend the school.

170. Book's statements is irrelevant to the Board's consideration of a use variance.

171. Upon information and belief, Board members did not express such concern for applicants for Christian schools.

28

172. Statements by Jackson Township residents made during the first hearing included: "There is a saying in Lakewood--I grew up with it since 1972--if you build it, they will come." This statement was followed by applause.

173. The resident's use of the word "they" was meant to refer to ultra-Orthodox Jews.

174. Such statement further demonstrated hostility toward the ultra-Orthodox Jewish population of Lakewood Township.

175. Another Jackson Township resident stated during the first hearing:  "[T]heir teachers are not accredited; they are teaching based on what knowledge? They go, the women teaching in these high schools--and this private schools--like go over to Israel for a year and come back and start teaching."

176. This statement demonstrated hostility toward ultra-Orthodox Jews.

177. The majority of the teachers currently working at the School are accredited by the State of New Jersey.

178. The second Board hearing on the Application was held November 20, 2013 and had to be held at the Jackson Memorial High School due to the large crowd, which exceeded 1,000 people.

179. Once again, Board members questioned the School's witness, Rabbi Birnbaum, on entirely irrelevant subjects such as:

    a.   "This school is accredited by the New Jersey Department of Education, correct?"

    b.   "What is your graduation rate?"

29

    c.    "What is the percentage that go on to college?"

180.    Upon information and belief, the Board has not asked such questions of non-Jewish applicants.

181.    Board members made other statements demonstrating hostility toward the Lakewood community, such as:

    a.    "Are you familiar with the zoning in Lakewood in regards to whether a private all girls high school is a permitted use in a residential zone?"

    b.    "[W]ill you tell the Board where you searched, what towns?"

182.    The objector's attorney, Ron Gasiorowski, similarly questioned the Plaintiff's traffic engineer as follows: "[D]o you know how many orthodox Jewish high schools there are in Lakewood?"

183.    Michael Kelly, the former Board Chairman, commented: "I had a permanent, catastrophic accident in Lakewood by one of those women who drives those vans."

184.    After Kelly was admonished not to use the words "they" and "them" by the current Board Chairman, he continued: "I am asking you to go to the county and the county will move it to Lakewood where it should be, and the county will help them out."

185.    The third Board hearing on the Application was held on February 5, 2014.

186.    Mr. Gasiorowski again questioned the Plaintiff's witness, Rabbi Birnbaum, on irrelevant issues such as:

30

a.   "Now with regard to your being a teacher, or in fact being an administrator, with regard to this being a private school, you are not a teacher who is certified as a teacher by the State of New Jersey, are you?"

b.   "Now, of those 16 teachers which you have and the 20 which you mentioned, are any of those teachers accredited by the State of New Jersey as being teachers?"

c.   "Now, do you recall during the years of 2010 and 2011 filing tax returns?"

d.   "My understanding in reading about that school was that the specific purpose of the formation of that school was to basically isolate young Jewish women so they would not in fact be influenced by the secular schools that they were attending with regard to the ways of the young women who were secular rather than religious. Is that also the goal of your school?"

e.   "Are there any non-Jewish girls presently attending school at the present time, or have there even been?"

f.   "Are there any African-American students in your school?"

g.   "Any Latina girls in your school?"

h.   "Are they Jewish?"

i.   "[A]re any there teachers on your staff other than men, any women on your teaching staff?"

j.   "What type of physical exercise would you do in the pool?"

31

k.   "Would you agree with me that this Board has a right and the ability to look at your school in its totality to determine whether or not the quality of life afforded to those students is in accordance with what would the standard practices carried out in various schools throughout the state, more particularly in Jackson?"

l.   "I take it that sometime in your life you have been inside a public high school, have you not?"

m.   "Do you know whether, with regard to their athletic facilities, that they have showers and lockers to accommodate the sanitary and well-being of the student?"

n.   "I take it for a significant part of the class day that there are courses which are given or classes which are given that deal with religious studies, the teaching of the Tora and the like?

o.   Now, if there is a seven hour school day, how many hours per day are assigned to those studies?"

p.   "Can you identify for me any other property you looked at either in Brick, Howell, or Lakewood that you negotiated with to purchase, or were there any?"

187.   Gasiorowski's questioning during the third hearing again demonstrated hostility toward the School based on its ultra-Orthodox Jewish faith.

32

188. The Board permitted Gasiorowski's questioning. Mr. Shea objected to these questions and the Board's attorney Gertner directed the Rabbi to answer, stating: "The issue of its relevance can be weighed by the Board once we have an answer."

189. The fourth Board hearing on the Application was held on April 2, 2014.

190. The objector's attorney questioned the Board's planner, Ian Borden, regarding "whether a student would have to adhere to all of the customs and traditions of the Orthodox Jewish culture?"

191. Such questioning demonstrates hostility toward the Orthodox Jewish faith.

192. After the objector's "educational consultant," Richard Farber, testified about the Plaintiff's school, the audience burst into applause and the Chairman of the Board had to admonish the crowd: "Ladies and Gentlemen, I expect you to conduct yourselves in a civil manner. There will be no further outbursts, clapping, or any signs of any emotion at this meeting. I will not tolerate it. I will clear the room if it's necessary."

193. The Board members then began questioning Mr. Farber regarding various matters irrelevant to a use variance application, including:

   a. The difference between accredited and nonaccredited schools;

   b. How colleges view these schools;

   c. Whether lack of a foreign language is a component at variance with college admission requirements; and

   d. Whether lack of a chemistry lab or biology lab affects college entrance.

33

194.   Such questioning by Board members demonstrated hostility toward the Orthodox Jewish nature of the School.

195.   Following summations by the applicant and the Objector's attorney, the Board's own Planner, Stuart Wiser, was asked by the Board Chairman to comment on the Application.

196.   Wiser testified at length about matters irrelevant to a use variance application, again demonstrating hostility toward the Orthodox Jewish nature of the School.

197.   Wiser stated: "Our office did some research and found that the New Jersey state requirements to graduate from public schools are three years of lab sciences, one year of language, four years of English, three years of math—algebra I, geometry—and three years of social studies.  We know from the rabbi's testimony that there is not going to be foreign languages, and there are not going to be biology and chemistry labs.  So the question I have with respect to what is the community being served is, is this school going to serve, going to rise to the level to serve the community that the legislature intended when it defined 'schools' as an inherently beneficial use?"

198.   Wiser's statement was met with applause from the audience.

199.   Wiser further stated: "We did some research on college admissions, and while we make room for the fact that not all colleges will have the same admissions standards, we looked at several New Jersey colleges . . . .  And I personally just simply will have a hard time reconciling the rabbi's statement that the graduates of this school will go into medical, legal, and others professional careers given the requirements, at least of the schools in New Jersey that we have looked at."

34

200. Wiser further stated: "We also don't know what will be taught here. We have nothing on the record as to his curriculum."

201. Wiser further stated: "I am reminded of---I think it was the October meeting—where one of the members of the public came up and . . . asked would a school for strippers be an inherently beneficial use. Certainly it is not that, and I don't mean to identify that, but the fact of the matter is that the legislature, in detailing or adding 'schools' to inherently beneficial use in the definition in the MLUL never defined what 'school' is."

202. Upon information and belief, the Board has never elicited such testimony from non-Jewish applicants.

203. Board Member Schulman then made the following statements:

    a. "[T]hat is a private school and is exclusively for the use of the Orthodox community; there will be no other children of other religions admitted to that school without being able to pass a strict religious component, . . . ."

    b. "And I want to relate something that I experience during my time living in Lakewood, . . . . I attended a meeting at the municipal courtroom in Lakewood during which the titular head of the Orthodox community in Lakewood, Rabbi Schenkolewski, stated several times that 'the Orthodox community will never assimilate; therefore, they stand alone.'"

    c. "[A]nd I think that the community of Jackson cannot expect the Orthodox residents in Jackson to assimilate into the Jackson community as a whole in the same way that they will not do so in Lakewood."

35

204. Schulman's statements demonstrate hostility and animus toward the ultra-Orthodox Jewish community.

205. On June 18, 2014, Board member Sheldon Hofstein made a motion to deny the Application.

206. While seconding a motion to deny the applicant, Board member Suttles stated: "One of the reasons I have is, nobody has actually proved to me that this is a school for anything. The environment that is described would probably be achieved if we let four hundred girl scouts in the building, only they wouldn't have to sell cookies."

207. Board member Suttles' statement that the proposed use is not "a school for anything" demonstrates hostility toward the Orthodox Jewish nature of the School.

208. The Board then voted unanimously to deny Plaintiff's application in its entirety.

209. On September 3, 2014, the Board adopted Resolution No. 2014-35 memorializing the denial of the School's application (the "Resolution").

210. The Board Resolution contained several findings of fact and law regarding the School's application that were unsupported by the evidence before it.

211. The Board Resolution contained statements that were contrary to New Jersey law.

212. The Board incorrectly referred to the relief requested in relation to parking as a variance, rather than a design waiver.

213. The Board refused to determine that the School's proposed use would constitute an inherently beneficial use, and therefore that it satisfied the "Positive Criteria" required for a use variance.

36

214. During the hearings, the Board engaged in substantial and erroneous debate on this issue and with respect to same, and substantially relied on the testimony of the objectors' Planner in making its determination on the inherently beneficial quality of the proposed use.

215. The Board erroneously determined that it had discretion to determine whether a parochial school was indeed an inherently beneficial use, stating that this conclusion was bolstered by the fact that there is no definition of "school" in the Municipal Land Use Law ("MLUL").

216. The Board acted contrary to law in finding that even if the School's use of the Property was presumed to be inherently beneficial, it was a rebuttable presumption.

217. The Board's Resolution states: "The Board questioned the extent to which, though a private, not-for-profit educational institution, it [the School] would be open to the public and be available for general public benefit."

218. Furthermore, the Board found that because the School was "not a school any of us are familiar with," because, for example, it did not have traditional science laboratories, locker rooms or communal showers, it was not a "school" as that term is understood by the MLUL.

219. The Board's findings regarding the "inherently beneficial" nature of the Plaintiff's proposed use was directly responsive to questions and statements made by Jackson Township residents to the Board during its hearings, including the following:

#8901236.1

a. "[W]hen you say that putting a school in is perfectly acceptable and meets the criteria of a benefit, I would argue that not every school is considered beneficial. And on a light-hearted note, if I put up a school of strippers down the street, I don't think that is inherently beneficial to the community. Thank you. (Applause.)"

b. "Just to say that a school is a benefit is not enough. I would suggest that if those ordinances and rules were read a little deeper, there would be a better understanding. Having a school that perhaps comes under state standards in education certainly would not mean it is a benefit. Just because it's a school doesn't mean it's a benefit."

c. "Also there is talk ad nauseum of the inherent benefit of a school. Any school is inherently beneficial to its students, regardless of location. . . . I don't see any of the benefits of this school. There is only one student from Jackson. There's no chance of any cultural contribution, and more than likely no more than a few job positions, and a loss of a rateable…"

d. "I would rather see the money go to something that's going to protect our town rather than something that's not going to be inherently beneficial."

220. The Resolution included a finding that there remained significant concern over the increase in "effluent" to be generated at the site as compared to that which would be generated by uses as of right that were more in line with the existing character of the neighborhood.

38

221.   Such conclusion regarding "effluent" was pretextual.

222.   Upon information and belief, the Board has not denied similar applications on the basis of concern over the increase in effluent.

223.   Upon information and belief, the Defendants have permitted other land uses to be developed in Jackson Township that would have a greater negative impact from "effluent."

224.   The Board conclusion regarding concern over effluent was unsupported.

225.   During the course of the hearings, the School's planner, Ian Borden, testified as to the capacity and sufficiency of the proposed septic system to be used on the Property. This would consist of three 1,500 gallon septic tanks, a pressure-dosing system, a 3,200 square foot disposal bed and a MicroFAST water treatment system.

226.   The system is based on an estimate that the School would produce 4,250 gallons of effluent per day. This conservative figure is derived from and complies with State DEP regulations. The size of the Property is approximately 7.5 acres, which is significantly larger than the R-1 requirements for a septic system of the type proposed.

227.   The record before the Board demonstrated that any septic system to be used on the Property would have to comply with DEP regulations and be granted an NJPDES permit.

228.   The record also established that many other sites in Jackson (including several schools) use septic systems that require NJPDES permits.

229.   The record also included uncontested evidence that there are 18 NJPDES permits in Jackson for sites with larger septic systems than that proposed by the School, many of which are adjacent to the R-1 Zone.

230.   The Board's erroneous findings and conclusions regarding "effluent" created by the Plaintiff's proposed use was directly responsive to questions and statements made by hostile Jackson Township residents during the Board's hearings, including the following:

    a.   "This school will be using a septic system, which can be very unreliable with a school with this many students and administrators.  If this system backs up just once, it can affect all of those wells in the residential areas that the school backs up to."

    b.   "The effluent plant, like I spoke of, four thousand gallons would take a matter of two hours for two motors running to saturate the ground.  Is anybody monitoring it?  Any alarms going off?  Anybody going to be there Friday night or Saturday morning, on site to check these things out?  or is it just going to saturate the area and then you have a ten or 12 day period when the facility can't be used.  What do we do in that situation?"

    c.   "In addition, a septic system where I believe Evan Hill, back on November 20, stated that 1300 gallons of effluent is what would be permitted based on zoning law.  If I am misconstruing that, my point being 4,000 gallons a day is a huge detriment to the quality of that septic system.  Septic systems are clearly not a recommendation for schools."

40

d. "I am also a little upset about the septic and well implications. And that is a big reason, in my mind, for denial. I just don't trust the plans that theoretically everything should work."

e. "My well is one of the closest wells to the septic system. Who is going to test my well on a periodic basis to make sure that it's not impacted by something in that system? Who is going to guarantee that if something is impacted from the school, that I am not going to have to pay for it?"

231. The Board's Resolution further stated "the Board believed that . . . water . . . concerns could not be mitigated so to alleviate those concerns."

232. However, the Board made no findings of fact or conclusion of law concerning "water concerns."

233. Nevertheless, any concern regarding "water supply" was pretextual.

234. Upon information and belief, the Board has not denied prior applications on the basis of concern over the increase in water supply.

235. Upon information and belief, the Defendants have permitted other land uses to be developed in Jackson Township that would have a greater negative impact on water supply.

236. The Board conclusion regarding concern over water supply was unsupported.

237. Regarding the integrity of its neighbors' water supply, the School presented evidence that it would drill down to 500 feet into the next confined aquifer.

41

238.  The Board's concerns regarding "water supply" created by the Plaintiff's proposed use was directly responsive to questions and statements made by hostile Jackson Township residents during the Board's hearings, including the following:

   a.  "I have a well.  The amount of water that is going to be going into this property is at least ten times more than what seven homes would put in.  That is a huge amount of water going in there.  This site is at the top of a hill.  All that water is going to be heading downhill towards all our wells. There is at least 20 wells that would be potentially impacted."

   b.  "Since I live on Kevin Court, will this impact my own well if there is alll these people using all the water and aquifer; how is that going to impact that?  Has anybody done a study on whether there are pine snakes or any other animals on that property endangered?"

239.  The Resolution included a finding that there remained concern over the traffic to be generated at the site, and that the Board stated that it was not convinced that the underlying assumptions upon which the School's expert based his conclusions could be reasonably enforced.

240.  Such conclusion regarding traffic was pretextual.

241.  Upon information and belief, the Board has not denied prior school applications on the basis of concern over the increase in traffic.

242.  Upon information and belief, the Defendants have permitted other land uses to be developed in Jackson Township that would have a greater traffic impact.

42

243. The Board conclusion regarding concern over traffic was unsupported.

244. The Plaintiff's traffic expert, Mr. John Rea, testified that the Property's driveway exiting out onto Cross Street would operate at an acceptable "C" Level of Service, well within accepted traffic engineering parameters.

245. The evidence before the Board further established that the School's proposed internal circulation was designed in accordance with proper traffic engineering principles. Mr. Rea confirmed that the design provided more than adequate stacking for buses. In addition, the Property's turning radius was designed so as to sufficiently accommodate any emergency vehicles.

246. The evidence before the Board also established that the Property is especially well--suited for the High School because it is located on a county road in close proximity to where a majority of the students reside.

247. Rabbi Ephraim Birnbaum testified on numerous occasions that no more than four hundred girls would attend the School and that the School would consent to such a cap on enrollment being made a condition of the Board's approval.

248. Rabbi Birnbaum testified that there would be no more than 27 members of staff working on-site at the High School and that such a cap on staff could be made a condition of the Board's approval.

249. In addition, the School's students would be required to come to the School by government-provided busing.

43

250. On the basis of these conditions, even the Board's traffic engineer concluded that the Plaintiff had provided measures to promote and provide traffic safety.

251. The Board's planning expert stated that these conditions could alleviate the Board's concerns and recognized that these conditions could in fact be policed by code enforcement officials.

252. To further mitigate any negative impacts of the proposed high school, the Plaintiff also agreed to widen the part of Cross Street leading onto the Property, in accordance with Ocean County standards for county roads.

253. In its Resolution, however, the Board stated that these conditions could not be enforced. The Board's denial of the requested relief on the basis of its unspecified concerns regarding the enforceability of the conditions proffered by the Plaintiff was arbitrary, capricious and unreasonable.

254. Upon information and belief, the Board has imposed similar conditions upon the approval of other applications for use variances.

255. The Board's findings regarding "traffic" impacts of the Plaintiff's proposed use was directly responsive to questions and statements made by hostile Jackson Township residents during the Board's hearings, including the following:

   a. "It is clear that there will be a impact on traffic in this area.  It's assumed by Mr. Rea that each bus coming in will be a full bus.  If those buses aren't full, if they have to go to different parts of this town, ten buses is certainly not adequate."

44

b.  "The other thing that I have is about traffic.  Now, I work in Lakewood.  I take Cross Street every single day, back and forth.  The traffic light on 528 and Hope Chapel is backed up all the way almost to Liberty, as we speak, on any given day, at any given time--that is including Saturdays as well as Sunday.  If that's going to go through, what is going to happen to the traffic to our roads, which are 75 percent county and the five percent is state, and the rest is development?"

c.  "My mother lived in Lakewood three miles from my house.  It used to take me ten minutes to get there.  Now I saw at least three new schools being built. It now takes me 45 minutes to dive seven miles, and if we add another school it's going to be ridiculous."

d.  "They are so disingenuous about ten school buses.  Okay, let them say ten buses. There will be 25 minivans that will be running back and forth.  They are not going to have events?  Mr. Chairman, what about graduation or other events that they are going to have there?  All those minivans are going to be stacked all over the place there, and nobody stops.  So the traffic is the main thing.  They can't absorb the traffic"

256.  Regarding the provision of parking at the Property, on multiple occasions counsel for the Plaintiff outlined the three options that had been put before the Board:

a.  The first option was to grant the Plaintiff a design waiver to reduce the number of spaces required to 81.  In light of the fact that none of the students would be permitted to drive to school, the Plaintiff likened its

45

position to that of an elementary school. Accordingly, the Plaintiff originally sought a waiver to include 51 spaces, in line with the Code requirements for elementary schools. However, this was later voluntarily increased to 81 spaces.

b.   The second option was to have the Plaintiff landbank the remaining 53 spaces as would be required by the Code.

c.   Finally, the third option was to refuse to grant a design waiver and require the Plaintiff to provide all 134 spaces.

257.   Despite repeated invitations to do so, the Board failed to state which option it preferred, including the option that would not require a design waiver.

258.   Plaintiff also established that, at present, the Property is in a dilapidated condition. An expert assessment highlighted numerous issues with the existing state of the Property, including, but not limited to, possible underground tanks, possible abandoned septic systems and abandoned buildings. Plaintiff observed that it should be required to remediate these problems as a condition of any approval.

259.   The Plaintiff's planner testified that the site plan was designed to respect the bulk standards of the neighborhood and incorporated residential design elements, honoring the developmental pattern of the neighborhood. Consequently, the proposal makes a conscious effort to protect the character of the established neighborhoods.

46

#8901236.1

260. Thus, the Board's denial insofar as it was predicated on a finding that a school is incompatible with the rural nature of the R-1 Zone was arbitrary, capricious and unreasonable.

261. Additionally, the Plaintiff took numerous steps to mitigate any impact of its proposed high school use on the surrounding neighborhood including but not limited to:

    a.    Volunteering to accept approval on the condition that:

        i.    No more than 400 students would be permitted to attend the School;

        ii.    The School would remain closed from July to September; and

        iii.    All students would be required to take a bus to school and not permitted to drive to school (which is the Plaintiff's strictly-enforced policy in any event);

    b.    Setting the high school four hundred feet back from the Galassi Court rear property line to minimize disturbance to the neighboring properties, far in excess of the fifty-foot buffer that is required;

    c.    Orienting the building so that the side yards are much larger than would be required by law to keep the design in line with the character of surrounding properties;

    d.    Offering to include a water treatment system, although not required by the Ocean County Health Department;

    e.    Voluntarily opting to drill down 500 feet, rather than 80-125 feet, into the

47

next confined aquifer to eliminate concerns about drawdown from the school's well to the surrounding property owners;

    f.    Adding a six-foot solid fence along the property line;

    g.    Decreasing the height and area of the proposed school sign;

    h.    Agreeing to provide curbing, pedestrian access and landscaping for the driveway; and

    i.    Offering the Board three options as to how many parking spaces would be required on the Property including providing the number required by the Code.

262.    In making its determination, the Board relied in great part on the testimony of objecting Jackson Township residents, the arguments of their counsel and testimony of their experts.

263.    The Board had an obligation to, if it identified any negative impacts, determine whether these detrimental effects can be reduced by imposing reasonable conditions on the use.

264.    The Board failed to determine whether any detrimental effects could be reduced by imposing reasonable conditions on the use.

265.    The Board erred in failing to correctly utilize the four step analysis for inherently beneficial uses as established in Sica v. Board of Adjustment of the Township of Wall, 927 N.J. 152 (1992), in determining the School's application.

48

266.  In denying the School's Application, the Defendant Board was knowingly responsive to Jackson Township residents who were hostile toward the ultra-Orthodox Jewish population.

267.  The Board was motivated to deny the School's Application based on the hostility of local Jackson Township residents.

268.  By denying the Application, the Board gave effect to the private biases of Jackson Township residents.

269.  Further demonstrating the Board's hostility and responsiveness to anti-Semitic bias of Jackson Township residents was the Board's reference to the Plaintiff's proposed use of a pool on the Property.

270.  The Board's Resolution includes the following statement: "**WHEREAS,** the Board also questioned the use of the pool."

271.  While the source of the Board's concern about the pool is not evident from the Resolution, the hearing transcripts and other public comments demonstrate that it stems from bias.

272.  A Jackson resident stated at the hearings: "Also talked about was the swimming pool. I have spoken to friends. They don't believe it's going to be a swimming pool. They believe it's going to be used for religious ritual."

273.  Upon information and belief, that resident was referring to a *mikveh*, or a bath used for the purpose of ritual immersion in Judaism.

274.  Comments regarding the same by Jackson Township residents on Facebook include:

49

#8901236.1

a. "The pool in question is most likely going to be used for when the students are menstruating."

b. "They're talking about a pool for this proposed high school for girls, and questioning why one is needed if it won't be used during the summer. They mentioned it would be enclosed, so I'm going to assume it will be a mikveh."

c. "What?????!!!!!! They menstruate in a pool???????? I hope I misunderstood that. If that's on purpose, that's disgusting."

d. "I believe in orthodox tradition girls are segregated while menstruating because they are 'unclean' until they have their ritual bath."

e. "That pool sounds dirty and just plain gross .. just clean up at home."

f. "Maybe they're trying to downplay the religious angle of their argument like this school will benefit Jackson residents."

g. "When we all know that the purpose of this school is to make Jackson more attractive for Brooklyn residents hoping to move, LOL."

h. "Ewwwww"

i. "Whether you understand the "ritual" or not does not make it any less gross."

j. "It will provide no benefit to jackson residents. Only to lakewood residents that want to move to jackson. Anyone have a number on the orthodox population in jackson?"

275.    The Board treated the School differently and worse than two Christian schools and other, larger nonreligious public schools.

50

276. The Township's Code discriminates against religious land uses on its face with respect to the NC zoning district.

277. The Township's land use regulations on their face treat religious land use on less than equal terms as nonreligious assembly and institutional land use.

278. "Parochial schools" are a religious assembly and institutional land use.

279. "Public schools," "parks," "playgrounds," "libraries," and "museums," among other nonreligious assembly and institutional land uses are permitted by right in the NC zoning district.

280. "Parochial schools" are prohibited in the NC zoning district.

281. In order to locate a parochial school in the NC zoning district, a property owner would be required to obtain a use variance for such use

282. Requiring a use variance to develop a parochial school in the NC zone is being treated on less than equal terms as a public school, park, playground, library or museum, which are permitted by right.

283. There is no stated purpose of the NC zoning district in the Township's Land Use Code.

284. Parochial schools are similarly situated with the permitted uses within the NC zoning district as to the regulatory purpose of the NC zoning district.

285. The Defendants' actions described above all took place under color of state law.


## COUNT I
**Action in lieu of prerogative writ**
**New Jersey Municipal Land Use Law**
**N.J.S.A. § 40:55D-1** *et seq.*

51

286. Paragraphs 1 through 285 are incorporated by reference as if set forth fully herein.

287. With regard to the Board's denial of the High School's Application, the Board's decision was arbitrary, capricious and/or unreasonable.

### Positive Criteria

288. As for the Positive Criteria, the Board erroneously determined that it had discretion to determine whether a parochial school was an inherently beneficial use when that question has been determined by case law and enshrined in the MLUL which states that schools (whether public or private) are inherently beneficial uses.

289. In finding that the School was not presumptively an inherently beneficial use, the Board made a fundamental error of law rendering its decision arbitrary, capricious and unreasonable.

### Negative Criteria

290. As for the Negative Criteria, the Plaintiff established through competent and credible fact and expert evidence that granting the variance would not result in substantial detriment to the public good and would not impair the intent and purpose of the Code or the Jackson Master Plan.

291. As detailed above, several schools are already located in the R-1 Zone. Nevertheless, they function well, make positive contributions to the community and have caused no substantial detriment to the surrounding property or the Jackson Master Plan simply by virtue of their location in the R-1 Zone.

52

292. Moreover, conditional uses permitted m the R-1 Zone under the Code include child care centers, nurseries and houses of worship. A high school whose students are not permitted to drive to school does not represent a significant departure from these types of establishment.

293. The Plaintiff took numerous steps to mitigate the impact of the School on the surrounding neighborhood.

294. The proposal would protect the character of the established neighborhoods.

295. The Board's denial insofar as it was predicated on a finding that a school is incompatible with the rural nature of the R-1 Zone was arbitrary, capricious and unreasonable.

296. The fact that the Plaintiff s septic system was designed to conform to DEP standards and required an NJPDES permit should have precluded any finding that the proposed wastewater disposal system would result in substantial detriment to the public good. The Board's denial of the requested relief in relation to its "significant concern over the increase in effluence" was erroneous and thus, arbitrary, capricious and unreasonable.

297. Additionally, given that the proposed septic system was designed to DEP standards and required an NJPDES permit, the Board's reliance on the purported 'zero tolerance' policy towards schools on septic systems in neighboring Lakewood Township was arbitrary, capricious and unreasonable as well.

298. The Board's denial, insofar as it was predicated on unspecified traffic concerns, was arbitrary, capricious and unreasonable for the reasons stated above.

53

299. The School is located approximately three hundred feet from the Lakewood Township border. Given its close proximity to Lakewood, where the majority of its students would come from, the Board's concerns about "urban sprawl" are clearly unfounded, and the Board's denial of the requested relief on that basis was arbitrary, capricious and unreasonable as well.

300. Building the School would further the public good and the purpose of the MLUL would be advanced by a deviation from the Code, which already permits the conditional uses of child-care centers, nursery schools, day-care centers and places of worship in the R-1 Zone, in that it facilitates the establishment of a school - which necessarily promotes public morals and general welfare.

### The Balancing Test

301. In refusing to conclusively accept that the School was an inherently beneficial use and therefore satisfied the Positive Criteria, the Board failed to engage in the balancing test mandated by law, and that too was arbitrary, capricious and unreasonable.

302. The fourth step in the *Sica* test requires the Board to weigh the Positive Criteria against the Negative Criteria in order to determine whether, on balance, the grant of the use variance would cause substantial detriment to the public good. Self-evidently, in order to do this the Board must first establish not only whether both the Positive Criteria and Negative Criteria have been satisfied, but the underlying strength of the Plaintiff s case for each.

54

#8901236.1

303. Applying this, the potential detrimental effects of the School on the surrounding area - all of which could be mitigated through conditions of approval in any event - were required to be assessed relative to the public interest served by the School. In refusing to acknowledge that the Plaintiff had satisfied the Positive Criteria, it was impossible for the Board to fairly conduct the necessary balancing. That too was arbitrary, capricious and unreasonable.

### Parking Design Waiver

304. The Board also erred in its decision to deny the design waiver for the parking requirements.

305. As none of the students would be permitted to drive to school and all students would be required to come to school by bus, there would clearly be no benefit in requiring the Plaintiff to provide all 134 spaces. Denial of the design waiver was arbitrary, capricious and unreasonable as well.

WHEREFORE, Plaintiff Oros Bais Yaakov High School demands judgment in its favor and against the Board as follows:

a.   The Board's denial of the School's Application be declared in violation of the MLUL, and therefore, null and void and of no effect;

b.   The Board's denial was arbitrary, capricious and/or unreasonable, and therefore, be reversed; and

c.   Awarding the School such other relief as this Court deems equitable and just.

55

#8901236.1

## COUNT II
### Violation of Religious Land Use and Institutionalized
### Persons Act of 2000 – "Nondiscrimination"
### 42 U.S.C. § 2000cc(b)(2)

306. Paragraphs 1 through 305 are incorporated by reference as if set forth fully herein.

307. Defendants have deprived and continue to deprive the Plaintiff of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that discriminates against it on the basis of religion and religious denomination.

## COUNT III
### Violation of Religious Land Use and Institutionalized
### Persons Act of 2000 — "Equal terms"
### 42 U.S.C. § 2000cc(b)(1)

308. Paragraphs 1 through 307 are incorporated by reference as if fully set forth herein.

309. Defendants have deprived and continue to deprive the Plaintiff of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that religious land uses them on terms that are less than equal to nonreligious assembly and institutional land uses.

## COUNT IV
### Violation of Free Exercise Clause
### United States Constitution, First Amendment

310. Paragraphs 1 through 309 are incorporated by reference as if fully set forth herein.

#8901236.1

311. Defendants have deprived and continue to deprive the Plaintiff of its right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by discriminating against it and against religious land uses in a manner that is not the least restrictive means of achieving a compelling governmental interest.

## COUNT V
### Violation of Equal Protection Clause
### United States Constitution, Fourteenth Amendment

312. Paragraphs 1 through 311 are incorporated by reference as if fully set forth herein.

313. Defendants have deprived and continue to deprive the Plaintiff of its right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating it and against religious land uses in the imposition and implementation of their land use regulations.

## PRAYER FOR RELIEF ON COUNTS II-V

WHEREFORE, OROS BAIS YAAKOV HIGH SCHOOL respectfully requests that this Court grant the following relief:

    a.   A declaration that the Township of Jackson's land use ordinances, to the extent that they discriminate against the Plaintiff's land use, are void, invalid and unconstitutional on their face and as applied to the Plaintiff on the ground that they violate the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth

57

#8901236.1

Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act;

b. A declaration that the denial of the Plaintiff's variance application to the Board to permit it to use the Property for religious education is void, invalid and unconstitutional on the ground that it violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act;

c. An order reversing the decision of the Jackson Township Zoning Board of Adjustment and an order declaring that the Plaintiff's application for a use variance and other relief to use the Property for purposes of religious education is hereby approved;

d. An order directing the Jackson Township Zoning Board of Adjustment to reverse its denial of the Plaintiff's application for a use variance and other variance relief and approve the application to permit the Plaintiff's use of the Property for purposes of religious education as applied for;

e. An order directing the Defendants to permit the School's proposed use on its NC-zoned Property, and process all applications, certifications, or other approvals necessary for such use as if the School's use were permitted.

f. Preliminary and permanent orders enjoining the Defendants, their officers, employees, agents, successors and all others acting in concert with them from

58

applying their laws in a manner that violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act, or undertaking any and all action in furtherance of these acts;

g.  An award of compensatory damages against Defendants in favor of the Plaintiff as the Court deems just for the loss of its rights under the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act incurred by the School and caused by the Defendants' laws and actions;

h.  An award to the Plaintiff of full costs and attorneys' fees arising out of Defendants' actions and land use decisions and out of this litigation; and

i.  Such other and further relief as this Court may deem just and appropriate.

WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys for Plaintiff
Oros Bais Yaakov High School

DATED:     June 14, 2017

By:_____
DONNA M. JENNINGS, ESQ.

59

## CERTIFICATION

Pursuant to R. 4:5-1

Pursuant to R. 4:5-1, I hereby certify that this matter is not the subject of any other action pending in any other court or any pending arbitration proceeding and that no such action or arbitration proceeding is contemplated at this time.  I do not know of any other party who should be joined in this matter.

WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys for Plaintiff
Oros Bais Yaakov High School

DATED:     June 14, 2017          By:_____
                                      DONNA M. JENNINGS, ESQ.

## CERTIFICATION

Pursuant to R. 4:25-4

Pursuant to R. 4:25-4, DONNA M. JENNINGS, ESQ., is hereby designated as trial counsel for Plaintiff in this matter.

WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys for Plaintiff
Oros Bais Yaakov High School

DATED:     June 14, 2017          By:_____
                                      DONNA M. JENNINGS, ESQ.

60

#8901236.1

## **CERTIFICATION**

Pursuant to R. 4:69-4

Pursuant to R. 4:69-4, I hereby certify that all transcripts have been filed with the Court.

WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys for Plaintiff
Oros Bais Yaakov High School

DATED:       June 14, 2017             By:_____
                                          DONNA M. JENNINGS, ESQ.

61

#8901236.1

# EXHIBIT Q





**Jason Allentoff** shared a link.
January 28 ·

Facebook Groups for iOS

Mayor Mike Reina welcomes you to town hall this Monday!



### Jackson's Meet The Mayor Returns | Micromedia Publications

The first for 2017 will take place on Monday, January 30th at 7 p.m.

MICROMEDIAPUBS.COM

2 Likes4 Comments

**Like**

**Comment**

22

**Comments**

**Richard Egan** Machine gun Ma

Like

Reply

1

January 28 at 8:03pm

**John Burrows** ask him what to do about the scourge of the cockroaches from the east

Like

Reply · January 29 at 2:47am

**Hope A FD** When is the next meet the mayor?

Like

Reply · February 13 at 6:28pm

**Richard Egan** Feb 27th

Like

Reply

2

February 14 at 8:51am

On Sun, Oct 22, 2017 at 10:29 AM, mordy Burnstein <mordyburnstein@gmail.com> wrote:

**Rosa Bueno HI** shared a link.

August 21, 2016

"Where's the black lives matter people? Or Al Sharpton? What these people did that poor man is disgusting and they should be in jail on hate crimes and false imprisonment and impersonating a cop."... "Just remember Liberty and Justice for all (unless you have political influence)"...other people's relevant comments...not very pristine correct practices...



## Hasids who beat gay black man try to dodge service in []diverse[] neighborhood

Two Shomrim thugs who copped a cushy plea deal to dodge jail for beating a gay black man are now refusing to even do their community service [] because it[]

NYPOST.COM

11 Reactions8 Comments

**Like**

**Comment**

1111

**Comments**

**Meredith Entlich Allen** Disgraceful

Like

Reply

2

August 21, 2016 at 7:02pm

**Robert Paul Skinner** Take out the trash

Like

Reply

3

August 21, 2016 at 7:23pm

**John Kent** Cockroaches

On Sun, Oct 22, 2017 at 10:26 AM, mordy Burnstein <mordyburnstein@gmail.com> wrote:

Jack Clark replied · 9 Replies

**Robert Paul Skinner** That's as stupid is as stupid does. The parents should pay to do this...

Like

Reply ·

1

June 27, 2016 at 8:21am

**Robert Paul Skinner** Singer has always been a sellout...

Like

Reply ·

1

June 27, 2016 at 8:23am

On Sun, Oct 22, 2017 at 10:24 AM, mordy Burnstein <mordyburnstein@gmail.com> wrote:

Like

Reply

10

August 26, 2016 at 4:25pm

**Robert Paul Skinner** Unfortunately religious rights are part of the fabric of America - and these people have found a way to use it against Gentiles. Our forefathers did not take into account that religious groups would use their own religious "bigotry" against us.

Like

Reply

2

August 26, 2016 at 5:06pm

On Sun, Oct 22, 2017 at 10:23 AM, mordy Burnstein <mordyburnstein@gmail.com> wrote:

**Raymond Cattonar** shared a link.

**Admin** · September 22, 2016

LAKEWOOD-A situation in Lakewood escalated quickly between a black man and Orthodox Jewish men after a car accident here on Wednesday.

# www.shorenewsnetwork.com

SHORENEWSNETWORK.COM

2 Reactions 7 Comments

**Like**

**Comment**

22

**Comments**

**Jennifer Askins-Hager** Was he a pedestrian?

Like

Reply · September 22, 2016 at 1:33pm

Christine Oliver Nappi replied · 3 Replies

**Carmine Pescatore** In Lakewood, stop signs and traffic lights are just a suggestion.

Like

· Reply

11

· September 22, 2016 at 2:55pm

Jennifer Askins-Hager replied · 1 Reply

**Robert Paul Skinner** They take the law into their own hands in Lakewood

Like

· Reply

2

· September 22, 2016 at 3:03pm

Robert Paul Skinner replied · 2 Replies

On Sun, Oct 22, 2017 at 10:22 AM, mordy Burnstein <mordyburnstein@gmail.com> wrote:

more bob...

**Rae Ann Walker** shared Jackson NJ Strong's post.

January 7, 2016 · Jackson, NJ

These are the streets that realtors have asked to canvass. Unlike Toms River Jackson residents have to opra request this. Here's the list a resident requested from the town. Why won't Jackson just post this online? Is it a big secret or too much work?



**Jackson NJ Strong** added <u>5 new photos</u>.

<u>January 7, 2016</u>

The map was posted a few days ago, and there were some questions about the street names that would be targeted.

The following pictures are from the OPRA'd vendor permit applications showing the targeted streets.

If you prefer not to be harassed by these realtors, get your No Knock sticker. Also, please call the police and report any offenders.

7 Likes 10 Comments

**Like**

**Comment**

77

**Comments**

**Rae Ann Walker** Here's the map.

Like

Reply · January 7, 2016 at 9:46pm

**John Burrows** The town might not want to because someone might intervene and harass the realtors.

Like

Reply · January 7, 2016 at 9:48pm

John Burrows replied · 2 Replies

**Randi Redington** My street is listed, for the right price I'll sell

Like

Reply

2

January 7, 2016 at 10:12pm

**Robert Paul Skinner** They're coming !!

Like

Reply · January 7, 2016 at 10:24pm

**Pete Zito** Tell them to come my way I'll sell for the right price so I can get the hell out of this state

Like

Reply · January 7, 2016 at 10:24pm

**Robert Paul Skinner** We cannot simply give up

Like

Reply · January 7, 2016 at 10:27pm

On Sun, Oct 22, 2017 at 10:18 AM, mordy Burnstein <mordyburnstein@gmail.com> wrote:

**Jim Hudacko**

January 16, 2016

I think I know the answer but want to hear from the group: Are residential homes in Jackson allowed to be used for places of worship?

3 Likes14 Comments

Like

Reply ·

1

January 16, 2016 at 3:18pm

**Robert Paul Skinner** Zoning has a new manager and I have been promised that things will change for the better regarding the issues...

Like

Reply ·

2

January 16, 2016 at 3:37pm

**Rae Ann Walker** I'm hoping for the best!

Like

Reply · January 16, 2016 at 9:33pm

**Robert Paul Skinner** I meant code enforcement - sorry gang for the confusion !!

Like

Reply

2

January 16, 2016 at 9:42pm

**Rae Ann Walker** I knew what you meant... 😊

Like

Reply · January 16, 2016 at 9:43pm



John Burrows Jackson is not prepared for the tsunami of orthodoxy that is mounting at the border. I beg you all to CONFRONT OR ACCOST the council members and demand that they appoint Rae Ann Walker to the zoning board she is strong enough and smart and will quell and regulate the tide before it envelopes Jackson. If they don't, VOTE THEM OUT!!!! This is no joke I am unleashed and can speak my mind. The Gilmore machine is busy patting themselves on the back from their overwhelming Republican win in Lakewood, there is sure to be a pay back and that will be an appointment or head nod to someone in Jackson that will only destroy what we know as Jackson and make it an extension of Lakewood. I can not emphasis how important this is GET INVOLVED.

Like · Reply · 10 · July 2, 2015

Phil Sullon Thank you for commenting on this post.



EXHIBIT
P-6
6/19/18



**Phil Stilton** · 9:00 Planning board unanimously found both ordinances to be in compliance with land use laws and the master plan. Council will vote on Tuesday. Meeting is over.

Like · Reply · 🌀 9 · March 6 at 7:40pm · Edited

**Nadine Nicastro Demczyszyn**  so what does that mean?

Like · Reply · 🌀 2 · March 6 at 7:41pm

**John Burnetsky**  Means it's up to the Council whether to approve or not.

Like · Reply · 🌀 2 · March 6 at 7:45pm

**Joyce Ann**  ut oh ... lets pray now

Like · Reply · 🌀 8 · March 6 at 7:45pm

**Alyssa Karr Koletis**  🌀

Like · Reply · March 6 at 7:49pm

**Phil Stilton**  John Burnetsky I heard it needs a pass by the school board now lol j/k

Like · Reply · 🌀 2 · March 6 at 8:28pm

**John Burnetsky**  Yikes!

Like · Reply · March 6 at 8:36pm

**Phil Stilton** · 9:00 Because if you're saying they are not we have a major problem.

Like · Reply · March 7 at 3:33pm

**Joseph R. Schulman**  No. They are consistent with our land use laws, per our attorney. But "THE" law and "LAND USE LAW" are not the same. Misleading or just an oversight on your part?

Like · Reply · March 7 at 3:40pm

**Phil Stilton**  Probably intentionally misleading because it has been declared as such on Facebook.

Like · Reply · March 7 at 3:42pm

 **Phil Stilton**  And whatever is posted first on Facebook is usually the most true statement and your view has probably already been copied to Jackson strong and all the other "we hate Phil" pages out there. Ray cattonar is probably blogging about it, Jackson strong already made flyers and Ciara glory probably already emailed the boss man.
Like · Reply · 💬 1 · March 7 at 6:35pm · Edited

 **Ed Bannon**  0:00 It may violate that act BUT, Jackson Residents SHOULD HAVE first right to be admitted to ANY Jackson Meeting – Afterall, WE pay the taxes here
Like · Reply · 💬 2 · 22 hrs

   ↳  Phil Stilton replied · 5 Replies

 **Joseph K. Schulman**  8:06 Phil Stilton, once again you presented misinformation. The Planning Board motions DID NOT say the proposed ordinances 3-17 and 4-17 were consistent with the LAW. That is your interpretation or your spin, not what was confirmed. They ONLY confirmed they were consistent with the MASTER PLAN, which they are. Please do not mislead people with your brand of "journalism".
Like · Reply · March 7 at 3:30pm

 **Phil Stilton**  Is the master plan inconsistent with the law?
Like · Reply · March 7 at 3:30pm

 **Phil Stilton**  Or are you saying they are inconsistent with the law. Please explain pls.
Like · Reply · March 7 at 3:32pm

 **Joseph K. Schulman**  Phil Stilton some are. But no one ever knows they are unless they are challenged! Let's see if these ordinances are challenged.
Like · Reply · March 7 at 3:32pm





**Jenna Glrza**
April 19 at 1:57pm ·
Asbury Park Press

Houses of worship coming to a neighborhood near you! So your neighbor can now hold prayer services with up to 35 people and strangers coming in and out whenever they want and in addition they will no longer have to pay taxes once the house is deemed a HOW! Why is it that only those NOT paying taxes are being represented by our government yet those paying taxes are losing all their rights? EVERY SINGLE TOWN this group sets it sights on winds up getting sued and then settles having to pay all the legal fees. They are allowed to discriminate, segregate with government funded schools and busing and housing and destroy towns all in the name of religion. Any 99.9 percent of residents aren't saying a damn thing about it. Don't say I didn't warn you.



About this article

### Chabad Jewish Center can stay in house; judge says Toms River broke law

Toms River must pay $122,500 in legal fees and damages to Rabbi Moshe Gourarie.
APP.COM



1



**Sharon Okie** I would move before you can't. My cousin lived in Middletown, NY when the Hasidic community took over everyone's property value dropped. They couldnt even sell their homes.

1

LikeShow more reactions
· Reply · 1w



**Jenna Glrza** Move where? They are taking over the whole state. All these affordable housing developments are being marketed specifically to them They own most of commercial property in Ocean County. Middlesex is next thanks to enclave in Cliffwood Beach. Jersey City is already taken over. Hoboken is almost gone. They have been playing monopoly in NJ for decades now. You have no idea how much they already own.

3

LikeShow more reactions
· Reply · 1w



**Gary Kobstad** Jenna Glrza its Definitely scary these people are fucking crazy
LikeShow more reactions
· Reply · 1w



**James Clark** I've been telling people for 20 years falling on deaf ears nobody ever thinks it's going to happen until it happens to them and then they just cut and run and take their dirty cash it's so sad it breaks my heart

4

LikeShow more reactions
· Reply · 1w



**John Burrows** Its a good thing they don't teach history other than their own. They keep pushing and pushing and then they say your anti Semitic, well none of my Jewish friends act like them. They are on target for a repeat of the 1930s.

2

LikeShow more reactions
· Reply · 1w



Mindy Murray Molch replied · 1 Reply



**James Clark** That's taking it a little too far buddy
LikeShow more reactions
· Reply · 1w

2



**Mindy Murray Moich** I'm sure not claiming to be the sharpest tool in the shed, so don't misunderstand people. Jenna Glrza, people want to stay ignorant. Rose colored glasses until its to late.
Even the Orthodox and the organized crime Vaad. They put rules in and the floc...See More
LikeShow more reactions
Reply · 1w

**Jenna Glrza** If anyone doesn't think there is a concerted effort going on watch this video. Start at about 6 mins. Anything within the hour and a half "circle radius" of Manhattan is a target. https://vimeo.com/147244731

3

 16 hrs



# Jackson Township Put on Notice by Lawyer for "Religious Gerrymandering" Over Dorm Ban

JACKSON-The Township of Jackson, in New Jersey has been put on notice by a lawyer representing...

SHORENEWSNETWORK.COM

 Like    Comment    Share

35

21 shares

 **James Clark** I'd like to put you on notice you can raise my tax dollars to fight these criminals they think they have more money than us so they can intimidate us with lawsuits
Like · Reply · 24 · 16 hrs

     **Devin Murasky** Yessssssss
    Like · Reply · 16 hrs

     **Joseph K. Schulman** They DO have more money than you or me or all of us put together and they have a long term plan and an abundance of patience.
    Like · Reply · 19 mins


EXHIBIT
P-17
6/9/18

 **Kate Ryan** Please keep us posted on weather the meeting gets cancelled tomorrow because of storm

Like · Reply · 4 · 16 hrs

 **Howard McLaughlin** And so it begins!

Like · Reply · 5 · 16 hrs

 **Sherilyn Ross** We are ready! Please keep us posted on wether the meeting is on or off tomorrow.

Like · Reply · 1 · 16 hrs

 **John William** This is what this guy does. http://www.storzerandgreene.com/

### Storzer & Greene, P.L.L.C. - Home Page

Storzer & Greene is now Storzer & Associates, P.C.  Visit our new website for information about the firm, its attorneys and cases.

STORZERANDGREENE.COM

Like · Reply · 2 · 15 hrs · Edited

 **Richard Egan** The meeting will probably be cancelled tomorrow it will have to wait till the 28th this ordinance was researched and met all state requirements for being non biased what we have now is legal fencing" by the other side so lets remain calm

Like · Reply · 19 · 16 hrs

 **Michael Migliore** Let the civil war begin 😆 how welcome would anyone in my family (especially the women) be allowed at these schools? Bullshit at its finest.

Like · Reply · 5 · 16 hrs · Edited

 **Bob Allen** ain't gunna be too civil if anything, lol

Like · Reply · 16 hrs

 **Melinda Gallagher** I'll apply with you, so we can get a full sampling of denials.

Like · Reply · 2 · 15 hrs

 **Michael Migliore** Lol "mom, I quit going to school further my nursing career, I'm going to become the next messiah instead."

Like · Reply · 7 · 15 hrs

 **Nicole Leigh** Did you see the comment on the story? That guy is delusional too. He probably doesn't even live in Jackson.

Like · Reply · 👍 2 · 16 hrs

 **Phil Stilton** He's from D.C.

Like · Reply · 👍 3 · 16 hrs

 **Adam Urban** I was gonna say. Have him spend a day in Lakewood. No let him drive one time through Lakewood. Then he'll understand.

Like · Reply · 👍 3 · 15 hrs

 **Adam Urban** And it has to be in his own car that he worked to pay for.

Like · Reply · 👍 3 · 15 hrs

Write a reply...  

 **Jennifer Askins-Hager** Jackson needs to counter sue, you know whatever school is built will not be open to Jackson people especially women. That's discrimination. The orthodox community segregates its own people honestly isn't segregation illegal? This whole suing every town around lakewood because of temper tantrums is getting so old. Don't move to a town and expect zoning laws or the towns integrity change for you because of your religion. That's not how this country works.

Like · Reply · 👍 25 · 16 hrs

 **Sherilyn Ross** Amen!

Like · Reply · 👍 1 · 16 hrs

 **Ryan Semblewski** Amen 🙏

Like · Reply · 15 hrs

 **Johnson Kraksterisky** Unfortunately it does work that way for certain groups ,it really does suck

Like · Reply · 14 hrs

Write a reply...  

 **Jackie Krutulis** Bullying at its finest so disgusted.

Like · Reply · 👍 11 · 16 hrs

 **Jennifer Askins-Hager** What's going to happen when they've pushed all us evil racist goyim (lol) out of this state? Whose going to pay for their Medicare, welfare, food stamps and hud vouchers??

Like · Reply · 12 · 16 hrs

 **Jack Adams** I call BULLSHIT......NUDGE...NUDGE...NUDGE....

Like · Reply · 3 · 16 hrs

 **Pasquale Varrone** "Fear and panic"....can he prove that or is he being slanderous toward the residents of Jackson...?



Like · Reply · 7 · 16 hrs

>  **Jennifer Askins-Hager** Yes! See these things are what need to be brought to a lawyer..being called anti Semitic is slander. Unless there is real proof.
>
> Like · Reply · 4 · 16 hrs
>
> | Write a reply... |   |

 **Rich Byrnes** You gotta fight, for your right.

Like · Reply · 1 · 16 hrs

 **Cindy Wetherell-carter** Hopefully the township will grow a set & fight, not give in to their usual crap of racism

Like · Reply · 8 · 16 hrs

**Todd Gibson Jr** We will fight. We will not become Lakewood.

Like · Reply · 12 · 16 hrs

>  **Cindy Wetherell-carter** Fingers crossed!!
>
> Like · Reply · 2 · 16 hrs
>
> | Write a reply... |   |

 **Jacy Mark** Isn't using religion in this case against an entity to force upon something that was legally voted upon by a governmental body based on the residents of this township illegal anyway? They are literally using religion to stomp their feet and cry about a township ordinance.

Like · Reply · 14 · 16 hrs

 **Johnson Kraksterisky** The ordinance is for all dorms regardless of religion

Like · Reply · 🕐 10 · 14 hrs

 **Linda Masera Connelly** Screw you ! Stop using your damn religion as a " weapon " to FORCE your will on others...... this is DISCRIMINATION on your part... you are violating OUR rights !

Like · Reply · 🕐 9 · 14 hrs · Edited

 **Joyce Ann** Exactly. I guess they are the only ones with rights.

Like · Reply · 🕐 1 · 14 hrs

 **Linda Masera Connelly** Joyce Ann so they think we MUST fight back this has gone too far !

Like · Reply · 🕐 1 · 1 hr

Write a reply...    

 **Scott Sargent** you want me on that wall...you need me on that wall

Like · Reply · 🕐 2 · 13 hrs

 **Jeanine Levi Mezzina** It sounds like this lawyer and the community he represents are using religion as a weapon against the people of Jackson and other towns surrounding Lakewood that are going to be forced to allow what ever they want. the dormitories are unsafe and should be illegal. Why is it that the taxpayers of Jackson have no say !

Like · Reply · 🕐 6 · 13 hrs

 **Jennifer Askins-Hager** This is what they use and I totally blame president Clinton, I'm sure he never thought it would be abused like it is by one "religion"... See More

 **Religious Land Use and Institutionalized Persons Act - Wikipedia**

EN.WIKIPEDIA.ORG

Like · Reply · 13 hrs

**nn Cornine** They want the citizens of Jackson to ◼
e this, accuse us of what is being done by them, w
sgusted so you do not care about what they want.
ke · Reply · ◯3 · 12 hrs

**ohn Pelsang** I hate to be the one to say it, but I thi◼
arn more about history with the actions of the pres◼
ke · Reply · 11 hrs

**iane N Campagna** So a lawyer is threatening to st◼
an on dormatories. Since Jackson currently has no
chool, religious or not, how do they have a right to ◼
is?? What financial benefit will the town gain from t◼
ney be open to people of all religions? Veterans, ho◼
isabled? Will all of our community be able to live the◼
emitic ? They want to use it for very restrictive use, ◼
ackson.
ike · Reply · ◯3 · 11 hrs

**ohn Pelsang** Yeah, I just did a post about that. I am◼
believe that Jackson has never had and currently do◼
chools, and never has Jackson had any dorms for s◼

https://www.facebook.com/jpelsang/posts/101551690◼

Like · Reply · ◯2 · 10 hrs · Edited

> **Diane N Campagna** Exactly so the lawyers are
> tree, they are using religion to stronghold the to◼
> they want, slamming is for something we never l◼
> benefit all of our community
> Like · Reply · ◯2 · 10 hrs

> **John Pelsang** It probably is a last ditch effort to◼
> lawyer. Or maybe its worse, maybe its about tyin◼
> and costing the town money while building the na◼
> Like · Reply · 10 hrs

> **Joe Fiero** Yep, St. Al's just happens to be on th◼
> Roman Catholic church.....
> Like · Reply · 14 mins

> **John Pelsang** Oh, that's right. Forgot about tha◼

**Ann Cornine** They want the citizens of Jackson to not fight it by using tactics like this, accuse us of what is being done by them, wearing you down and get disgusted so you do not care about what they want. They win.

Like · Reply · 🟢 3 · 12 hrs

**John Pelsang** I hate to be the one to say it, but I think we are starting to learn more about history with the actions of the present.

Like · Reply · 11 hrs

**Diane N Campagna** So a lawyer is threatening to sure the township over a ban on dormatories. Since Jackson currently has no dormatories for any school, religious or not, how do they have a right to threaten the council with this?? What financial benefit will the town gain from these dormatories, will they be open to people of all religions? Veterans, homeless, seniors, disabled? Will all of our community be able to live there? Who's being anti emitic? They want to use it for very restrictive use, not open to the public of Jackson.

Like · Reply · 🟢 3 · 11 hrs

**John Pelsang** Yeah, I just did a post about that. I am no lawyer but I do believe that Jackson has never had and currently does not have any religious schools, and never has Jackson had any dorms for schools of any type.

https://www.facebook.com/jpelsang/posts/10155169041209886

Like · Reply · 🟢 2 · 10 hrs · Edited

**Diane N Campagna** Exactly so the lawyers are barking up the wrong tree, they are using religion to stronghold the town until getting what they want, slamming is for something we never had, and that will not benefit all of our community

Like · Reply · 🟢 2 · 10 hrs

**John Pelsang** It probably is a last ditch effort to try to fool a novice lawyer. Or maybe its worse, maybe its about tying up Jackson in court and costing the town money while building the name of a DC firm.

Like · Reply · 10 hrs

**Joe Fiero** Yep, St. Al's just happens to be on the grounds of a Roman Catholic church.....

Like · Reply · 14 mins

**John Pelsang** Oh, that's right. Forgot about that one.

**Joe Fiero** Or.... Jesus's Harvest Time Academy and School of Ministry.

There are another one or two as well.

Like · Reply · 6 mins

**John Pelsang** It seems as though I am starting to lose my case. Let me ask, are there any with dorms?

Like · Reply · 2 mins



Write a reply...

**George Harak** It's a fucking joke.

Like · Reply · 😊 2 · 10 hrs

**Billy Koopy** It really upsets me that they keep crying about their religion being discriminated against... This is the same group that is fighting to have a cross removed from the top of a church in Lakewood ( so I was told). Will confront anybody blasting the Christian radio station in their town.. And harassed a pastor because he supervised a homeless campground...

Like · Reply · 😊 2 · 4 hrs

**Raymond Tremer** Screw them friggin lawyers and politicians don't care what happens to our town

Like · Reply · 49 mins



 **James Clark** I'd like to put you on notice you can raise my tax dollars to fight these criminals they think they have more money than us so they can intimidate us with lawsuits

Like · Reply · 👍24 · 17 hrs

 **Devin Murasky** Yesssssssss

Like · Reply · 17 hrs

**Joseph K. Schulman** They DO have more money than you or me or all of us put together and they have a long term plan and an abundance of patience.

Like · Reply · 👍1 · 1 hr

 **Jack Adams** Joseph K. Schulman Yes they do. Large amounts of cash! Kars for Kids.Com. They even have a sellers account at the Auction to turn these Kars for Kids units into CASH!

Like · Reply · 45 mins

**Joseph K. Schulman** Jack Adams you and I both know that over time, homes will be purchased legally and paid for handsomely by the people who want to live here. Over time, enabled by group unity, they will form a bloc vote that will elect whomever they choose. At first, they will support traditional JAckson residents for public office both on the school board and on town council. But deals will be made and promises extracted. Over time, they will become dominant. How much time depends on how long the current majority of JAckson residents/voters can continue to win at the polls. It's a numbers game and only a matter of when, not if. Complicating this will be the secret deals they will make with "pliable" candidates looking for support and willing to follow orders for their own benefit. Some of this is likely already happening, IMO. Also IMO, once the new dominant voting bloc is in control, these new ill-conceived ordinances will be eliminated. There is a better way to keep JAckson rural and diverse.

Like · Reply · 👍1 · 32 mins

 **Joseph K. Schulman** Saw that all muni offices are closed today and meeting for tonight has been moved to Thursday night.

Like · Reply · 👍1 · 31 mins

 **Jack Adams** Joseph K. Schulman I agree 100%

Like · Reply · 20 mins

# EXHIBIT R

# GERTNER & GERTNER, LLC

### Counsellors at Law

PO Box 1149
Jackson, New Jersey 08527
732-523-5444
Fax: 732-363-3345
sgertner@gertneresq.com

**Sean D. Gertner**
Member NJ, VA, MD & DC Bars

*Of Counsel*
Jerome A. Gertner

March 5, 2019

Via Telefax (732) 240-6097 and e-courts
Honorable Marlene Lynch Ford, A.J.S.C.
Superior Court of New Jersey
Ocean County Court House
P.O. Box 2191
Toms River, NJ 08754-2191

> RE: **Oros Bais Yaakov High School v. The Zoning Board of Adjustment**
> **Docket No.: OCN-PW-L-2981-14**
> **Our File No. 3366-472A**

Dear Judge Ford:

As you are aware, I represented, and am still counsel of record regarding Count 1 of Plaintiff's case related to the above-captioned matter.[1] As I further understand, discovery has been extended as to the second and third counts of the Plaintiff's Amended Complaint (though certain elements of discovery have continued to proceed) while there have been settlement discussions related primarily to federal claims made by <u>Agudath Israel of America v. the Township of Jackson</u>, Case No.: 3-17-CV-03226. The goal was that discussions in that case would lead to possible settlement in this matter.

Those discussions have taken a different turn, therefore requiring this matter be treated separately. As such, kindly utilize this correspondence with the consent of the Board's counsel on Counts 2 and 3 of this matter, requesting that a Management Conference be held before Your Honor.

---

[1] If I am required to file a new Substitution or other pleadings to ensure that I remain counsel of record as to Count 1 of the Complaint, please advise.

Physical Address:
740 Bennetts Mills Road
Jackson, NJ 08527

Thank you for your courtesies.

Respectfully submitted,
Gertner & Gertner, LLC

Sean D. Gertner

SDG/mc

cc: Howard Mankoff, Esq. (via email hbmankoff@mdwcg.com)
  Donna Jennings, Esquire (via e-mail djennings@wilentz.com)
  Jean L. Ciprani, Esq. (via email jlc@gm-law.net)
  Terence Wall (via email twall@jacksontwpnj.net)
  Jeffrey M. Purpuro (via email jpurpuro@jacksontwpnj.net)
  Marci Hamilton, Esq. (via email mhamilton@childusa.org)

# EXHIBIT S

Fw: Information request - Danielle Sinowitz

https://outlook.office.com/owa/?ItemID=AAMkAGMyZGZhNj...

# Fw: Information request

**Janice Kisty**

Fri 3/8/2019 8:57 AM

2019 MAR 17  P 10: 02

To:Danielle Sinowitz <dsinowitz@jacksontwpnj.net>;

**Danielle,**
**Please process.  Reminder that 2014 and maybe 2015 is destroyed with permission from the State.**
**Thank you.**

*Janice Kisty*
*Township Clerk/Registrar*
Jackson Township
95 W. Veterans Highway
Jackson, NJ  08527
732-928-1200 x1200
fax 732-928-4377

**From:** phil sheker <philsheker@gmail.com>
**Sent:** Friday, March 8, 2019 7:05 AM
**To:** Janice Kisty
**Subject:** Information request

To whom it may concern ,
OPRA request: Please send me all emails , documents and paperwork sent to and from Mike Reina ,Helene Schlegal, Rob Nixon ,
Barry Calogero , Ken Bressi , A Eden and Scott Martin  with regard to Eruvs, Eruv wires, Eruv poles'' between 01/01/14 thru 01/016.

Thank you,
Phil

# EXHIBIT T

# Fw: Thank you

## Janice Kisty

Tue 3/12/2019 9:49 AM

To:Danielle Sinowitz <dsinowitz@jacksontwpnj.net>;

Danielle,
Please confer with Robin as to these records having permission to be destroyed.  Thank you.

*Janice Kisty*
*Township Clerk/Registrar*
Jackson Township
95 W. Veterans Highway
Jackson, NJ  08527
732-928-1200 x1200
fax 732-928-4377

**From:** phil sheker <philsheker@gmail.com>
**Sent:** Monday, March 11, 2019 6:57 AM
**To:** Janice Kisty
**Subject:** Thank you

To whom it may concern ,
OPRA request: Please send me all emails , documents and paperwork sent to and from Mike Reina ,Helene Schlegal, Rob Nixon ,
Barry Calogero , Ken Bressi , A Eden, Samantha Novak  and Scott Martin  with regard to Dorms, yeshivas and boarding houses "
between 01//01/12 thru 01/014.

Thank you,
Phil

# EXHIBIT U

OCEAN COUNTY SUPERIOR COURT
OCEAN COUNTY COURTHOUSE
CIVIL LAW DIVISION
TOMS RIVER     NJ 08754

COURT TELEPHONE NO. (732) 929-2016
COURT HOURS  8:30 AM - 4:30 PM

TRACK ASSIGNMENT NOTICE

DATE:    OCTOBER 20, 2014
RE:      PW OROS BAIS YAAKOV HIGH SCHOOL VS ZONING JACKSON
DOCKET:  OCN L-002981 14

THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 4.

DISCOVERY IS PRESUMPTIVELY 450 DAYS BUT MAY BE ENLARGED OR SHORTENED BY THE
JUDGE AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST
DEFENDANT, WHICHEVER COMES FIRST.

THE MANAGING JUDGE ASSIGNED IS:  HON VINCENT J. GRASSO

        IF YOU HAVE ANY QUESTIONS, CONTACT TEAM    002
AT: (732) 929-4771 EXT 4771.

        IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
        PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH R.4:5A-2.

                ATTENTION:
                           ATT: STEVEN I. PFEFFER
                           LEVIN SHEA PFEFFER
                           2105 WEST COUNTY LINE ROAD
                           SUITE 3
                           JACKSON          NJ 08527

JUAMH6

**Appendix XII-B1**

<table>
<tr><td colspan="2" rowspan="2"></td><td colspan="2">**CIVIL CASE INFORMATION STATEMENT**<br>(CIS)<br><br>Use for initial Law Division<br>Civil Part pleadings (not motions) under *Rule* 4:5-1<br>**Pleading will be rejected for filing, under *Rule* 1:5-6(c),**<br>**if information above the black bar is not completed**<br>**or attorney's signature is not affixed**</td><td colspan="2">FOR USE BY CLERK'S OFFICE ONLY<br>PAYMENT TYPE: ☐CK ☐CG ☐CA<br><br>CHG/CK NO.<br><br>AMOUNT:<br><br>OVERPAYMENT:<br><br>BATCH NUMBER:</td></tr>
</table>

| ATTORNEY / PRO SE NAME<br>Steven Pfeffer, Esquire | TELEPHONE NUMBER<br>(732) 364-7333 | COUNTY OF VENUE<br>Ocean |
|---|---|---|
| FIRM NAME (if applicable)<br>Levin, Shea & Pfeffer | | DOCKET NUMBER (when available)<br>~~L2981-14~~ |
| OFFICE ADDRESS<br><br>2105 West County Line Road<br>Jackson, NJ 08527 | | DOCUMENT TYPE<br>Complaint<br><br>JURY DEMAND   ☐ YES   ☒ No |

| NAME OF PARTY (e.g., John Doe, Plaintiff)<br><br>Oros Bais Yaakov High School,<br>Plaintiff | CAPTION<br>Oros Bais Yaakov High School v. Zoning Board of Jackson Township |
|---|---|

| CASE TYPE NUMBER<br>(See reverse side for listing)<br><br>701 | HURRICANE SANDY<br>RELATED?<br>☐ YES   ☒ NO | IS THIS A PROFESSIONAL MALPRACTICE CASE?   ☐ YES   ☒ NO<br>IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW<br>REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |
|---|---|---|
| RELATED CASES PENDING?<br>☐ Yes   ☒ No | | IF YES, LIST DOCKET NUMBERS |
| DO YOU ANTICIPATE ADDING ANY PARTIES<br>(arising out of same transaction or occurrence)?<br>☐ Yes   ☒ No | | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known)   ☐ NONE<br>☐ UNKNOWN |

| **THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.** |
|---|

| CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION |
|---|

| DO PARTIES HAVE A CURRENT, PAST OR<br>RECURRENT RELATIONSHIP?<br>☒ Yes   ☐ No | IF YES, IS THAT RELATIONSHIP:<br>☐ EMPLOYER/EMPLOYEE<br>☐ FAMILIAL | ☐ FRIEND/NEIGHBOR<br>☒ BUSINESS | ☐ OTHER (explain) |
|---|---|---|---|

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?   ☐ YES   ☐ No |
|---|

| USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR<br>ACCELERATED DISPOSITION<br><br>OCT ?? 2014<br>SUPERIOR CT - OCEAN |
|---|

| ♿ | DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS?<br>☐ Yes   ☒ No | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|---|
| | WILL AN INTERPRETER BE NEEDED?<br>☐ Yes   ☒ No | IF YES, FOR WHAT LANGUAGE? |

| I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be<br>redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b). |
|---|
| ATTORNEY SIGNATURE: |

Effective 08-19-2013, CN 10517-English

RECEIVED & FILED

OCT 15 2014

SUPERIOR CT., OCEAN

LEVIN, SHEA & PFEFFER, P.A.
2105 W. COUNTY LINE ROAD, #3
JACKSON, NJ
08527

HERBERT SMITH FREEHILLS NEW YORK LLP
450 LEXINGTON AVENUE
NEW YORK, NY
10017

Attorneys for Plaintiff
Oros Bais Yaakov High School

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: OCEAN COUNTY

DOCKET #: PW L2981-14

---

OROS BAIS YAAKOV HIGH SCHOOL,

    Plaintiff,

v.

THE ZONING BOARD OF
ADJUSTMENT FOR THE TOWNSHIP
OF JACKSON,

    Defendant.

Civil Action

**COMPLAINT**

**(In Lieu of Prerogative Writs)**

---

Plaintiff, Oros Bais Yaakov High School, an Orthodox Jewish girls' high school located at 50 Lapsley Lane, Lakewood, New Jersey, by way of Complaint in lieu of prerogative writs against defendant The Zoning Board of Adjustment for the Township of Jackson says:

## FACTUAL ALLEGATIONS

### Background

1. Plaintiff, Oros Bais Yaakov High School (the "Plaintiff" or "High School") is an

1

Orthodox Jewish girls' high school whose administrative offices are located at 50 Lapsley Lane, Lakewood, New Jersey.

2. Plaintiff is the contract purchaser of 38 Cross Street, an approximately 7.5 acre parcel identified as Block 21401, Lot 6, Jackson Township, New Jersey (the "Property").

3. The High School is currently run from a site in Lakewood Township. Approximately 220 girls attend the school at present.

4. Defendant, the Zoning Board of Adjustment for the Township of Jackson (the "Board") is a municipal agency organized pursuant to N.J.S.A. 40:55D-69 with its principal place of business at 95 West Veterans Highway, in the Township of Jackson, in the State of New Jersey.

5. Plaintiff submitted an application to the Board for a use variance pursuant to N.J.S.A. 40:55D-70(d)(1) to allow it to construct a new high school building and relocate to the Property. The Plaintiff also sought a design waiver for the proposed number of parking spaces at the Property (together, the "Application").

6. The Property is approximately 7.5 acres in size and is situated within Jackson Township's Residential (R-1) Zone (the "R-1 Zone").

7. Permitted conditional uses in the R-1 Zone include child-care centers, nursery schools, day-care centers, churches and other places of worship. While numerous schools have been built in the R-1 Zone, schools are not listed as permitted or conditional uses of property in the R-1 Zone.

8. Additionally, under § 244-197(N)(1) of the Code of the Township of Jackson (the "Code"), the required number of parking spaces for a high school is "1 for each 3 students based on design capacity". For a student population of 400 this equates to 134

spaces. Due to the uncontroverted evidence before the Board that no students would be allowed to drive to school and all students would be required to travel to school by bus, the Plaintiff sought a design waiver under N.J.S.A. 40:55D-51(b) to provide fewer parking spaces than required.

### The Application

9. On August 16, 2013, Plaintiff submitted its Application to the Board following which a series of public hearings were held.

10. A total of five public hearings were held in front of the Board: on October 2, 2013, November 20, 2013,  February 5, 2014, April 2, 2014 and June 18, 2014 (the "Hearings").

11. The Plaintiff proposed to relocate its girls' high school onto the Property, on which it sought to build a two-story building of approximately 35,000 square feet which would cover less than six percent of the Property.

12. Over the course of the Hearings the Plaintiff's witnesses gave extensive testimony as to the mechanics of its proposal, the inherent benefits of the High School, and the steps that had been taken to obviate any potential detriment to the surrounding community.

13. Rabbi Ephraim Birnbaum, the High School's principal, testified on numerous occasions that no more than four hundred girls would attend the High School and that such a cap on enrollment could be made a condition of the Board's approval.

14. The majority of the teachers currently working at the High School are accredited by the State of New Jersey.

15. Rabbi Birnbaum testified that there would be no more than 27 members of staff working on-site at the High School and that such a cap on staff could be made a

condition of the Board's approval.

16. Rabbi Birnbaum gave detailed testimony as to the achievements of previous High School graduates. Ninety-seven percent of students from the High School have gone on to higher education and the graduation rate for the High School's last graduating class was 100%, 51 out of 51 students.

17. Students at the High School study subjects that allow them to go into a range of professional fields including medicine, law, business administration, accounting, and therapy. In doing so they benefit not only the local community of Jackson, but more broadly Ocean County, the state of New Jersey, and the United States of America.

18. Rabbi Birnbaum provided uncontested evidence that even students who are of an age where they can obtain a drivers' license would not be permitted to drive to school as doing so would violate the school's rules.

19. All students would be required to arrive to school by bus, the provision of which is guaranteed by state law.

20. The Plaintiff's planning expert, Mr. Ian Borden, gave testimony as to the High School's day-to-day operations. The High School would be open from 8:30am to 5:00pm, Monday to Friday, and the lighting within the parking area would be turned off from 8:00pm. The school year would run from September until June.

21. The Property would not be used for any catering events, music concerts, art shows or similar activities. The only additional event to be held on the Property would be parent-teacher conferences which would occur no more than twice each year and would be scheduled over a four-hour time period to stagger the arrival and exit of

attendees. Furthermore, outside of the school year there would be no events, summer camps or activities of any kind.

22. Mr. Borden also testified as to the capacity and sufficiency of the proposed septic system to be used on the Property. This would consist of three 1,500 gallon septic tanks, a pressure-dosing system, a 3,200 square foot disposal bed and a MicroFAST water treatment system.

23. The system is based on an estimate that the High School would produce 4,250 gallons of effluent per day. This conservative figure is derived from and complies with DEP regulations. The size of the Property – approximately 7.5 acres – is much larger than the R-1 requirements for a septic system of the type proposed.

24. The record before the Board was clear that any septic system to be used on the Property would have to comply with DEP regulations and be granted an NJPDES permit. The evidence also established that many other sites in Jackson (including several schools) use septic systems that require NJPDES permits. There was also uncontested evidence that there are 18 NJPDES permits in Jackson for sites with larger septic systems than that proposed by the Plaintiff, many of which are adjacent to the R-1 Zone.

25. As regards to maintaining the integrity of its neighbors' water supply, Plaintiff adduced evidence that it would drill down to 500 feet into the next confined aquifer.

26. The Plaintiff's proposal also included plans to enhance the runoff from the Property so that the post-development runoff would release only 2.6 cubic feet per second, rather than 10 cubic feet per second as exists presently.

5

27. As regards the provision of parking at the Property, on multiple occasions counsel for the Plaintiff outlined the three options that had been put before the Board:

    a. The first option was to grant the Plaintiff a design waiver to reduce the number of spaces required to 81. In light of the fact that none of the students would be permitted to drive to school, the Plaintiff likened its position to that of an elementary school. Accordingly, the Plaintiff originally sought a waiver to include 51 spaces, in line with the Code requirements for elementary schools. However, this was later voluntarily increased to 81 spaces.

    b. The second option was to have the Plaintiff landbank the remaining 53 spaces as would be required by the Code.

    c. Finally, the third option was to refuse to grant a design waiver and require the Plaintiff to provide all 134 spaces.

28. Despite repeated invitations to do so, the Board failed to state which option it preferred.

29. The Plaintiff's traffic expert, Mr. John Rea, testified that the Property's driveway exiting out onto Cross Street would operate at an acceptable "C" Level of Service, well within accepted traffic engineering parameters.

30. The evidence before the Board further established that the High School's proposed internal circulation was designed in accordance with proper traffic engineering principles. Mr. Rea confirmed that the design provided more than adequate stacking for buses. In addition, the Property's turning radius was designed so as to sufficiently accommodate any emergency vehicles.

31. The evidence before the Board also established that the Property is especially well-suited for the High School because it is located on a county road in close proximity to where a majority of the students come from.

32. In sum, information, fact, and expert testimony in favor of the Application were presented by the High School before the Board justifying the approval of the Application.

### Positive Criteria

33. As outlined above, the Plaintiff adduced detailed evidence as to the High School's teaching provisions, its operations and the achievements of its students. The record evidence established that the Plaintiff's proposal presumptively satisfied the Positive Criteria, since a parochial school is recognized as being an inherently beneficial use.

### Negative Criteria

34. As for the negative criteria, Plaintiff first established that under § 244-47(C) of the Code conditional uses permitted in the R-1 Zone include child-care centers, nursery schools, day-care centers and places of worship.

35. The evidence before the Board established that the Plaintiff's proposed school is not a significant deviation from these types of use, particularly in light of the fact that none of the students are permitted to drive to school.

36. Plaintiff also established that multiple schools exist in the R-1 Zone and that the presence of multiple schools in the R-1 Zone has neither caused substantial detriment to the public good nor substantially impaired the intent and purpose of the zone plan and zoning ordinance.

37. Within Jackson Township there are several other schools that have been constructed in the R-1 Zone. Two of the most recently developed public schools are the Elms Elementary School located on Goetz Lane and Jackson Liberty High School located on North Hope Chapel Road. Elms Elementary was completed in 2004 and houses over 830 students and 55 full-time teaching staff, while Liberty High was completed in 2007 and has approximately 1,400 students and 90 full-time teaching staff.

38. Similarly there are two Christian private schools in the R-1 Zone, St Aloysius on Aldrich Road and Jesus Harvest Time Academy on Freehold Road, both of which were granted significant zoning relief to build in the R-1 Zone.

39. By law, the Plaintiff would be required to ensure a fifty foot buffer between the school and the rear property line, the Galassi Court neighborhood. To further mitigate any potential impact on the surrounding properties the Plaintiff proposed to extend this buffer to four hundred feet, and to supplement the buffer with additional evergreen trees and landscaping.

40. The Plaintiff's architect, Ms. Catherine Flores, supplied expert evidence as to the ways in which the proposal was designed to take into consideration the surrounding residential dwellings, including by setting the building far back from the street and any of the residences, and orienting the building so that the side yards are much larger than would be required by law.

41. To reduce the Board's concerns about the impact of the High School on local traffic, the Plaintiff proposed that any variance granted be made subject to the following conditions:

    a.  Capping enrolment at four-hundred students;

    b. Placing a cap on the number of staff permitted on site; and

    c. Requiring students to come to school by government-provided bussing.

42. On the basis of these conditions the Board's traffic engineer concluded that the Plaintiff had provided measures to promote and provide traffic safety.

43. Indeed, the Board's planning expert observed that these conditions could alleviate the Board's concerns and recognized that these conditions could in fact be policed by code enforcement officials.

44. To further mitigate any negative impacts of the proposed high school, the Plaintiff also agreed to widen the part of Cross Street leading onto the Property, in accordance with Ocean County standards for county roads.

45. Plaintiff also established that, at present, the Property is in a dilapidated condition. An expert assessment highlighted numerous issues with the existing state of the Property, including, but not limited to, possible underground tanks, possible abandoned septic systems and abandoned buildings. Plaintiff observed that it should be required to remediate these problems as a condition of any approval.

### The Board's Deliberations and Resolution

46. The Board denied the requested use variance relief and parking design waiver. In declaring its decision in the Resolution, the Board incorrectly referred to the relief requested in relation to parking as a variance, rather than a design waiver.

### Positive Criteria

47. The Board refused to conclusively determine that the High School would constitute an inherently beneficial use, and therefore whether it satisfied the Positive Criteria.

9

48. First, the Board erroneously determined that it had discretion to determine whether a parochial school was indeed an inherently beneficial use, and that this conclusion was bolstered by the fact that there is no definition of "school" in the Municipal Land Use Law ("MLUL").

49. The Board's Resolution observes that "[t]he Board questioned the extent to which, though a private, not-for-profit educational institution, it [the High School] would be open to the public and be available for general public benefit."

50. Furthermore the Board found that because the High School was "not a school any of us are familiar with" – for example, in that it did not have traditional science laboratories, locker rooms or communal showers – it was not a "school" as that term is understood by the MLUL.

51. Notwithstanding the uncontroverted testimony that the High School's students go onto careers in fields including medicine, law and accounting, Board member John Suttles – evidencing the Board's anti-ultra-Orthodox sentiments – concluded that "the environment that is described would probably be achieved if we let four hundred girl scouts in the building, only they won't have to sell cookies".

52. The Board also considered that because the ultra-Orthodox Jewish members of the Lakewood community do not "assimilate" to the Board's perception of cultural norms, a school intended for students of that community could not therefore be inherently beneficial to the broader community.

53. During deliberations, Board Member Joseph Schulman stated the following:

"I'd like to make a remark that I think may help to clarify in the Board members' minds the question of beneficial use to the community, and that is this: That this is

10

a school, obviously – I am not saying anything that hasn't been stated before – that is a private school and is exclusively for the use of the Orthodox community; there will be no other children of other religions admitted to that school without being able to pass a strict religious component, as the rabbi has said himself during testimony.

And I want to relate something that I experienced during my time living in Lakewood, which was my whole life before I moved to Jackson. I attended a meeting at the municipal courtroom in Lakewood during which the titular head of the Orthodox community in Lakewood, Rabbi Schenkolewski, stated several times that "the Orthodox community will never assimilate; therefore, they stand alone."

And in a question of inherent beneficial use, it seems to me that the applicant is asking us to recognize the regional aspect while at the same time trying to prove that it's an inherently beneficial use to the whole community, while it's not for the whole community, for lack of a better way to put it....

That's where I see the conflict in the argument with beneficial use, whether it is a benefit to the community of Jackson for that reason, and I think that the community of Jackson can not [sic] expect the Orthodox residents in Jackson to assimilate into the Jackson community as a whole in the same way that they will not do so in Lakewood.

So I believe that there is a parallel, there is a history there, and there is a demonstrated way of doing things that stands in opposition to the notion of inherently beneficial to the entire community. And I hope that helps the Board."

11

**Negative Criteria**

54. The Board found that granting the variance would result in substantial detriment to the public good and substantial impairment of the zone plan and zoning ordinance because:

    a. It was "concerned" about the increase in effluent that would be generated by the school relative to other permitted uses in the R-1 Zone;

    b. Despite the existence of several Jackson schools which utilize septic systems, granting this variance would purportedly contravene neighboring Lakewood Township's alleged 'zero tolerance' policy against schools being serviced by septic systems;

    c. It was concerned about the traffic generated by the High School if it could not reasonably enforce the conditions to which the Plaintiff was willing to be bound;

    d. Allowing the High School to relocate to the Property would purportedly contravene neighboring Lakewood Township's desire to reduce bus traffic on the roads;

    e. A school is inconsistent with the rural nature of the R-1 Zone; and

    f. Building a school on the Property would purportedly result in urban sprawl because the High School is purportedly not in close proximity to the population being served.

**CAUSES OF ACTION**

**FIRST COUNT**
**(THE BOARD'S DECISION ON THE APPLICATION WAS ARBITRARY, CAPRICIOUS AND UNREASONABLE)**

55. The High School repeats and realleges paragraphs 1 through 54 as if fully set forth

12

herein.

56. With regard to the Board's denial of the High School's Application, the Board's decision was arbitrary, capricious and/or unreasonable.

## Positive Criteria

57. As for the Positive Criteria, the Board erroneously determined that it had discretion to determine whether a parochial school was an inherently beneficial use when that question has been determined by case law and enshrined in the MLUL which states that schools (whether public or private) are inherently beneficial uses.

58. In finding that the High School was not presumptively an inherently beneficial use, the Board made a fundamental error of law rendering its decision arbitrary, capricious and unreasonable.

## Negative Criteria

59. As for the Negative Criteria, the Plaintiff established through competent and credible fact and expert evidence that granting the variance would not result in substantial detriment to the public good and would not impair the intent and purpose of the Code or the Jackson Master Plan.

60. As detailed above, several schools are already located in the R-1 Zone. Nevertheless they function well, make positive contributions to the community and have caused no substantial detriment to the surrounding property or the Jackson Master Plan simply by virtue of their location in the R-1 Zone.

61. Moreover, conditional uses permitted in the R-1 Zone under the Code include childcare centers, nurseries and houses of worship. A high school whose students are

not permitted to drive to school does not represent a significant departure from these types of establishment.

62. The Plaintiff took numerous steps to mitigate the impact of the High School on the surrounding neighborhood including but not limited to:

    a.  Volunteering to accept approval on the condition that:

        i.  No more than 400 students would be permitted to attend the High School;

        ii.  The High School would remain closed from July to September; and

        iii.  All students would be required to take the bus to school and not permitted to drive to school (which is the Plaintiff's strictly-enforced policy in any event).

    b.  Setting the High School four hundred feet back from the Galassi Court rear property line to minimize disturbance to the neighboring properties, far in excess of the fifty foot buffer that is required;

    c.  Orienting the building so that the side yards are much larger than would be required by law to keep the design in line with the character of surrounding properties;

    d.  Offering to include a water treatment system although not required by the Ocean County Health Department;

    e.  Voluntarily opting to drill down 500 feet – rather than 80-125 feet - into the next confined aquifer to eliminate concerns about drawdown from the school's well to the surrounding property owners;

    f.  Adding a six-foot solid fence along the property line;

    g.  Decreasing the height and area of the proposed school sign;

14

h. Agreeing to provide curbing, pedestrian access and landscaping for the driveway; and

i. Offering the Board three options as to how many parking spaces would be required on the Property including providing the number required by the Code.

63. The Plaintiff's planner testified that the site plan was designed to respect the bulk standards of the neighborhood and incorporates residential design elements, honoring the developmental pattern of the neighborhood. Consequently, the proposal makes a conscious effort to protect the character of the established neighborhoods.

64. Thus, the Board's denial insofar as it was predicated on a finding that a school is incompatible with the rural nature of the R-1 Zone was arbitrary, capricious and unreasonable.

65. The evidence established that the proposed septic system would be more than capable of dealing with the High School's waste water output, as demonstrated by testimony from the Plaintiff's expert.

66. The Plaintiff would be one of a number of schools in Jackson Township serviced by a septic system and the size of the Property is much larger than required for a septic system of the type proposed.

67. Most significantly the proposed septic system, which was designed in compliance with DEP regulations, would require an NJPDES permit.

68. The fact that the Plaintiff's septic system was designed to conform to DEP standards and required an NJPDES permit should have precluded any finding that the proposed wastewater disposal system would result in substantial detriment to the public good. The Board's denial of the requested relief in relation to its "significant concern over the

increase in effluence" was erroneous and thus, arbitrary, capricious and unreasonable as well.

69. Additionally, given that the proposed septic system was designed to DEP standards and required an NJPDES permit, the Board's reliance on the purported 'zero tolerance' policy towards schools on septic systems in neighboring Lakewood Township was arbitrary, capricious and unreasonable as well.

70. To mitigate any traffic concerns the Plaintiff offered to make approval of the variance subject to three conditions: capping the number of students, capping the number of staff, and requiring the students to come to school by bus. The Board's planner recognized during deliberations that an infraction of such conditions could be dealt with by a code enforcement official.

71. In its Resolution however, the Board noted its concern that these conditions could not be reasonably enforced. The Board's denial of the requested relief on the basis of its unspecified concerns regarding the enforceability of the conditions proffered by the Plaintiff was arbitrary, capricious and unreasonable.

72. As the Plaintiff's traffic expert testified, provided that the conditions are put in place, the Property's driveway exiting out into Cross Street would operate at an acceptable "C" Level of Service. This uncontested evidence undermined the Board's concerns about increased traffic that the High School would generate.   The Board's denial, insofar as it was predicated on unspecified traffic concerns, was arbitrary, capricious and unreasonable.

73. The High School is located approximately three hundred feet from the Lakewood Township border. Given its close proximity to Lakewood, where the majority of its

16

students would come from, the Board's concerns about "urban sprawl" are clearly unfounded, and the Board's denial of the requested relief on that basis was arbitrary, capricious and unreasonable as well.

74. Building the High School would further the public good and the purpose of the MLUL would be advanced by a deviation from the Code in that it facilitates the establishment of a school – which necessarily promotes public morals and general welfare.

**The Balancing Test**

75. In refusing to conclusively accept that the High School was an inherently beneficial use and therefore satisfied the Positive Criteria, the Board failed to engage in the balancing test mandated by law, and that too was arbitrary, capricious and unreasonable.

76. The fourth step in the *Sica* test requires the Board to weigh the Positive Criteria against the Negative Criteria in order to determine whether, on balance, the grant of the use variance would cause substantial detriment to the public good. Self-evidently, in order to do this the Board must first establish not only whether both the Positive Criteria and Negative Criteria have been satisfied, but the underlying strength of the Plaintiff's case for each.

77. Applying this, the potential detrimental effects of the High School on the surrounding area – all of which could be mitigated through conditions of approval in any event – were required to be assessed relative to the public interest served by the High School. In refusing to acknowledge that the Plaintiff had satisfied the Positive Criteria, it was impossible for the Board to fairly conduct the necessary balancing. That too was arbitrary, capricious and unreasonable.

**Parking Design Waiver**

78. The Board also erred in its decision to deny the design waiver for the parking requirements. Given that none of the students would be permitted to drive to school and all students would be required to come to school by bus, there would clearly be no benefit in requiring the Plaintiff to provide all 134 spaces. Denial of the design waiver was arbitrary, capricious and unreasonable as well.

WHEREFORE, Plaintiff Oros Bais Yaakov High School demands judgment in its favor and against the Board as follows:

    i.  The Board's denial of the High School's Application be declared in violation of the MLUL, and therefore, null and void and of no effect;

    ii.  The Board's denial was arbitrary, capricious and/or unreasonable, and therefore, be reversed; and

    iii.  Awarding the High School such other relief as this Court deems equitable and just.

**SECOND COUNT**
**RLUIPA – "Discrimination and Exclusion – Equal Terms"**
**42 U.S.C § 2000CC-(B)(1)**
**(The Board's Decision to Deny Plaintiff's Request to Develop a Parochial School in the R-1 Zone But to Permit Development of Secular Schools in the R-1 Zone Violates the Equal Terms Clause)**

79. The Plaintiff repeats and realleges paragraphs 1 through 78 as if fully set forth herein.

80. RLUIPA's "equal terms" provision provides that, "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution."

81. As outlined above, two of the most recent public schools constructed in Jackson Township, Elms Elementary and Liberty High, both impose a significantly more

18

intense use of land than the Plaintiff's proposed facility. Both schools were built in the R-1 Zone.

82. A claim under RLUIPA's "equal terms" provision consists of four elements: (1) the plaintiff must be a religious assembly or institution, (2) subject to a land use regulation, that (3) on its face or as applied treats the religious assembly on less than equal terms, with (4) a nonreligious assembly or institution.

83. Satisfying these requirements in the present case: the Plaintiff is an Orthodox Jewish institution, subject to the MLUL and the Code, under which it has been treated on less than equal terms with at least two secular public schools, Elms Elementary and Liberty High.

84. As outlined above, despite established case law and statute determining that schools are an inherently beneficial use and that no distinction can be made between public and parochial schools in this respect, the Board repeatedly refused to acknowledge that the High School was an inherently beneficial use.

85. The discriminatory views held by members of the Board were evidenced in a number of comments made during the Hearings.

86. Notably, during deliberations, Board member Joseph Schulman provided a remark that he believed "may help to clarify in the Board members' minds the question of beneficial use to the community". He alleged that "the community of Jackson can not [sic] expect the Orthodox residents in Jackson to assimilate into the Jackson community as a whole in the same way that they will not do so in Lakewood... there is history there, and there is a demonstrated way of doing things that stands in opposition to the notion of inherently beneficial to the entire community."

87. Further to this, another Board member, John Suttles, later stated that one of his reasons for denying the Application was that "nobody has actually proved to me that this is a school for anything. The environment that is described would probably be achieved if we let four hundred girl scouts in the building, only they wouldn't have to sell cookies."

88. Based on the treatment afforded to Elms Elementary and Liberty High public schools, the refusal to recognize the High School as an inherently beneficial use, the animus shown towards Lakewood's Orthodox Jewish community at the Hearings and the ultimate denial of the requested relief sought by the Plaintiff, it is submitted that in refusing the Application, the Board applied the Code and the MLUL in an unequal and consequently unlawful manner.

WHEREFORE, Plaintiff demands a judgment be entered in its favor against the Township:

(i)    enjoining further enforcement of the provisions of the Code and the MLUL in an unequal fashion;

(ii)   invalidating the Resolution on the grounds that it is premised on the unlawful application of provisions of the Code and the MLUL;

(iii)  awarding the Plaintiff its attorney's fees and costs; and

(iv)   all such other relief that this Court deems proper.

**Third Count**
**RLUIPA – "Discrimination and Exclusion – Nondiscrimination"**
**42 U.S.C. § 2000cc-(b)(2)**

**(The Board's Unequal Treatment of the Plaintiff's Ultra-Orthodox Jewish School Compared with Christian and Public Schools Developed in the R-1 Zone Violates RLUIPA's "Nondiscrimination" Provision and, as a result, the Resolution Must Be Invalidated)**

89. The Plaintiff repeats and realleges paragraphs 1 through 88 as if fully set forth herein.

90. RLUIPA's "nondiscrimination" provision provides that "No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination."

91. There are two Christian private schools located in Jackson: St. Aloysius located on Aldrich Road and Jesus Harvest Time Academy located on Freehold Road. Both of these schools were built in the R-1 Zone (or its equivalent at the time) and both were granted significant zoning relief by the Board to allow this.

92. St Aloysius opened in 1994 and now contains 300 students in grades kindergarten through 8.

93. The Jesus Harvest Time Academy contains kindergarten through 12th grade and was constructed circa 1990.

94. The Board's denial of the Application is in contrast to its previous decisions to give precisely the same type of relief requested by the Plaintiff to multiple Christian schools and other, larger nonreligious schools. This fact, coupled with the anti-ultra-Orthodox sentiment evidenced during the Hearings underscores the Board's discriminatory treatment of Plaintiff's Application.

WHEREFORE, Plaintiff demands a judgment be entered in its favor against the Township:

(i)     enjoining further enforcement of the provisions of the Code and the MLUL in an unequal fashion;

(ii)     invalidating the Resolution on the grounds that it is premised on the unlawful application of provisions of the Code and the MLUL;

(iii)     awarding the Plaintiff its attorney's fees and costs; and

(iv)     all such other relief that this Court deems proper.

LEVIN, SHEA & PFEFFER, P.A.
Attorneys for Plaintiff
Oros Bais Yaakov High School

By: _____
         STEVEN I. PFEFFER
         A Member of the Firm

Dated: October 14, 2014

HERBERT SMITH FREEHILLS NEW YORK, LLP
Attorneys for Plaintiff
Oros Bais Yaakov High School

By: _____
         PHILIP A. PFEFFER
         A Member of the Firm

Dated: October 14, 2014

22

## DESIGNATION OF TRIAL COUNSEL

In the event that this matter requires a plenary hearing or trial before the Court, the Plaintiff, pursuant to *R.* 4:5-1(c), hereby designates Steven I. Pfeffer of Levin Shea & Pfeffer, P.A., as its counsel for the purposes of said hearing or trial.

LEVIN, SHEA & PFEFFER, P.A.
Attorneys for Plaintiff
Oros Bais Yaakov High School

By: _____
      STEVEN I. PFEFFER
      A Member of the Firm

Dated: October 14, 2014

HERBERT SMITH FREEHILLS NEW YORK, LLP
Attorneys for Plaintiff
Oros Bais Yaakov High School

By: _____
      PHILIP A. PFEFFER
      A Member of the Firm

Dated: October 14, 2014

23

### _R. 4:5-1 CERTIFICATION_

I hereby certify pursuant to _R._ 4:5-1 that this matter is not the subject of any other action pending in any court or of a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated.  I further certify that I am unaware of any non-party who should be joined in this action pursuant to _R._ 4:28 or who is subject to joinder pursuant to _R._ 4:29-1(b) because of potential liability to any party based on the same transactional facts.

_____
Steven I. Pfeffer

DATED: October 14, 2014

24

### _R._ **4:69-4 CERTIFICATION**

I hereby certify pursuant to _R._ 4:69-4 that copies of the transcripts of the Board hearings were ordered by the High School and all of the transcripts will be provided to the Court and to counsel for the Board after the initial conference in this matter, or as otherwise directed by the Court.

_____
Steven I. Pfeffer

DATED: October 14, 2014

25

# EXHIBIT V

David's Bridal, Inc. v. House of Brides, Not Reported in Fed. Supp. (2009)

2009 WL 10690456

2009 WL 10690456
Only the Westlaw citation is currently available.
**Not for Publication**
United States District Court, D. New Jersey.

Re: DAVID'S BRIDAL, INC., et al.
v.
HOUSE OF BRIDES, et al.

Civil Action No. 06–5660 (SRC)
|
Signed 11/10/2009

**Attorneys and Law Firms**

Christopher P. Kelly, Reppert Kelly, LLC, Basking Ridge, NJ, for David's Bridal, Inc., et al.

Joanna L. Crosby, Tressler LLP, Newark, NJ, for House of Brides, et al.

## LETTER OPINION AND ORDER

MICHAEL A. SHIPP, UNITED STATES MAGISTRATE JUDGE

**\*1** Dear Counsel:

This matter comes before the Court by way of Plaintiffs' motion for spoliation. (Doc. No. 61.)[1] For the reasons set forth below, the Plaintiffs' motion is granted in part and denied in part.

### 1. Background

This trademark and copyright matter involves two competing United States bridal retailers. (Pl.'s Moving Br. 3–4.) The Court will set forth a partial background of the correspondence, conferences and filings for the seven months preceding the spoliation motion to provide context.

On April 30, 2008, Plaintiffs' counsel submitted correspondence which requested the Court's assistance to compel the 30(b)(6) deposition of Dale Buziecki.[2] (Pl.'s April 30, 2008 Letter, Doc. No. 45.) The correspondence detailed approximately six weeks of efforts Plaintiffs' counsel made to schedule the deposition. Id. The Court conducted a telephone status conference on May 5, 2008.

During the conference, counsel stated that they had tentative dates for the deposition. On June 17, 2008, the Court entered a text order. The text order provided that counsel must e-file a joint letter which sets forth the status of the Buziecki deposition and provides an update on the current status of discovery. (June 17, 2008 docket entry.) On June 23, 2008, counsel e-filed the joint letter.

The June 23, 2008 joint letter reflected Defendants' position that Mr. Buziecki was unavailable to be deposed until November 2008 due to a medical condition. (Def.'s June 23, 2008 Letter, Doc. No. 46.) Plaintiffs requested at a minimum an affidavit or note from Mr. Buziecki's treating physician. Id. The Court conducted a telephone status conference on June 24, 2008. During the conference, the Court stated that another person should serve as Plaintiffs' 30(b)(6) witness and that Defendants should provide a more sufficient explanation of Mr. Buziecki's medical condition.

On August 6, 2008, Plaintiffs' counsel submitted correspondence which indicated that Defendants failed to produce any additional information concerning the nature of Mr. Buziecki's health condition and failed to cooperate with Plaintiffs in producing an alternate witness for deposition. (Pl.'s August 6, 2008 Letter, Doc. No. 47.) On August 8, 2008, Defendants' counsel submitted correspondence which indicated that Mr. Buziecki was the only suitable Rule 30(b)(6) witness for the topics Plaintiffs noticed. (Def.'s August 8, 2008 Letter, Doc. No. 49.)

On August 15, 2008, the Court entered a text order which provided that Defendants must provide substantive information concerning the nature of Mr. Buziecki's medical condition by August 22, 2008. The text order also provided that counsel must file a joint proposed scheduling order which included a date and location for Mr. Buziecki's deposition. Counsel submitted a joint proposed order on August 29, 2008 which included an October 2, 2008 deposition date for Mr. Buziecki. (Def.'s August 29, 2008 Letter, Doc. No. 50.) The Court conducted a telephone status conference on September 2, 2008. During the telephone status conference, the Court indicated that Mr. Buziecki's deposition must proceed on October 2, 2008.

**\*2** On October 30, 2008, Plaintiffs submitted correspondence which requested a pre-motion conference in advance of an anticipated motion for spoliation

of evidence. (Pl.'s October 30, 2008 letter, Doc. No. 55.) Plaintiffs' correspondence related that Mr. Buziecki appeared for his deposition on October 2, 2008. The correspondence also provided:

> Mr. Buziecki testified at his deposition that HOB sold zero dresses from the Compare to David's Bridal collection during the approximate sixteen months that it offered the collection for sale on its website and in its stores. He also testified that HOB routinely purges and/or destroys all electronic and paper records relating to sales of its products, including purchase orders, customer invoices and correspondence with its actual and prospective customers. He testified that HOB has maintained this practice throughout the course of this litigation, beginning in at least 2006. As a result of the destruction of these records, Buziecki testified that there is no way to determine the sales quantity of any one category of products that HOB has sold (including from the Compare to David's Bridal collection). He further testified that HOB has no way of knowing whether any customers sent emails expressing confusion between the Compare to David's Bridal line and authentic David's Bridal merchandise because he never instructed anyone at HOB to look through customer emails and that all such emails have since been purged from HOB's computer servers.

*Id.*

On November 12, 2008, the Court entered a text order which required Defendants to file a letter in response to Plaintiffs' correspondence which alleged spoliation of evidence. The text order also set the matter down for a telephone status conference. Defendants' November 14, 2008 correspondence provided, in part:

> Plaintiffs have not met their burden of demonstrating that they should be entitled to this information. Mr. Buziecki testified during his deposition that House of Brides did not sell a single dress from the 'Compare to David's Bridal' line of dresses. While Plaintiffs have produced documentation since the deposition of a single order that was placed for 'Compare to David's Bridal' gowns, the origin of this order is unknown, and Plaintiffs already have this information. Therefore, House of Brides' sales of other dresses and correspondence related thereto would not be relevant to the copyright and trademark infringement issues in this lawsuit.
>
> ...
>
> In addition, Mr. Buziecki testified that the reason that House of Brides purged its credit card orders from customers and all customer and potential customer information is because it received a request from its credit card company vendors regarding the retention of credit card information. As a result, to the extent that House of Brides' document destruction or retention policy is to destroy invoices after a certain period of time, this policy is wholly unrelated to this lawsuit. Mr. Buziecki did testify, however, that information related to House of Brides' invoices is still available from House of Brides' accounting department.

*Id.* Defendants' correspondence also asserted that Plaintiffs failed to comply with Local Rule 26.1(d)(2) for requesting electronic information. *Id.*

The Court conducted a telephone status conference on November 18, 2008. After hearing from both counsel, the Court granted Plaintiffs' request to file a spoliation motion. It is against this backdrop that Plaintiffs filed the current motion.

**\*3** Plaintiffs' motion for spoliation alleges that Defendants House of Brides, Inc. and House of Brides World's Largest "On-line" Wedding Store, Inc. ("HOB" or "Defendants") systematically destroyed all paper and electronic records of sales and customer email records when HOB knew or should have known that they would be subject to discovery. (Pl.'s Moving Br. 17.) Plaintiffs allege that Defendants vehemently denied having ever sold

a single wedding gown from its "Compare to David's Bridal" collection and further denied that it received a single email message from customers regarding the line. (Pl.'s Reply to Def.'s Surreply 2.) Therefore, Defendants did not produce any "Compare to David's Bridal" sales and email records in response to Plaintiffs' discovery requests.

In its original opposition to Plaintiffs' motion, HOB asserted that no email records or messages could be produced because all such records or messages had been purged as part of Defendants' regular records retention policy. (Def.'s Opp'n Br. 7.) Defendants stated, "House of Brides has been purging its customer information since it began taking orders on the Internet." *Id.* Defendants also stated that around February 2008, it began the practice of purging all of its customer purchase orders approximately every three months as a result of instructions from a credit card company. *Id.* at 7–8. Further, in September 2007 HOB's website administrator disabled the "Compare to David's Bridal" products from its website. (Def.'s Surreply Br. 5.)

In an attempt to prove the existence of "Compare to David's Bridal" electronic sales, in March 2008 Plaintiffs purchased four "Compare to David's Bridal" gowns and produced the below order confirmation:

Dear House of Brides Customer,

Thank you for choosing the House of Brides! We are confirming your purchase of COMPARE TO DAVID's BRIDAL in STYLES: D4002, D4012, D4026, & D4033 COLORS: WHITE, IVORY/ CHAMPAGNE, WHITE/SILVER & WHITE/SILVER size(s) 8,8,8 & 8. The manufacturer has received and approved your order with estimated shipping to your location for END OF MAY. We will then notify you and ship the order to your mailing address. Thank you for shopping at the House of Brides. http://www.houseofbrides.com.

(Pl.'s Reply Br. 3–4.)

On December 1, 2008, the Court granted Defendants' motion to add Third–Party Defendant Emme Bridal, Inc. On January 21, 2009, Defendants filed their third-party complaint. On February 16, 2009, Marc D. Haefner, Esq., entered an appearance on behalf of Emme Bridal, Inc.

The Court conducted oral argument on Plaintiffs' motion on February 17, 2009. During oral argument, the Court questioned how the Defendants could follow-up with customers if they destroyed all of the customer records. The Court related to counsel during oral argument that it had serious concerns about the representations made to the Court. The Court stated on the record:

> I am very, very much concerned about the representations being made to the Court here because having heard both sides, it is absolutely clear to me that there is an absolute lack of candor to the Court somewhere. Both sides can't be right here. You're clearly saying very different things and I'm very, very concerned about a blatant lack of candor here. So somewhere somehow we're going to peel back and get to it.... I don't think I've had a case yet where I've been as concerned about the lack of candor to the Court because somewhere somehow something is being lost or something is just being blatantly misrepresented here.

(Second Supplemental Cert. of Christopher Kelly, Ex. A, 17–18.)

Following oral argument on the record, the Court met with counsel in Chambers. The Court again related to counsel that it had serious issues with the representations made by counsel.

On February 18, 2009, just over 17 months after the initial discovery request, two days after counsel entered an appearance on behalf of Emme Bridal, Inc., and one day after the Court expressed its displeasure on the record and in Chambers regarding the motion, Defendants learned of the availability of relevant email records. (Def.'s February 23, 2009 letter, Doc. No. 85.) Allegedly, customer inquiry email messages sent to *info@houseofbrides.com* were forwarded to different computers in the Defendants' office. *Id.* In addition, Defendants "discovered [that] all of its electronic sales invoices from Internet sales during the

**David's Bridal, Inc. v. House of Brides, Not Reported in Fed. Supp. (2009)**

2009 WL 10690456

subject time period are in fact available." *Id.* Defendants recovered approximately 38,600 email records. (Def.'s Surreply Br. 4.)

**\*4** Defendants attributed the non-production of relevant discovery, in part, to technology managers. Defendants stated that because the line was disabled from the website, they could not view electronic records through the "Search Function." *Id.* However, subsequent to February 5, 2009, Defendants' new technology manager provided instructions on how to retrieve such information. *Id.* Defendants contend that their production is now complete and that the discovery provided by Third–Party Defendant Emme Bridal, Inc. confirms that the production is complete. *Id.* at 6–7.[3]

Defendants argue that sanctions are unwarranted because the delay in producing responsive documents was a result of "honest mistakes" and "not from any attempt to hide records." *Id.* at 7. Defendants claim that because Plaintiffs' motion for sanctions is based solely upon alleged spoliation of evidence, its sudden production of documents makes the spoliation claim effectively moot. *Id.* at 12.

Plaintiffs argue that Defendants' continued pattern of evasion, false statements under oath and delay in producing evidence warrants sanctions. (Pl.'s Reply to Def.'s Surreply 3–6.) Plaintiffs request: (1) a full reimbursement of all counsel fees and costs incurred by Plaintiffs in connection with the motion; (2) an instruction to the jury that Defendants submitted false statements under oath during the course of discovery and that the jury may consider this when assessing Defendants' credibility about other matters; (3) that Dale Buziecki, chief representative for Defendants, appear in New Jersey for a follow-up deposition at a time convenient to all parties; and (4) that Plaintiffs may apply to re-open this motion following its receipt and review of additional discovery in this matter. *Id.* at 6–7.

**2. Discussion**

Spoliation occurs when a party has intentionally or negligently breached its duty to preserve potentially discoverable evidence. *Kounelis v. Sherrer,* 529 F. Supp. 2d 503, 519 (D.N.J. 2008). Four essential factors must be found for a spoliation inference to apply: (1) the evidence in question must be within the party's control; (2) it

must appear that there has been actual suppression or withholding of the evidence; (3) the evidence destroyed or withheld was relevant to claims or defenses; and (4) it was reasonably foreseeable that the evidence would later be discoverable. *Mosaid Technologies Inc. v. Samsung Electronics Co., Ltd.,* 348 F. Supp. 2d 332, 336 (D.N.J. 2004). In the present case, Defendants' control over the evidence is not at issue. Accordingly, this Court must determine whether Defendants intentionally withheld email and sales information relating to the "Compare to David's Bridal" line, if this evidence was relevant to Plaintiffs' claims, and if it was reasonably foreseeable that the destroyed evidence would later be discoverable.

**a.** Defendants Suppressed the "Compare to David's Bridal" Evidence.

HOB suppressed evidence. Within this Circuit, some courts have construed the term "suppression" to mean intentionally or knowingly destroyed or withheld as opposed to lost, accidentally destroyed or otherwise properly accounted for. *Mosaid,* 348 F. Supp. 2d. at 337 (citing *Veloso v. Western Bedding Supply,* 281 F. Supp. 2d 743, 746 (D.N.J. 2003); *Costello v. City of Brigantine,* 2001 WL 732402 at \*26 (D.N.J. June 28, 2001)). Other courts have used an approach that does not require an analysis of intent. *Mosaid,* 348 F. Supp. 2d at 338. "The evidentiary rationale [for an adverse inference] is nothing more than the common sense observation that a party who has notice that [evidence] is relevant to litigation and who proceeds to destroy [evidence] is more likely to have been threatened by [that evidence] than a party in the same position who does not destroy the [evidence]." *Nation–Wide Check Corp. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 218 (1st Cir. 1982).

**\*5** In the case at hand, Defendants failed to comply with clearly defined and reasonable discovery requests. Defendants, over a period of nearly two years, willingly destroyed some evidence while on notice and/or while a party to Plaintiffs' litigation.[4] Defendants originally attempted to justify the destruction of sales orders by stating that they were compelled to follow credit card company directives.[5] (Def.'s Opp'n Br. 7.) To allow a policy which permits private credit card companies to induce the destruction of relevant discovery documents would threaten the integrity of the judicial system and the Court. *Mosaid,* 348 F. Supp. 2d at 334 (holding

sanctions appropriate when a party's spoliation of evidence threatens the Court's integrity).

As such, this Court finds that Defendants intentionally withheld email records and sales information related to the "Compare to David's Bridal" line.

### b. Defendants Suppressed Evidence Relevant to Plaintiffs' Case.

Evidence of Defendants' "Compare to David's Bridal" sales is relevant to Plaintiffs' trademark, copyright, and unfair competition claims. First, Defendants' sales records are relevant to establish Defendants' profits. *Gucci Am., Inc. v. Daffy's Inc.*, 354 F.3d 228 (3d Cir. 2003). Second, email communications between Defendants and customers may serve as corroborative evidence of Defendants' sales. The invoice produced by Plaintiffs illustrates that Defendants sent confirmation notices and electronic invoices to customers who placed orders on Defendants' website. Lastly, email records may help demonstrate the likelihood of customer confusion, the core element of trademark infringement under the Lanham Act and a requirement under the Third Circuit's *Lapp* factors test. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198 (3d Cir. 2000).

### c. It was Reasonably Foreseeable that the Withheld Evidence would be Discoverable.

It was absolutely foreseeable that sales records for the line of dresses at issue in the current lawsuit would be discoverable. In addition, it was reasonably foreseeable that email records relating to the orders would be discoverable. Defendants stated in the original opposition brief to the spoliation motion that Plaintiffs did not comply with Local Rule 26.1(d)(2) because Plaintiffs did not notify HOB of the categories of electronic discovery that may be sought in the case. (Def.'s Opp'n Br. 6.) However, the Court finds that the discovery sought, including electronic discovery, was reasonably foreseeable, even though Plaintiffs allegedly failed to provide the notification pursuant to Local Rule 26.1(d)(2).

### d. Weighing the Factors and Scope of Relief.

The Third Circuit has held that the following factors should be considered when selecting appropriate sanctions: (1) the degree of fault of the party who altered or destroyed evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and when the offending party is seriously at fault whether it will serve to deter such conduct by others in the future. *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994). The *Schmid* court explained that the purpose of sanctions is to "restore the accuracy of the trial, compensate innocent victims, and punish guilty spoliators–courts select the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." *Id.*

**\*6** The Court finds that under the first factor, Defendants are entirely at fault for destroying some of the requested discovery. Defendants cannot place the blame on a third party, such as a credit card company, or a negligent technology consultant, because it is solely the Defendants' responsibility to safeguard and produce relevant discovery during litigation. Defendants are also entirely at fault for the untimely production of discovery. Defendants only produced the discovery: (1) after a pre-motion telephone status conference; (2) after the full briefing of the motion; (3) after oral argument on the record regarding the motion during which the Court expressed its displeasure regarding the Defendants' arguments; (4) after the Court expressed its concerns regarding the Defendants' position in Chambers following oral argument; and (5) after it was clear that Emme Bridal would fully comply with its discovery obligations and produce records which demonstrated HOB's sales of the Compare to David's Bridal line of dresses.[6] However, the Court finds that the degree of prejudice suffered by the Plaintiffs is not substantial because of the subsequent production of documents from Defendants following oral argument. In addition, Third–Party Defendant Emme Bridal produced discovery which Plaintiffs could utilize in support of their case. The Court also finds that the Defendants are seriously at fault and that sanctions against them will serve to deter such conduct by others in the future.

In consideration of the factors and potential sanctions, the Court finds that there is a lesser sanction that will avoid substantial unfairness to the opposing party. Here, an award of attorneys fees, one of the sanctions requested by Plaintiffs, is entirely appropriate. Plaintiffs aptly stated:

David's Bridal, Inc. v. House of Brides, Not Reported in Fed. Supp. (2009)

2009 WL 10690456

There can be little doubt that the records that have now been produced by HOB would never have been produced had plaintiffs not brought the within motion. The resulting prejudice suffered by plaintiffs includes ... the time and expense that was incurred in bringing this application (the attorneys fees now exceed $20,000) [.] ... The actions of HOB have not been harmless. They have resulted in both delay and many thousands of dollars in counsel fees, all of which could have been avoided had HOB earlier taken the actions that it was compelled to take as a result of this motion.

(Pl.'s Reply to Def.'s Surreply 3–4).

Therefore, the Court will award Plaintiffs reasonable attorney's fees in connection with Plaintiffs' motion for spoliation, which will include attorney's fees related to the supplemental briefing and any other reasonable counsel fees associated with same. Plaintiffs must submit a detailed Fee Certification for the Court's review with an attached proposed form of order by **November 17, 2009**. In addition, the Court will award Third–Party Defendant, Emme Bridal, Inc., with attorney's fees and costs to review the papers and attend the hearing on the spoliation motion. Third–Party Defendant must submit a detailed Fee Certification for the Court's review with an attached proposed form of order by **November 17, 2009**.

### 3. Conclusion

For the foregoing reasons, the Court grants Plaintiffs' request for attorney's fees; denies Plaintiffs' request for a spoliation inference; and denies all other relief requested by Plaintiffs. The Court also grants Third–Party Defendant's request for attorney's fees.

**All Citations**

Not Reported in Fed. Supp., 2009 WL 10690456

Footnotes

1   For the sake of judicial economy, the Court administratively terminated the motion pending the continuation of the settlement conference. The case failed to settle. Therefore, the Court now issues its decision on the motion.

2   Dale Buziecki is Defendants' former President, sole officer, and sole stockholder. (Def.'s June 23, 2008 Letter, Doc. No. 46.)

3   According to Defendants, the "Compare to David's Bridal" line consisted exclusively of *DaVinci* wedding dresses produced by Third–Party Defendant Emme Bridal. (Def.'s Surreply Br. 7, fn 4.) Emme Bridal's initial disclosures indicated that it retained purchase orders and invoices relating to purchases by HOB during the relevant time period. *Id.* at 6–7.

4   Defendants recovered and provided a substantial number of email records. (Def.'s Surreply Br. 3–4.) However, Defendants acknowledged, "Emails from HOB's general Internet email inbox, info@houseofbrides.com, many of which contain spam, have always been purged and such emails are no longer available." (Def.'s Surreply Br. 3.)

5   Following oral argument, Defendants "discovered" that it did have evidence of sales. Defendants stated, "[O]n February 19, HOB discovered that all of its electronic sales invoices from Internet sales during the subject time period are in fact available." (Def.'s Surreply Br. 4.)

6   As previously set forth, counsel for Emme Bridal entered an appearance on February 16, 2009. Counsel for Emme Bridal also attended oral argument on the spoliation motion. It was clear to the Court from counsel's early appearance that Emme intended to fully comply with its discovery obligations. Shortly later, on March 16, 2009, Emme related, "[W]e have, on an expedited basis, requested and obtained a computer generated summary of sales of Davinci Bridal dresses to HOB from July 4, 2006 through September 17, 2007." (Third–Party Def.'s March 19, 2009 Letter, Doc. No. 97.)

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT W

Case 3:17-cv-03226-MAS-DEA Document 32-3 Filed 04/22/19 Page 162 of 179 PageID: 527
Kachigian v. Berkshire Life Ins. Co. of America, Not Reported in... (2013)
2013 WL 1338288

2013 WL 1338288
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Steven KACHIGIAN, Plaintiff,

v.

BERKSHIRE LIFE INSURANCE
COMPANY OF AMERICA, and the
Guardian Life Insurance Company of
America, New York, New York, Defendants.

Civil Action No. 09–6217 (DEA).

|

April 1, 2013.

**Attorneys and Law Firms**

Anne P. McHugh, Pellettieri, Rabstein & Altman, Esqs., Princeton, NJ, for Plaintiff.

Ryan P. Mulvaney, Steven P. Del Mauro, McElroy, Deutsch, Mulvaney & Carpenter, LLP, Newark, NJ, for Defendants.

OPINION

DOUGLAS E. ARPERT, United States Magistrate Judge.

**\*1** This matter comes before the Court on a series of motions *in limine* by Plaintiff Steven Kachigian ("Plaintiff" or "Mr. Kachigian") and Defendant Berkshire Life Insurance Company of America ("Defendant" or "Berkshire"). Specifically, Defendant filed motions *in limine* (1) for an order dismissing the Complaint or, alternatively, either barring Plaintiff from presenting evidence that a material and substantial duty of his occupation was physically carrying a laser on sales calls, or for a spoliation inference [dkt. no. 53]; (2) to preclude testimony by 10 new witnesses as well as Plaintiff's experts, Dr. Jeffrey Lamb and Dr. David Miller [dkt. no. 54]; and (3) to preclude Plaintiff from presenting any evidence that a material and substantial duty of his pre-disability occupation included demonstrating the laser during sales marketing calls and training physicians on the use of the laser [dkt. no. 52]. Plaintiff has opposed Defendant's Motions [dkt. nos. 60, 61, 62].

Plaintiff filed a motion *in limine* to exclude testimony of Defendant's experts, Robert O. Cathcart and Ernest P. Smith [dkt. no. 51]. Defendant has opposed Plaintiff's Motion [dkt. no. 59].

The Court has considered the Parties' submissions pursuant to Fed R. Civ. P. 78 and, for the reasons set forth below, these motions are **GRANTED**, in part, and **DENIED**, in part.

**I. INTRODUCTION & PROCEDURAL HISTORY** [1]

This is a breach of contract action arising out of Defendant's denial of Plaintiff's claim for total disability benefits. On June 24, 2002, Berkshire issued a disability income policy ("the Policy") to Plaintiff. The Policy provides monthly disability benefits in the event of "total disability." "Total disability," as defined by the Policy, means "because of sickness or injury, you are not able to perform the material and substantial duties of your occupation." The Policy defines "your occupation" as "the regular occupation ... in which you are engaged at the time you became disabled." The central issue in this case is whether Plaintiff is totally disabled, as defined by the Policy.

This action was initiated on December 8, 2009. On March 8, 2012, U.S. District Judge Peter G. Sheridan issued a Memorandum Opinion and Order denying Defendant's Motion for Summary Judgment. By Order dated November 11, 2012, this action was referred to U.S. Magistrate Judge Douglas E. Arpert to conduct all proceedings and order the entry of final judgment in accordance with 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.

**II. SPOLIATION**

In discovery, Defendant sought production of logs, appointment books, schedules and calendars (collectively, "logs") allegedly kept by Plaintiff that evidence his day-to-day activities at Cosmetic Laser Leasing ("CLL"). Defendant claims the logs are "the only proof that would substantiate or refute what Plaintiff claims to have done day-in and day-out" during the course of his employment with CLL. Def.'s Reply Br., dkt. no. 68, at 4. Because Defendant claims the logs were never produced, it asks the Court to dismiss Plaintiff's claims, bar Plaintiff from presenting evidence that the material and substantial duties of his occupation required lifting and transporting

Kachigian v. Berkshire Life Ins. Co. of America, Not Reported in Fed. Supp. (2013)
2013 WL 1338288

the laser, or to issue an adverse inference instruction to the jury. In opposition, Plaintiff maintains that the logs were turned over to CLL as part of the Transfer of Ownership Agreement between Plaintiff and CLL.

### A. Legal Standard

**\*2** Spoliation is " 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.' " *Mosaid Technologies Inc. v. Samsung Electronics Co., Ltd.,* 348 F.Supp.2d 332, 335 (D.N.J.2004) (citing *Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422, 430 (S.D.N.Y.2004)). If a party engages in spoliation of evidence, the Court may issue appropriate sanctions.

The Third Circuit has adopted a four-part test for evaluating a spoliation claim. Spoliation occurs where: (1) the evidence was in the party's control; (2) the evidence is relevant to the claims or defenses in the case; (3) there has been actual suppression or withholding of evidence; and (4) the duty to preserve the evidence was reasonably foreseeable to the party. *Bull v. United Parcel Serv., Inc.,* 665 F.3d 68, 73 (3d Cir.2012). The party who seeks a spoliation sanction bears the burden of proving these factors. *See id.* at 77.

The Court considers first whether spoliation occurred and, second, what (if any) sanctions are appropriate.

### B. Whether Spoliation Occurred

Here, one of the spoliation factors is easily dealt with. There appears to be no dispute that the evidence in question was relevant. Indeed, the logs go to the heart of Mr. Kachigian's claim—that carrying the laser on sales calls was a material and substantial part of his occupation. The other factors, however, require a greater analysis.

### 1. *Control*

The Court begins with the notion that the logs were (at least at one time) unquestionably under Plaintiff's control. Mr. Kachigian admitted as much during his deposition. Kachigian Tr. 196:14–197:22. However, Plaintiff maintains that the duty to preserve did not arise until after logs had passed to CLL as part of the Transfer of Ownership Agreement. The Transfer of Ownership was fully effected on December 31, 2006. In the absence of

any compelling evidence to the contrary, the Court accepts Mr. Kachigian's position that he surrendered the logs to CLL as part of the Transfer of Ownership Agreement. For this reason, and for the reasons more fully explained below, the Court also accepts Plaintiff's position that once he surrendered the logs, he no longer retained control over them. The primary issue then becomes, *when was the duty to preserve triggered?* Once that date is determined, the issue of actual suppression can be addressed.

### 2. *Duty*

A party has a duty to preserve documents that it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation. *Scott v. IBM Corp.,* 196 F.R.D. 233, 249 (D.N.J.2000). The question of reasonable foreseeabi l ity is a " 'flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry.' " *Bull,* 665 F.3d at 77–78 (citation omitted). Here, a brief recitation of the relevant dates and facts is necessary.

**\*3** Plaintiff filed his initial claim for benefits with Berkshire on June 28, 2006. On July 11, 2006, in a telephone call with Berkshire's Lead Claims Consultant, Kevin Sherman, Plaintiff offered to provide Berkshire with his schedule and appointment books. On July 24, 2006, Mr. Kachigian and Mr. Sherman spoke by telephone. They agreed that Mr. Kachigian's present situation did not fit the Policy's definition of "total disability," as Mr. Kachigian was continuing to perform his occupational duties at CLL. During the call, Mr. Kachigian also indicated that he would pursue further medical treatment, including physical therapy, in hopes of continuing to work. Based on this conversation, Mr. Sherman and Mr. Kachigian agreed to close Mr. Kachigian's claim.

On November 2, 2006, Mr. Kachi gi an filed a second claim for benefits. Mr. Kachigi an decided on this course of action after completing several months of physical therapy and consulting with his treating physician, Dr. Lamb. On November 9, 2006, Berkshire again requested copies of Plaintiff's schedules, appointments and any other documentation that would evidence Plaintiff's occupational duties and time spent performing those duties. [2]

The Transfer of Ownership was fully effected on December 31, 2006. By that time, Plaintiff relinquished control of the logs by turning them over to CLL.

Several months later, during a call on August 20, 2007, Plaintiff advised Berkshire that, if his claim was denied, he intended to pursue an appeal through the company, the Department of Insurance or, if necessary, litigation. On August 29, 2007 Berkshire denied Plaintiff's second claim based on the Policy's definition of "total disability."

After litigation was commenced, on May 18, 2010, Defendant served formal document requests seeking Plaintiff's logs. When Plaintiff responded that the logs had been turned over to his former business partner, Dr. Jerry Gertzman, Defendant served Dr. Gertzman with a Subpoena seeking the logs. Although Dr. Gertzman produced documents in response to that Subpoena, Defendant claims the logs were not produced or, to the extent they were produced, they were incomplete.

The operative ti meframe here is December, 2006—i.e., the time when Plaintiff turned the logs over to CLL. At the time Plaintiff filed his second claim, in early-November, 2006, it was not "objectively foreseeable," *Bull,* 665 F.3d at 78, that his claim would be denied and future litigation would be likely. To the contrary, Plaintiff had every reason to believe his claim would be granted at that time. There is nothing in the record, moreover, to suggest Plaintiff's understanding would have changed between that date and the date when he turned the logs over to CLL on December 31, 2006. To be sure, the likely success of Plaintiff's claim deteriorated with each month that passed without progress. Therefore, it is likely the duty was triggered at some time before he explicitly threatened litigation in August, 2007. However, because the Court concludes the duty to preserve was not triggered until after the logs were transferred, it need not make a specific finding as to the triggering date.

### 3. *Actual Suppression*

**\*4** A "party's failure to produce a document can have the same practical effect as destroying it." *Bull,* 665 F.3d at 73. As a result, "under certain circumstances, nonproduction of evidence is rightfully characterized as spoliation." *Id.* "When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party that has prevented production did so out of

the wellfounded fear that the contents would harm him." *Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326, 334 (3d Cir.1995) (citations omitted).

However, actual suppression requires more than ordinary negligence. Consequently, "a finding of bad faith is pivotal to a spoliation determination." *Bull,* 665 F.3d at 79. Thus, no "unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for." *Brewer,* 72 F.3d at 334. The Third Circuit has made it clear that withholding documents in bad faith, as is alleged here, requires a showing of intent. Bull, 665 F.3d at 79.

Here, Plaintiff does not claim the logs were accidentally lost or destroyed. Instead, Plaintiff maintains that the logs were transferred to CLL and, therefore, no longer his responsibility. At his deposition, Plaintiff testified that he turned over all logs to Dr. Gertzman as part of the Transfer of Ownership in December, 2006:

> Q: Well, by June of 2005, let's take the first six months of 2005, what were you doing day in and day out?
>
> A: Calling on physicians.
>
> Q What proof would it be?
>
> A: Logs.
>
> Q: OK. So you had logs?
>
> A: [Witness indicating]
>
> ...
>
> Q: And you have no evidence of [your job duties] in connection with this litigation that you've been able to produce, do you?
>
> A: I stated I gave my records over to Dr. Gertzman at the time of the transfer of ownership [in December, 2006].

Kachigian Tr. 196:14–197:22. To be sure, there are strong public policy concerns that would not allow a party to shirk his responsibility by merely passing it off on another party or entity. Still, the record does not demonstrate any bad faith or intent on the part of Plaintiff to withhold the documents. Nor does it reflect any bad faith or intent on behalf of CLL or Dr. Gertzman. The most plausible

Case 3:17-cv-03226-MAS-DEA Document 32-3 Filed 04/22/19 Page 165 of 179 PageID: 530
Kashigian v. Berkshire Life Ins. Co. of America, Not Reported in... (2013)
2013 WL 1338288

explanation is more benign. In the Court's view, it seems likely the logs were simply misplaced or lost after they were delivered to CLL. This position is underscored by the passage of time between when the records were turned over to CLL and when Defendant served its first request for production of documents, nearly four years later.

This is not to say a more prudent approach by Plaintiff might have been to retain copies for his personal records. Still, the Court is constrained by the Third Circuit's direction and, therefore, finds no actual suppression occurred. Since no spoliation occurred, there is no need to reach the issue of sanctions. Accordingly, Defendant's Motion *in limine* in this regard is **DENIED.**

### III. EXPERTS

#### A. Legal Standard
**\*5** District courts serve as the gatekeepers and must determine the reliability of proffered expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The objective of the district court's gatekeeping role "is to ensure the reliability and relevancy of expert testimony" and "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Nonetheless, "rejection of expert testimony is the exception rather than the rule." FED.R.EVID. 702, *Committee Notes on Rules 2000 Amendment.*

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case. [3]

Rule 702 is generally understood to embody "a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir.2003). The party offering the proposed expert testimony bears the burden of establishing the admissibility of the testimony by a preponderance of the evidence. *In re Human Tissue Products Liab. Litig.,* 582 F.Supp.2d 644, 655 (D.N.J.2008) (citing *Padillas v. Stork–Gamco, Inc.,* 186 F.3d 412, 417 (3d Cir.1999)).

With these legal standards in mind, the Court turns to examining whether the parties have proved, by a preponderance of the evidence, the admissibility of their experts' conclusions.

#### B. Plaintiff's Motion to Exclude Defendant's Experts
Plaintiff seeks to exclude Defendant's experts, Robert O. Cathcart and Ernest P. Smith. Mr. Cathcart is offered as an expert in the sale and marketing of medical devices. Mr. Cathcart is being offered to (a) assess Plaintiff's claims in support of his job functions, and (b) refute Plaintiff's position that carrying and transporting the laser was a material and substantial part of his occupation.

Mr. Smith is an accountant. Mr. Smith was retained by Defendant to analyze the financial and occupational aspects of Plaintiff's claim for disability benefits. Specifically, Mr. Smith was retained to review the books, records and tax returns of CLL and Plaintiff to ascertain what Plaintiff did while at CLL, the income attributable to the work performed by Plaintiff, and the financial performance and viability of CLL. Mr. Smith offers four conclusions in his report:

**\*6** 1. Plaintiff provided minimal occupational and business activity information to the Defendant in regards to his involvement with CLL.

2. Plaintiff's disability did not prevent him from earning revenue from his material and substantial duties at CLL.

3. Plaintiff did not develop an adequate business plan.

Case 3:17-cv-03326-MAS-DEA Document 32-3 Filed 04/22/19 Page 166 of 179 PageID: 531
Callaghan v. Benkmann, Not Reported in F.Supp.2d (2013)
2013 WL 1338288

4. Prior to the onset of disability, Plaintiff's work experience did not demonstrate the sustai nability of CLL as a profitable venture.

Del Mauro Decl. at Ex. 10 (Expert Witness Report of Ernest Patrick Smith).

### 1. *Qualification*

Qualification refers to the requirement that the witness possess specialized expertise. *Schneider,* 320 F.3d at 404. The Third Circuit has interpreted this requirement "liberally" in holding that "a broad range of knowledge, skills, and training qualify as an expert." *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741 (3d Cir.1994); *see also Waldorf v. Shuta,* 142 F.3d 601, 625 (3d Cir.1998); *In re Human Tissue Products,* 582 F.Supp. at 655.

#### i. *Mr. Cathcart*

First, the Court believes Mr. Cathcart is qualified to testify as an expert in the sale and marketing of medical devices. Mr. Cathcart is a Senior Business Leader with Medical Devices and has 28 years of experience in marketing and selling medical devices to physicians, cardiologists and nurses. Cathcart Decl. at ¶ 1. Throughout his career, Mr. Cathcart has called on approximately 10,000 physicians, trained approximately 150 sales representatives and managed between 400 and 500 sales representatives. *Id.* at ¶¶ 13, 17. Even acknowledging Plaintiff's argument that Mr. Cathcart has never sold a laser comparable to the one at issue here, the Court nonetheless believes Mr. Cathcart's qualifications satisfy the liberal requirements established by the Third Circuit. *See Waldorf,* 142 F.3d at 625.

#### ii. *Mr. Smith*

Mr. Smith is also qualified to offer expert testimony, subject to the caveat regarding Mr. Smith's fourth conclusion described below. Mr. Smith has over 25 years of experience conducting forensic investigations for disability insurance claims in the medical industry. Smith Aff. at ¶¶ 17, 18. Mr. Smith holds professional certifications as a Certified Public Accountant and in Certified Financial Forensics, and is a Certified Valuation Analyst and Certified Fraud Examiner. *Id.* at ¶ 2. Mr. Smith's career has focused on internal auditing, investigative auditing, measurement of damages, business valuation and dispute resolution services. *Id.* at ¶ 14. Mr.

Smith has also participated in over 1,000 investigations regarding, among other matters, business valuations. *Id.*

Regarding the aforementioned caveat, Plaintiff disputes Mr. Smith's qualifications as they relate to his fourth conclusion, that Plaintiff's work experience does not demonstrate that he would have the ability to maintain his position with CLL on a long-term basis. To be sure, it is questionable that a forensic accountant is qualified to offer a prognosis of one's occupational outlook as a traveling laser salesman in the medical industry. Still, the admissibility of Mr. Smith's fourth conclusion is best addressed in the context of 'fit,' as described below. Because the Court finds that Mr. Smith's proposed conclusion in this regard does not fit the issues of the case, the question of Mr. Smith's qualifications here is moot.

### 2. *Reliability*

**\*7** In *Daubert* the Supreme Court set forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony. These factors include: (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *Daubert,* 509 U.S. at 590–92.

*Kumho* addressed the applicability of *Daubert* to non-scientific cases. In non-scientific cases, such as here, the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's expertise, and the subject of his testimony." *Kumho,* 526 U.S. at 150. Thus, "the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* at 152. The objective of *Daubert'* s gatekeeping role, however—"to ensure the reliability and relevancy of expert testimony"—remains unchanged. *Id.* In any case, the district court enjoys "considerable discretion" to "determine the criteria for judging reliability under the particular circumstances." *Betterbox Communications Ltd. v. BB Technologies, Inc.,* 300 F.3d 325, 329 (3d Cir.2002).

#### i. *Mr. Cathcart*

Mr. Cathcart's proposed testimony is reliable. In his report, Mr. Cathcart concludes that it is neither necessary nor essential to present or demonstrate the laser during sales calls in order to efficiently and successfully generate sales. In support of this conclusion, Mr. Cathcart relied on the laser's product manual as well as the deposition testimony of Plaintiff, Brian McNamara, Richard Al beralla and Dr. Gertzman. Mr. Catchart also relied on his 28 years of experience in selling and marketing medical devices.

Mr. Cathcart's conclusions flow logically from his experience in the field and are likewise based on relevant documents and information from this case. That Mr. Cathcart has no direct experience marketing an equivalent laser device, as Plaintiff points out, is not dispositive. The circumstances in this case are undoubtedly unique. As a result, Mr. Catchart's experience marketing medical devices need not be identical to Plaintiff's in every way. It is enough that Mr. Cathcart's experience is functionally equivalent. Thus, under the circumstances of this case, Mr. Catchart's proposed testimony is reliable. Mr. Cathcart may testify as to generally accepted methods in the medical sales industry as they are routinely applied and practiced.

### ii. *Mr. Smith*

Plaintiff's argument appears to attack Mr. Smith's qualifications and whether his expert opinions 'fit' the case at hand. Therefore, the Court need not address the reliability requirement other than to note that a comprehensive review of Mr. Smith's expert report and qualifications suggests that his conclusions (to the extent they are allowed by the Court) are reliable.

### 3. *Fit*

**\*8** Finally, the Court must evaluate whether the experts' proffered testimony "fit the issues in the case." *Schneider,* 320 F.3d at 404. " 'Fit' in the context of Rule 702 refers to the helpfulness of the expert's testimony in assisting the trier of fact." *In re Human Tissue Products,* 582 F.Supp.2d at 657. Said differently, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider,* 320 F.3d at 404.

The Parties' main point of contention with regard to Defendant's experts appears to revolve around whether their testimony fits the issues of the case. In order to

resolve this dispute, it is necessary to briefly construe the contested issue in this case (i.e., *Whether carrying the laser on sales calls was a material and substantial duty of Mr Kachigian's occupation* ).

Neither side contends the language of the Policy is ambiguous. The Court will therefore give effect to the plain meaning of the policy language. *Kachigian v. Berkshire Life Ins. Co. of Am.,* 2012 WL 762486, at * 3 (D.N.J. Mar.8, 2012) (Sheridan, J.) (Opinion denying Berkshire's motion for summary judgment). The plain meaning of the Policy requires Plaintiff to demonstrate: because of sickness or injury, he was not able to perform the material and substantial duties of his occupation. "A duty is 'material' when it is sufficiently significant in either a qualitative or quantitative sense that an inability to perform it means that one is no longer practicing the 'regular occupation.' " *Kaelin v. Tenet Employee Benefit Plan,* 405 F.Supp.2d 562, 582 (E.D.Pa.2005). Defendant retained its experts in large part to contest Plaintiff's position that carrying the laser was a material and substantial aspect of his job.

### i. *Mr. Cathcart*

First, Mr. Cathcart's report purports to "assess Plaintiff's claims that the only way to effectively and profitably market and sell leases for the laser was for him to lift, transport and demonstrate the laser on in-person sales visits." Def.'s Opp. Br., dkt. no. 59, at 19. Plaintiff believes Mr. Cathcart's proposed testimony impermissibly undermines his autonomy to choose how to best perform his occupational duties. Based on his experience and corresponding report, however, the Court concludes that Mr. Catchart's proffered testimony fits the issues of the case.

Mr. Cathcart's testimony is directly relevant to the primary issue in the case. And the jury may find it helpful to understand the dynamics of Mr. Kachigian's occupation and field from an individual who has extensive experience as a medical salesperson. While Plaintiff's concerns are not lost on the Court, it is nonetheless "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" that are "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 595. That is to say, the jury is free to discredit Mr. Cathcart's testimony or accord it whatever weight it deems

appropriate. Accordingly, Plaintiff's motion *in limine* to bar the testimony of Mr. Catchart is **DENIED**.

### ii. *Mr. Smith*

**\*9** Mr. Smith's report offers four conclusions. *See supra* p. 10. Plaintiff argues that Mr. Smith opines "well outside the realm of his expertise" and, further, that many of Mr. Smith's purported conclusions do not require expert testimony. Pl.'s Br., dkt. no. 51, at 24. The Court will address each of Mr. Smith's proposed conclusions.

Mr. Smith's first and second conclusions are closely tied. Both purport to analyze the data presented in order evaluate how Mr. K achi gi an allocated his time while at CLL. As such, much of Mr. Smith's analysis here fits the issues in this case.

As to Mr. Smith's first conclusion, however, there appears to be a disconnect between the words Mr. Smith chose to phrase his conclusion and the analysis that supports it. While the conclusion itself—that Plaintiff provided minimal occupational and business activity information to the Defendant in regard to his involvement with CLL—is problematic, much of the analysis fits the issues of this case. For example, it is acceptable for Mr. Smith to analyze CLL's cash flows and Plaintiff's calendars in order to reach a conclusion as to the amount of time Plaintiff spent transporting the laser. It is similarly appropriate for Mr. Smith to translate this data into the amount of time he believes Plaintiff spent performing other tasks, such as management duties. Both of these findings address Plaintiff's material and substantial duties.

What is not appropriate, however, is Mr. Smith's bare conclusion that Plaintiff has provided insufficient data regarding his occupational activities. That is a question of fact and credibility for the jury to weigh. Thus, Plaintiff's motion *in limine* with regard to Mr. Smith's first conclusion is **GRANTED** in this regard only, and **DENIED** in all other respects. Mr. Smith may still present his conclusions; indeed, he may even testify that, in his view, the limited nature of the data available made it difficult to conduct his analysis. What he may not do, however, is tell the jury in conclusory fashion that Plaintiff's submissions in this regard were somehow fatally deficient.

Mr. Smith's second conclusion, that Plaintiff's disability did not prevent him from earning revenue from his material and substantial duties at CLL, also fits the issues of the case. Plaintiff argues that Mr. Smith's second conclusion is purely a question of fact, to be determined by the jury. Plaintiff is correct that the issue of Mr. Kachigian's earnings is a question of fact; however, this does not mean an expert in forensic accounting could not assist the jury. Mr. Smith examined Plaintiff's pre- and post-disability income in order to assess whether that information supported Plaintiff's claim that carrying the laser was a material and substantial aspect of Plaintiff's occupation. Courts frequently rely on this type of analysis when determining whether a given occupational duty was material and substantial. *See, e.g., Lasser v. Reliance Standard Life Ins. Co.,* 344 F.3d 381, 387 (3d Cir.2003) (finding diminution in income controlling). It is appropriate, then, that the jury be allowed to hear testimony on this issue from Mr. Smith. Thus, Plaintiff's *motion in limine* with regard to Mr. Smith's second conclusion is **DENIED**.

**\*10** Next, Mr. Smith's third and fourth conclusions do not fit the issues of the case. Both conclusions focus on the viability of Plaintiff's employer—a point that, even if true, is not relevant to the functions of Plaintiff's occupation.

With regard to his third conclusion, that Plaintiff did not develop an adequate business plan, Mr. Smith's testimony is apparently offered to rebut Plaintiff's position that CLL failed because Plaintiff could not lift and transport the laser. Regardless of whether or not Plaintiff called this issue into question, it is not relevant. *See* Pl.'s Br., dkt. no. 51, at 25 (Mr. Smith's fourth conclusion "has no relevance to the facts and/or issues to be decided in this case"). Thus, Plaintiff's motion *in limine* with regard to Mr. Smith's third conclusion is **GRANTED** and Mr. Smith's trial testimony will be limited accordingly.

Finally, Defendant fails to identify how Mr. Smith's fourth conclusion—that prior to the onset of disability, Plaintiff's work experience did not demonstrate the sustainability of CLL as a profitable venture—is relevant to the case. Whether CLL was a sustainable enterprise has no bearing on whether carrying and transporting the laser was a material and substantial part of Plaintiff's occupation. Nor does it bear upon any other element Plaintiff must prove in this case. Thus, Plaintiff's motion *in limine* with regard to Mr. Smith's fourth conclusion is **GRANTED** and Mr. Smith's testimony will be limited accordingly.

### C. Defendant's Motion to Exclude Plaintiff's Experts & New Witnesses

Defendant seeks an *in limine* ruling barring, in whole or in part, testimony of persons identified by Plaintiff for the first time in the proposed Final Pre–Trial Order ("FPTO").[4] Defendant's original Motion sought to bar the testimony of eight "new" fact witnesses and two expert witnesses. Plaintiff's counsel has since certified that Plaintiff will not call the eight fact witnesses at trial. A. McHugh Cert., dkt. no. 60–1, at ¶ 2. Thus, this portion of Defendant's Motion is **DENIED** as moot. As to the expert witnesses, Defendant's Motion seeks to bar the testimony of Plaintiff's treating physicians, Dr. Lamb and Dr. Miller.

#### 1. *Dr. Lamb*

The Parties appear to have reached an agreement as to Dr. Lamb. Plaintiff's counsel's Certification states, "if Plaintiff decides to call Dr. Lamb it will be strictly as a treating physician." A. McHugh Cert. at ¶ 16. Defendant now seeks an order confirming as much. Accordingly, with respect to Dr. Lamb, Defendant's Motion is **GRANTED** as to any purported expert testimony. If called to testify, Dr. Lamb must testify as a treating physician only, and may not offer any expert opinions regarding the material and substantial duties of Plaintiff's occupation. Nor may Dr. Lamb offer testimony as to causation or prognosis. Dr. Lamb's testimony must be limited to the factual observations he derived from treating Mr. Kachigian. *See Damiani v. Momme,* 2012 WL 1657920, at * 4 (E.D.Pa. May 11, 2012) (Plaintiff's "doctors are free to testify as to Plaintiff's statements to them during their care and treatment; as to their own examination, diagnosis, and treatment of Plaintiff; and as to Plaintiff's prognosis based on their observations during treatment. What these treating physicians may not do is offer independent opinions as to the cause of Plaintiff's injuries.").

#### 2. *Dr. Miller*

**\*11** Defendant argues that Dr. Miller's purported expert testimony should be barred for two reasons: (1) Plaintiff violated the disclosure requirements of FED. R. CIV. P. 26(a)(1) and 26(a)(2), and (2) even if the Court finds Dr. Miller was properly identified as an expert, his testimony is nonetheless inadmissible as a 'net opinion.'

As to Defendant's first argument, the Court believes Plaintiff has satisfied the disclosure requirements of Rule 26(a). Plaintiff identified Dr. Miller as a person with knowledge of relevant facts in his initial Rule 26 disclosures on April 15, 2010. On August 3, 2010, Dr. Miller was also identified by Plaintiff in his answers to Defendant's interrogatories. Similarly, on August 10, 2010, in response to Defendant's Document Request No. 30 for all "[w]ritten expert report[s] prepared by all expert witnesses who you intend to call as a witness in the trial of this matter," Plaintiff responded by referring Defendant to all treating doctors, including Dr. Miller. Plaintiff also identified all medical records provided in his answers to interrogatories. Plaintiff later supplemented his answers to interrogatories when he sent a copy of Dr. Miller's report on January 10, 2011. Defendant also had a copy of Dr. Miller's CV as of March 11, 2011. Finally, Dr. Miller's deposition was taken on November 7, 2012. Given the above, Defendant cannot now claim that it was unaware of Dr. Miller's status as both a treating physician and an expert upon whom Plaintiff intended to rely on at trial.

Defendant's second argument is an attack on the substance of Dr. Miller's testimony as opposed to his actual qualifications. The 'net opinion' rule is neither an evidentiary rule under the Federal Rules of Evidence nor a factor in the *Daubert* analysis; instead, it is simply a restatement of the well-settled principle that "an expert's bare conclusions, unsupported by factual evidence, [are] inadmissible." *Buckelew v. Grossbard,* 87 N.J. 512, 524, 435 A.2d 1150, (1981). Thus, the net opinion rule "requires the expert to give the 'why and wherefore' of the opinion, rather than a mere conclusion." *Curtis v. Besam Group,* 2008 WL 1732956, at *6 (D.N.J. Apr.10, 2008).

In this case, the Court will preclude Dr. Miller from offering any expert opinion as to Plaintiff's "required" occupational duties. Defendant takes issue with Dr. Miller's proposed testimony regarding Plaintiff's ability to continue working in his previous profession. Indeed, on page 2 of Dr. Miller's report, he states:

> Final disposition: It is within a reasonable degree of medical probability that Mr. Kachigian was unable to continue working in his *previous profession as a salesman of cosmetic laser machines which*

*required him to lift these machines on
a regular basis.*

A. McHugh Cert. at ¶ 10 (Exhibit G) (Expert Report of Dr. Miller) (emphasis added). Dr. Miller's conclusions here go too far. First, it is difficult to see how a description of Plaintiff's job responsibilities could be derived from the factual evidence available to Dr. Miller as a treating physician. Perhaps more importantly, however, Dr. Miller's testimony goes to the ultimate issue in the case to be decided by the jury: whether Plaintiff was required to lift the laser on a regular basis as part of his job duties. Accordingly, Defendant's Motion is **GRANTED,** in part, and **DENIED,** in part. Dr. Miller may testify as a medical expert. He may not, however, offer an opinion regarding the material and substantial aspects of Plaintiff's occupation.

### IV. UNATHORIZED PRACTICE OF MEDICINE

*12 Defendant seeks an *in limine* ruling barring Plaintiff from presenting evidence or testimony, or arguing to the jury, that a material and substantial duty of his occupation included demonstrating the laser hair removal device on himself during sales marketing visits with prospective customers. Defendant argues that Plaintiff's actions in demonstrating the machine on himself constituted the unauthorized practice of medicine. If this were the case, so goes the argument, Plaintiff's disability with regard to this activity would be legal—not factual—in nature. Since legal disabilities are not covered by the Policy, Defendant argues, Plaintiff should not be allowed to present evidence or otherwise testify to his actions in this regard.

#### A. Unauthorized practice of medicine

In New Jersey, the "practice of medicine or surgery" is defined as "the practice of any branch of medicine and/or surgery, and any method of treatment of human ailment, disease, pain, injury, deformity, mental or physical condition" N.J.S.A. § 45:9–5.1. The New Jersey Board of Medical Examiners has determined that laser hair removal constitutes the practice of medicine. *See* N.J.A.C. § 13:35–4A.3 (" 'Surgery' means a manual or operative procedure, including the use of lasers...."); N.J.A.C. § 13:35–12.2 (Definition of 'electrology' "specifically excludes laser and other intense light source hair removal"); N.J.A.C. § 13:28–2.15 (Prohibiting cosmetologists from performing or offering to perform "any service that has been

determined by the New Jersey State Board of Medical Examiners to be a medical service," including "laser hair removal"); *see also Vivat,* NJ State Boards of Medical Examiners and Cosmetology and Hairstyling, Admin. Consent Order, Lic. No. WG01881200 (Jul. 22, 2011) (reprimanding respondent for unauthorized practice of medicine when she performed laser hair removal without license). Pennsylvania has likewise determined that laser hair removal constitutes the unauthorized practice of medicine. *See Charleston v. Salon Secrets Day Spa, Inc.,* 2011 WL 1562247, at *4–5 (E.D.Pa. Apr.25, 2011) (acknowledging laser hair removal device could not be used without medical supervision).

In this case, Plaintiff admits that he demonstrated the laser on himself. Plaintiff does not appear to dispute that performing laser hair removal, in general, requires a medical license. Plaintiff argues, instead, that the unauthorized practice of medicine does not occur when one practices medicine on oneself (as opposed to another individual).

#### B. Legal disability

One who is prevented from performing his or her normal occupation because of some act of law is deemed "legally" disabled. "Disability insurance policies generally provide coverage for factual disabilities, such as injury or sickness, and not for legal disabilities." *New York Life Ins. Co. v. Daly,* 2001 WL 1231736, at *4 (E.D.Pa. Oct.10, 2001); *accord Massachusetts Mut. Life Ins. Co. v. Millstei n,* 129 F.3d 688, 691 (2d Cir.1997) (Plaintiff's loss of income was due to unlawful conduct, not physical inability to perform occupational duties); *Goomar v. Centennial Life Ins. Co.,* 855 F.Supp. 319, 326 (S.D.Cal.1994), *aff'd sub nom.,* 76 F.3d 1059 (9th Cir.1996) ( "Plaintiff's inability to practice his regular occupation [medicine] is due to his license revocation rather than sickness or injury.").

*13 Here, Plaintiff alleges that transporting the laser was a material and substantial part of his job duties because, *inter alia,* he needed to demonstrate the laser or otherwise instruct physicians on its use. However, as discussed above, Plaintiff's activities in this regard may amount to unauthorized practice of medicine. If this were the case, Plaintiff's inability to perform them would rightly be characterized as a legal disability, not covered by the Policy. However, based on the evidence submitted and authority cited, the Court is unable to conclude as a matter of law that using the laser on himself constituted

the unauthorized practice of medicine or that Plaintiff's prohibitions in this regard amounted to a legal disability. Thus, Defendant's Motion is **DENIED.**

An appropriate Order follows.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1338288

Footnotes

1    As the facts of this case are well-known to the Parties, counsel and the Court, they will be set forth below only as they relate to the instant motions.

2    It appears that Mr. Sherman also requested copies of Mr. Kachigian's schedule and appointment books during a telephone call on November 3, 2006.

3    Although the language of Rule 702 was changed in 2011, the Advisory Committee Notes state the changes were "stylistic only" and thus do not reflect an "intent to change any result in any ruling on evidence admissibility." FED.R.EVID. 702, *Committee Notes on Rules—2011 Amendment.*

4    In anticipation of these motions *in limine,* and with the agreement of counsel, the proposed FPTO has not yet been filed.

---

**End of Document**                                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT X

2011 WL 3583408

2011 WL 3583408
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

The KATIROLL COMPANY, INC., Plaintiff,

v.

KATI ROLL AND PLATTERS,
INC. and Niraj Jivani, Defendants.

Civil Action No. 10–3620 (GEB).
|
Aug. 3, 2011.

**MEMORANDUM OPINION**

BROWN, Chief Judge.

**\*1** This matter comes before the Court on a motion by Plaintiff for spoliation sanctions and to compel discovery (Doc. No. 108). The Court has considered the parties' submissions and decided the motion without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, that motion is denied in part and granted in part.

**I. BACKGROUND**

This is a trademark infringement case involving two restaurants that sell a similar type of food called katirolls. Plaintiff originally brought this action on March 3, 2010, in the Southern District of New York alleging, among other things, infringement of their distinctive trade dress. (Compl.; Doc. No. 1). The Southern District of New York transferred the case to New Jersey based on a lack of personal jurisdiction. (Memorandum Order dated July 9, 2010; Doc. No. 31).

Shortly after the transfer, this Court granted a motion for a preliminary injunction after a two-day evidentiary hearing. After setting forth its findings of fact and conclusions of law, this Court found that Plaintiff was entitled to a preliminary injunction on its trade dress claims but found that it had not carried its burden on infringement of the trademark. (Doc. Nos.72, 73).

This motion focuses on the discovery positions of the parties. Particularly, this motion focuses on whether Defendants' fact discovery has been late forthcoming and whether Defendants purposely and deliberately destroyed important discoverable information. Fact discovery in this case is ongoing and does not close until September 30, 2011. (Doc. No. 110).

**II. SPOLIATION SANCTIONS AND MOTION TO COMPEL**

**A. Standard of Review**

Parties to litigation often are required to preserve litigation evidence. This duty "arises when the party in possession of the evidence knows that litigation by the party seeking the evidence is pending or probable and the party in possession of the evidence can foresee the harm or prejudice that would be caused to the party seeking the evidence if the evidence were to be discarded." *Kounelis v. Sherrer,* 529 F.Supp.2d 503, 518 (D.N.J.2008). If the party does not so preserve the evidence, they are said to have spoliated that evidence, which can give rise to sanctions. "In determining whether spoliation sanctions are appropriate, the two key considerations are the 'degree of fault of the party who altered or destroyed the evidence' and 'the degree of prejudice suffered by the opposing party.' " *Id.* (quoting *Schmidt v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3d Cir.1994)).

Sanctions for spoliation include: "dismissal of a claim or granting judgment in favor of a prejudiced party; suppression of evidence; an adverse inference, referred to as the spoliation inference; fines; and attorneys' fees and costs." *Id.* A spoliation inference is the mildest sanction and "permits a jury to draw an adverse inference that the spoliated evidence might or would have been unfavorable to the position of the offending party." *Veloso v. Western Bedding Supply Co., Inc.,* 281 F.Supp.2d 743, 746 (D.N.J.2003) (internal quotation marks omitted). To qualify for a spoliation inference, the movant must show at least four things: "First, it is essential that the evidence in question be within the party's control. Second, it must appear that there has been actual suppression or withholding of the evidence. Third, the evidence destroyed or withheld was relevant to claims or defenses. And fourth, it was reasonably foreseeable that the evidence would later be discoverable." *Mosaid Tech., Inc. v. Samsung Elec. Co., Ltd.,* 348 F.Supp.2d 332, 336 (D.N.J.2004).

**\*2** There is a split in this district's jurisprudence as to the fault required to support the second factor— the suppression or withholding of the evidence. Some courts have required that spoliation to be the result of intentional conduct before giving an adverse inference instruction. *Veloso v. Western Bedding Supply Co.,* 281 F.Supp.2d, 743, 746–49 (D.N.J.2003); *Costello v. City of Brigantine,* No. 99–4072, 2001 WL 732402, at \*26 (D.N.J. Jun. 28, 2001). Others have held that the inference is justified where the party possessing the evidence destroyed it negligently. *Kounelis,* 529 F.Supp.2d at 518 (appropriate where either negligently or intentionally destroyed, but balancing the degree of fault with the prejudice produced); *Mosaid Techn., Inc. v. Samsung,* 348 F.Supp.2d 332, 337–38 (D.N.J.2004); *Scott v. IBM Corp.,* 196 F.R.D. 233, 249 (D.N.J.2000) (finding that spoliations might be appropriate where there was nothing to indicate documents were intentionally destroyed).

This Court concludes that the best rule is to use the amount of prejudice to the opposing party to help to determine the degree of fault required: Where there is substantial prejudice to the opposing party, negligence may be sufficient to warrant a spoliation inference. Where there is minimal prejudice to the opposing party, intentional conduct is required.

### B. Application

The Plaintiff complains to this Court about a series of discovery abuses that allegedly require a spoliation inference. However, the Court concludes in its discretion that, as to some conduct, the prejudice to Plaintiff of the alleged destruction of evidence is minimal and that it was partially at fault. Thus, no spoliation inference is appropriate. In other instances, the Court lacks sufficient information to make a determination but is troubled by aspects of Defendants' failed disclosures. While the Court finds it is premature to enter a spoliation inference in these instances, the Court is open to spoliation sanctions in the future and grants the motion to compel in some instances. In still other instances, the Court determines that a spoliation instruction is warranted.

### 1. The Appearance of the Restaurant

This Court's February 1, 2011 order gave Defendants twenty days to change the infringing color of the restaurant from orange to another color. (Doc. No. 73). Thereafter, Defendants' counsel agreed that Defendants

would leave the restaurant in its current condition until February 4, 2011, so that Plaintiff could take video and pictures of the restaurant in its infringing form. However, Plaintiff complains that the Defendants painted a few test patches of new colors on the wall prior to the pictures. (Pl.'s Br. at 11).

There is little question that the change in the appearance of the restaurant fits the first, third and fourth criterion for the spoliation instruction: the appearance was within the Defendants' control, it was ultimately changed before evidence could be taken, and Defendants knew that Plaintiff wanted to take pictures of the restaurant. The only real question is about the intentionality of the conduct and the prejudice to the Plaintiff.

**\*3** Plaintiff has suffered little prejudice from this action, and Defendants are minimally at fault for the issue. *See Kounelis,* 529 F.Supp.2d at 519. First, Plaintiff has suffered minimal if any prejudice. Defendants' counsel represented that the test patches of a gold color were 2 feet by 1 foot, and were small compared to the size of the restaurant; Plaintiff has submitted no evidence to contradict this. As such, the jury will not have difficulty imagining the entire restaurant was orange rather than orange with two small test patches of gold on either the video or the pictures taken on the day of inspection. This is particularly true in light of Plaintiff's prior assertion before this Court that Mr. Jivani's use of gold is so similar to orange that for certain lightings and on certain computer screens, it will appear as orange. Further, Plaintiff is in possession of pictures of the restaurant prior to the change, so the evidence is somewhat cumulative. (Dolich Decl. at Ex. E).

Second, while Mr. Jivani was at fault for painting prior to the video and pictures, such fault was minimal because the painting was undertaken to comply with this Court's preliminary injunction order. Such conduct was not intentional. Thus, the fault and prejudice do not weigh in favor of a spoliation sanction and the Court will not order one.

After Plaintiff realized that Mr. Jivani had painted the test patches, Plaintiff requested the security surveillance video taken prior to the repainting, which the Defendants agreed to provide. Defendants claim that they were unable to save the video but cite no support for that statement. (Defs.' Br. at 11). As the Court acknowledged above,

there is minimal prejudice to Plaintiff because the video that Plaintiff could have taken during the inspection would have been sufficient. However, the Court is not satisfied with Defendants' explanation and finds it highly suspect. Indeed, after having represented that they had the video, Defendants somewhat lamely state that they were unable to save the video. (*Id.*). As such, the Court orders Defendants to provide it with a full, sworn explanation of what happened to the surveillance video from each person involved in its preservation. If the Court is not satisfied with that explanation, it will conclude that the noncompliance is intentional and grant a spoliation inference.

#### 2. Mr. Jivani's Old Facebook Pages

Plaintiff asks for a spoliation sanction as a result of Mr. Jivani's failure to preserve his Facebook pages in their original state—in other words, Plaintiff wanted PDFs of these pages prior to their being taken down. (Pl.'s Br. at 5–6). However, Plaintiff does not dispute that Facebook took these pages down because of its own take-down request. (*See* Dolich Decl. at Ex. B). To hold Defendants responsible for this subsection of pages would be unjust.[1]

Plaintiff also requests that the Court create an inference of spoliation based upon Mr. Jivani changing his profile picture on Facebook from a picture displaying the infringing trade dress without preserving that evidence. Defendants, for their part, claim that Plaintiff is in possession of all relevant posts prior to the change. Both parties agree that changing the user's Facebook profile picture changes the picture associated with each and every post that user has made in the past.

**\*4** There is little question that the evidence fulfills the third requirement, but the other requirements are at issue.

Defendants argue that the Court should not impose a spoliation inference because the website was public and Plaintiff could have printed the website itself. This seems to be directed at the first requirement, that the discovery be in Defendants' control. However, Courts in this district have still found public websites to be within the control of parties who own them. *Arteria Property Pty Ltd. v. Universal Funding V.T.O., Inc.,* 2008 WL 4513696 at *5 (D.N .J.2008). Further, this is an attempt to "pass the buck" to Plaintiff to print websites that Defendants are obliged to produce. Given that Defendants have

a discovery obligation to produce them and that only Defendants knew when the website would be changed, it is more appropriate for Defendants to have that burden. Thus, the Court concludes that the first factor, Defendants' control, is present.

The presence of remaining two factors is less than clear. As to the forseeability of the discoverability of the evidence, the Court notes that the change of a profile picture on Facebook is a common occurrence. Active users often change their profile pictures weekly .[2] Therefore, it is hardly surprising that Mr. Jivani has changed his profile picture during the pendency of this litigation. Further, while Mr. Jivani was on notice that he had to preserve evidence, it would not have been immediately clear that changing his profile picture would undermine discoverable evidence. As such, the Court determines that this spoliation was unintentional; however, it nonetheless concludes that the loss of this evidence is somewhat prejudicial to Plaintiff. *See Mosaid Tech., Inc. v. Samsung Elec. Co., Ltd.,* 348 F.Supp.2d at 336.

Given these considerations of fault, the Court determines that a less imposing alternative is the best solution. Mr. Jivani must to coordinate with Plaintiff's counsel to change the picture back to the allegedly infringing picture[3] for a brief time so that Plaintiff may print whatever posts it thinks are relevant—such action shall not be considered an additional act of infringement. The Court however, determines that it is incumbent on Plaintiff to, during the appointed time, print such posts as it thinks are necessary to make its case. Thereafter, Mr. Jivani must immediately change his profile picture back to his noninfringing picture.

#### 3. Documents from Defendants' Website

Plaintiff complains that it does not have a copy of the Defendants' website showing what the restaurant looked like prior to its repainting. Defendants respond that Plaintiff is in possession of pictures showing the restaurant prior to repainting, which are sufficient for Plaintiff to make its case. Again, the first, third, and fourth elements of the test are met. The question revolves around the second element, whether such evidence was destroyed intentionally or negligently, and what prejudice accrued to Plaintiff as a result.

*5 Essentially, this is Plaintiff's complaint about Defendants' repainting prior to the inspection again. As discussed, Plaintiff had the opportunity to take pictures and video of the restaurant with a minor change. The Court does not know whether Plaintiff took advantage of that opportunity but, as discussed, the minor change in appearance was not very prejudicial to Plaintiff (particularly in light of the fact that Plaintiff has maintained that the gold color of the test patches is similar to the original orange). Consequently, Plaintiff suffered minimal prejudice.

However, the Court concludes that it is implausible that Mr. Jivani has no other electronic copies of these pictures on his hard drive or in emails to his web developer, etc. As such, Mr. Jivani is directed to search his home computer and any other computers he frequently uses and disclose any pictures he has of the restaurant prior to its repainting. The Court directs Defense counsel to remind Mr. Jivani of the consequences of destroying evidence before a tribunal.

The Court also determines that, without the printout of the website, the evidence will be insufficient to show that the website itself embodied pictures of the infringing restaurant and substantial prejudice has accrued to Plaintiff's ability to show that website itself infringed its trade dress. As such, on this limited issue, the Court will grant a spoliation instruction unless Defendants produce an image of the portion of the website that included the photographs within one week of the order accompanying this opinion.

#### 4. Annual Report

Plaintiff claims that a spoliation inference should result from Defendants' failure to provide its 2010 annual report. Plaintiff requested the report to confirm Defendants' representation that *Rasik* Jivani was no longer a shareholder of the corporation because he had transferred the stock to *Niraj* Jivani. Defendants claimed that they were unable to produce the report because it was no longer in their possession, despite the fact that they filed it during the pendency of this litigation. (*See* Doc. No. 59, Ex. A, p. 1). Defendants did provide documents related to the transfer of stock and stock certificates and corporate bylaws. (Defs.' Br. at 12).

It does appear that Defendants were at the very least grossly negligent in failing to keep a copy of a report that they agreed to provide to opposing counsel and the Court.

*Mosaid Tech.,* 348 F.Supp.2d at 336; (*See* Doc. No. 57–1, ¶ 3). However, apparently this is a public document available from the New Jersey Secretary of State. As a result, the Court cannot see any prejudice that accrues from the failure to produce it—it is still available to both parties.

Indeed, the Court observes that it would have been easier for Plaintiff to request the filing than to draft this portion of the motion. The Court further observes that it would have been easier for Defendants to request the filing than to respond to this portion of the motion. Given the lack of prejudice to Plaintiff, the Court finds that a spoliation sanction is inappropriate, despite Defendants' fault in not preserving their copy of the report. *See Kounelis,* 529 F.Supp.2d at 519.

*6 However, counsel for Defendants is directed to request the report from the Secretary of State and provide it to Plaintiff if it has not already so provided.

#### 5. Emails Between Mr. Jivani and the Web Developer

According to Mr. Jivani's testimony, in October of 2011, Mr. Jivani hired a web developer for his website. Mr. Jivani, in failing to comply with this Court's preliminary injunction order, alleged that he was unable to contact the developer to put the disclaimer on the website and change the color. (4/4/11 tr. at 12–13). Plaintiff requested the emails between Mr. Jivani and his web developer to confirm that he did indeed hire the developer as of October. (Pl's. Br. at 14). Plaintiff asserts that Defendants never produced the emails. Defendants claim that all of the emails in their possession were produced and that all other communication took place in person or by telephone.

The emails produced consist of one exchange, where, on February 8, 2011, Mr. Jivani's web developer sent him a copy of the image of his home page prior to adding the disclaimer:

Hi Niraj,

As per your *phone request,* Please see your website's home page's html file, in the attachment. (Before adding the disclaimer part in the 'Home Page').

Best Regards,

Dr. Hema, Phd.

Nadiyam Technologies, Inc.

(Dolich Decl. at Ex. G) (emphasis added). Mr. Jivani did not reply to the substance of this email, but replied on a related topic on March 16, 2011 (and immediately forwarded the reply email to counsel):

> Hema I have *called* you on March 3rd and 4th to change the colors[.] I am on a court order [as] I have told you before ... you MUST change the color[.][T]his is horrible service being a few weeks that have gone by and no action has been taken to change the colors!

(*Id.*) (ellipsis in original, emphasis added).

There is no doubt that Dr. Hema Latha's email and Niraj Jivani's email reflect that telephone conversations had taken place between the two of them. As such, if the emails have not been altered or somehow fabricated, it is clear that *some* communication took place by telephone. Therefore, there may be no emails to be had.

However, there may be emails that were not produced or deleted. It seems suspicious that a person with as active an online persona as Mr. Jivani only ever sent one email to his web developer, an email happens to cast him in a positive light. Indeed, the Court wonders how Dr. Latha came into possession of the photographs that were allegedly posted on the website if there were no emails or other electronic communication between the two.[4] Further, there are relatively easy ways to confirm these questions that do not require a spoliation sanction at this juncture.

In order to confirm whether Mr. Jivani sent other emails, the Court directs Defendants as follows:

> (1) Mr. Jivani shall allow his counsel to conduct a search of each of his email accounts, particularly "katirollandplatters@gmail .com" for emails from his web developer; defense counsel shall conduct such a search and turn over any emails procured;[5]

*7 (2) Mr. Jivani will request, via a signed request communicated through counsel, that Dr. Hema Latha forward to defense counsel directly, any emails that Mr. Jivani and Dr. Latha have exchanged, assuming he has not deleted them;

> (3) Mr. Jivani shall have no contact, except through counsel, with Dr. Latha until such time as Dr. Latha has responded to the request for emails;

> (4) Mr. Jivani, with the assistance of counsel, is to request phone records for each phone on which he made these calls for the months of October, 2010, and February and March of 2011 to confirm Mr. Jivani's alleged calls to Dr. Latha, to be delivered, if possible, directly to his counsel; such records shall be produced to the Court with appropriate redactions of calls not to Dr. Latha.

Counsel for the Defendants shall report every week to Judge Bongiovanni by a brief letter submission on the progress of these investigations and file, as an attachment, any resulting emails or phone records, appropriately redacted or under seal. Counsel may choose the day that he will consistently place such a letter on the docket. If no emails are recovered and Mr. Jivani is unable to produce records of phone calls or text messages to Dr. Latha (or alleges that such phone calls were made on the phones of any third parties or pay phones), the Court will consider sanctions against him. As of now, the existence of such emails is too hypothetical to impose sanctions.

### 7. Defendants' New Facebook Page

Plaintiff argues that Defendants made a new Facebook page and did not disclose its existence in a discovery response. The Court agrees that Defendants should have disclosed its existence, but because Plaintiff has found the page independently and Defendants created the page in order to comply with this Court's preliminary injunction, sanctions are not appropriate. *See Kounelis,* 529 F.Supp.2d at 519 (prejudice to discovering party considered when imposing sanctions).

### 8. Financial Documents

Plaintiff requested that Defendants produce restaurant sales reports as well as other financial data. Plaintiff does not complain about the production of many of these items. However, Plaintiff does complain that it has not received

2011 WL 3583408

the point of sale reports, hand logs for cash transactions, that the corporation's tax returns were unsigned, the corporation's bank account statements redacted several ATM transactions (which may be relevant for piercing analysis), and that Defendants did not produce a copy of their insurance policy.

Defendants respond that the proprietary point of sale software has created problems for such production, that counsel is investigating the redaction to the bank account statements, and that they did produce the copy of the insurance policy. Defendants make no representations about the hand logs or tax returns. Nor do Defendants argue that the requests are in any way overbroad.

The Court finds that these are run-of-the-mill discovery issues, on which the parties should confer to resolve. The Court does not believe a sanction or order compelling production is appropriate at this juncture. There has yet to be a litigation in which every document was produced in a timely fashion. The Court also sees no reason why Defendants must produce electronic records of their bank accounts to Plaintiff or need bear the cost of putting the data into a spreadsheet. Defendants' counsel shall address each of these discovery issues in his weekly report until they are resolved.

### 9. Deposition of Niraj Jivani

*8 While both parties agree that Plaintiff will have another opportunity to depose Niraj Jivani, Plaintiff argues that it should be compensated for the costs of the additional deposition. Plaintiff suggests that this is justified because Defendants were late in the production of several items, including their insurance policy, prior to Mr. Jivani's deposition. The Court disagrees.

As suggested by Defense counsel, the need for a supplemental deposition was also necessitated by Plaintiff's insistence on taking Mr. Jivani's deposition only a few weeks after new counsel arrived on the case, without the opportunity for that counsel to come up to speed with the discovery requested. Further, it appears that Plaintiff has four more hours of questions, not all of which can be

related to the insurance policy. As such, Plaintiff would have had to schedule an additional day of deposition anyway. Thus, the Court awards no fees for the additional deposition.

### 10. Counsel Are Directed to Conduct Themselves with the Collegiality and Good Faith that is Befitting of New Jersey Attorneys

The Court reminds counsel that attorneys in this jurisdiction are expected to conduct themselves with professionalism, to creatively find solutions to common problems, and to cooperate with each other. The email and other correspondence that has appeared before the Court do not reflect these high standards. Emails accusing opposing counsel of ethical violations, resistance to simple requests, attempts to pass responsibility to the other party for simple discovery requests, and inflexibility are reflected in many recent communications in this case. (*See, e.g.,* Dolich Ex. I; Doc. No. 114; Doc. No. 117; Doc No. 108–2; Doc. No. 118; Doc. 129 Ex. 2). The Court also reminds the parties that their attempts to pass the burden of discovery to each other often result in more work in emails than the work it would take to obtain the document themselves.

The Court understands that there is animosity between the parties. The testimony at the preliminary injunction hearing was enough to make that abundantly clear. However, despite the animosity between their clients, attorneys before this Court are expected to confer in *good faith* prior to bringing issues before the Court.

### III. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the request for spoliation sanctions and grants certain requests for the production of documents. The Court files an appropriate order concurrent with this opinion.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 3583408

---

Footnotes

1    The fact that it was not *legally* improper for Plaintiff to serve this notice (as acknowledged in this Court's prior opinion), does not undermine the fact that it was the primary and but-for cause of the spoliation.

2011 WL 3583408

2    Further, the Court notes that it may even be somewhat misleading to have printouts of Defendant's posts with the infringing picture, as if they always appeared that way. Indeed, it is likely that many posts existed for a substantial portion of their lifetime without the allegedly infringing photograph. This is an issue that can be resolved in the proper questioning of witnesses.

3    These photographs have not been destroyed, they been attached in several PDFs to this Court. It would be a simple process to recover the photograph from those PDFs. Then, Plaintiff may print the posts it thinks are relevant to the case.

4    It would have been possible to transfer such things in person. It is also possible that the pictures were on the website prior to Dr. Latha starting his work with the website. However, both of these possibilities seem less likely than an email.

5    *See* Local Civil Rule 26.1(d)(1). The Court also notes that "archive" is the primary email management function on "Gmail ." As such, it is unusual though not unheard of, for users to actually delete emails.

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.