WILENTZ, GOLDMAN & SPITZER, P.A.
Donna M. Jennings (DJ7790)
90 Woodbridge Center Drive
Post Office Box 10
Woodbridge, New Jersey 07095
*Co-Counsel for Plaintiff WR Property LLC*

STORZER & ASSOCIATES, P.C.
Sieglinde K. Rath (SR7208)
Roman Storzer, *admitted pro hac vice*
Robert L. Greene, *admitted pro hac vice*
9433 Common Brook Road, Suite 208
Owings Mills, MD 21117
Tel: (202) 857-9766
*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AGUDATH ISRAEL OF AMERICA, a New York non-profit corporation, and WR PROPERTY LLC, a New Jersey limited liability company, | **Civil No. 3:17-cv-03226** |
| Plaintiffs, | **PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND DAMAGES** |
| v. | |
| TOWNSHIP OF JACKSON, NEW JERSEY, MICHAEL REINA, ROBERT NIXON, HELENE SCHLEGEL, JEFFREY PURPORO, WILLIAM CAMPBELL, and KENNETH PIESLAK, | |
| Defendants. | |

Plaintiffs AGUDATH ISRAEL OF AMERICA, a New York non-profit corporation, and

WR PROPERTY LLC, a New Jersey Limited Liability Company, and by their undersigned

attorneys, complains of Defendants, TOWNSHIP OF JACKSON, NEW JERSEY,  MICHAEL

REINA, ROBERT NIXON, HELENE SCHLEGEL, JEFFREY PURPORO, WILLIAM CAMPBELL, and KENNETH PIESLAK as follows:

## INTRODUCTION AND NATURE OF ACTION

1.     This lawsuit stems from religiously and racially discriminatory actions of the Township of Jackson and its officials.  These actions include outrageous targeting of Orthodox Jews, including but not limited to acting as part of a common scheme with hostile local residents, to prevent Orthodox Jews from moving to Jackson Township and to subject them to harassment if they do.  The scheme includes the adoption of targeted land use ordinances, as well as targeted enforcement of the Township's land use ordinances.

2.     The Township's attacks on this specific minority community are part of a longstanding, coordinated scheme that has caught the attention of both the New Jersey Attorney General's Civil Rights Division, which launched an investigation of the Township's land use policies and practices and the United States Department of Justice, which has also commenced its own investigation.

3.     On March 16, 2017, the Township Council of the Township of Jackson, New Jersey, passed Ordinances No. 03-17 and 04-17 (the "School Ordinances"). The School Ordinances prohibited schools from locating in the Township's residential zoning districts, and prohibited outright dormitories throughout the Township.

4.     On September 12, 2017, the Township Council of the Township of Jackson, New Jersey passed Ordinance No. 20-17 (the "*Eruv* Ordinance" and, collectively, the "Ordinances" when discussing all three Ordinances). The *Eruv* Ordinance prohibits the establishment of any *eruv* throughout the Township by prohibiting outright the placement of articles of any nature in

the right of way of any street or public place.

5.      The purpose of each of these Ordinances was to target the Orthodox Jewish community, to prevent that community from being able to have the necessary educational institutions to teach their youth, and to discourage that community from residing in Jackson Township and practicing their religion.

6.      This action is commenced by Plaintiffs, AGUDATH ISRAEL OF AMERICA INC., a New York non-profit corporation (hereinafter "Agudath Israel"), and WR PROPERTY LLC, a New Jersey limited liability company (hereinafter "WR Property") (collectively, the "Plaintiffs"), to redress violations of their civil rights, as protected by the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq. ("RLUIPA"), the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, 42 U.S.C. § 1982, ,the New Jersey Law Against Discrimination,  and the common law of the State of New Jersey caused by the enactment of the Ordinances by the Defendant, Township of Jackson (hereinafter "Township").

7.      Specifically, the adoption of the Ordinances was motivated by discriminatory animus against the Orthodox Jewish community, they treat religious educational institutions differently and worse than various nonreligious assembly and institutional uses, they unreasonably limit and exclude religious educational institutions from the Township, they make housing unavailable within the Township based on religion, and they are meant to discourage the Orthodox Jewish Community from residing and locating in the Township.

8.      The Ordinances were enacted as part of a campaign to erect a wall on its border with Lakewood Township, where many Orthodox Jews live, in order to discourage them from

moving into Jackson. Its Mayor has told residents "Don't sell" to the Orthodox Jewish community, its Township Council President said that a suggestion that Orthodox Jews move into communities such as Jackson was "reprehensible," and referred to that community as a "threat" to Jackson, and noted that the Township Council "is on the same page" with a community that harbors substantial hostility toward the Orthodox Jewish community.

9.     The Township, through its officials, has repeatedly targeted the Orthodox Jewish community.  These unlawful Ordinances, and additional unlawful enforcement are outside the officials' lawful duties, target Orthodox Jewish individuals, and have the effect of denying these individuals their rights to housing free of harassment as guaranteed by the Fair Housing Act, and the United States Constitution, and New Jersey law..

10.     The targeted enforcement -- amounting to unlawful harassment -- of Orthodox Jewish residents of Jackson Township includes the targeting of *sukkahs*, the singling out of *eruvs* for prohibition from the Township because of their association with Orthodox Jews,  and even the "monitoring" of specific home addresses that hostile individuals have identified as being owned by Orthodox Jews.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(3), (4), 42 U.S.C. § 2000cc, *et seq.*, 42 U.S.C. § 3613(a), *et seq.*, and 42 U.S.C. § 1983, which confer original jurisdiction on federal district courts in suits to redress the deprivation of rights, privileges and immunities secured by the laws and Constitution of the United States, particularly the First and Fourteenth Amendments to the Constitution of the United States, and

the Religious Land Use and Institutionalized Persons Act of 2000 and the Fair Housing Act.

12.     This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the acts and transactions complained of occurred, and continue to occur in this District.

## THE PARTIES

14.     Plaintiff Agudath Israel of America Inc. is a non-profit organization incorporated by act of the New York legislature in 1939, with headquarters at 42 Broadway, New York, New York 10004. Agudath Israel was founded ninety-five years ago to unite a broad array of Orthodox Jews, and to serve and advocate the interests of Orthodox Jewry. It has a branch in New Jersey and actively advocates for the interests of Orthodox Jewry in this State.

15.     Jewish education is prominent among the causes for which Agudath Israel advocates. The right of Orthodox Jews to educate their children in accord with the traditions and beliefs of their faith is a central element of the religious exercise of Agudath Israel and its members.

16.     Included among Agudath Israel's members are several Orthodox Jewish residents of New Jersey and of Jackson Township itself.

17.     Those Agudath Israel members residing in Jackson Township have children who they wish to have educated in their religious faith at an Orthodox Jewish religious school.

18.     Those Agudath Israel members residing in Jackson Township either live within an

established *eruv* in the Township or wish to establish an *eruv* in the Township in order to more fully exercise their religion on the Sabbath and Yom Kippur.

19.     Orthodox Jewish individuals are significantly less likely to move to a location that does not provide adequate religious educational opportunities for their children and the ability to establish an *eruv* in their community.

20.     Defendant's Ordinances have thus impeded and interfered with the rights of Agudath Israel's members to the associational, personal, social, and professional benefits of an integrated community and one that does not discriminate against them on the basis of their religious beliefs.

21.     Agudath Israel asserts those constitutional and statutory rights on behalf of its members.

22.     Additionally, at the July 26, 2016 meeting of the Jackson Township Council, former Council President Rob Nixon announced that the Township had filed complaints with the United States Department of Justice and the New Jersey Division of Civil Rights in the Attorney General's Office, mentioning statements made by an Agudath Israel official that suggested that Orthodox Jewish persons should consider moving into towns surrounding Lakewood, New Jersey, including Jackson. Such complaints were rejected as described below.

23.     Agudath Israel thus has a particular interest in this litigation based on its own freedom of association, religious exercise and equal protection of the laws. It also seeks to vindicate its members' rights and to protect its members from anti-Orthodox hostility.

24.     Plaintiff WR Property is a domestic limited liability company formed under the laws of the State of New Jersey in 2014.

25.     Plaintiff WR Property owns approximately 4.93 acres on White Road in the Jackson Township, identified on the tax map of the Township of Jackson as Block 21401, Lot 1 ("the Property").

26.     The Property is zoned R-3.

27.     WR Property acquired the Property for the purpose of developing or marketing it for development of an Orthodox Jewish religious school. WR Property specifically seeks to assist in the development of an Orthodox Jewish religious school on the Property, and is aware of substantial interest by several entities interested in locating in Jackson Township.

28.     WR Property expended more than three hundred thousand dollars in acquiring the Property in view of such prospective development.

29.     WR Property is now unable to develop the Property as an Orthodox Jewish religious school and has lost opportunities to develop its Property for such purpose as a direct result of the adoption of the School Ordinances.

30.     Plaintiff WR Property has a direct stake, and substantial material interest in the outcome of this case.

31.     Defendant, TOWNSHIP OF JACKSON, NEW JERSEY ("Jackson Township" or "Defendant"), is a municipal corporation of the State of New Jersey, having offices at 95 West Veterans Highway, in the Township of Jackson, in the State of New Jersey.

32.     Defendant is a "government" within the meaning of 42 U.S.C. § 2000cc-5(4)(A).

33.     Defendant MICHAEL REINA is the Mayor of the Township of Jackson, New Jersey, and is being sued in his official and individual capacities.

34.     Defendant ROBERT NIXON is the Council President of the Township of

Jackson, New Jersey, and is being sued in his official and individual capacities.

35.     Defendant HELENE SCHLEGEL is the former Township Administrator of the Township of Jackson, New Jersey, and is being sued in her official and individual capacities.

36.     Defendant KENNETH PIESLAK is the Code Compliance Supervisor of the Township of Jackson, New Jersey, and is being sued in his official and individual capacities.

37.     Defendant JEFFREY PURPORO is the Zoning Enforcement Officer of the Township of Jackson, New Jersey, and is being sued in his official and individual capacities.

38.     Defendant WILLIAM CAMPBELL is the Code Enforcement Officer of the Township of Jackson, New Jersey, and is being sued in his official and individual capacities.


## FACTUAL ALLEGATIONS

**A.     Background.**

39.     Jackson Township is located within Ocean County, New Jersey.

40.     Jackson Township is approximately one hundred square miles in area.

41.     Jackson Township regulates zoning within its borders through the Land Use and Development Regulations codified at Chapter 244 of the Township's Code (hereinafter the "Land Use Code").

42.     Jackson Township is located directly to the west of Lakewood Township, New Jersey.

43.     A large Orthodox Jewish community resides in Lakewood Township.

44.     This Orthodox Jewish population, sometimes referred to as "ultra-Orthodox" or *haredi*, is characterized by distinctive dress, customs, religious practices, and educational needs,

among other attributes.

45.     Orthodox Jewish families believe that it is important for their children to be educated in Orthodox Jewish elementary and high schools. These schools teach Jewish (as well as secular) studies but, more importantly from the perspective of the Orthodox Jewish parents who send their children there, they instill in their students Jewish ethical and moral values.

46.     High schools for Orthodox Jewish boys (called *mesivtas*) are most often boarding schools.

47.     Dormitories are an indispensable component of a boarding school.

48.     Orthodox Jews, including Agudath Israel, believe that Jewish tradition values learning and the pursuit of knowledge as an all-encompassing ethic.

49.     Plaintiffs believe that this all-encompassing ethic is derived from the Bible. The Torah commands that one should "speak of [the Torah's precepts] while you sit in your home, while you walk on the way, when you retire and when you arise." Deuteronomy 6:5-9.

50.     The Babylonian Talmud, Sabbath 127a, states: "These are the precepts whose fruits a person enjoys in This World but whose principal remains intact for him in the World to Come. They are: the honor due to father and mother, acts of kindness, early attendance at the house of study morning and evening, hospitality to guests, visiting the sick, providing for a bride, escorting the dead, absorption in prayer, bringing peace between man and his fellow - and the study of Torah is equivalent to them all."

51.     Plaintiffs believe that it is essential to provide a *mesivta* education and experience for the education of Orthodox Jewish youth.

52.     Plaintiffs believe that there is a very powerful religious obligation in Jewish life to

teach children religious studies, as part of a prayer that is recited three times a day by most Orthodox Jews. The practical way of fulfilling that key religious obligation is through the medium of a religious school.

53.     It is the Plaintiffs' sincerely held religious belief that *mesivta* education should be provided in a cloistered environment.

54.     Plaintiffs believe that it is essential for *mesivta* students to be removed from the distractions of everyday life so that they may concentrate on their studies, experience a community of dedicated religious practitioners and scholars, and devote their attention to spiritual development with appropriate models and guides as to how to live their lives in accord with the Torah.

55.     Plaintiffs believe that it is important that teachers at *mesivtas* provide vital moral and spiritual examples to their students and closely supervise the students' moral and spiritual development.

56.     Plaintiffs believe that the establishment of *mesivta* to educate high-school children is in accord with the command set forth in the Mishnah, which deals with ethical behavior, to "Exile yourself to a place of Torah and do not assume that it (Torah study) will come after you, [or] that your colleagues will cause it to remain with you; and do not rely on your own understanding." (Chapters of our Fathers: Chapter 4, Mishnah 14.)

57.     The Orthodox Jewish community operates religious boarding schools in Lakewood Township and other areas with large numbers of Orthodox Jews.

58.     The Orthodox Jewish community also operates higher education institutions that would typically require dormitories.

59.    There are currently no Orthodox Jewish religious schools in the Township.

60.    Because of a shortage of available housing in Lakewood, some Orthodox Jews have moved from Lakewood Township and elsewhere to townships surrounding Lakewood, including Jackson, Toms River, Howell and Brick Townships.

61.    The Township has an estimated 500 Orthodox Jewish families living mostly in the eastern section of the Township.

62.    Since approximately 2010, Orthodox Jewish residents residing within the Township have established *eruvim* in certain neighborhoods within the Township.

63.    An *eruv* is an area enclosed by a wire boundary that symbolically extends the private domain of Jewish households into public areas, permitting activities within it that are normally forbidden in public on the Sabbath and Yom Kippur.

64.    Many Jews, including the Plaintiffs, have the sincerely held religious belief that, without an *eruv*, they are not permitted to push or carry objects outside their homes on the Sabbath and Yom Kippur.

65.    An *eruv* allows observant Jews to carry or push objects from place to place within a designated unbroken area during the Sabbath and on Yom Kippur.

66.    An *eruv* permits those observant Jews in wheelchairs and individuals with small children, in strollers or carried, to attend religious services on those days.

67.    An *eruv* also permits observant Jews to carry items such as food, medication, canes, water bottles, house keys, personal identification, books, prayer shawls and/or reading glasses on those days outside of their homes.

68.    There are many *eruvim* throughout the country. Upon information and belief, over

half of the fifty states in the United States contain at least one *eruv.*

69.     An *eruv* can involve attaching PVC plastic pipes known as *lechai'in* to utility poles and/or erecting metal poles in the road right of way, and attaching strings or wires between these poles at a height of 10-15 feet to mark the *eruv* area.

70.     The *eruvim* established in the Township consist of both *lechai'in* affixed to utility poles owned by Verizon and Jersey Central Power & Light and erection of the metal poles and the hanging of strings or wires between these poles.

71.     As a result of the *eruvim* established in the Township, Jewish residents of the Township have been able to more fully practice their religion on the Sabbath and on Yom Kippur by engaging in activities within the area of the *eruv,* at their Synagogue and in communal activities that take place in the homes of fellow community members on those days.

72.     Having an established *eruv* is crucial to Observant Jews who may desire to relocate to Jackson Township, so that they may reside in a community where they can freely and fully exercise their religion.

73.     This attempt by Orthodox Jews to obtain housing and reside in the Townships surrounding Lakewood has been met with substantial resistance among residents in these surrounding Townships.

74.     It has also been met with legislative and other governmental action targeting the needs of the Orthodox Jewish community.

75.     Jackson Township has been at the forefront of such opposition, taking various actions to discourage the Orthodox Jewish community from moving into its jurisdiction.

76.     Jackson Township adopted (1) Ordinances 04-17 and 03-17, which (a) banned

schools from residential zoning districts, leaving them as permitted uses in only a small fraction of the Township's jurisdiction; (b) banned dormitories entirely from the jurisdiction; and (2) Ordinance No. 20-17, which prohibited the establishment of an *eruv* anywhere within the Township's right of way.

**B.     Ordinances 03-17 and 04-17 Prohibit Schools from Residential Zoning Districts and Bans Dormitories Completely from the Jurisdiction.**

77.     On February 14, 2017, the Township Council introduced two Ordinances, Ordinance No. 03-17 and Ordinance No. 04-17.

78.     Ordinance No. 03-17 sought to amend sections 244-46, 244-48, 244-50 of Jackson Township's Code to prohibit "private or parochial schools not operated for profit" from locating in the R-2, R-3, R-5, R-20, R-15 and R-9 Residential zoning district and the MF Multifamily zoning district.

79.     Prior to the enactment of Ordinance No. 03-17, "private or parochial schools not operated for profit" were permitted in the R-2, R-3, R-5, R-20, R-15, R-9, and MF zoning districts by right.

80.     Private and parochial schools were already banned in the R-1 zoning district in 2010, as described below, and in the R-30 district.

81.     Schools remain permitted only in the PMURD, LC, NC districts, which constitute a small fraction of the land in Jackson Township and even less of which is available or developable, and also within zoning districts in the "Pinelands" area of the Township, where development is severely constrained.

82.     Ordinance No. 03-17 does not provide a reasonable opportunity for the Orthodox

Jewish community to locate a religious school the Township.

83.     Ordinance No. 03-17 also amended section 244-48 of Jackson Township's Code to prohibit "public schools" as a permitted use in certain zoning districts. Upon information and belief, the reason for this is because New Jersey law prohibits differential treatment between public and private schools. Additionally, the Township already has several public schools that were sited in residential zoning districts, including two recently constructed as discussed below.

84.     Ordinance No. 03-17 also banned "dormitories" throughout Jackson Township.

85.     The Ordinance includes a definition of "dormitory" in the Township's Land Use Code under section 244-6 entitled "Definitions" as:   "Any building, or portion thereof, designed or converted to contain living quarters which are provided as residences or for overnight sleeping for individuals or groups, operated as an accessory use to a school, college, university, boarding school, convent, monastery, non- profit educational institution, religious order, or other."

86.     Such "Dormitories" are "dwellings," as that term is defined by the Fair Housing Act, 42 U.S.C. § 3602.

87.     Ordinance No. 03-17 also created a new section of the Land Use Code, section 244-176.1, entitled "Prohibited Uses" that provides:

> a.      All uses not expressly permitted in any given district are expressly prohibited in such district. No structure or addition thereto shall be built, moved or remodeled and no land shall be used, occupied, reoccupied, designed or improved for use or occupancy except for a use that is expressly permitted within the zone.
>
> b.      The following shall be prohibited as principal or accessory uses or structures in all zoning districts within the Township of Jackson:
>
> (1) Dormitories

88.     There are no prohibited uses under the new section of Jackson Township's Code §

244-176.1 other than dormitories.

89.     Ordinance No. 04-17 mirrored Ordinance No. 03-17 with respect to the addition of a definition of dormitory and the creation of § 244-176.1 entitled "Prohibited Uses." Ordinance No. 04-17 did not include the prohibition on schools in residential districts.

90.     Upon information and belief, the Township was aware of the Orthodox Jewish community's need for religious schools with dormitories, including knowledge of recent action against Ocean Township, New Jersey (Civ. No. 16-0096) where this Court held that preventing a religious school with dormitories from locating in the Township violated RLUIPA and ordered the Township to permit the operation of such school, and against Howell Township, New Jersey (Civ. No. 16-2457), where this Court held that the plaintiffs' claims could proceed where they "allege that Defendants harbor hostility towards the ultra-Orthodox Jewish faith."

91.     The first reading of the School Ordinances took place at the Jackson Township Council's January 24, 2017 meeting.

92.     The School Ordinances were placed on the agenda for second reading and adoption at the Township Council meeting on February 28, 2017.

93.     Over 150 Orthodox Jewish Township residents appeared at the February 28 meeting in opposition to the School Ordinances.

94.     Many Orthodox Jews spoke against the proposed School Ordinances, informing the Jackson Township Council of the significant impact they would have on the Orthodox Jewish community.

95.     The Township tabled the School Ordinances at the meeting, indicating that they had to be approved as consistent with the Township Master Plan by the Township Planning

Board before adoption.

96.    The Asbury Park Press reported in an article the next day, March 1, 2017, entitled "Jackson Pulls Back on Dorm Ban," that included:

> The measure has engendered controversy as many see it as aimed at curtailing the recent influx of Jewish families as the borders of the neighboring Lakewood community rapidly expand.

97.    The Township Planning Board approved the adoption of the School Ordinances at its March 6, 2017 meeting, to the applause of over 200 non-Orthodox Jewish residents in attendance.

98.    The second reading of the School Ordinances took place at the Township Council's March 16, 2017 meeting.

99.    Many of the residents who spoke at the March 16 meeting referred to Lakewood and the Orthodox Jewish community and indicated that they supported the School Ordinances to prevent Jackson from becoming like Lakewood.

100.    One Jackson resident who was questioning Ordinance 03-17's exclusion of public schools stated: "It's a little shortsighted. It seems like you're shooting yourself in the foot to solve a problem here. . . . If the problem is to keep Jews out of Jackson, then you need to . . ." and was silenced by the Council.   The Council's Attorney stated in response: "All such comments become part of the record.  To highlight a particular group and to suggest that is part of the motivation of Council, ask that you refrain from making those comments."

101.    Another resident stated at the March 16, 2017 meeting: "I see you moving here to change or convert our town to accommodate the small Jewish population that is just beginning to move into towns adjacent to Lakewood. I see the Jewish population forcing and pushing their

cultural and religious way of life on Jackson its residents and our neighbors the way it has done in Lakewood for years." His comments resulted in considerable applause from the residents in attendance.

102.    Another resident stated at the March 16, 2017 meeting: "Every home [in Lakewood] comes with a temple, a school for the Jewish." His comments also received substantial applause from the residents.

103.    The Township Council adopted the School Ordinances at its March 16, 2017 meeting.

104.    Notice of adoption of the School Ordinances was published on March 24, 2017.

105.    Schools are now prohibited throughout the Township's residential zones.

106.    Various public schools have been developed throughout the Township in residential zoning districts, including a public high school in 2006.

107.    Dormitories are now prohibited throughout the Township in its entirety.

108.    There is no location within the Township where a private religious school with dormitories can be located as a permitted or conditional use.

109.    Public schools do not have dormitories.

110.    Plaintiff WR Property cannot now develop its property as a religious school.

111.    Plaintiff Agudath Israel's members that live in Jackson are prevented by the School Ordinances from living in a community that provides a religious school with dormitories for their children.

112.    Plaintiff Agudath Israel's members that live in Jackson are prevented by the School Ordinances from living in a community that permits reasonable opportunities to locate

religious schools within its jurisdiction.

113.    Other members of Plaintiff Agudath Israel that may seek to move to Jackson will be discouraged from doing so because of the lack of religious school opportunities.

114.    The purpose of the School Ordinances was to prevent Orthodox Jewish religious schools from locating in Jackson Township.

115.    The Township Council was not motivated by any legitimate nondiscriminatory reason in adopting the School Ordinances.

116.    In adopting the School Ordinances, the Township Council was motivated by animosity toward the Orthodox Jewish community.

117.    In adopting the School Ordinances, the Township Council was directly responsive to residents who supported the School Ordinances and were substantially motivated by hostility against Orthodox Jews.

118.    In enacting the School Ordinances, the Township presented no evidence that religious schools with or without dormitories would threaten any Township interest generally, or would threaten any Township interest more than various permitted uses.

119.    The Township possesses no compelling or sufficiently substantial governmental interest to justify the restrictions contained in the School Ordinances.

120.    The Asbury Park Press published an article that evening, entitled "Jackson dorm law advances amid cries of anti-Semitism." Some of the public comments appearing in that news article and in the public comments section include: "Great job! Don't let the cult out of Lakewood!," "Hasidics will always play the race card when they don't get their way," and "Now the Orthodox will go to a corrupt federal judge and he will overturn the town ordinance. The fix

is in."

121.    In an article published on March 16, 2017 in the Asbury Park Press, anti-

Orthodox comments by members of the public in and to the story included:

    i.    "Okay, Now for step #2. They lost locally. Now they'll go find a corrupt federal judge and he'll/she'll rule in favor of the Orthodox Jewish group (the Judge has already been bought and paid for). This is the way they do things."

    ii.    "The Hasidism have enormous resources even as many of them are on welfare."

    iii.    "What the Jews are doing is wanting people who have lived for decades in Jackson to sell their beloved homes, leave behind the lives they have built in Jackson, so they can ship more of their people into Ocean County. There is a major reason why Trump was elected. Because American citizens are sick and tired of being pushed out of their homes, their jobs; all for people to come here to take away the benefits-that American citizens fought so hard to have. We were never a socialist country, but I witness too many times the Hasidic's pulling out their cards from the gov't for free stuff. And now they want to take our very town from us. A message to the Hasidic-the Old Testament states to not covet anything of your neighbors-including their homes. Exodus 20:17"

    iv.    "Please don't be so naive. First of all, it's not the Jews! You are painting a lot of very nice and hard-working people with a terrible brush. All of your problems only stem from the Ultra-Religious! The Hasidics and Ultra- Orthodox! And then it's mostly the rabbis and the rich developers who are to blame! The followers are sheeple who are cut off from the modern world and don't know much about anything! If you really want to see what's going on just Google Monsey, NY, Kiryas Joel, NY and Bloomingburg, NY. There is a population explotion in Brooklyn, and they are coming to a town near you. And no, they won't go away - they will double their numbers in about 10 years. So figure out who will be the majority soon in Jackson. Oh, and they do know how to pay off the politicians, don't they?"

122.    John Burrows, a former member of the Township Board of Adjustment, made the

following comment on Facebook which was subsequently published by a local news outlet:

This September 10 being suicide awareness day I implore senator Singer to step up and commit suicide.

He is nothing but the byproduct of a human body eating matzoh and gafelta fish.

His actions as a senator are only to advance the mischievous will of the Lakewood cult.

He is deplorable and why King Gilmore allows this to happen is the problem. Perhaps both of them should commit suicide!

After many years of watching senators Singer's proposals and interests which are solely to support and advance the Lakewood medieval cult, on the backs of the surrounding communities it's time to come to an end. He is so obviously bought, paid for, and in the pocket of the Lakewood cult, I do not know why he is allowed to hold this position and should be terminated, or he should do the honorable thing and DIE!

Also Lakewood should no longer have 3.5% tax, especially if their goal is to be the 3rd largest city in nj. they are prospering way too much, another gift from that POS Singer, pay you far share you filthy f'ing cockroaches!

123.   Other anti-Semitic comments by members of the public in the Township have included:

- "Are you crazy! You don't live near Lakewood. You don't see the abuse of this fake group. The LCSW[1] is not the law. Our Police are great and we don't need any bias freelance vigilantes on our streets."

- "Its a Un-American social terror who only care about there special interest. How dare you tread on our trained and tax paid police. Just because Ultra-Orthodox cry anti-Semitic ever 5 minutes to get their way dosent mean we have to bend our law to put up with crooked fake LCSW we want to be police bull. Why don't you write about the child molestation rampid in that community, and the out of control childbirth rates taxing our worlds resources or the Herpesvirus spread by the mohel putting there mouth on babie privets!! That's child molestation according to Dryfus."

- "On Sunday's I am Christian I celebrate sabath and do not work.

---

[1] *See infra.*

But I turn on lights and drive . I classify work differently then Jews people ... How about light timers. How about waking to a local clinic and seeing a dr and him administering medicine. I Would never ask a police officer. I suppose they should have Christian friends or hire christian people as helpers on sabath so the police officers can do the job and protect the community. Lakewood is filled with guns and drugs ... They need to be on patrol. Not switching lights and getting meds from the pharmacy."

- "The members of the Orthodox community just won't accept the fact that a well kept Christian neighborhood have seen the results of what happens when Orthodox Jews move into a neighborhood. Just by taking a ride through Lakewood is proof positive."

- "I agree with you . Why they live off the public dole is a mystery to me. Why aren't they responsible for paying taxes? They also over breed"

124.    On March 8, 2017, the Township issued a statement titled "Dormitory Ordinance" that addresses the School Ordinances.

125.    The Township's "Dormitory Ordinance" statement attempted to justify the exclusion of schools and dormitories by stating that schools were now "permitted within certain zones of the Township," namely commercial zones, and that prohibiting dormitories is justified because "residential uses are not permitted in the Highway Commercial or Neighborhood Commercial zones."

126.    It is the School Ordinances that restricted schools to commercial zones.

127.    The tortured logic of the "Dormitory Ordinance" statement demonstrates that the purported reasons for the School Ordinances are pretextual, and designed to mask the Township's discriminatory intent.

128.    The Township enacted the School Ordinances in order to prevent Orthodox Jewish religious schools and religious boarding schools from locating and operating in Jackson

Township, and to discourage Orthodox Jews from moving into the Township.

129.    There have been no negative impacts by educational institutions with dormitories in Jackson Township, as there are none.

130.    Upon information and belief, the only "dormitories" in Jackson Township are housing units that continue to be operated by Six Flags Great Adventure for its seasonal employees.

131.    The Township has no land use concerns about the Six Flags dormitories, nor has it effected any enforcement action against such dormitories.

132.    While Jackson Township's Code bans dormitories from operating anywhere within its jurisdiction, the Township Code permits other land uses that entail group residential components. For example, the Code permits the construction and operation of "Community residences for the developmentally disabled," "Community shelters for victims of domestic violence," and "Life care facility or development" in various of its residential zoning districts.

133.    The Code also permits the construction and operation of "Hotel or motel," "Hotels with a minimum of 30 guest rooms," "Age-restricted multifamily dwellings," "Assisted living facilities," and "Rehabilitation facilities" in various of its zoning districts.

134.    Jackson Township also permits multifamily residential construction in its "MF Multifamily Zone," "MF-AH-6 Multifamily Affordable Housing Zone," "PRC Planned Retirement Community Zone," and "PMURD Planned Mixed Unit Residential Development Zone."

135.    Jackson Township also permits mobile homes in its "MHP Mobile Home Park Zone."

136.    While Jackson Township's Code bans schools in all of its residential zoning districts, it permits other assembly and institutional land uses in various residential zoning districts, including "Municipal parks, playgrounds and other such municipal buildings and uses," "Federal, state, county and other public buildings and grounds, including public schools, parks, playgrounds or other public recreational uses or areas," "Child-care centers, nursery schools and day-care centers," "Health care facilities," "Hospitals, philanthropic or eleemosynary uses," and "Quasi-public and private club recreation areas."

137.    Jackson Township contains a wide variety of large assembly, institutional and commercial land uses, including the Six Flags Great Adventure, the Jackson Premium Outlets, ten public schools, several assisted living facilities, funeral homes, medical facilities, campgrounds, golf clubs, and rehabilitation facilities.

138.    Jackson Township is the largest municipality by area in Ocean County.

139.    Defendant Reina was quoted in an April 2017 news article as supporting commercial development including hotels near Six Flags Great Adventure.

140.    There is no legitimate governmental interest in prohibiting new schools of any nature from the residential zones of the Township.

141.    There is no legitimate governmental interest in prohibiting dormitories throughout the Township's jurisdiction.

142.    The Township cannot demonstrate that there exists no less intrusive means of achieving any government interest other than prohibiting schools completely from residential zoning districts and prohibiting dormitories completely from its jurisdiction, or that it has narrowly drawn its regulations to serve its interests.

**C.**	**Ordinance No. 20-17 prohibits the establishment of *eruvim* within the Township and was enacted for a discriminatory purpose.**

143.	The Township became concerned about *eruvs* existing within the Township in July 2016.

144.	On July 7, 2016 Defendant Michael Reina, in an email to the Township attorney and Defendants Helene Schlegel, Robert Nixon and Kenneth Pieslak, wrote that "Code has been made aware to look out for any obstructions be they signs, above head wires, ropes, etc…"

145.	Upon information and belief, Reina's reference to "Code" refers to the Township's Code Enforcement Officer.

146.	On August 29, 2016 Defendant Reina sent an email to a Jackson Township resident, copying Defendants Nixon and Schlegel, which stated in part "we are looking at the issue regarding the use of ERUV wires and their placement within the public ROW."

147.	In the Spring of 2017, certain Orthodox Jewish Township residents organized themselves as the Jackson Eruv Association (the "JEA").

148.	Members of the JEA sought to move forward with expansion of the existing *eruvim* in the Township.

149.	A representative for the JEA contacted Verizon and was advised that the first step in this process was to contact the Township and acquire municipal consent to expand the existing *eruvim*.

150.	On July 17, 2017, a JEA representative emailed the Township to request guidance on how best to proceed with respect to the *eruv* expansion.

151.	On July 27, 2017, the Township responded by citing to § 372-8 of the Township

Code stating: "Requests to the Council for such permission must be in writing, addressed to the Council and provided to the Township Clerk. Requests must specify the location, type of object and reason for requesting permission."

152.    § 372-8 of the Township Code at the time read as follows:

Obstruction of streets restricted.

No person shall encumber or obstruct any street or public place with any article or thing whatsoever unless permission has been first obtained in writing from the Township Committee of the Township of Jackson.

153.    Violation of § 372-8 was punishable by a fine of not less than $100.00 or more than $2,000.00 or imprisonment for a term not to exceed 90 days, or both.

154.    The Township had previously made a determination in April 2017 that no Ordinance was being violated by the presence of the *eruvim*.

155.    Defendant Pieslak, the Township's Code Compliance Supervisor, on April 6, 2017, specifically wrote to a resident, in part:

We are aware of the group of homes that have installed the poles connected by the wire in Brookwood []and found there to be no violation of any Ordinance/Law.

156.    On April 24, 2017, Defendant Purporo, the Zoning Enforcement Officer, specifically wrote, in part:

So if I were to ask for these wires to be removed, I'd have no black and white codes to cite.

. . . .

Bottom line, from a Planning and Zoning perspective, relative to Chapter 244, as nothing seems to exist on this matter, I have nothing to enforce.

157.    It was not until there was pressure from Township residents, as discussed below,

that the Township cited to a violation of § 372-8 of the Township Code.

158.    On August 7, 2017, the JEA made application to the Township for the continued existence of the *eruv* established in the Brookwood and Pitney neighborhoods of the Township.

159.    Shortly thereafter, the JEA made application to the Township for the continued existence of the *eruv* established in the White's Road neighborhood of the Township.

160.    The Township distributed a flyer to residents indicating that all residents had ten days to comply with the provisions of § 372-8 of the Township Code.

161.    The flyer included pictures of basketball hoops, advertising signs, real estate signs, for sale signs, poles and *eruv* wires.

162.    In July 2017, the Township began a coordinated and active campaign to target enforcement of § 372-8 of the Township Code by issuing notices of violation of same to residents.

163.    Upon information and belief, approximately twelve notices of violation of § 372-8 of the Township Code were issued to Township residents in the first six months of 2017.

164.    Upon information and belief, approximately 268 notices of violation of § 372-8 of the Township Code were issued to Township residents in the two months of July and August 2017 alone.

165.    Upon information and belief, seven of these Notices of Violation directly concerned removal of *eruv* markers, although an additional three concerned removal of metal poles, and fourteen provided no description.

166.    Upon information and belief, approximately 213 of the Notices of Violation concerned removal of basketball hoops.

167.    Upon information and belief, such enforcement of the Township Code was designed to appear neutral with notices of violation issued for basketball hoops, signs, bushes blocking sidewalk, and brush blocking the right of way as well as for *eruv* markers.

168.    Upon information and belief, Notices of Violation for removal of any obstructions or items other than *eruv* markers was a subterfuge to conceal the discriminatory intent behind the issuance of the Notices of Violation, which was to abolish *eruvim* throughout the Township.

169.    On August 11, 2017, at the request of Agudath Israel, the Township agreed that it would not issue summonses to residents who received Notices of Violation for the removal of *eruv* markers on utility poles pending receipt of requests for permission to place *eruv* markers and formal action by the Jackson Township Council granting or denying those requests.

170.    Thereafter, instead of reviewing such requests, on August 22, 2017, the Township introduced Ordinance No. 20-17 which amended § 372-8 of the Township Code.

171.    Ordinance No. 20-17's preamble stated that it was being enacted: "in light of the recent spate of enforcement of § 372-8 of the Township Code 372-8 of the Township Code which prohibits obstruction of the right of way throughout the Township, the Township Council believes it is necessary to avoid confusion and any possibility of uneven treatment of articles in the Township right-of-way."

172.    Pursuant to Ordinance No. 20-17, § 372-8 of the Township Code was replaced in its entirety with: "No person shall encumber or obstruct any street or public place with any article or thing whatsoever."

173.    Under Ordinance 20-17, the second clause of Section 372-8 that the Township may grant permission to residents was removed in its entirety.

27

174.    The first reading of the Ordinance took place at the Jackson Township Council's August 2017 meeting.

175.    The second reading of the Ordinance took place at the Township Council's September 12, 2017 meeting.

176.    According to a local news report, "[h]undreds of Orthodox residents of the Township showed up" at the September 12, 2017 meeting "to plead their case to the township council, but the body remained strong in their intent to keep Jackson eruv free."

177.    According to the same news article, "Mayor Michael Reina said the enforcement came at the request of the township council through Business Administrator Helene Schlegel after some residents asked why the code enforcement department wasn't enforcing the right of way ordinances," and "Council President Ken Bressi disputed that claim in August, saying he was surprised to find out the mayor's office initiated the crackdown upon returning home from a vacation."

178.    The Township Council adopted the Ordinance at its September 12, 2017 meeting.

179.    As a result of the adoption of Ordinance No. 20-17, *eruvim* are now prohibited throughout the Township.

180.    Enactment of Ordinance No. 20-17 occurred against a backdrop of extreme anti-Semitic hostility in the Township.

181.    Township residents have written to the Township Council stating the following:

- "Lakewood looks like a spider web has be dropped on it and I certainly don't want to see it happen to our wonderful town."

- "We need our township governing body to stand firm and assure us that this will not be allowed. This has the potential of being just the first step in converting Jackson into another Lakewood."

- "It seems as if the Hacidic families are grouping their houses

together for some reason bc a non-Hacidic family was asked if they could put poles on their property. No one should even be allowed to ask that or for residents to free pressured to allow them to do so. If this is a cultural or religious symbol, it creates a VERY divided community with physical boundaries of separation.

- Just like the Jim Crow laws labeling "white or black fountains", this is a sign that "Hacidics only" are welcome…"

- "Things like this are definitely changing the landscape of Jackson"

- "Can you imagine driving past Harmony farms with poles & wires labeling it as Orthodox owned & run? What is going to be done, they are 10 steps ahead of us."

182.   In response to an inquiry from a Jackson Township resident regarding enforcement of the Code with respect to *eruv* wires, the Township Business Administrator responded: "We are requesting that our Township Attorney provide us with previous legal decisions regarding these wires that will provide a firm answer that we can solidly defend."

183.   Plaintiff Agudath Israel's members that live in Jackson are prevented by the Ordinance from living in a community that permits the establishment of an *eruv* and the ability to engage in ordinary and reasonable activities such as carrying a child, pushing a stroller, using a wheelchair, riding a bike or holding a key on the Sabbath and Yom Kippur.

184.   Other members of Plaintiff Agudath Israel that may seek to move to Jackson will be discouraged from doing so because of the lack of an ability to establish an *eruv*.

185.   The purpose of the Ordinance was to discourage Orthodox Jewish individuals from residing in Jackson Township.

186.   The Township Council was not motivated by any legitimate nondiscriminatory reason in adopting the Ordinance.

187.   Upon information and belief, enforcement of § 372-8 of the Township Code by

the issuance of Notices of Violation for *eruv* markers as well as adoption of Ordinance No. 20-17 was motivated by complaints from the public regarding the established *eruvim* in the Township and an openly anti-Semitic campaign by the public in the Township.

188.    Upon information and belief, as early as September 2016, Defendant Reina indicated to a Jackson Township resident, "we are looking at the issue regarding the use of ERUV wires and their placement within the public ROW."

189.    In adopting the Ordinance, the Township Council was substantially motivated by hostility toward the Orthodox Jewish community.

190.    In adopting the Ordinance, the Township Council was directly responsive to residents who supported the Ordinance and were substantially motivated by hostility against Orthodox Jews.

191.    In enacting the Ordinance, the Township presented no evidence that an *eruv*, which had been in existence for over six years in the Township, would threaten any legitimate Township interest.

192.    The Township possesses no compelling or sufficiently substantial governmental interest to justify the restriction contained in the Ordinance.

193.    There is no legitimate governmental interest in prohibiting the establishment of *eruvim* throughout the Township.

194.    There still exist blue ribbons affixed to utility poles in the Township, for which the Township has not taken enforcement action.

195.    There still exists a flag affixed to a utility pole in the Township, for which the Township has not taken enforcement action.

196.     There still exists a basketball hoop affixed to a utility pole in the Township, for which the Township has not taken enforcement action.

197.     The Township has continued to permit these obstructions and encumbrances to its streets.

198.     Subsequent to adoption of the Ordinance, the Township attorney recognized: "If a utility pole lawfully exists in the Township and was lawfully erected with municipal consent, a person may enter into an agreement with the owner of the pole for the use of the pole. NJSA 48:3-19."

**D.     The Township's Pattern and Practice of Discrimination Against the Orthodox Jewish Community.**

199.     The adoption of the Ordinances is part of a pattern of Jackson Township discriminating against Orthodox Jews and discouraging them from moving into the Township.

200.     This policy of discrimination against Orthodox Jews has manifested itself in a number of ways over the last several years.

201.     Members of the Orthodox Jewish community have recently sought housing in Jackson Township.

202.     Members of the Orthodox Jewish community and real estate agents serving that community have inquired into the potential availability of homes, which has caused an outcry against the Orthodox Jewish community by Jackson Township residents.

203.     Certain Jackson Township residents have initiated and participated in a campaign known as "Jackson Strong," which is intended to discourage homeowners from selling to the Orthodox Jewish community.

204.    Upon information and belief, Jackson Township officials support this campaign.

205.    A Jackson Township resident published the following comment on a social media website concerning a meeting with Defendant Reina:

> A great report from a resident who went the the Meet the Mayor meeting last night with [Jackson Township] Mayor Mike Reina and we thought we'd share.
>
> . . . .
>
> Meet the Mayor was a success. The signs will be Great Success to let everyone know Don't Sell Jackson Strong! The mayor said the key to keeping Jackson the way we all know and love it is Tell your neighbors DONT SELL. STAY STRONG!

206.    Upon information and belief, Mayor Reina's statement "Tell your neighbors DONT SELL" referred to the sale of homes to the Orthodox Jewish community.

207.    In reaction to a statement made by Rabbi Shmuel Lefkowitz, an official of Plaintiff Agudath Israel, that young Orthodox Jewish families should consider moving to jurisdictions in the vicinity of Lakewood, including Jackson, the Township took various steps to discourage Orthodox Jews from moving to the Township.

208.    Local media reported that Defendant Nixon, president of the Jackson Township Council, stated that Agudath Israel's statements regarding Orthodox Jews moving into areas such as Jackson was "not acceptable" and "reprehensible."

209.    Township residents vehemently expressed their concern to the Township about the possibility of Orthodox Jews moving to Jackson Township.

210.    A reported account of a Township Council meeting stated that Defendant Nixon told Township residents that "the threat can be eliminated if people held their ground and refused the offers being made on their properties and remain committed to Jackson Township and their

neighbors."

211.    Nixon announced that the Township filed complaints with the United States Department of Justice and the New Jersey Attorney General asserting that Orthodox Jews' attempts to buy homes in the Township constituted so-called "blockbusting."

212.    These complaints were made despite the fact that such offers to purchase homes in the Township were by members of the Orthodox Jewish community that sought themselves to move into the Township, and were generally made in substantial excess of their actual value.

213.    Such efforts to move into a community do not constitute "blockbusting," either under New Jersey or federal law.

214.    The New Jersey Attorney General's Office rejected the Township's complaint.

215.    The United States Department of Justice, after reviewing the Township's complaint, responded to the Township's attorneys on October 14, 2016 that "we have determined that no action by the Department of Justice is necessary at this time."

216.    The Township's actions in filing these complaints were responsive to local residents' hostility towards the Orthodox Jewish community.

217.    At the Township Council's July 26, 2016 meeting where Defendant Nixon announced the Township's complaints made to federal and state authorities, a large number of local residents participated in the public comment section.  Nearly all of the comments were hostile toward the Orthodox Jewish population and Lakewood.

218.    In response to these public comments, Nixon stated: "[E]veryone in this room is on the same page."  (Emphasis added.)

219.    In order to further discourage Orthodox Jews from purchasing homes in Jackson

Township, in or about August 2015, the Township adopted a "no-knock" ordinance that prohibits individuals from knocking on doors in the Township unless they are registered with the Township, and prohibits solicitation at premises that are listed on a "No-Knock Registry."

220. Penalties for violation of the ordinance include fines of $1,250 and 90 days in jail.

221. The "no-knock" ordinance was specifically aimed at members of the Orthodox Jewish community soliciting homeowners regarding the potential sale of their homes.

222. Other forms of door-to-door canvassing including political campaigning and non-profit fundraising are unaffected by the "no-knock" ordinance.

223. Former Township Council President Barry Calogero admitted that a majority of the complaints brought by residents involved the Orthodox Jewish community.

224. The Township's adoption of the "no-knock" ordinance was responsive to local residents' hostility towards the Orthodox Jewish community.

225. Defendant Nixon stated that all Jackson Township residents should sign up for the no-knock registry.

226. Nixon further stated: "Don't believe those who attempt to flippantly dismiss this tool. Our law is strong, it's effective, and its penalties hit harder than those laws passed in towns nearby."

227. Jackson Township has been involved in affordable housing litigation for several years.

228. In a state court action (Docket Nos. L-822-92, L-1879-15) related to Jackson Township's *Mount Laurel* affordable housing obligations, the issue of the Township's refusal to adopt Ordinance 30-16, which would have created a "Planned Inclusionary Community Zone,"

and the reasons for such refusal, were raised by certain parties.

229.   Ordinance 30-16 would have provided for affordable housing units, integrated with market rate units to be developed in the Township.

230.   Ordinance 30-16 was the result of extensive negotiations between the developers of a potential housing site and the Township.

231.   During the course of those proceedings, in 2016 Township representatives repeatedly stated that they wanted to (a) limit the number of bedrooms that such housing development would include; and (b) substantially reduce the size of the "clubhouse" included in such development or eliminate it entirely.

232.   A statement read by the Jackson Township Attorney at the November 29, 2016 Township Council meeting regarding Ordinance 30-16 stated in part: "The revised ordinance hasn't addressed any of the issues (clubhouse and bedroom restrictions and small minimum lot sizes) raised in Item 12 of my previous memo."

233.   Upon information and belief, the Township's opposition to greater numbers of bedrooms and restrictions on a clubhouse was directly related to its hostility toward the Orthodox Jewish community.

234.   A certification filed in that action stated in part:

> Township representatives articulated the rationale for bedroom restrictions and the elimination of or reduction in size of the clubhouse -- preventing and inhibiting Jewish people from Lakewood Township (commonly referred to as Orthodox) from moving into the EL site.

235.   Plaintiffs believe that Jews should "be fruitful and multiply" and are obliged to have children, as "[a]lthough a man has fulfilled the mitzvah of be fruitful and multiply -- he is commanded by the rabbis not to desist from procreation while he yet has strength, for whoever

adds even one Jewish soul is considered as having created an entire world." Moses Maimonides, Mishneh Torah, Hilkhot Ishut 15:16.

236.   These religious beliefs often result in larger family sizes for Orthodox Jews and a need for more bedrooms.

237.   The clubhouse referenced with respect to Ordinance 30-16 would have been available for use by the Orthodox Jewish community for worship services and other religious events.

238.   Clubhouses are otherwise explicitly permitted by Township's Land Use Code in the PRC, PMURD, MF-AH-6, and MHP zoning districts.

239.   No motion or second was made by any member of the Township Council on Ordinance 30-16 at the Township Council's meeting on November 29, 2016, resulting in the ordinance not moving forward.

240.   The Township residents in attendance at the meeting applauded at the result of Ordinance 30-16 not moving forward.

241.   Another example of hostility toward the Orthodox Jewish community is the Township's actions with respect to the Lakewood Civilian Safety Watch ("LCSW"), a neighborhood watch group, from entering its jurisdiction.

242.   Despite Jackson Township's police chief Matthew Kunz stating—after investigating complaints by Township residents—"Please know that no evidence of the alleged activities was discovered or corroborated in the course of investigating the matter. This is a civilian group, and they appear to be cognizant of their limitations," Defendant Reina ordered him to advise the LCSW not to patrol the Township.

243.   Subsequently, the Township Council passed Resolution No. 192R-16, which bans local police from affiliating with any neighborhood watch group based outside of the Township.

244.   Resolution No. 192R-16 states in part:

    1.   The Jackson Police Department shall not cooperate with or form any association with any neighborhood watch organized outside of Jackson Township.

    2.   A neighborhood watch organized in Jackson Township shall not use any vehicle, uniform or ID cards and shall not receive training or assistance from any organization other than from a federal, state, county or local law enforcement agency

245.   Township Council president Nixon said that the action came in response to complaints from residents who were unhappy that the LCSW had been observed patrolling Jackson streets.

246.   In 2010, the Township adopted Ordinance No. 30-10, which created an "R-1 Residential Zone," which excluded schools as a permitted or conditional use in the R-1 zoning district.

247.   A significant area of the Township was thereafter rezoned "R-1 Residential."

248.   The rezoning of property within the Township to the R-1 zoning district occurred predominantly near the Township's border with Lakewood Township.

249.   Many Orthodox Jews who live in Jackson Township near the border of Lakewood Township live in the areas rezoned to R-1.

250.   A large residential development called "Westgate" was developed in the late 1990s on the western edge of Lakewood Township, adjacent to the area in Jackson Township where much of the R-3 zoned property was rezoned R-1 in 2010.  Nearly all of the residents of the Westgate development are Orthodox Jews.

251.    Two of the most recently developed public schools in the Township are the Elms Elementary School located on Goetz Lane and the Jackson Liberty High School located on North Hope Chapel Road. Elms Elementary was completed in 2004 and houses over 830 students and 55 full-time teaching staff. Liberty High was completed in 2007 and has approximately 1,400 students and 90 full-time teaching staff.

252.    At the time of their construction, both Elms Elementary and Jackson Liberty High School were located in residential zoning districts. Upon information and belief, Liberty High and Elms Elementary did not experience any public hostility or opposition by the Township to their location and/or construction.

253.    Jackson Liberty High School is located very near the border with Lakewood and near Lakewood's Westgate community.

254.    Upon information and belief, the former president of the Jackson Township Board of Education stated that the Board condemned property near the municipal border with Lakewood in order to prevent the Westgate development from spreading into Jackson Township. She stated that the goal of preventing the Westgate development from spreading into Jackson Township overrode all other criteria, including the fact that the location was very close to the existing Jackson Memorial High School and that the municipality owned enough property in central and western Jackson Township to build a new high school without the need to exercise its condemnation powers.

255.    Larry Schuster is a former alternate on the Township Board of Adjustment, appointed by the Mayor and Council to that position.

256.    Upon information and belief, on August 7, 2017, Larry Schuster commented on a

news article on NJ.com regarding an elite Orthodox Jewish college in Lakewood New Jersey stating: "Job placement ? They don't work !"

257.    Upon information and belief, Larry Schuster made other anti-Semitic comments, including "There is a small fee to post ads here --- 1-A Jew joke. . . ," and "Jew got to be kidding me."

258.    The Oros Bais Yaakov High School, an Orthodox Jewish religious girls school, recently attempted to locate in Jackson Township. In 2013, the school applied to the Jackson Township Zoning Board of Adjustment for a use variance to permit its use.

259.    Substantial hostility of Township residents toward the Orthodox Jewish community was demonstrated during the hearings.

260.    The Zoning Board denied the school's use variance application.

261.    Zoning Board members were directly responsive to the questions and statements made by Township residents hostile toward to that school.

262.    In the context of the use variance application, Township Zoning Board members made various comments relating to Lakewood Township. Another Board member made the following statements:

    a.    "[T]hat is a private school and is exclusively for the use of the Orthodox community; there will be no other children of other religions admitted to that school without being able to pass a strict religious component, "

    b.    "And I want to relate something that I experience during my time living in Lakewood, I attended a meeting at the municipal courtroom in Lakewood during which the titular head of the Orthodox community in Lakewood, Rabbi Schenkolewski, stated several times that 'the Orthodox community will never assimilate; therefore, they stand alone.'"

    c.    "[A]nd I think that the community of Jackson cannot expect the

Orthodox residents in Jackson to assimilate into the Jackson community as a whole in the same way that they will not do so in Lakewood."

263.    Other <u>Zoning Board members</u> that voted on that school's application made the following statements about the Orthodox Jewish community on social media websites:

    a.    "Jackson is not prepared for the tsunami of orthodoxy that is mounting at the border. I beg you all to CONFRONT OR ACCOST the council members and demand that they appoint Rae Ann Walker to the zoning board she is strong enough and smart and will quell and regulate the tide before it envelopes Jackson."

    b.    Describing the Orthodox community as "Cockroaches."

    c.    "They DO have more money than you or me or all of us put together and they have a long term plan and an abundance of patience."

    d.    "Over time, enabled by group unity, they will form a bloc vote that will elect whomever they choose Over time they will become dominant."

    e.    "[A]sk him what to do about the scourge of the cockroaches from the east[.]"

    f.    "Jackson is not prepared for the tsunami of orthodoxy that is mounting at the border. . . ,"

    g.    " . . .They are on target for a repeat of the 1930s."

    h.    "They DO have more money than you or me or all of us put together and they have a long term plan and an abundance of patience."

264.    That school filed suit in the Superior Court for Ocean County, New Jersey against the Board, alleging, *inter alia,* violations of RLUIPA, which is pending ("Oros litigation").

265.    The individual Defendants and other Township officials have been responsive to and coordinated an effort with Township residents to keep the Orthodox Jewish community out

of Jackson Township.

266.    In 1985, both the New Jersey Supreme Court, in *State v. Cameron*, 100 N.J. 586, 596, 498 A.2d 1217, 1222 (1985), and the New Jersey Appellate Division, in *Farhi v. Comm'rs of Borough of Deal*, 204 N.J. Super. 575, 578, 499 A.2d 559, 560 (Law. Div. 1985), upheld the right of individuals to worship in their home with up to 25 people present at a gathering without being deemed a church or house of worship.

267.    A Jackson Township resident, referring to specific homes, wrote to Defendants Pieslak, Purporo, Nixon and Schlegel:

> Between the Shuls, ERVU wires and now this, This wonderful neighborhood is going down the gutter so fast.  I have emailed so many times with no response.  WHAT IS GOING TO BE DONE with this????
>
> People do NOT want to live By this and so many people are leaving and only the Orthodox are moving in because WE Accomodate them

268.    On June 26, 2017, a Jackson Township resident sent an email to Defendants Schlegel, Pieslak, and Purporo regarding a home located at 146 S. New Prospect that was purportedly being used for an assembly use.

269.    Upon information and belief, the assembly involved Orthodox Jewish men for religious services, or a "*shul*."

270.    Another email about that property was sent by a Jackson Township resident to Defendant Reina on June 30, 2017, which stated "I witnessed many Jewish males coming out of a residential house at 146 New Prospect Rd."

271.    Another email about that property was sent from a Jackson Township resident  to Defendants Nixon, Schlegel, Purporo, Pieslak, and others, including Township residents on July 3, 2017 stating, "I'm just curious is this house going to be allowed to continue to operate as a

synagogue?"

272.    According to Defendant William Campbell, the owner of this property had received a Code Enforcement Notice from the Township on June 1, 2017 for a code violation.

273.    In June 2017, the Township Zoning Officer, Defendant Purporo, began monitoring that property.

274.    Defendant Purporo provided monthly reports to Defendants Reina and Schlegel that indicated surveillance of that property.

275.    On July 3, 2017, Mr. Purporo wrote a notice of violation for that property for "changing use from residential to an assembly use w/o approvals. . . ."

276.    Upon information and belief, other Township officials and employees began monitoring that property.

277.    These included Connie Sidor and Defendant William Campbell in the Township's Code Enforcement office.

278.    The monitoring of this property was done at the request and instruction of Defendant Reina.

279.    Defendant Reina specifically requested: "Kindly surveil property during weekday hours as well as Friday into Saturday."

280.    "Friday into Saturday" would be the Sabbath for the Orthodox Jewish community.

281.    In 2017, the Township, at the instruction and request and with the knowledge of Defendants, also began monitoring and surveilling other homes owned by Orthodox Jews.

282.    These homes included:

      a.    2 Danielle Court

b.      4 Danielle Court

c.      64 Villanova Drive

d.      5 Chelsea Road

e.      24 Winchester Drive

f.      1 Emory Court

g.      12 Mulberry Court

h.      4 Honeysuckle Lane

i.      21 Hickory Hill Road

j.      713 Green Valley Road

k.      6 Meadow Run Court

l.      41 Pitney Lane

m.      13 California Drive

283.    Defendant Pieslak made the following comments to Defendant Schlegel with respect to some of these properties, as well as 146 N. New Prospect:

a.      2 and 4 Danielle Court - ERUV wires. They are placed well within the property line.

b.      146 N. New Prospect - Rental CCO obtained and registered as a Rental Property with 'TBD' for renters. In the meantime from all we can tell this is actively being used as a school or Shul.

c.      64 Villanova - Renter left for Israel for about 6 weeks. He is letting a friend (couple) stay there from time to time while he is gone. They are not paying rent as reported but instead doing them a favor watching the place. Both the owner and property manager are aware.

d.      24 Winchester - newly repoprted for Friday night activity, cars, etc. Home is lived in. <u>We will monitor</u>.

(Emphasis added.)

284.    Other properties monitored by the Township and owned by the Orthodox Jewish community were similarly monitored for being used for Orthodox Jewish prayer, including:

      a.    2 Harvest Court

      b.    9 Harvest Court

      c.    6 Meadow Run Court

285.    The Township's monitoring of these properties included the following statements by Defendant Pieslak:

      a.    On Friday (2/10/2017) evening there were 10 walkers observed entering 9 Harvest. Additionally a total of 10 vehicles came between both properties. They parked in the driveway of #7 and #9 and then some were parked legally on the street.

      b.    I apologize for not getting back to you sooner but I was out sick and I am just getting caught up. For Friday evening on Harvest Ct. there were 6 vehicles in the driveway of 7 Harvest Ct. and 5 vehicles in the driveway at 9 Harvest Ct. One car was on the street and no noise in the area.

      c.    Also, 6 Meadow Run Ct. was monitored and there were 5 cars in the driveways there with no noise in the area.

      d.    There were also other areas monitored in the Township where there have been calls of concern. The numbers you see are the maximum numbers throughout the monitoring period. With this we are finding no violations at this time at any location. We will continue to monitor over time.

286.    On September 15, 2016, Defendant Nixon emailed Defendants Schlegel and Reina in part: "I received a complaint today that 713 Green Valley Road is being used as a shul. . . ."

287.    In response, Defendant Schlegel wrote: "We will monitor these sights and provide a report on Monday."

288.    On September 16, 2016, Defendant Nixon sent an email to Defendants Schlegel

and Reina stating:

> Not sure if Green Valley is active or a rumor but the Brookwood Parkway house is an active and long running issue for the neighborhood. Code went to look at it months ago I believe but it hasn't resolved.
>
> Keep me posted and thanks.

289.    On September 19, 2016, Defendant Schlegel sent an email to Defendants Nixon and Reina stating in part:

> With regards to possible shuls, the findings are as such:
>
> 1. 9 Harvest Ct - Initially 2 cars, then 2 more arrived and 3 walkers observed. No other activity. Quiet.
>
> 2. 713 Green Valley Road (vacant)No lights, no activity all evening. No furnishings.
>
> 3. 6 Meadow Run Ct. - Initially no cars, no activity. Later 2 cars, no activity.
>
> 41 Pitney - 17 cars, 2 walkers observed. No additional cars later. Quiet.
>
> We are wasting valuable time and money checking every complaint that comes in. We can't keep chasing ghosts. It's the same people and addresses every week. We have other more serious issues, heroin drug houses, etc. These are the issues that we need to be concentrating on. I know that the possible shuls are a serious issue but the other issues are life threatening and safety issues and are affecting many of Jackson's youth and families.
>
> We understand that this is a sensitive issue, however, we have to address all the issues in the Township, not just this issue. We are currently down one full-time code enforcement officer and must prioritize the complaints.

290.    Upon information and belief, the Township also monitored 18 Bridgewater Court on Friday evenings.

291.    Defendant Pieslak is recorded on an audio clip on the Jackson Leaks website introducing himself to the homeowner and saying "[W]e've received some complaints last week that on Friday, you're conducting services in the house . . . . we have a code that doesn't allow it.

It only allows it in certain zones and you need X amount of property and be 200 foot setbacks and so forth."

292.    Another individual, identified on the Jackson Leaks website as Code Enforcement Officer Connie Sidor, explained on another audio recording that "[t]he complaint came in, and we have a video of, they say, 30 people going into the garage and holding some kind of service or something. So, the ordinance says you can't hold, on a continuous basis, any type of church or religious service."

293.    Upon information and belief, individuals in cars monitored the home on Friday afternoons before commencement of the Sabbath.

294.    On March 6, 2017, Defendant Purporo sent an email to Defendant Pieslak stating: "Is 41 Pitney on you 'watch' list?"

295.    This monitoring was done at the behest of and with the participation and knowledge of the individual Defendants.

296.    This monitoring started as early as July 2016.

297.    The Township undertook this ongoing monitoring in direct response to complaints of Jackson Township residents to the individual Defendants or combinations of them who made comments such as:

      a.    From a Jackson Township resident to Defendants Pieslak, Purporo, Nixon, and another Township resident: Also, Another house listed today on Meadowrun Ct because of the Shul being used by the Rabbi. Another great Jackson Family FORCED out! It's a sad day in Jackson.

      b.    From a Jackson Township resident to Defendants Pieslak, Purporo, Nixon, and another resident: So with the two houses added up, that's 11 cars. That's just assuming one person per car. Say there are 2 people per car. That's already 22 people! Let's not forget about the 10 plus walkers!! I'm pretty sure that's goes over 25. I

have pictures of 9 Harvest having 9 cars in front & 7 having 6 on other weekends. I can't understand how two houses that are working side by side together do not deserve some kind of warning or violation? They have already asked surrounding neighbors to put up ERUV wires to attach house to house . . . .

c.   From a Jackson Township resident to Defendant Nixon: I believe a house of worship may be operational at 41 Pitney Lane. On Friday nights there are at least two dozen cars wrapped around a circular driveway. The cars remain there throughout Saturday. This may be used as a house of worship and an eventual school. I wouldn't be surprised if Meadow Run Ct is planned to be another community center for the religious families moving into the Sams Rd, Gail Chambers Rd, Kitay Ct area. As observant families move deeper into Jackson they are faced with roads that are dangerous to walk on after dark. Observant families live in insular groups and once they acquire several homes in an isolated area such as on Meadow Run Ct, alternate uses for these estate type homes becomes a huge incentive . . . .

Anyone is welcome to move to Jackson, but using single family for alternate uses to bypass our laws and civil codes is unacceptable. Using homes for shuls, dormitories, schools, and camps is unacceptable. Prospective homeowners should move to areas where they can legally access the venues they require, rather than move in and illegally change the nature of the town. Bypassing zoning codes is behavior which will have a profound effect on quality of life of all the citizens who have settled in Jackson until now.

Over the July 4th weekend my husband was mowing the lawn and a car with NY license plates pulled across the street with the driver shouting "Do you want to sell your house?" I have the "No knock" sticker so he kept his distance. Another day I observed a car parked across the street and the driver stared at my house. I opened my shades wide and stared back at him until he left. My name is Epstein, I'm not politically correct and I find this behavior disgusting. I have had my door pounded on, realtor junk mail, and weird phone calls.

I have no intention of selling or rolling over for this aggressive creepy behavior. I won't participate in the destruction of our precious quality of life.

The below listing for a probable future shul had motive behind it. I believe it was a call to move here and then set up a community

center. E Veterans Hwy and Meadow Run Ct aren't mythical streets. Knowing the issues that Toms River is facing I'm bringing this to your attention. Thank you for your unwavering support for our military, police and emergency personnel, and for our quality of life in Jackson.

d.  From a Jackson Township resident to Defendants Nixon, Purporo, Schlegel, Reina, and a Township resident: Having men sleeping over every Friday night is yes A form of Dormitory! They are being housed for religious purposes! This isn't having "company" or a family visit. Let's not forget how we were told the "character of Jackson will be upheld" well this isn't what is happening here. This street on a Friday & Saturday looks like Lakewood. Multiple homes being used for religious purposes. So basically our town will be doing nothing to stop these homes from becoming Shuls through out our entire town or is it just this side of Jackson, that is collateral damage. We are the older side of Jackson so I guess our neighborhoods don't matter.

e.  From a Jackson Township resident to Defendants Reina, Schlegel, Pieslak, Nixon and a Jackson Township resident: I know that Ken has been advised that there is nothing that can be done about this FULL ACTING SYNAGOGUE on 9 Harvest ct. That it's their right to worship in the privacy of their own home! But honestly it's out of control! It's a FULL SYNAGOGUE! There's no privacy about any of this! Every driveway is full of cars & the streets too!! Back Wooded trails are gateways to the back entrance to 9 Harvest also! Every single week is absolutely abusive! It's overused. Houses 11 & 7 Harvest ct. are participating as a full parking garage for 9 Harvest! So three homes for two days of worshipping!! How unfair for the other neighbors!

The message is being sent- Move to Jackson, who needs a synagogue built we'll just use existing homes, and that's what IS HAPPENING HERE. There had to be close to 50/60 men!! I know this because the NEW neighbor in brookwood 4 that just literally moved in last week, lives on Forest Dr, walked with my other new neighbor of 1000 Woodlane rd. to Harmony Farms together. That means this new neighbor KNEW his religious needs would be accommodated here in Jackson. That's heartbreaking to me as a resident who has been told that our ZONING LAWS would never allow homes in Residential Neighborhoods, that are zoned single family to be used as "HOUSES OF WORSHIP" Something has to be done!! It's only a matter of time that a home in MY neighborhood, Brookwood 4, will have a SHUL/SYNAGOGUE once a minyan(l0 men) is established. Why should that be

allowed? Then what? How many Shuls are going to be allowed in one neighborhood? On one street? In one town? How many men are allowed to attend? Right now there are three active Shuls within a mile of each other.

41 Pitney lane
6 meadowrun ct &
Brewers Bridge Rd/cooks bridge rd.

That's is just one small corridor of Jackson! How will you control it once it's in every single neighborhood & every street. Houses are being bought all over Jackson. They need a synagogue to walk to and Jackson does not have them, so why continue to move here???? They know what they are doing! People will continue to move out of Jackson until you give them a reason to stay. These Shuls will decrease the Value of our homes, they negatively affect the character of the town & quality of life of the neighbors who live around them.

  f. From a Jackson Township resident to Defendant Pieslak: there seems to be a home on 24 Winchester that may be using the home as a shul. There are way too many cars parked in the driveway, street and side of the house behind the bushes on Friday night until Saturday night. People are walking over as well.

  g. From a Jackson Township resident to Defendants Purporo, Pieslak and Schlegel: This is the third straight day of worshipping in a single family home!! They are using 1 Mulberry as a parking lot! Cars all over the street this should be a traffic issue ! Overused Shul please look into this.

298. In addition, the Township engaged in monitoring of *sukkahs* in the Township.

299. The eight-day long festival of Sukkot is one of the three pilgrimage festivals of the Jewish year.

300. During Sukkot, observant Jews are commanded to erect *sukkahs* in their yards.

301. A *sukkah* is a tent-like structure representing the huts in which the Israelites dwelt during their 40 years of wandering in the desert after escaping from slavery in Egypt.

302. The *sukkah* should have at least three walls and a covering on the top of the

structure.

303.    *Sukkahs* are erected in the yards of Orthodox Jewish residents.

304.    In September 2015, a Jackson Township resident complained to Defendant Reina about the erection of *sukkahs*.

305.    The Township, through Defendant Purporo, then decided that zoning permits would be required for the erection of *sukkahs* in the Township.

306.    The Township issued violations for the erection of *sukkahs* in the Township.

307.    In response to resident complaints, the Township, through its officials, questioned the erection of *sukkahs* and issuance of zoning permits in the Township with Defendant Reina emailing Defendant Purporo as follows:

> Jeff,
>
> So I can better understand this conversation who is the one that is calling these "accessory structures"? What accessory purpose do they serve, what is the capacity and the benefit of having a tent like structure placed in the front of any house? There seems to be a concern township wide and I do see this issue even being "temporary" an eyesore and a bad precedent to be setting in residential communities. In all my years residing in this town I have never seen a accessory structure in a residential front yard with the exception of what we know as PODS, which mostly assist residents during remodels or getting ready to move. Kindly advise this office with written documentation of where this originated from and when. Thank you.
>
> Sincerely,
>
> Michael Reina

308.    In August 2016, Defendant Reina wrote in response to an email from a Township resident discussed in paragraph 313 below, and copying Defendants Schlegel and Nixon, "we are once again requesting that the office Zoning revisit and not to allow non permanent structures to be placed in front yards, . . . ."

309.   Upon information and belief, this reference was to the erection of Sukkahs in the Township.

310.   Upon information and belief, this was part of a calculated effort on behalf of the Defendants to prohibit Orthodox Jews, including the members of Plaintiff Agudath, from practicing their religion in the Township.

311.   In 2016, the Township became concerned about the use of trailers in the Township.

312.   Defendant Reina expressed this concern to Defendants Nixon, Schlegel and another councilman as follows:

> In my travels I have noticed that trailers have become an increasingly popular way of getting congregations of different faith based groups, students and employees into small spaces to accommodate needs, In my opinion and experience this over populates land use and increases vehicular traffic ten fold in the areas being used with this type of "housing", It is also a safety hazard for life and property should any emergency arise, not to mention an eyesore. This usage is being abused in several different communities and the possibilities of it starting here is something that I adamantly oppose.

313.   On August 26, 2016, a Jackson Township resident sent an email to Defendant Reina stating:

> Good morning, as I look at my neighborhood along with various other neighborhood in the area panic selling I was wondering what the mayors though were on everything that is happening in our town. We have blockbusting taking place, illegal zoning happening, panic peddling. What is your take on what's happening in this town and have you done anything to help the situation? I would like to know where you see our town in five years, if you could maybe paint a picture in my mind, especially the east side of town I would greatly appreciate it. Thank you for your time,

314.   In response in part, Defendant Reina emailed to a Jackson Township resident:

> There is now a residential trailer ban ordinance going for a second reading

that once voted on and passed will no longer allow the use of trailers (co-joined or single use and not longer than 20 feet in length) being used as "temporary permanent outdoor use structures" (and other backdoor zoning approved uses). . . .

315.     Defendants Nixon and Schlegel were copied on this email.

316.     On August 13, 2016, the Township thereafter adopted Ordinance 21-16 limiting the use of trailers and portable storage structures in the Township.

317.     Upon information and belief, this Ordinance was enacted to target the Orthodox Jewish community to prevent them from assembling in or utilizing trailers for worship.

318.     Upon information and belief, the Township is aware that the Township's zoning code makes it difficult for new synagogues to locate within its jurisdiction, which compels the Orthodox Jewish community to utilize temporary structures for worship.

319.     Upon information and belief, the Township utilizes trailers on its own properties for its own purposes.

320.     In April 2016, a Jackson Township resident emailed Defendant Nixon stating:

I sent this to Ken in code enforcement. This LLC sham is HUGE problem! I walked around my neighborhood to pass the no knock out of sixty or so houses I believe two are l l c from Lakewood and I just saw some people looking at another house.  Lucky me. HELP! ! ! ! !

321.     In response, on April 17, 2016, Defendant Nixon emailed a Jackson Township resident in pertinent part as follows:

I am currently working on a robust LLC registration and landlord reporting law for the town.  In the meantime, continue to call the police if you see a property where the doors are open or if it looks like trespassing is occurring…

322.     On December 27, 2016, the Township adopted Ordinance 32-16, which requires that Landlords in the Township register annually on the anniversary date of their initial

registration or face penalties.

323.   Upon information and belief, this Ordinance was enacted to target the Orthodox Jewish community to penalize Orthodox Jewish individuals and entities acquiring properties within the Township.

324.   Ordinance 244-207B.(15) provides that real estate "for sale" signs must be removed from properties in the Township "15 days after the termination or completion of the matter of business being advertised."

325.   In direct response to complaints of a Jackson Township resident, the Township took action, including the issuance of violation notices, to individuals in violation of Ordinance 244-207B.(15).

326.   In particular, a Jackson Township resident stated in various emails to the individual Defendants or combinations of them:

a.   From a Jackson Township resident to Defendant Purporo: There is a house, 27 Bridgewater Ct, that has had a SOLD sign up since Thanksgiving. According to our code it's been up past the 15 days allowed! Can you please take this email as an official complaint. The strange thing about it all, it seems that Imperial, which is the real estate agency who is displaying the sign, had nothing to do with it's sale or listing. So why is their sign up to begin with?
This house was sold on 11-24-2015 & reported on 12-11-15 which is well past our code of the 15 days! I believe this sign is being kept up to intimidate residents to sell their homes, better known as blockbusting! Please help by having it removed.

b.   From a Jackson Township resident to Defendant Purporo, who then forwarded it to Defendants Reina, Pieslak and Schlegel: 20 Meadow Run Ct, has had their sold sign up for months!! Obviously against code, can you please have it removed! Once again Esther from ReMax had nothing to do with listing or sale! Another blockbusting tactic! The faster it's down the better for those neighbors who do not want to be forced to sell their homes!

c.   From a Jackson Township resident to Defendants Purporo and Pieslak:

Once again, ESTHER KLEIN, purposely leaving her sold signs up way past code! Such a tactic of blockbusting!! She is constantly doing this!!! 293 Metedeconk Trail closed NOVEMBER, 18, 2015. I think she a little past due! Please remove this sign so she can stop advertising against code!

d.  From a Jackson Township resident to Defendants Purporo, Pieslak, Schlegel, and two other Jackson Township residents: My friend listed her home, 58 claridge drive, to Keller Williams the selling agent was Imperial. The Keller Williams For Sale sign was removed by the listing agent after the closing on MAY 25th. TWO WEEKS ago Imperial Real Estate put up their SOLD sign on the property, unbelievable their blockbusting tactics!! So here we are, almost two months after closing. He, the continued code violator of real estate signs in our town, is still continuing to use his signs as ways to advertise homes being bought by the orthodox to intimidate others in the neighborhood to sell. His name is on the signs in the pictures below! Please have it removed & hopefully some violation ensue since Imperial is well aware of our codes and has no respect for them.

327.   Upon information and belief, the enforcement action pursuant to Ordinance 244-207B.(15) specifically targeted the Orthodox Jewish community to prohibit them from moving into and residing in the Township.

328.   This series of actions constitutes an ongoing pattern and practice of discriminating against Orthodox Jewish residents, interfering with and obstructing their protected rights, and harassment in their reasonable practice of their religion.

329.   In or about November 2017, the State of New Jersey, Office of the Attorney General ("AG") opened an investigation, "In re Jackson Township Ordinance Nos. 03-17 04-17 and 20-17."

330.   In furtherance of that investigation, the AG served a subpoena upon Defendant Schlegel seeking that certain documents and information be produced.

331.   Upon information and belief, that matter is still pending.

332.    Despite the pendency of that matter and the within litigation, as well as the Oros litigation, Plaintiffs have learned that the Township has engaged in spoliation of documents which are to be preserved as evidence for both matters.

333.    On February 25, 2019, an OPRA request was submitted to the Township seeking "all emails and letters to and from Mike Reina, Rob Nixon, Barry Calogero, Scott Marin, Ann Updegrave and Ken Bressi with regards to Oros Bais Yaakov, girls schools, and schools between 01/01/14 thru 01/01/15."  The OPRA request was sent to Janice Kisty, Clerk of the Township, as well as the former Clerk, Ann Marie Eden.  *Id.*  The request was received on February 26, 2019.

334.    On March 22, 2019, the Township responded to the OPRA request, providing records responsive to this Request, but provided its response to another party, "Opra Baby."  One of the emails appearing in the records provided was between Defendants Reina and Schlegel dated October 31, 2014.  This email was redacted.  In its response, the Township stated: "Please be advised 'schools' is overly broad and requires clarification" and "Please note: Redactions have been made pursuant to NJSA 47:1A-1.1."

335.    On March 24, 2019, "Opra Baby" sent another OPRA request to the Township requesting "all emails between Mike Reina and Helene Schlegel in Oct 2014 with regard to the Oros bais Yaakov lawsuit or complaint."   In addition, "Opra Baby" sent a second OPRA request that same day stating: "I see that an email between Mike Reina and Helene Schlegel in Oct 2014 with subject complaint or 'Re complaint'' was redacted, under opra I would like the unredacted copy of this email ( it should not have been redacted )."

336.    On March 25, 2019, the Township advised "Opra Baby" that the "<u>records requested have been destroyed</u> under general correspondence as per approval from the

NJDARM."   (Emphasis added.)   The response referenced the "Authorization from Records Disposal approved on 3/6/19 (2009-2016) for Administration.  Also Please find Authorization from Records Disposal approved on 1/31/18 (2014), [2]/15/19 (2015) for Council."

337.    The same day, "riseupocean" sent an email to the Township indicating that its request had never been responded to.   The next day, March 26, 2019, "riseupocean" sent an OPRA request to the Township seeking the unredacted emails at issue noting that the Township had sent out the redacted emails to other parties the week before.   In response the Township replied on March 26, 2019 as follows:

> Please be advised I will gladly send you the redacted emails that were previously sent to other parties. As for this being handled as a new request which would require a new search, the searchable emails have been destroyed.
>
> Note: You will not be receiving anything UN-redacted as the email conversation between the Mayor and the Administrator was redacted under NJSA 47:1A-1.1, advisory, consultative, deliberative process privilege, and NJSA 47:1A-9b, executive privilege.
>
> Please advise if you would like me to send you what has previously been released.

(Emphasis added.)

338.    The Township also sent another response that day to "Opra Baby" indicating:  "It has been destroyed. You were provided all that is available which was redacted by our legal team. If you would like me to re-send what you've already been provided please advise." (Emphasis added.)

339.    The information requested directly relates to the claims at issue in this lawsuit, specifically that the Township Ordinances passed on March 16, 2017, No. 03-17 and 04-17, prohibited schools from locating in the Township's residential zoning districts and prohibited

dormitories in the Township, targeting specifically the Orthodox Jewish community.

340.    The Township Clerk, Janice Kisty, is fully familiar with the ongoing litigation involving the Township.

341.    Ms. Kisty was deposed in the Oros litigation.  It was Ms. Kisty who approved the request to destroy the correspondence.

342.     Her approval on the Request and Authorization for Records Disposal Form appeared on March 6, 2019, eight days after the OPRA request was received by the Township.

343.     The response to the OPRA request, sent on March 26, 2019 (well beyond the seven-day response requirement imposed by state law) cited this approval as the reason the records were destroyed and could not be produced.

344.    This destruction of evidence occurred within a few days of the Plaintiffs' February 27, 2019 correspondence to the Court indicating that ongoing settlement negotiations were conducted in bad faith and had ceased, as described below, and the Court's text Order of March 1, 2019 scheduling a conference call with the Court.

345.    Ms. Kisty also emailed Township employee, Danielle Sinowitz, "Reminder that 2014 and maybe 2015 is destroyed" with respect to an OPRA request seeking information about *eruvs*, on March 12, 2019 to Ms. Sinowitz regarding another OPRA request received on March 11, 2019.

346.    That OPRA request sought emails and records regarding "Dorms, yeshivas and boarding houses."

347.    Ms. Kisty wrote as follows:

> Danielle,
>
> Please confer with Robin as to these records <u>having permission to be</u>

<u>destroyed</u>.  Thank you.

(Emphasis added.)

348.    Upon information and belief, Robin is Robin LaBue, Esq., one of the Township's attorneys.

349.    This destruction of evidence occurred the day after the ZBA's purported counsel in the Oros litigation on Counts 2 and 3, Sean Gertner, Esq., sent correspondence to the state Circuit Court indicating that settlement negotiations had ceased and requested a Case Management Order.

350.    In August 2017, the parties were referred to mediation with the Honorable Alexander Carver.

351.    The parties agreed to engage in the joint preparation of Ordinances or remedial legislation to address the discriminatory Ordinances adopted by the Township.

352.     For well over a year, the parties and their planners attended many meetings in an effort to finalize this remedial legislation.

353.    On July 26, 2018, this Court conducted a Settlement Conference to assist the parties with their negotiations.

354.     Following the Settlement Conference, Plaintiffs continued to, in good faith, negotiate the form of the remedial legislation Ordinances.

355.    Reports were made to the Court that the parties were close to concluding negotiations.

356.    In December 2018, the parties finalized the remedial legislation in the form of two draft Ordinances.

357.    The Parties represented to the Court that they were satisfied with the draft Ordinances and the Ordinances were to be placed on the agenda for the Jackson Township Council after January 1, 2019, with a timetable to have adoption concluded by February 2019.

358.    The remedial legislation Ordinances were not placed on the Township's agenda for adoption or even discussion.

359.    Upon information and belief, this is due to the fact that Defendant Reina and the Township Council would not and will not support them.

360.    Plaintiffs specifically requested that the remedial legislation Ordinances be placed on the agenda for the Township Council's February 13, 2019 meeting.

361.    On February 15, 2019, Plaintiffs again requested that the remedial legislation Ordinances be placed on the Agenda for the Township's February 26, 2019.

362.    On February 18, 2019, Plaintiffs were advised that the request would be shared with the governing body.

363.    During this time period, Defendants were engaged in retaining new counsel for this litigation as well as the Oros litigation.

364.    On February 6, 2019, the Mayor stated: "game on, gloves off" with respect to this litigation and the hiring of new counsel.

365.    This new counsel believes that the Religious Land Use and Institutionalized Persons Act is unconstitutional.

366.    On or about February 19, 2019, the Jackson Strong Facebook page Administrator, who upon information and belief, is a Jackson Township resident, posted "There are 3 lawsuits against the twp currently and I don't think we are going to give in to their demands."

367.    Upon information and belief, Defendants Reina and Nixon, and Council Vice President Barry Calogero attended a meeting on February 21, 2019 with the new counsel.

368.    On or about February 22, 2019, the Jackson Strong Facebook page Administrator, who upon information and belief, is a Jackson Township resident, posted:

> THIS JUST IN: JACKSON TOWNSHIP HAS OFFICIALLY HIRED RELIGIOUS LAND USE EXPERT, MARCI HAMILTON, TO REPRESENT JACKSON. Ms. Hamilton is one of the best, if not the best, attorney in this field. She has written many papers about the disservice and burden that this unfair law(RLUIPA) has placed upon towns across the country. It has contributed to excessive building and segregation. Thank you to Mayor Reina for getting our twp. the best possible counsel to help preserve the quality of life in the town that we love. Here is a link to an article written by our new attorney. We are VERY excited about this!!!! . . .

369.    It was not until February 26, 2019, that the Township passed a Resolution appointing new counsel for this litigation as well as the Oros litigation.

370.    The Jackson Strong Facebook page Administrator knew about the hiring of new counsel on February 22, 2019.

371.    The settlement negotiations between the Parties were conducted in bad faith by Defendants.

372.    On October 18, 2018, a Jackson Township resident wrote an email to Defendant Reina referring to the Orthodox Jewish community as "these people" and indicating "they would take over Jackson as they have done so in Lakewood."

373.    Defendant Reina responded that he "would like to address your concern personally" and provided a phone number to the resident.

374.    In late 2018, a Facebook group called "Rise Up Ocean" formed.

375.    Upon information and belief, Rise Up Ocean was formed "to oppose what it calls

the overdevelopment of Lakewood, New Jersey, by Orthodox Jews."

376.    On April 5, 2019, the New Jersey Division of Civil Rights wrote a letter to Mark

Zuckerberg, the Chief Executive Officer of Facebook, Inc. to bring attention to the comments on

the Rise Up Ocean's page "inciting violence against Orthodox Jews."

377.    The letter concluded:

> You at Facebook also have a role to play in monitoring comments that
> incite violence based on race, religion, gender, sexual orientation, gender
> identity or  expression, national origin, ancestry, or disability.

378.    Upon information and belief, Rise Up Ocean has formed a closed Facebook

group.

379.    Upon information and belief, Defendants Campbell and a Jackson Township

resident are members of this new closed Facebook group.

380.    In February 2019, the Township of Lakewood, New Jersey adopted a Resolution

that condemned Rise Up Ocean.

381.    Upon information and belief, the Township of Jackson was asked to introduce a

similar Resolution, but failed to do so.

382.    Upon and information and belief, the Township of Jackson adopted a Resolution

which opposed the State forming the Lakewood Student Transportation Authority, which was

created in order to provide busing for Orthodox Jewish children.

383.    Upon information and belief, members of Plaintiff Agudath are not moving to the

Township due to the campaign of hostility toward the Orthodox Jewish community.

384.    An email from a Jackson Township resident dated February 14, 2017 summarized

the hostility:

> Multiple families can in fact cohabit in a single family residence. This is all

very disheartening because the writing is on the wall. We have no control over our residential neighborhoods. It's a free for all. And as far as I am concerned anything that we can do to slow down this process of our Town being turned into a huge religious enclave is automatically shot down by our so called legal department. It seems to me that someone is going to need to get clever and figure out a way to preserve the quality of life in Jackson. Maybe the answer is to start with a new law firm specializes in land use matters not a law firm that is in the pocket of a radical religious community. Create your own case law! Why are our rights and freedoms are being compromised in favor of a religion? As an atheist I will not stand for religious wires to be put up in my community. And I don't appreciate public schools being rented out to house religious articles such as a Torah. Is there no such thing as a separation of church and state anymore? I have been fortunate enough to somehow get inside The Orthodox community and I could tell you that there is certainly a plan and that plan is to buy up as much as they possibly can and take Jackson. So if we don't get on the ball and figure out a way to slow it down legally then we are dead. I'm begging you all to please pull out the big guns and find our town a proactive law firm or perhaps hire a land/use attorney on retainer to do what needs to be done to protect us. That being said I appreciate the efforts that are being made by council .such as the landlord registration the no knock and most recently the ordinance on dormitories. But we are dealing with  a very shrewd group and a very organized operation when it come to the Orthodox community. baby steps just aren't going to be enough.

385.   The Township's actions described above all took place under color of state law.

386.   The Township was informed of the applicability of federal law to its actions.

387.   The harm to the Plaintiffs caused by the Township is immediate and severe.

388.   The Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' wrongful laws and actions.

389.   The unlawful, targeted and discriminatory actions by the individuals named in this lawsuit do not stem from any legitimate legislative actions.

390.   The unlawful, targeted, and discriminatory actions by the individuals named in this lawsuit were not undertaken as part of the proper work of any government agency.

391.     The unlawful, targeted, discriminatory actions by the individuals named in this lawsuit were not taken during any lawmaking session, but all occurred outside of the sphere of legitimate legislative activities.

## COUNT I
### Equal Protection Clause -- Religion
### Fourteenth Amendment to the United States Constitution
### 42 U.S.C. § 1983

392.     Plaintiffs repeat and reallege paragraphs 1 through 391 as if fully set forth herein.

393.     Defendants' laws and actions, on their face, deprived and continue to deprive all Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment, by (1) discriminating against and targeting the Plaintiffs for disfavor on the basis of religion; and (2) by treating religious institutions on less than equal terms as similarly situated nonreligious institutions.

394.     The Plaintiffs have no adequate remedy at law for the harm caused by Defendants' violation of their constitutional rights.

395.     Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm. The Plaintiffs will continue to suffer such harm unless the Township's acts and conduct complained of are permanently enjoined.

## COUNT II
### Equal Protection Clause -- Race
### Fourteenth Amendment to the United States Constitution
### 42 U.S.C. § 1983

396.     Plaintiffs repeat and reallege paragraphs 1 through 395 as if fully set forth herein.

397.     Defendants' laws and actions, on their face, deprived and continue to deprive all Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment, by discriminating against and targeting the Plaintiffs for disfavor on the basis of their race.

398.     The Plaintiffs have no adequate remedy at law for the harm caused by Defendants' violation of their constitutional rights.

399.     Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm. The Plaintiffs will continue to suffer such harm unless the Township's acts and conduct complained of are permanently enjoined.

### COUNT III
**Free Exercise Clause**
**First and Fourteenth Amendments to the United States Constitution**
**42 U.S.C. § 1983**

400.     Plaintiffs repeat and reallege paragraphs 1 through 399 as if fully set forth herein.

401.     Defendants' laws and actions, on their face, deprived and continue to deprive all Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment by discriminating against and targeting the Plaintiffs for disfavor on the basis of religion.

402.     The Plaintiffs have no adequate remedy at law for the harm caused by Defendants' violation of their constitutional rights.

403.     Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm.  The Plaintiffs will continue to suffer such harm unless the Defendants' acts and conduct complained of are permanently enjoined.

**COUNT IV**
**Establishment Clause**
**First and Fourteenth Amendments to the United States Constitution**
**42 U.S.C. § 1983**

404.     Plaintiffs repeat and reallege paragraphs 1 through 403 as if fully set forth herein.

405.     By adopting the Ordinances based on hostility toward Plaintiffs and Orthodox Jews, Defendants were hostile toward and disapproving of religion, specifically the Orthodox Jewish faith.

406.     Defendants do not have a secular legislative purpose for prohibiting schools in residential areas and prohibiting dormitories completely from its jurisdiction. Rather, the Defendants were motivated by an anti-religious and, more specifically, anti-Orthodox Jewish animus; they have as their object and purpose the suppression of religion and religious conduct.

407.     On its face, the Ordinances have the principal and primary effect of inhibiting religion, in that they prevent the Orthodox Jewish community from providing religious education opportunities for their children and from establishing an *eruv* where they may choose to reside and/or locate.

**COUNT V**
**Freedom of Association**
**First and Fourteenth Amendments to the United States Constitution**
**42 U.S.C. § 1983**

408.     Plaintiffs repeat and reallege paragraphs 1 through 407 as if fully set forth herein.

409.     Defendants' laws and actions, on their face, deprived and continue to deprive Plaintiffs of their right to freedom of expressive association, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth

Amendment, by intruding upon the Plaintiffs' right to associate for purposes of protected expressive activity and preventing the Orthodox Jewish community from establishing religious schools in the Township and from establishing *eruvim*, causing other Orthodox Jews to hesitate to move into the Township and harming those already residing in the Township.

410.    The Plaintiffs have no adequate remedy at law for the harm caused by Defendants' violation of their constitutional rights.

411.    Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm.  The Plaintiffs will continue to suffer such harm unless the Township's acts and conduct complained of are permanently enjoined.


### COUNT VI
### "Nondiscrimination"
### Religious Land Use and Institutionalized Persons Act
### 42 U.S.C. § 2000cc(b)(2)

412.    Plaintiffs repeat and reallege paragraphs 1 through 411 as if fully set forth herein.

413.    Defendants' laws and actions deprived and continue to deprive Plaintiffs of their right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by imposing land use regulations that discriminate against the Plaintiffs and Orthodox Jews on the basis of religion.


### COUNT VII
### "Equal Terms"
### Religious Land Use and Institutionalized Persons Act
### 42 U.S.C. § 2000cc(b)(1)

414.    Plaintiffs repeat and reallege paragraphs 1 through 413 as if fully set forth herein.

415.    Defendants' laws and actions deprived and continue to deprive Plaintiffs of their right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by imposing land use regulations that treat religious assemblies and institutions on less than equal terms as nonreligious assemblies and institutions.

## COUNT VIII
**"Exclusions and Limits"**
**Religious Land Use and Institutionalized Persons Act of 2000**
**42 U.S.C. § 2000cc(b)(3)(A)**

416.    Plaintiff repeat and reallege paragraphs 1 through 415 as if fully set forth herein.

417.    Defendants' laws and actions deprived and continue to deprive Plaintiffs of their right to the free exercise of religion, as secured by the Religious Land Use and institutionalized Persons Act, by imposing land use regulations that totally exclude religious schools with dormitories from their jurisdiction.

## COUNT IX
**"Exclusions and Limits"**
**Religious Land Use and Institutionalized Persons Act of 2000**
**42 U.S.C. § 2000cc(b)(3)(B)**

418.    Plaintiffs repeat and reallege paragraphs 1 through 417 as if fully set forth herein.

419.    Defendants' laws and actions deprived and continue to deprive Plaintiffs of their right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by unreasonably limiting religious assemblies, institutions, or structures within their jurisdiction.

## COUNT X
**Fair Housing Act -- Religious Discrimination
42 U.S.C. § 3604(a)**

420.    Plaintiffs repeat and reallege paragraphs 1 through 419 as if fully set forth herein.

421.    The Defendants, by their continuing conduct, acts and legislative enactments targeted at the Orthodox Jewish community, have discriminated against the Plaintiffs by making residential housing unavailable in the Township because of religion, in violation of 42 U.S.C. § 3604(a).

422.    The Defendants' School Ordinances prohibiting dormitories from existing anywhere in Jackson Township discriminates against Orthodox Jews on the basis of religion, in violation of 42 U.S.C. § 3604(a).

423.    The Defendants' actions in monitoring the homes of Orthodox Jewish residents in the Township discriminates against Orthodox Jews on the basis of religion, in violation of 42 U.S.C. § 3604(a).

424.    The Defendants' Ordinances prohibiting the establishment of *eruvim* throughout the Township discriminates against Orthodox Jews on the basis of religion, in violation of 42 U.S.C. § 3604(a).

425.    Plaintiffs are aggrieved persons as that term is defined in the Fair Housing Act, 42 § 3602(i), and they have suffered irreparable harm as a result of Defendants' conduct.

426.    The Plaintiffs have no adequate remedy at law for the harm caused by Defendants' violation of their rights.

**COUNT XI**
**Fair Housing Act -- Racial Discrimination**
**42 U.S.C. § 3604(a)**

427.     Plaintiffs repeat and reallege paragraphs 1 through 426 as if fully set forth herein.

428.     The Defendants, by their continuing conduct, acts and legislative enactments targeted at the Orthodox Jewish community, has discriminated against the Plaintiffs by making residential housing unavailable in the Township because of race, in violation of 42 U.S.C. § 3604(a).

429.     The Defendants' School Ordinances prohibiting dormitories from existing anywhere in Jackson Township discriminates against Orthodox Jews on the basis of race in violation of 42 U.S.C. § 3604(a).

430.     The Defendants' actions in monitoring the homes of Orthodox Jewish residents in the Township discriminates against Orthodox Jews on the basis of race, in violation of 42 U.S.C. § 3604(a).

431.     The Defendants' Ordinances prohibiting the establishment of *eruvim* throughout the Township discriminates against Orthodox Jews on the basis of race, in violation of 42 U.S.C. § 3604(a).

432.     Plaintiffs are aggrieved persons as that term is defined in the Fair Housing Act, 42 § 3602(i), and they have suffered irreparable harm as a result of Defendants' conduct.

433.     The Plaintiffs have no adequate remedy at law for the harm caused by Defendants' violation of their constitutional rights.

**COUNT XII**
**Fair Housing Act**
**42 U.S.C. § 3617**

434.    Plaintiffs repeat and reallege paragraphs 1 through 433 as if fully set forth herein.

435.    The Defendants have intentionally harassed, intimidated and interfered with the housing rights of Plaintiff Agudath and its members in violation of the Fair Housing Act, 42 U.S.C. § 3617, through an ongoing series of intentional actions, including but not limited to: (a) preventing Plaintiffs' religious practices through the enactment of the Ordinances as aforesaid; (b) by monitoring the homes of Orthodox Jewish residents in the Township as aforesaid; and (c) by enacting legislation in an orchestrated attempt to target the Orthodox Jewish community and prevent them from residing in and locating into the Township.

436.    The Plaintiffs have sustained and continue to sustain direct injuries including, but not limited to, being barred from the full use and enjoyment of property owned by them in the Township, as guaranteed by the Fair Housing Act.

437.    Plaintiffs are aggrieved persons as that term is defined in the Fair Housing Act, 42 § 3602(i), and they have suffered irreparable harm as a result of Defendants' conduct.

438.    The Plaintiffs have no adequate remedy at law for the harm caused by Defendants' violation of their constitutional rights.

**COUNT XIII**
**Property Rights of Citizens**
**42 U.S.C. § 1982**

439.    Plaintiffs repeat and reallege paragraphs 1 through 438 as if fully set forth herein.

440.    The Plaintiffs are members of the Jewish race.

441.    The actions by Defendants are violations of the Plaintiffs' right to have the same rights as enjoyed by other citizens to hold and convey real and personal property in violation of 42 U.S.C. § 1982.

442.    Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm.  The Plaintiffs will continue to suffer such harm unless the Township's acts and conduct complained of are permanently enjoined.


## COUNT XIV
### New Jersey Law Against Discrimination
### N.J. Stat. Ann. § 10:5-1, *et seq.*

443.    Paragraphs 1 through 442 are incorporated by reference as if set forth fully herein.

444.    By denying Plaintiffs, on the basis of religion, the opportunity to obtain the accommodations, advantages, facilities, and privileges of ownership of real property, Defendants violated and continues to violate Plaintiff's rights under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*

445.    Defendants' conduct has caused significant irreparable harm to Plaintiffs.

446.    Defendants are liable for the irreparable harm caused to Plaintiffs, and should be enjoined from further violating Plaintiffs' rights.


## COUNT XV
### New Jersey Law Against Discrimination
### N.J. Stat. Ann. § 10:5-1, *et seq.*

447.    Paragraphs 1 through 446 are incorporated by reference as if set forth fully herein.

448.    By denying Plaintiffs, on the basis of race, the opportunity to obtain the accommodations, advantages, facilities, and privileges of ownership of real property, Defendants violated and continues to violate Plaintiffs' rights under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*

449.    Defendants' conduct has caused significant irreparable harm to Plaintiffs.

450.    Defendants are liable for the irreparable harm caused to Plaintiffs, and should be enjoined from further violating Plaintiffs' rights.

**COUNT XVI**
**Action in lieu of prerogative writ**
**Declaratory Judgment**
**Targeted Ordinance**

451.    Paragraphs 1 through 450 are incorporated by reference as if set forth fully herein.

452.    The actions of Jackson Township in adopting Ordinances No. 03-17 and 04-17 were arbitrary and capricious and contrary to law.

453.    The School Ordinances do not advance one of the purposes of the Municipal Land Use Law as set forth in N.J.S.A. 40:55D-2.

454.    Upon information and belief, the School Ordinances are not substantially consistent with the land use plan element and the housing plan element of the Township master plan or designed to effectuate such plan elements.

455.    The School Ordinances do not comport with constitutional constraints on the zoning power, including those pertaining to due process and equal protection.

**RELIEF SOUGHT**

**WHEREFORE**, Plaintiffs demand Judgment as follows:

A.     Declaratory judgment holding that the School Ordinances are unconstitutional and illegal under the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, 42 U.S.C. § 1982, the New Jersey Law Against Discrimination, New Jersey common law and the New Jersey Municipal Land Use Law;

B.     Declaratory judgment holding that the *Eruv* Ordinance is unconstitutional and illegal under the United States Constitution and the Fair Housing Act;

C.     Annulment of the Ordinances;

D.     Preliminary and permanent orders enjoining the application of the Ordinances;

E.     Declaratory judgment declaring that a religious school with dormitories is a permitted use on Plaintiff WR Property LLC's property;

F.     An award to Plaintiffs of full costs, disbursements and attorneys' fees, to the extent permitted by law, arising out of Defendants' laws and actions and out of this litigation;

G.     An award to Plaintiffs of nominal, compensatory and punitive damages; and

H.     Granting such other, further and different relief as to this Court deems just, proper and equitable.

Respectfully submitted by the Plaintiffs this 15th day of April, 2019.

**STORZER & ASSOCIATES, P.C.**


/s/ Sieglinde K. Rath _____
Sieglinde K. Rath
Roman P. Storzer, *admitted pro hac vice*
Robert L. Greene, *admitted pro hac vice*
9433 Common Brook Road, Suite 208
Owings Mills, MD 21117

*Counsel for Plaintiffs*

**WILENTZ, GOLDMAN & SPITZER, P.A.**

/s/ Donna M. Jennings
Donna M. Jennings
90 Woodbridge Center Drive
Post Office Box 10
Woodbridge, New Jersey 07095

*Co-Counsel for Plaintiff, WR Property LLC*

## CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that this matter is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding, and that no such action, arbitration or administrative proceeding is contemplated at this time. There is, however, a state action pending in *Oros Bais Yaakov High School v. Township of Jackson, NJ, et al.*, Docket No. OCN-L-2981-14, alleging RLUIPA claims against the Township by an Orthodox Jewish school.  I do not know of any other party who should be joined in this action.


**STORZER & ASSOCIATES, P.C.**

/s/Sieglinde K. Rath _____
Sieglinde K. Rath
Roman P. Storzer, *admitted pro hac vice*
Robert L. Greene, *admitted pro hac vice*
9433 Common Brook Road, Suite 208
Owings Mills, MD 21117

*Counsel for Plaintiffs*

**WILENTZ, GOLDMAN & SPITZER, P.A.**

/s/Donna M. Jennings _____
Donna M. Jennings
90 Woodbridge Center Drive
Post Office Box 10
Woodbridge, New Jersey 07095

*Co-Counsel for Plaintiff, WR Property LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY         that on this 15th day of April, 2019, the foregoing

document was electronically filed via the Court's ECF system with notices to the following:

Howard B. Mankoff, Esquire
Marshall Dennehey Warner Coleman & Goggin
425 Eagle Rock Avenue, Suite 302
Roseland, New Jersey 07068
(973) 618-4118
hmankoff@mdwcg.com


Pauline F. Tutelo, Esquire
Marshall Dennehey Warner Coleman & Goggin
425 Eagle Rock Avenue, Suite 302
Roseland, New Jersey 07068
(973)618-4100
pftutelo@mdwcg.com


/s/Sieglinde K. Rath _____
Sieglinde K. Rath