## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AGUDATH ISRAEL OF AMERICA, a New York non-profit corporation, and WR PROPERTY LLC, a New Jersey limited liability company, | Civ. No. 3:17-CV-03226 |
| Plaintiffs, | |
| v. | |
| TOWNSHIP OF JACKSON, NEW JERSEY, MICHAEL REINA, ROBERT NIXON, HELENE SCHLEGEL, JEFFREY PURPURO, WILLIAM CAMPBELL, and KENNETH PIESLAK, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 65

**STORZER & ASSOCIATES, P.C.**
Sieglinde K. Rath (SR7208)
Roman P. Storzer, *admitted pro hac vice*
Robert L. Greene, *admitted pro hac vice*
9433 Common Brook Road, Suite 208
Baltimore, MD 21117
Tel: 202.857.9766
Fax: 202.315.3996
*Counsel for Plaintiffs*

**WILENTZ, GOLDMAN & SPITZER, P.A.**
Donna M. Jennings (DJ7790)
90 Woodbridge Center Drive
Post Office Box 10
Woodbridge, New Jersey 07095
*Co-Counsel for Plaintiff WR Property LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF FACTS ..................................................................................................2

    Plaintiffs and Their Religious Beliefs and Practices.................................................2

    The Defendants ............................................................................................................4

    Local Hostility Toward Orthodox Jews .....................................................................5

    Jackson Officials Are Themselves Hostile Towards Orthodox Jews and Are Also
    Responsive to Residents' Hostility Towards Orthodox Jews. ...................................8

    Jackson Officials Adopt Ordinances in Response to Residents' Hostility Towards
    Orthodox Jews ..........................................................................................................10

STANDARD OF REVIEW ...............................................................................................18

ARGUMENT .....................................................................................................................19

  1.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS. 19

      A.    Plaintiffs Are Likely to Succeed on their Discrimination Claims. .......................19

          1.    Legal Standard. .......................................................................................19

          2.    The Town Has Discriminated Against Plaintiffs. ......................................23

                a.    The series of events leading up to a ordinances and enforcement and
                     the context in which the Council adopted same.............................23

                b.    Statements made by the decisionmaking body. .............................24

                c.    Statements made by community members, to whom officials were
                     responsive. .....................................................................................25

                d.    A discriminatory impact was foreseeable. .....................................25

                e.    Less discriminatory avenues were available to the Defendants.....26

      B.    Plaintiffs are likely to succeed on their Equal Terms Claims (Count VII)............26

      C.    Plaintiffs are likely to succeed on their Exclusions and Limits Claims (Counts
          VIII and IX). ........................................................................................................27

2. PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF THE INJUNCTION IS DENIED...................................................................................................................28

3. GRANTING PRELIMINARY INJUNCTIVE RELIEF TO PLAINTIFFS WILL NOT HARM DEFENDANTS. ...............................................................................................29

4. INJUNCTIVE RELIEF WILL SERVE THE PUBLIC INTEREST. ...............................30

CONCLUSION.......................................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Al Falah Ctr. v. Twp. of Bridgewater*, No. CV 112397, 2013 WL 12322637 (D.N.J. Sept. 30, 2013)................................................................................................................. 25

*Chabad Jewish Ctr. of Toms River v. Twp. of Toms River*, No. CV31601599, 2018 WL 1942360 (D.N.J. Feb. 5, 2018)............................................................................................... 6

*Chabad Lubavitch of Litchfield Cy. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183 (2d Cir. 2014)................................................................................................................. 20

*Chabad of Nova, Inc. v. Cooper City,* 575 F. Supp. 2d 1280 (S.D. Fla. 2008) ............................ 28

*Church of Scientology of Ga. v. City of Sandy Springs*, 843 F. Supp. 2d 1328 (N.D. Ga. 2012). 20

*Church of the Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520 (1993).............. 19, 20, 21, 22

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985).................................................... 19

*City of New Orleans v. Dukes*, 427 U.S. 297 (1976) .................................................................... 20

*Congregation Kollel, Inc. v. Twp. of Howell, N.J.*, No. CV 16-2457 (FLW), 2017 WL 637689 (D.N.J. Feb. 16, 2017)........................................................................................... 11

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352 (S.D.N.Y. 2015) ....................................................................................... 21, 22, 28

*Elrod v. Burns,* 427 U.S. 347 (1976) .......................................................................................... 28

*Farhi v. Comm'rs of Borough of Deal*, 204 N.J. Super. 575, 499 A.2d 559 (Law. Div. 1985) ..... 6

*Franchi v. New Hampton Sch.*, 656 F. Supp. 2d 252 (D.N.H. 2009) ........................................... 23

*Freedom Baptist Church of Del. Cty. v. Twp. of Middletown,* 204 F. Supp. 2d 857 (E.D. Pa. 2002)................................................................................................................. 28

*Garden State Islamic Ctr. v. City of Vineland,* 358 F. Supp. 3d 377 (D.N.J. 2018).................... 22

*Harris v. Itzhaki*, 183 F.3d 1043 (9th Cir. 1999) ........................................................................ 22

*Hassan* v. *City of New York,* 804 F.3d 277 (3d Cir. 2015), *as amended* (Feb. 2, 2016) .............. 19

*Homan v. City of Reading*, 963 F. Supp. 485 (E.D. Pa. 1997) .................................................... 23

*Islamic Soc'y of Basking Ridge v. Twp. of Bernards*, 226 F. Supp. 3d 320 (D.N.J. 2016)..... 19, 25

*Kos Pharm. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004)........................................................... 19

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,* 508 U.S. 384 (1993) ........................... 21

*LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir. 1995)........................................................ 25

*Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253 (3d Cir. 2007). 22, 26

*Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236 (3d Cir. 2011), *as amended* (Mar. 7, 2012)................................................................................................................. 18

*Opulent Life Church v. City of Holly Springs,* 697 F.3d 279 (5th Cir. 2012).............................. 29

*Oros Bais Yaakov High School v. Township of Jackson, NJ*, Docket No. PW-L-2981-14 (Law Div.) .................................................................................................................. 7, 11

*Oxford House- Evergreen v. Plainfield,* 769 F. Supp. 1329 (D.N.J. 1991) .................................. 30

*Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435 (3d Cir. 2000), *as amended* (Nov. 29, 2000) ..................................................................................................... 21

*Pryor v. Nat'l Collegiate Athletic Ass'n.*, 288 F.3d 548 (3d Cir. 2002) ....................................... 20

*Raab Family P'ship v. Borough of Magnolia*, Civ. No. 08-5050, 2009 WL 361135 (D.N.J. Feb. 13, 2009) ...................................................................................................... 22

*ReMed Recovery Care Ctrs. v. Twp. of Willistown,* 36 F. Supp. 2d 676 (E.D. Pa. 1999) ........... 30

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) .............................................................. 21

*Schad v. Borough of Mount Ephraim,* 452 U.S. 61 (1981) ........................................................... 28

*Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987) ......................................................... 23

*State v. Cameron*, 100 N.J. 586, 498 A.2d 1217 (1985) ............................................................... 6

*Suppan v. Dadonna,* 203 F.3d 228 (3d Cir. 2000) ...................................................................... 20

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002) ................. 15, 21, 25

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ........... 19, 20, 22, 23

*Wiley Mission v. New Jersey*, No. CIV. 10-3024, 2011 WL 3841437 (D.N.J. Aug. 25, 2011) ... 21

*Yeshiva Gedola Na'os Yaakov v. Twp. of Ocean, NJ,* Civ. No. 3:16-0096 (D.N.J.) ................... 11

## Statutes

42 U.S.C. § 1982 .......................................................................................................... 19, 23

42 U.S.C. § 2000cc ......................................................................................... 19, 22, 26, 28

42 U.S.C. § 2000cc-2 ........................................................................................................ 22

42 U.S.C. § 3604 ......................................................................................................... 19, 22

N.J.S.A. 10:5-1, *et seq.* ............................................................................................... 19, 23

## Other Authorities

Joint Statement of Sens. Hatch and Kennedy, 146 Cong. Rec. S7774-01, S7774, 2000 WL 1079346 ....................................................................................................... 20

## Constitutional Provisions

U.S. Const. Amend. I ................................................................................................... 19, 21

U.S. Const. Amend. XIV .................................................................................................... 19

## PRELIMINARY STATEMENT

Jackson Township, New Jersey ("Jackson" or the "Township") is plagued by anti-Semitism.  Many residents of the Township have pledged to be "Jackson Strong" to ensure that the "tsunami" of Orthodox Jewish population in neighboring Lakewood Township does not reach Jackson.  They have written to Township officials, have made their position clear at Township meetings, and have posted on social media that they want to "to keep Jews out" of their neighborhoods by asking their "township governing body to stand firm" and "quell and regulate the tide before it envelopes Jackson" by assuring residents that Jackson is not converted "into another Lakewood" where there is a "scourge of the cockroaches."[1]

While the Constitution generally does not reach such private bigotry, it does prohibit Jackson officials' responsiveness to that bias.  As a result, the Township has adopted ordinances designed to keep Orthodox Jews out of Jackson by targeting religious schools, dormitories and *eruvs* (wire boundaries that permit Orthodox Jews to exercise their religious beliefs), and created a "watch list" to monitor places where Jews worship, among many other actions targeting the Orthodox Jewish community.  They have gone so far as to petition (unsuccessfully, of course) the United States Department of Justice and the Attorney General of New Jersey, to help prevent Orthodox Jews from moving into the Township.  The Township's Mayor echoes Jackson residents' hostility, making statements such as "It's a religious value to you.  It's not a religious value to me," "What's next, Sharia law?," and answering "Absolutely not" when asked "If these were churches would we be fighting them?"

Currently, Orthodox Jews in Jackson are prevented from leaving their homes on *Shabbos*

---

[1] "Lakewood" refers to Lakewood Township, New Jersey, which is the municipality immediately to the east of Jackson Township, and is a location where a large Orthodox Jewish community resides.

because the Township passed an ordinance that prevents them from creating an *eruv* that would enable them to push strollers or wheelchairs.  They cannot send their children to religious schools within the Township because Jackson has passed ordinances that prevent the construction of schools that can accommodate their needs.  In addition to these ordinances, Jackson officials have responded to the animus of residents by singling out for enforcement and monitoring Jackson's Orthodox Jews and locations where they gather for prayer.  These are just a few of the examples of anti-Jewish animus exhibited by the Township.

This targeting of a minority religious and ethnic group cannot be permitted to continue.  Ordinances designed to "keep Jews out" cannot stand.  These Ordinances cannot be understood to accomplish anything other than to target the Orthodox Jewish community and were adopted for that very specific purpose.  For the reasons described below and in Plaintiffs' supporting Declarations, Plaintiffs respectfully request that the Court preliminarily enjoin the Defendants from continuing to enforce these targeted ordinances and policies, and permit Plaintiffs to live, study, and practice their religious beliefs free from such reprehensible discrimination.

## STATEMENT OF FACTS

### Plaintiffs and Their Religious Beliefs and Practices

Plaintiff Agudath Israel of America Inc. ("AIA") is a non-profit organization founded ninety-five years ago to unite, serve and advocate the interests of Orthodox Jewry.  Its New Jersey branch advocates for the interests of Orthodox Jewry in New Jersey.  Declaration of Rabbi Avi Schnall (Aug. 27, 2019) ("Schnall Decl.") ¶¶ 3-4.  AIA and its members believe in the right of Orthodox Jews to educate their children in accord with the beliefs of their faith.  *Id.* ¶ 9.

AIA has many members who both live in Jackson as well as members who seek to move to Jackson.  Defendant's Ordinances have infringed upon their right to the associational, personal,

social, and professional benefits of an integrated community and one that does not discriminate against them on the basis of their religious beliefs.  Schnall Decl. ¶ 22.

Orthodox Jews believe that they must worship at *shul* on *Shabbos* (the Jewish Sabbath) and Holy Days, that they must bring their children to *shul* on such days, that they must have a *bris* (ritual circumcision) at *shul*, that they must celebrate the birth of a baby girl at a *Shabbos kiddush* (celebratory meal), and that they must have their children learn from relatives *l'dor vador* (from generation to generation).  Orthodox Jews are also religiously forbidden from carrying children, a cane or walker, or pushing strollers or wheelchairs on *Shabbos*.  Schnall Decl. ¶ 6;  Declaration of Gershon Klein (Aug. 7, 2019) ("Klein Decl.") ¶¶ 4, 7; Declaration of Shimon Brundy (Aug. 7, 2019) ("S. Brundy Decl.") ¶¶ 4, 6; Declaration of Rachel Brundy (Aug. 7, 2019) ("R. Brundy Decl.") ¶¶ 4, 6; Declaration of Moshe Heiman (Aug. 8, 2019) ("Heiman Decl.") ¶¶ 4, 6; Declaration of Andrew Mozes (Aug. 8, 2019) ("Mozes Decl.") ¶¶ 4, 6; Declaration of Yaakov Shain (Aug. 8, 2019) ("Shain Decl.") ¶¶ 4, 7.   An *eruv* religiously permits Orthodox Jews to practice these religious beliefs on *Shabbos* or on other Holy Days.  Without an *eruv*, young children and those who need walkers, canes, wheelchairs or strollers are not permitted to leave home.  Those who care for them are also prohibited from practicing their religious beliefs because they are not permitted to carry a child or push a wheelchair or a stroller.  *See generally* Declarations of Schnall, Klein, S. Brundy, R. Brundy, Heiman, Mozes, Shain, *supra.*

As set forth *infra*, Jackson passed an *Eruv* Ordinance that prevents Orthodox Jews from living in the community in a manner that permits the exercise of their religious beliefs.  They are forced to stay home on *Shabbos* and certain Holy Days.  They cannot worship at *shul,* cannot bring their children to *shul,* have missed ritual celebrations for their own children and cannot have elderly family members or those with young children visit for *Shabbos*.  *See generally* Declarations of

Schnall, Klein, S. Brundy, R. Brundy, Heiman, Mozes, Shain, *supra.*

The religious beliefs of Orthodox Jews also require them to send their children to religious schools, rather than public schools.  *See* Schnall Decl. ¶¶ 9-15; Declaration of Devorah Gruskin (Aug. 7, 2019) ("Gruskin Decl.") ¶ 4; Declaration of Shaya Cohen (Aug. 8, 2019) ("Cohen Decl.") ¶ 4; Declaration of Rabbi Mayer Censor (Aug. 8, 2019) ("Censor Decl.") ¶ 11; Declaration of Yaacov Hanover (Aug. 22, 2019) ("Hanover Decl.") ¶ 6.  However, Jackson enacted school ordinances that prevent Orthodox Jewish students that reside in the Township from being educated in the Township according to their religious beliefs.  They instead are bussed nearly two hours round-trip to schools outside of Jackson and as a result are missing religious studies.  Schools that seek to but are prohibited from locating in Jackson include those that have turned away students due to space constraints and those that believe that they must have a dormitory for their young students.  Gruskin Decl. ¶¶ 5-8; Cohen Decl. ¶¶ 5-11; Censor Decl. ¶¶ 1-12; Hanover Decl. ¶¶ 1-8; Heiman Decl. ¶¶ 8-13; Declaration of Rabbi Sholom Strickman ("Strickman Decl.") ¶¶ 4-5.

WR Property LLC, the owner of an "R-3"-zoned 4.93-acre parcel in Jackson Township (the "Property"), acquired the Property at a substantial cost for the purpose of developing or marketing it for development of an Orthodox Jewish religious school.  It is now unable to do so due to the Township's new targeted ordinances.  Declaration of Adam Pfeffer ¶¶ 3-6.

### The Defendants

Jackson Township is the third largest municipality in New Jersey and contains a wide variety of large assembly, institutional and commercial land uses, including Six Flags Great Adventure, the Jackson Premium Outlets, ten public schools, several assisted living facilities, funeral homes, medical facilities, campgrounds, golf clubs, and rehabilitation facilities. Declaration of Donna M. Jennings (Sept. 6, 2019) ("Jennings Decl.") ¶¶ 3, **Exh. 1, 44, 72-81, 83.**

As described below, the individual Defendants[2] are current and former Township officials who have either expressed hostility towards Orthodox Jews, were responsive to Township residents' hostility towards Orthodox Jews by taking enforcement actions designed to prevent them from moving into the Township and to limit their ability to worship and educate their children according to their religious beliefs, or were following directions to do so.  Even Ann Updegrave, a long-serving Councilwoman for the Township who left the Council in December 2018, described former running mate Defendant Reina and Defendant Nixon as "anti-semites."  *Id.* ¶ 21, **Exh 19.**

### Local Hostility Toward Orthodox Jews

Adjacent Lakewood Township has a large Orthodox Jewish population.  Many of these individuals have moved into Jackson over the last few years.  In response, other Jackson residents have demonstrated extreme hostility toward them in the form of communications with officials, speaking at Township meetings, and posting on social media.  For example, a Township resident wrote to Defendants Pieslak, Purporo, Nixon and Schlegel on June 1, 2017 regarding specific homes where Orthodox Jewish men had gathered for religious services, stating:

> Between the Shuls, ERVU [sic] wires and now this, This wonderful neighborhood is going down the gutter so fast. . . . **WHAT IS GOING TO BE DONE with this???? People do NOT want to live By this and so many people are leaving and only the Orthodox are moving in because WE Accomodate [sic] them**

(Jennings Decl. **Exh. 14**) (emphasis added).  Another Jackson Township resident wrote to Defendants Pieslak, Purpuro, Nixon, and another Township resident stating:

Also, Another house listed today on Meadowrun Ct **because of the Shul being used by**

---

[2] Defendant Michael Reina has been the Mayor of Jackson Township since 2008. Dkt. #40 ¶ 33; Dkt. #52 ¶ 33. (Jennings Decl. ¶ 4, **Exh. 2.**)  Defendant Kenneth Pieslak is the former Code Compliance Supervisor for the Township. Dkt. #40 ¶ 36; Dkt. #52 ¶ 36.  Defendant Robert Nixon is the President of the Township Council. Dkt. #40 ¶ 34; Dkt. #52 ¶ 34.  Defendant Helene Schlegel is the former Township administrator for the Township. Dkt. #40 ¶ 35; Dkt. #52 ¶ 35.  Defendant Jeffrey Purpuro is the current Zoning Enforcement Officer for the Township. Dkt. #40 ¶ 37; Dkt. #52 ¶ 37.  Defendant William Campbell is a Code Enforcement Officer for the Township. Dkt. #40 ¶ 38; Dkt. #52 ¶ 38.

**the Rabbi**. Another great Jackson Family FORCED out! It's a **sad day in Jackson**. (Jennings Decl. **Exh. 13**) (emphasis added).

Another resident sent an e-mail to Reina and the Council referring to a rabbi and stating that the "landscape of Jackson has changed dramatically." Jennings Decl. ¶ 23, **Exh. 21.** Another e-mail was sent to Reina and the Council stating that they need to place a limit on homes purchased that are converted to houses of worship. The title of the e-mail stated that the majority of Jackson taxpayers do not want to see it become "another Lakewood." Jennings Decl. ¶ 24, **Exh. 22.**

A resident also wrote to Township officials about a property, pointing out the address of a house that "appears to be an illegal house of worship for quite awhile now."[3] Township Business Administrator Schlegel responded, assuring the resident that the house received a summons. Jennings Decl. ¶ 25, **Exh. 23.** A Township resident commented:

> "**Its a Un-American social terror who only care about there special interest**. How dare you tread on our trained and tax paid police. Just because Ultra-Orthodox cry anti-Semitic ever 5 minutes to get their way dosent mean we have to bend our law to put up with crooked fake LCSW we want to be police bull. Why don't you write about the child molestation rampid in that community, and the out of control childbirth rates taxing our worlds resources or the Herpesvirus spread by the mohel putting there mouth on babie privets!! That's child molestation according to Dryfus. [sic]." *Id.* ¶ 61, **Exh. 59** (emphasis added).

> "Are you crazy! You don't live near Lakewood. **You don't see the abuse of this fake group.** " Jennings Decl. ¶ 61, **Exh. 59** (emphasis added).

In late 2018, a Facebook group called "Rise Up Ocean" formed to oppose the Orthodox Jewish community. On April 5, 2019, the New Jersey Division of Civil Rights wrote a letter to

---

[3] In New Jersey, there is a constitutional right to the free exercise of religious beliefs within the privacy of one's home for a gathering of people for religious services. *See generally State v. Cameron*, 100 N.J. 586, 596, 498 A.2d 1217, 1222 (1985); *Farhi v. Comm'rs of Borough of Deal*, 204 N.J. Super. 575, 578, 499 A.2d 559, 560 (Law. Div. 1985); *Chabad Jewish Ctr. of Toms River v. Twp. of Toms River*, No. CV31601599, 2018 WL 1942360 (D.N.J. Feb. 5, 2018).

Facebook, Inc. to bring attention to the comments on the Rise Up Ocean's page "inciting violence against Orthodox Jews."  The letter concluded:

> "You at Facebook also have a role to play in monitoring comments that incite violence based on race, religion, gender, sexual orientation, gender identity or expression, national origin, ancestry, or disability."  Jennings Decl. ¶ 62, **Exh. 60**

The Township was then asked to introduce a resolution condemning Rise Up Ocean County, but refused to do so.  Jennings Decl. ¶¶ 8, 60, **Exhs. 6 & 58.**

The hostility towards Orthodox Jews has also been expressed by the Township's Zoning Board members who denied an application for an Orthodox Jewish girls' high school.[4]  Comments by the Township Zoning Board <u>members</u> included:

> "Jackson is not prepared for the **tsunami of orthodoxy** that is mounting at the border. I beg you all to CONFRONT OR ACCOST the council members and demand that they appoint Rae Ann Walker to the zoning board she is strong enough and smart and will **quell and regulate the tide before it envelopes Jackson**." Declaration of Mordechai Burnstein ¶ 4 , **Exh. B** (emphasis added);

> "[A]sk him what to do about the **scourge of the cockroaches** from the east[.]"  Burnstein Decl. ¶ 5, **Exh. C** (emphasis added);

> "This September 10 being suicide awareness day **I implore senator Singer to step up and commit suicide**. **He is nothing but the byproduct of a human body eating matzoh and gafelta fish. His actions as a senator are only to advance the mischievous will of the Lakewood cult.** He is deplorable and why King Gilmore allows this to happen is the problem. Perhaps both of them should commit suicide!  After many years of watching senators Singer's proposals and interests which are solely to support and advance **the Lakewood medieval cult**, on the backs of the surrounding communities it's time to come to an end. He is so obviously bought, paid for, and in the pocket of the Lakewood cult, I do not know why he is allowed to hold this position and should be terminated, or he should do the honorable thing and DIE!  Also Lakewood should no longer have 3.5% tax, especially if their goal is to be the 3rd largest city in nj. they are prospering way too much, another gift from that POS Singer, **pay you far [sic] share you filthy f'ing cockroaches!**"

---

[4] That denial is the subject of a pending discrimination lawsuit in state court in Ocean County.  *Oros Bais Yaakov High School v. Township of Jackson, NJ*, Docket No. PW-L-2981-14 (Law Div.).  Mayor Reina has characterized that lawsuit as "based on bias of anti-semitism which is what I warned everyone of.  I also know that our current zoning laws stopped this application cold, it was some dumb comments from board members and the internet posts (including the rant of pictures) that gave **<u>them</u>** the extra umphh . . . ."  (Jennings Decl. **Exh. 3**) (emphasis added).

Jennings Decl. ¶ 63, **Exh. 61** (emphasis added);

"They are on target for a repeat of the 1930s," obviously referencing the Holocaust and its precursor events.  Burnstein Decl. ¶ 6, **Exh. D**.

These are but a few examples of hostility in Jackson Township toward Orthodox Jews, and specifically to the idea of that community moving to the Township.

### Jackson Officials Are Themselves Hostile Towards Orthodox Jews and Are Also Responsive to Residents' Hostility Towards Orthodox Jews.

Township officials have been responsive to this anti-Orthodox prejudice, assuring Jackson residents that they would look out for their anti-Orthodox interests.  Jennings Decl. ¶¶ 6, 25, **Exhs. 4, 23.**   They have also expressed their own sentiments that reflect hostility towards Orthodox Jews.  Defendant Nixon said that it would be "reprehensible " and "not acceptable" for Orthodox Jews to move into Jackson.  Jennings Decl. ¶¶ 46, 53, **Exh. 44, 51.**  Councilman Bressi referred to such development by Orthodox Jews as "creeping crud."  Jennings Decl. ¶ 54, **Exh. 52.**

Township officials have actively monitored *shuls* in Jackson.  Defendant Purpuro has written about a Township "watch list" for Orthodox Jewish homes (Jennings Decl. **Exh. 11**) and has admitted that Township officials were responsive to citizen complaints about Orthodox Jews (Jennings Decl. ¶ 20, **Exh. 18**).[5]  Mayor Reina directed a township employee to "surveil" a property allegedly operating as a *shul* during the weekday hours "as well as Friday into Saturday

---

[5] Defendant Purpuro has admitted that Township officials were responsive to citizens complaints about Orthodox Jews, including that (1) he issued a summons on a religious assembly after receiving complaints from local residents via emails; (2) he received complaints from residents about individuals using their homes for *shuls* and he investigated those complaints; (3) he received up to ten complaints regarding properties that were allegedly being used as a *shul*, and issued a citation on one of those properties, 146 South New Prospect;  (4) he received complaints regarding *sukkahs,* temporary religious hut-like structures used for the holiday of *Sukkos,* and investigated those complaints; (5) He was directed by Township officials to investigate *sukkahs*; (6) he received about five complaints regarding tarps being placed around pools as a means of modesty at residential homes and investigated those complaints; and (7) he received complaints regarding the use of pools on Jewish properties and investigated those complaints.

[the Jewish Sabbath]" (*id.*, **Exh. 5.**).[6]  Defendant Shlegel participated in the effort to surveil alleged *shuls* in the Township and provided reports to Defendants Reina and Council President Nixon, telling Nixon: "We will monitor these sights [sic] and provide a report on Monday." *Id.* **Exh. 10.**

Defendant Pieslak also actively engaged in the effort to monitor the Orthodox Jewish community in Jackson Township, providing the reports as to the fact that the property is being used as a *shul* and the amount of activity on a Friday night.  (Jennings Decl. **Exhs. 7 & 8.**)  Defendant Campbell wrote to Defendant Purpuro about a property allegedly being used as a *shul*:

> "I guess the meeting was a waste of your time.  I counted 11 cars total.  Couldn't get the ones in the backyard in the picture to [sic] good.  That's more than there ever was.  God only knows how many on foot?"  (Jennings Decl. **Exh. 12.**)

On July 3, 2017, Defendant Purpuro wrote a notice of violation for a property for "changing use from residential to an assembly use w/o approvals" after receiving emails from residents stating "I **witnessed many Jewish males** coming out of a residential house at 146 New Prospect Rd." and "I'm just curious is this house going to be allowed to continue to operate as a synagogue?" Jennings Decl. ¶¶ 64-66, **Exhs. 62, 63, & 64** (emphasis added).  Just after making this statement, Defendant Purpuro began monitoring that property and providing monthly reports to Defendants Reina and Schlegel that indicated surveillance of that property at the request and instruction of Defendant Reina. Jennings Decl. ¶¶ 7, 64, **Exhs. 5, 62.**

After "surveilling" that property, the Township, at the instruction of, and with the knowledge of the individual Defendants, also began monitoring and surveilling at least <u>sixteen</u> other homes owned by Orthodox Jews.  Many of the houses were targeted based on complaints identifying these houses as *shuls*.  Jennings Decl. ¶¶ 7, 9-10, 12-13, 15, 18-19, **Exhs. 5, 7, 8, 10,**

---

[6] Reina admitted that he heard residents express anti-Orthodox sentiment, "never denied" that there is "anti-Jewish sentiment in Jackson Township," and testified that several specific residents were anti-Orthodox or made anti-Orthodox statements.  (Jennings Decl., **Exh. 2.**)

**11, 13, 16, 17.**  Mayor Reina also assured a Jackson resident that he "would like to address your concern personally" and provided a phone number in response to the resident's statement that the Orthodox Jewish community (whom the resident referred to as "these people") "would take over Jackson as they have done so in Lakewood."  (Jennings Decl. ¶ 17, **Exh. 15.**)

At a meeting held in March of this year, Mayor Reina was asked, with respect to the issue of synagogues and *shuls*, "If these were churches would we be fighting them?"  Mayor Reina responded: "Absolutely not."  Declaration of Yisroel Schenkolewski dated August 22, 2019 ¶¶ 3-4.  Defendant Nixon encouraged all residents to sign up for a "no knock" registry that was specifically targeted to prevent members of the Orthodox Jewish community from contacting homeowners regarding the potential sale of their homes.  Jennings Decl. ¶ 67, **Exh. 65.**

<u>**Jackson Officials Adopt Ordinances in Response to**</u>
<u>**Residents' Hostility Towards Orthodox Jews**</u>

<u>The School Ordinances</u>.  On March 16, 2017, Jackson adopted Ordinances No. 03-17 and 04-17 (the "School Ordinances"), which prohibited schools from locating in any of the Township's residential zoning districts (other than one with a minimum lot size of 500 acres), and completely prohibited dormitories throughout the Township.[7]  Jennings Decl. ¶¶ 26-27, **Exhs. 24 & 25.**

The School Ordinances prevent Orthodox Jews from sending their children to a religious school in the Township, which is required by their religious beliefs.  The School Ordinances also prohibit dormitories, which are an essential component of boarding high schools for Orthodox Jewish boys.  Gruskin Decl. ¶¶ 4-8; Cohen Decl. ¶¶ 4-11; Censor Decl. ¶¶ 1-12; Hanover Decl. ¶¶ 4-6, 8; Strickman Decl. ¶¶ 4-7.  The Township was well aware of the Orthodox Jewish

---

[7] Prior to the enactment of Ordinance No. 03-17, "private or parochial schools not operated for profit" were permitted in nearly every residential zoning district (including the R-2, R-3, R-5, R-20, R-15, R-9, and MF zoning districts) by right. Dkt. #40 ¶ 79; Dkt. #52 ¶ 79.  Now, no residential zoning districts, other than those in the Pinelands, an entirely separate section of the zoning code, and the PMURD (discussed *infra*), permit schools.

community's need for religious schools with dormitories as a result of two other lawsuits within the immediate area, *Congregation Kollel, Inc. v. Twp. of Howell, N.J.*, No. CV 16-2457 (FLW), 2017 WL 637689 (D.N.J. Feb. 16, 2017), and *Yeshiva Gedola Na'os Yaakov v. Twp. of Ocean, NJ*, Civ. No. 3:16-0096 (D.N.J.), as well as its *Oros Bais Yaakov* litigation.  *See supra,* n.4; Jennings Decl. ¶ 28, **Exh. 26.**

As a result of the School Ordinances, the Orthodox Jews who live in Jackson are forced to send their children to school in Lakewood Township.  Many of the children are late due to the traffic during the one hour drive each way, resulting in them missing their morning prayers and other critical religious learning, and are exhausted from getting up so early and from the long ride, which affects their ability to learn.  The School Ordinances have also prevented Orthodox Jewish schools from moving to Jackson and have caused schools in Lakewood to turn away students because they are enrolling so many students from Jackson.  Gruskin Decl. ¶¶ 5-7; Cohen Decl. ¶¶ 5-10; Censor Decl. ¶¶1-11; Hanover Decl. ¶¶ 5-6; Heiman Decl. ¶¶ 8-13; Strickman Decl. ¶¶ 5-7.

The School Ordinances were adopted in direct response to hostility towards Orthodox Jews by residents who wanted to prevent them from moving to Jackson.  At the meeting during which they were being considered, many speakers explicitly referred to Lakewood and the Orthodox Jewish community and indicated that they supported the School Ordinances:

"**[I]f the problem is to keep Jews out of Jackson**, then you need to . . ."

Another Jackson resident stated: "I see you moving here to change or convert our town to accommodate the small Jewish population that is just beginning to move into the towns adjacent to Lakewood like Jackson, Manchester, Howell, Brick and Toms River. **I see the Jewish population forcing and pushing their cultural and religious way of life on Jackson, its residents and our neighbors** the way it has done in Lakewood for years."

"These people don't want to happen -- **what has happened to Lakewood happen here**. . . . That place can't handle what it has now, and they're venturing off to us." . . . "**Every home [in Lakewood] becomes a temple, a school for the Jewish**."

"We have the right to fight for our way of life, and so we should, **knowing the Jewish population is not moving into our towns and communities to better them, to respect them**, or for the reasons mentioned above."

Jennings Decl. ¶ 29 (emphases added), **Exh. 27.**  The Township Council adopted the School Ordinances at the meeting where those comments were made, and where those comments received substantial applause from the other residents.[8]  Jennings Decl. ¶ 29, **Exh. 27.**  Defendant Reina has testified that it would be a "fair statement" that "the testimony that was actually made at the council meeting was from those, that segment of the population that is ignorant and that is anti-Semitic."  Jennings Decl. ¶ 4, **Exh. 2.**  (Mr. Reina does not vote on ordinances.  *Id.* ¶ 4, **Exh. 2.**)

In addition to speaking at meetings, members of the public posted on-line comments that were hostile to Orthodox and Hasidic Jews, including those in response to The Asbury Park Press articles about the School Ordinances:

"Great job! Don't let the cult out of Lakewood," *id.* ¶ 30, **Exh. 28.**

"**What the Jews are doing is wanting people who have lived for decades in Jackson to sell their beloved homes**, leave behind the lives they have built in Jackson, **so they can ship more of their people into Ocean County**. . . .We were never a socialist country, but I witness too many times the Hasidic's pulling out their cards from the gov't for free stuff. **And now they want to take our very town from us. A message to the Hasidic-the Old Testament states to not covet anything of your neighbors-including their homes.** Exodus 20:17" Jennings Decl. ¶ 31 , **Exh. 29** (emphasis added).

"**All of your problems only stem from the Ultra-Religious! The Hasidics and Ultra-Orthodox!** And then it's mostly the rabbis and the rich developers who are to blame! The followers are sheeple who are cut off from the modern world and don't know much about anything! If you really want to see what's going on just Google Monsey, NY, Kiryas Joel, NY and Bloomingburg, NY. There is a population explotion [sic] in Brooklyn, and they are coming to a town near you. And no, they won't go away - they will double their numbers in about 10 years. **So figure out who will be the majority soon in Jackson.**" Jennings

---

[8] This is not the first time Jackson passed laws designed to keep out the influx of Orthodox Jews from Lakewood. In 2010, the Township enacted Ordinance 30-10 which banned private schools in the newly created R-1 district which encompasses a significant area of the Township near the Lakewood border and in which the Orthodox Jewish community resides. Jennings Decl. ¶ 32, **Exh. 30.**  Dkt. #40 ¶ 246; Dkt. #52 ¶ 246.

Decl. ¶ 31 (emphasis added), **Exh. 29.**

"Hasidics will always play the race card when they don't get their way," *id.* ¶ 30, **Exh. 28.**

"Now the Orthodox will go to a corrupt federal judge and he will overturn the town ordinance.  The fix is in."  Jennings Decl. ¶ 30, **Exh. 28.**

"Okay, Now for step #2. They lost locally. Now they'll go find a corrupt federal judge and he'll/she'll rule in favor of the Orthodox Jewish group (the judge has already been bought and paid for). This is the way they do things."  Jennings Decl. ¶ 31, **Exh. 29.**

"The Hasidim have enormous resources even as many of them are on welfare."  Jennings Decl. ¶ 31, **Exh. 29.**

Former Councilman Scott Martin, who voted for the Ordinances and acknowledged he knew that the Orthodox Jewish community has a desire for schools with dorms stated: "My understanding is Lakewood has over 160 schools with dorms. So it's not just one. You have to look at -- you have to look down the road," and stated that he is "concerned" that "what happened in Lakewood . . . is going to happen in Jackson."  Jennings Decl. ¶ 22, **Exh. 20.**  He also stated that the difference between dormitories at Six Flags and dormitories for Jewish schools is that it would "open[] the flood gates."  Jennings Decl. ¶ 22, **Exh. 20.**  Councilwoman Anne Updegrave also acknowledged that she received support from Jackson residents via email for the Ordinances referencing the Orthodox Jewish community.  Jennings Decl. ¶ 21, **Exh. 19.**

Against this backdrop of hostility towards Orthodox Jews, the Township adopted the School Ordinances, which hit their mark by preventing Orthodox Jews from educating their children in Jackson and purposefully discouraging Orthodox Jews from locating to Jackson.

The *Eruv* Ordinance.  As described above, having an established *eruv* is crucial to observant Jews who may desire to relocate to Jackson Township, so that they may reside in a community where they can freely and fully exercise their religion.  However, on September 12, 2017, the Township Council specifically targeted Orthodox Jews by adopting Ordinance No. 20-17 (the "*Eruv* Ordinance" and, collectively, the "Challenged Ordinances" when discussing all three

13

Ordinances).   The *Eruv* Ordinance prohibits the establishment of any *eruv* throughout the Township by an outright prohibition against the placement of articles of any nature in the right of way of any street or public place.   Jennings Decl. ¶ 33, **Exh. 31.**   The only purpose of the *Eruv* Ordinance was to prohibit Orthodox Jews from living within an *eruv's* boundaries, and therefore prohibiting Orthodox Jews from living and worshipping in that municipality.[9]

The *Eruv* Ordinance was passed in response to attempts in the spring of 2017 by Orthodox Jewish Township residents who organized themselves as the Jackson Eruv Association (the "JEA") to expand an existing *eruv* in the Township.   The Township was on notice of the JEA's proposed expansion because a JEA representative emailed the Township on July 17, 2017 seeking guidance on how best to proceed with respect to the *eruv* expansion.   Jennings Decl. ¶ 72, **Exh. 70.**   Mayor Reina has admitted this saying:

Q.   Do you think it was because of basketball hoops?
A.   I think it was because of what people were doing in the right of way at the time.
Q.   Placing eruvs?
A.   Placing four by four pol[e]s, metal objects in the right of way, which was prohibited. We never had that, you know, in residential neighborhoods. Someone is going to get a basketball hoop and drive it into cement, and now, that is in the right of way. That was never allowed, people turned around and said okay, little Johnny is going to bring the basketball inside.
Q.   But when they started to put pol[e]s in for eruvs that is when people complained about it?
A.   Yes.
Q.   **And that ultimately resulted in this ordinance, correct?**
A.   **I would have to say yes.**

Jennings Decl. ¶ 4, **Exh. 2** (emphasis added).   Thus, the Township's Mayor admitted that the Township was directly responsive to the hostility of local residents—in a Township where

---

[9]   Recently, the matter of *New Jersey Attorney General v. Township of Mahwah, et al.,* Case No. 2:17-cv-11988, in which the State of New Jersey sought to enjoin Defendants from not only limiting access to public parks based on religion, but to prevent implementation of an *eruv*, was resolved with the parties agreeing that the existing *eruv* would remain in place.

residents demonstrate clear prejudice against Orthodox Jews—in adopting the *Eruv* Ordinance.[10]

Prior to the adoption of the *Eruv* Ordinance, section 372-8 of the Township Code provided that "No person shall encumber or obstruct any street or public place with any article or thing whatsoever <u>unless permission has been first obtained in writing from the Township Committee of the Township of Jackson</u>." Jennings Decl. ¶ 34, **Exh. 32** (emphasis added). This had permitted the placement of materials in the right of way with permission from the Township, and the Township had previously made a determination in April 2017 that no Ordinance was being violated by the presence of the *eruvs* when Defendant Pieslak, the Township's Code Compliance Supervisor wrote to a resident: "We are aware of the group of homes that have installed the poles connected by the wire in Brookwood [] and found there to be no violation of any Ordinance/Law." Jennings Decl. ¶ 35, **Exh. 33.** Just a few days later, Township Zoning Officer Defendant Purpuro confirmed this, stating, in part, "if I were to ask for these wires to be removed, I'd have no black and white codes to cite . . . Bottom line, from a Planning and Zoning perspective, relative to Chapter 244, as nothing seems to exist on this matter, I have nothing to enforce." Jennings Decl. ¶ 36, **Exh. 34.** However, Township residents and officials were not satisfied with these responses.

During the time-frame leading up to the enactment of the *Eruv* Ordinance, residents put pressure on officials to issue violations to Orthodox Jews who used or erected materials forming part of an *eruv* and wrote to the Township Council stating:

> "We need our township governing body to **stand firm and assure us that this will not be allowed**. This has the potential of being **just the first step in converting Jackson into another Lakewood**." Jennings Decl. ¶ 37, **Exh. 35** (emphasis added).

> "Can you imagine driving past Harmony farms with poles & wires labeling it as Orthodox

---

[10] The motivation behind the *Eruv* Ordinance was never about signs, flags or basketball hoops, as such items are still affixed to utility poles and in rights of way in the Township and the Township has not taken enforcement actions against various such encroachments. Declaration of Ross Bowen ¶ 4, Exh B. *See Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 167 (3d Cir. 2002).

owned & run? What is going to be done, **they are 10 steps ahead of us**."  Jennings Decl. ¶ 37, **Exh. 35** (emphasis added).

"This is all very disheartening because the writing is on the wall. We have no control over our residential neighborhoods. It's a free for all. **And as far as I am concerned anything that we can do to slow down this process of our Town being turned into a huge religious enclave** is automatically shot down by our so called legal department. . . . And I don't appreciate public schools being rented out to house religious articles such as a Torah. . . . **I have been fortunate enough to somehow get inside The Orthodox community and I could tell you that there is certainly a plan and that plan is to buy up as much as they possibly can and take Jackson** . . . .That being said I appreciate the efforts that are being made by council .such as the landlord registration the no knock and most recently the ordinance on dormitories. **But we are dealing with a very shrewd group and a very organized operation when it come to the Orthodox community. baby steps just aren't going to be enough."**  Jennings Decl. ¶ 38, **Exh. 36** (emphasis added).

Township officials again were responsive to these complaints.  When Reina received a complaint on August 28, 2016 from a resident regarding the Orthodox Jewish community, he responded by "requesting that the office of Zoning revisit and not to allow non permanent structures to be placed in front yards (referring to *sukkahs*) and **we are looking at the issue regarding the use of ERUV wires and their placement within the public ROW**."  Jennings Decl. ¶ 6, **Exh. 4** (emphasis added).  On July 7, 2016, Defendant Reina, in an email to the Township attorney and Defendants Schlegel, Nixon and Pieslak, wrote that "Code [Township's Code Enforcement Officer] has been made aware to look out for any obstructions be they signs, above head wires, ropes, etc. . . ."  Jennings Decl. ¶ 39, **Exh. 37.**  This was a veiled reference to look for *eruvs*.  In April 2017, Defendant Pieslak promised a concerned resident that the Township would begin enforcing laws regarding *eruvs*, despite the fact that he had just stated that the *eruvs* did not violate any law.  Following that pressure, the Township began issuing notices of violations for *eruv* markers.  Jennings Decl. ¶ 36, 40-41, **Exhs. 34, 38, 39.**

Defendant Reina has additionally made the following statements about *eruvs*:

"The government should never bow down to any entity, especially religion. It's not right."

"I'm not going to make your religion or my religion dictate how the rest of the township

lives."

"I am not going to allow one religion to supersede every other religion . . . Is an eruv a piece a part of a culture of a religion"

"[I]t would be no different than me going into Lakewood and saying I'm moving into this township which is predominantly Jewish. I'd like, for me to feel better and to feel blessed, I'd like a crucifix on every telephone pole. I feel safer. Now my religion also turns around and tells me I shouldn't eat meat on Friday. Do I decree a law in Jackson that you can't eat meat on Friday? That's just, it's a silly thing to say. But it's also a silly thing for . . . to come over and say I need to have this wire up because it's part of my religion."

"[I]t's a religious value to you. It's not a religious value to me. It's not a religious value to any other religion other than to you specifically, to your religion."

"What's next, Sharia law?"

Heiman Decl. ¶ 14. Councilman Calogero also indicated that "if Infact [sic] there is a violation I respectfully request emeditate [sic] enforcement actions to be taken to the fullest extent permitted." Jennings Decl. ¶ 42, **Exh. 40.**

Against this backdrop of animus and hostility against Orthodox Jews, on August 22, 2017, the Township introduced Ordinance No. 20-17, which amended § 372-8 of the Township Code to remove the portion of the law that permitted the Township to grant permission to residents to place articles in the right of way. *Eruvs* are now effectively prohibited from being erected in the Township unless solely on utility poles.[11] Jennings Decl. ¶ 33, **Exh. 31.** Once again, the ordinance hit its mark, as Orthodox Jews are prohibited from creating an *eruv* that would enable them to leave their homes on *Shabbos* and worship according to their religious beliefs.

Other Targeted Actions. In addition to passing the Challenged Ordinances, Jackson officials have engaged in deliberate actions designed to harass Orthodox Jewish residents of Jackson and to thwart relocation of Orthodox Jews to the community. These actions included

---

[11] During the course of settlement discussions, the Township passed Resolution No. 368R-17, which recognized the legal right of residents to obtain consent to attach markers to utility poles. Jennings Decl. ¶ 73, **Exh. 71.**

monitoring homes where Orthodox Jews gathered to pray (*shuls*), even though such use is permitted under New Jersey law (*see* n.3, *supra*); maintaining a "Watch" list of such properties (Jennings Decl. ¶ 13, **Exh. 11**); passing a "no-knock" ordinance designed to prevent Orthodox Jews from buying homes in Jackson (Jennings Decl. ¶ 43, **Exh. 41)**; prohibiting users of the Township's "spray park" from arriving in organized groups and wearing street clothing (Jennings Decl. ¶ 44, **Exh. 42**), which is something that Orthodox Jews would be required to do according to modesty requirements of their faith; selectively enforcing real estate sign laws against Jewish realtors (Jennings Decl. ¶ 45, **Exh. 43**); issuing violations for *sukkahs* (Jennings Decl. ¶ 20, **Exh. 18);** issuing violations for using tarps as a means of modesty around pools at residential homes (Jennings Decl. ¶ 20, **Exh. 18**); investigating the use of portable toilets by the Orthodox community (Jennings Decl.  ¶ 20, **Exh. 18);** enacting Ordinance 21-16, which limits the use of trailers and portable storage structures in the Township to prevent Orthodox Jews from assembling in or utilizing trailers for worship (Jennings Decl. ¶ 47, **Exh. 45)**; and refusing to adopt an ordinance related to the Township's *Mount Laurel* affordable housing obligations, opting instead to restrict the number of bedrooms and eliminate or reduce the size of a clubhouse in order to "prevent[] and inhibit[] Jewish people from Lakewood Township (commonly referred to as Orthodox) from moving into the EL site."  Jennings Decl. ¶¶ 48-49, **Exhs. 46 & 47.**

### STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."  *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 249–50 (3d Cir. 2011), *as amended* (Mar. 7, 2012) (quoting *Kos Pharm. v. Andrx Corp.*, 369 F.3d 700,

708 (3d Cir. 2004)).

**ARGUMENT**

I.      **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.**

    A.      <u>Plaintiffs Are Likely to Succeed on their Discrimination Claims.</u>

        1.      *Legal Standard.*

Discrimination on the basis of religion or race violates the First Amendment's Free Exercise Clause, the Equal Protection Clause, the Establishment Clause, RLUIPA's Nondiscrimination provision, Property Rights of Citizens provision (42 U.S.C. § 1982), New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.,* and the Fair Housing Act.   *See Church of the Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 532 (1993); *Hassan* v. *City of New York,* 804 F.3d 277, 301 (3d Cir. 2015), *as amended* (Feb. 2, 2016); *Islamic Soc'y of Basking Ridge v. Twp. of Bernards*, 226 F. Supp. 3d 320, 324, 341 (D.N.J. 2016); 42 U.S.C. § 2000cc(b)(2); 42 U.S.C. § 3604.   Here, the Challenged Ordinances and the monitoring of and selective issuing violations to Orthodox Jews are substantially motivated by hostility toward the Orthodox Jewish community.

**Equal Protection Clause (Counts I and II)**.   The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."   *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).   A plaintiff must establish that any difference in treatment was the result of intentional discrimination directed at a suspect class such as religion or race.   *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Hassan v. City of New York*, 804 F.3d at 294.

Courts have held that discriminatory purpose may be inferred from the totality of relevant facts, including the following circumstantial and direct evidence: (a) the series of events leading

19

up to a land use decision; (b) the context in which the decision was made; (c) whether the decision or decisionmaking process departed from established norms, including the Defendant's actions with respect to other projects; (d) statements made by the decisionmaking body and community members; (e) reports issued by the decisionmaking body; (f) whether a discriminatory impact was foreseeable; and (g) whether less discriminatory avenues were available. *See Arlington Heights*, 429 U.S. at 267; *Church of the Lukumi Babalu Aye*, 508 U.S. at 540; *Church of Scientology of Ga. v. City of Sandy Springs*, 843 F. Supp. 2d 1328, 1371 (N.D. Ga. 2012); *Chabad Lubavitch of Litchfield Cy. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 199 (2d Cir. 2014).

Direct evidence of discriminatory intent, often unavailable in successful discrimination cases, is not necessary. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights,* 429 U.S. at 266; *Pryor v. Nat'l Collegiate Athletic Ass'n.*, 288 F.3d 548, 563 (3d Cir. 2002); Joint Statement of Sens. Hatch and Kennedy, 146 Cong. Rec. S7774-01, S7774, 2000 WL 1079346 ("More often, discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or "'not consistent with the city's land use plan.'"). Discriminatory purpose also need not be the sole motivating factor, but it must be a significant factor for the challenged law or action. *Arlington Heights*, 429 U.S. at 265. "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Id.*; *Suppan v. Dadonna,* 203 F.3d 228, 236 (3d Cir. 2000).

If Plaintiff makes such a showing, the law at issue is subject to strict judicial scrutiny, such that the law may be upheld only if it furthers a compelling state interest and is narrowly tailored to accomplish that purpose. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

**First Amendment's Free Exercise Clause (Count III)**.  Discrimination against a party on the basis of religion violates the First Amendment's Free Exercise Clause.  To state a free exercise claim, a plaintiff must establish that "the object of [the challenged] law is to infringe upon or restrict practices because of their religious motivation," or that the law's "purpose . . . is the suppression of religion or religious conduct."  *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 423 (S.D.N.Y. 2015) (quoting *Church of the Lukumi Babalu Aye,* 508 U.S. at 533).

**Establishment Clause (Count IV)**.  To prove a violation of the Establishment Clause, Plaintiffs must prove that Defendants adopted the Ordinances and have taken actions based on hostility towards Plaintiffs and Orthodox Jews, and that such actions have the principal effect of inhibiting religion.  *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,* 508 U.S. 384, 395 (1993); *see also Tenafly Eruv Ass'n*, 309 F.3d at 174.

**Freedom of Association (Count V).**  To prove a violation of their Freedom of Association rights, protected by the First Amendment of the United States Constitution, Plaintiffs must establish that the Challenged Laws interfere with their association for the purpose of engaging in activities protected by the First Amendment and that such interference is direct and substantial, or significant.  *Wiley Mission v. New Jersey*, No. CIV. 10-3024, 2011 WL 3841437, at *16 (D.N.J. Aug. 25, 2011); *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 445-46 (3d Cir. 2000), *as amended* (Nov. 29, 2000); *Congregation Rabbinical Coll. of Tartikov*, 138 F. Supp. 3d at 429-30 (additional citations omitted); U.S. Const. Amend. I.  This includes the right to associate for religious purposes.  *See Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984) (discussing "right to associate with others in pursuit of a wide variety of . . . educational, religious, and cultural ends"); *Wiley Mission*, 2011 WL 3841437, at *15 (church is an expressive

association).  A locational burden on Plaintiffs' ability to associate for the purpose of engaging in activities protected by the First Amendment is sufficient to establish a violation.  *Congregation Rabbinical Coll. of Tartikov,* 138 F. Supp. 3d at 430.

**RLUIPA's Nondiscrimination Provision (Count VI)**.  RLUIPA's Nondiscrimination Provision requires that "No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination."  42 U.S.C. § 2000cc(b)(2).  Various courts, including courts within this Circuit, have applied the *Arlington Heights* analysis to claims under the Nondiscrimination provision.  *See Church of the Lukumi Babalu Aye,* 508 U.S. at 540; *Garden State Islamic Ctr. v. City of Vineland,* 358 F. Supp. 3d 377, 388 (D.N.J. 2018).  If the Plaintiff produces such *prima facie* evidence, the Defendants bear the burden of persuasion on all elements of the Nondiscrimination claim.  42 U.S.C. § 2000cc-2(b).  RLUIPA's Nondiscrimination provision is a strict liability offense; it is not subject to strict scrutiny review.  42 U.S.C. § 2000cc(b)(2); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 269 (3d Cir. 2007).

**Fair Housing Act (Counts X, XI, and XII)**.  The Fair Housing Act, 42 U.S.C. § 3604(a), makes it unlawful to "make unavailable . . . a dwelling to any person because of race [or] religion . . . ."  To prove a violation of the "intentional discrimination" provision of the FHA, "the plaintiff[s] must first establish a prima facie case.  Adapted to this situation, the prima facie case elements are: (1) plaintiff[s'] rights are protected under the FHA; and (2) as a result of the defendant[s'] discriminatory conduct, plaintiff[s] ha[ve] suffered a distinct and palpable injury."  *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999).  *See Raab Family P'ship v. Borough of Magnolia*, Civ. No. 08-5050, 2009 WL 361135, at *6 (D.N.J. Feb. 13, 2009).  The challenged Ordinances prohibit dormitories throughout the Township which are the dwellings in which the

students would reside.  "Dwellings" includes dormitories under the FHA.  *See Franchi v. New Hampton Sch.*, 656 F. Supp. 2d 252, 260 (D.N.H. 2009) ("Because a boarding school dormitory is occupied as a residence by one or more individuals, then fits the statutory definition of dwelling").

**Property Rights of Citizens, 42 U.S.C. § 1982 (Count XIII).**  Plaintiffs must show that Defendants violated their right as members of the Jewish race to have the same rights as enjoyed by other citizens to hold and convey real and personal property.  *See Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987); *Homan v. City of Reading*, 963 F. Supp. 485, 491 (E.D. Pa. 1997).

**New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.* (Counts XIV and XV).**  Plaintiffs must show that Defendants are denying Plaintiffs, on the basis of religion, the opportunity to obtain the privileges of ownership of real property.

2.    *The Town Has Discriminated Against Plaintiffs.*

Various direct and indirect evidence of the types deemed relevant by the Supreme Court in *Arlington Heights* clearly demonstrate hostility against Orthodox Jews based on their religion.

a.    The series of events leading up to a ordinances and enforcement and the context in which the Council adopted same.

As set forth above, the Challenged Ordinances were adopted during a period of great hostility towards Orthodox Jews by local residents and Township officials.  In addition to the hostile actions set forth above, when members of the Orthodox Jewish community and real estate agents serving that community inquired into the potential availability of homes, there was an outcry against the Orthodox Jewish community by Township residents.  Some Township residents initiated and participated in a campaign known as "Jackson Strong," which is intended to discourage homeowners from selling to members of the Orthodox Jewish community.  Jennings Decl. ¶ 50, **Exh. 48.**  These sentiments were shared by and supported by Township officials.  One resident met with Defendant Reina and stated "**The mayor said the key to keeping Jackson the**

way we all know and love it is Tell your neighbors **DONT SELL. STAY STRONG!**"
Burnstein Decl. ¶ 7, **Exh. E.**  (emphasis added).

When Rabbi Shmuel Lefkowitz of Plaintiff AIA stated that young Orthodox Jewish families should consider moving to jurisdictions around Lakewood, including the Township, the Township took various steps to prevent that from happening.  Jennings Decl. ¶ 51, **Exh. 49.** Defendant Nixon stated that AIA's statements regarding Orthodox Jews moving into areas such as Jackson was "not acceptable" and "reprehensible" and that "the threat can be eliminated if people held their ground and refused the offers being made on their properties and remain committed to Jackson Township and their neighbors."  Jennings Decl. ¶¶ 53, 81, **Exh. 51, 83.**

When the Oros Bais Yaakov high school attempted to locate in the Township in 2013, Township residents and zoning board members exhibited substantial hostility toward the Orthodox Jewish community during the hearings and on social media, including the following:

"[T]hat is a private school and is exclusively for the use of the Orthodox community; there will be no other children of other religions admitted to that school without being able to pass a strict religious component," Jennings Decl. ¶ 52, **Exh. 50;**

"They DO **have more money** than you or me or all of us put together and they have a long term plan and an abundance of patience."  Burnstein Decl. ¶ 3, **Exh. A.** (emphasis added);

"Over time, enabled by group unity, they will form a bloc vote that will elect whomever they choose . . . . Over time they will become dominant."  Burnstein Decl. ¶ 3, **Exh. A.**

Following the Zoning Board's denial, the Township then adopted the School Ordinances which ensured that no additional such uses would be permitted under the Code.

b.      Statements made by the decisionmaking body.

As set forth *supra*, Township officials have made various anti-Orthodox statements, including admitting that they would not be "fighting" if they were churches and calling it "reprehensible," "not acceptable," and "creeping crud" for Orthodox Jews to move into Jackson.

Schenkolewski Decl.  ¶ 4; Jennings Decl. ¶¶ 53-54, 85, **Exhs. 51, 52, 83.**

The Township even went so far as to file complaints with state and federal authorities about Orthodox Jews' attempts to buy homes in the Township by claiming that they somehow constituted "blockbusting."  Jennings Decl. ¶¶ 55-56, **Exhs. 53 & 54.**  Nixon announced that the Township had filed these complaints at the Township Council's July 26, 2016 meeting where a large number of local residents made public comments that were hostile toward the Orthodox Jewish population and Lakewood.  In response to those hostile comments, Nixon assured Township residents that "[E]veryone in this room is on the same page."[12]  Jennings Decl. ¶ 57, **Exh. 55.**

        c.     Statements made by community members, to whom officials were responsive.

Discriminatory motivation can be imputed to governmental decision-makers if they were "knowingly responsive" to community animus against a protected group. *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995).  *See Al Falah Ctr. v. Twp. of Bridgewater*, No. CV 112397, 2013 WL 12322637, slip op. at *7 (D.N.J. Sept. 30, 2013); *Islamic Soc'y of Basking Ridge*, 226 F. Supp. 3d at 327-333.  This is outlined in great detail above, for example when Defendant Reina admitted that support for the dormitory and school ordinances was based on anti-Semitism amongst Township residents.  Jennings Decl. ¶ 4, **Exh. 2.**

        d.     A discriminatory impact was foreseeable.

As set forth above, the Township had knowledge that Orthodox Jews need *eruvs* to worship and leave their homes on *Shabbos* and other Holy Days and had knowledge that Orthodox Jews need to send their children to religious schools.  *See also Tenafly Eruv Ass'n*, 309 F.3d at 167

---

[12] The New Jersey Attorney General's Office rejected the Township's complaint, and the United States Department of Justice, after reviewing the Township's complaint, responded to the Township's attorneys on October 14, 2016 that "we have determined that no action by the Department of Justice is necessary at this time."  Jennings Decl. ¶¶ 56, 58, **Exhs. 54, 56.**

(municipality's prohibition of affixing *lechis* used by Orthodox Jewish residents to utility poles to establish an *eruv* violated the Free Exercise Clause's mandate of neutrality toward religion and "singled out religiously motivated conduct of Orthodox Jewish residents for discriminatory treatment"). There is no question that the Township knew exactly what it was doing when it enacted the Challenged Ordinances.

> e.    Less discriminatory avenues were available to the Defendants.

The Township cannot possibly demonstrate that there exists no less intrusive means of achieving any purported government interest other than prohibiting schools completely from residential zoning districts and prohibiting dormitories completely from its jurisdiction, prohibiting *eruvs* or targeting home worship. Nor can the Township possibly demonstrate that it has narrowly drawn its regulations to serve its interests.

> B.    Plaintiffs are likely to succeed on their Equal Terms Claims (Count VII).

In the Third Circuit, "a plaintiff asserting a claim under the RLUIPA Equal Terms provision must show (1) it is a religious assembly or institution, (2) subject to a land use regulation, which regulation (3) treats the religious assembly on less than equal terms with (4) a nonreligious assembly or institution (5) that causes no lesser harm to the interests the regulation seeks to advance." *Lighthouse Inst. for Evangelism*, 510 F.3d at 264; *see* 42 U.S.C. § 2000cc(b)(1). This is a strict liability provision. *Id.* at 269.

Plaintiff AIA is a religious institution, and it and its members are subject to the Challenged Ordinances, which are land use regulations. People meeting at *shuls* and religious schools are religious assemblies. The Challenged Ordinances and the Township's enforcement actions treat religious assemblies on less than equal terms than nonreligious assemblies or institutions. Monitoring homes for prayer gatherings is religious based.

The Township's Code bans schools in all of its residential zoning districts, but it permits other assembly and institutional land uses in various residential zoning districts, including Municipal parks, playgrounds and other such municipal buildings and uses, Federal, state, county and other public buildings and grounds, including public schools, parks, playgrounds or other public recreational uses or areas, Child-care centers, nursery schools and day-care centers, Health care facilities, Hospitals, philanthropic or eleemosynary uses, and Quasi-public and private club recreation areas. Jennings Decl. ¶ 68, **Exh. 66.** The Township Code also permits other land uses that entail group residential components in various of its residential zoning districts, including Community residences for the developmentally disabled, Community shelters for victims of domestic violence, Life care facility or development. *Id.*

The Code also permits the construction and operation of a Hotel or motel, Hotels with a minimum of 30 guest rooms, age-restricted multifamily dwellings, Assisted living facilities, and Rehabilitation facilities in various of its zoning districts. *Id.* Also allowed are multifamily residential construction in its MF Multifamily Zone, MF-AH-6 Multifamily Affordable Housing Zone, PRC Planned Retirement Community Zone, and PMURD Planned Mixed Unit Residential Development Zone and permits mobile homes in its MHP Mobile Home Park Zone. *Id.* But dormitories are now prohibited throughout the Township. Public schools do not require dormitories, but dormitories are an essential component of religious boarding schools for Orthodox Jewish boys. Strickman Decl. ¶¶ 2-5. However, dormitories exist at Six Flags Great Adventure amusement park, and the Mayor has admitted that he has no problem with a proposed sports complex project in the Township that included dormitories. Jennings Decl. ¶ 4, **Exh. 2.**

C.    Plaintiffs are likely to succeed on their Exclusions and Limits Claims (Counts VIII and IX).

RLUIPA provides that "[n]o government shall impose or implement a land use regulation

that . . . . (A) <u>totally excludes</u> religious assemblies from a jurisdiction; . . . ."  42 U.S.C. §

2000cc(b)(3)(A) (emphasis added).  *See Schad v. Borough of Mount Ephraim,* 452 U.S. 61 (1981)

(municipality cannot prohibit a category of constitutionally protected activity outright from a

jurisdiction); *Congregation Rabbinical Coll. of Tartikov*, 915 F. Supp. 2d at 637 (challenge to

ordinances that prevent plaintiffs from building a "rabbinical college" was "sufficient to make out

a plausible Exclusions and Limits claim."); *Freedom Baptist Church of Del. Cty. v. Twp. of

Middletown,* 204 F. Supp. 2d 857, 870 (E.D. Pa. 2002) ("It is, for example, well-established that a

municipality cannot entirely exclude a type of conduct that the First Amendment protects.").

Section 2000cc(b)(3)(B) of RLUIPA provides: "No government shall impose or implement

a land use regulation that . . . unreasonably limits religious assemblies, institutions, or structures

within a jurisdiction."  The "unreasonable limitations" provision of RLUIPA applies where land

use regulations "make it difficult for religious institutions to locate anywhere within the

jurisdiction."  *Bethel World Outreach Ministries v. Montgomery Cty. Council,* 706 F.3d 548, 560

(4th Cir. 2013).  *See Chabad of Nova, Inc. v. Cooper City,* 575 F. Supp. 2d 1280, 1289-91 (S.D.

Fla. 2008) (finding unreasonable limitation where a synagogue was limited to a specific zone and

would be forced to incur additional expense in order to satisfy special frontage requirements).

Because the School Ordinances totally and unreasonably exclude dormitories and unreasonably

limit schools (religious assemblies and institutions), and because the *Eruv* Ordinance unreasonably

limits religious structures, Plaintiffs are likely to succeed on Counts VIII and IX.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF THE INJUNCTION IS DENIED.

"[T]he loss of First Amendment freedoms, even for minimal periods of time,

unquestionably constitutes irreparable injury."  *See Elrod v. Burns,* 427 U.S. 347, 373 (1976).

"This principle applies with equal force to the violation of RLUIPA rights because RLUIPA

enforces First Amendment freedoms, and the statute requires courts to construe it broadly to protect religious exercise." *Opulent Life Church v. City of Holly Springs,* 697 F.3d 279, 295 (5th Cir. 2012). By passing the Challenged Ordinances, Defendants have prevented Plaintiffs and AIA's members from worshipping, studying and living in the Township.

The *Eruv* Ordinance. The *Eruv* Ordinance prevents Jackson's Orthodox Jews, including AIA's members, from practicing their religious beliefs. They have been, and continue to be, forced to stay home on *Shabbos* and other Holy Days, and have not been permitted to worship at *shul*, or bring their children to *shul*. They have been unable to attend and properly celebrate religious ceremonies. They cannot have elderly family members or those with young children visit for *Shabbos* and Holy Days and cannot visit family members who live within walking distance. Those who want to move to Jackson will similarly be unable to engage in these religious practices. *See* Schnall Decl. ¶ 22; Klein Decl. ¶¶ 4-8; S. Brundy Decl. ¶¶ 4-7; R. Brundy Decl. ¶¶ 4-7; Heiman Decl. ¶¶ 4-7; Mozes Decl. ¶¶ 4-7; Shain Decl. ¶¶ 4-8. Jackson has prohibited Orthodox Jews from living in and exercising their religious beliefs in the Township.

The School Ordinances. As described above, the School Ordinances prevent Orthodox Jews, including AIA's members, from educating their children according to their religious beliefs. *See generally* Gruskin Decl. ¶¶ 5-8; Cohen Decl. ¶¶ 5-11; Censor Decl. ¶¶ 1-12; Hanover Decl. ¶¶ 1-8; Heiman Decl. ¶¶ 8-13. Some schools seek to relocate to Jackson to have space for students who they are turning away, and to serve the Jackson community. They cannot do so because of Jackson's School Ordinances. Strickman Decl. ¶¶ 2-7. It is also the religious belief of Orthodox Jews that young men should live in a dormitory, to live and study together. They are prohibited from doing so in Jackson. Strickman Decl. ¶¶ 2-5.

## III.    GRANTING PRELIMINARY INJUNCTIVE RELIEF TO PLAINTIFFS WILL NOT HARM DEFENDANTS.

If this Court grants a preliminary injunction in favor of the Plaintiffs, the Defendants will not be harmed in any cognizable way.  Plaintiffs are simply asking for an order directing the Township to cease enforcement of ordinances that violates statutory and constitutional provisions and suppresses religious freedom.

## IV.    INJUNCTIVE RELIEF WILL SERVE THE PUBLIC INTEREST.

"The public interest in the protection and enforcement of civil rights and anti-discrimination laws generally weighs in favor of granting injunctive relief against violations." *ReMed Recovery Care Ctrs. v. Twp. of Willistown,* 36 F. Supp. 2d 676, 688 (E.D. Pa. 1999) (citing *Oxford House- Evergreen v. Plainfield,* 769 F. Supp. 1329, 1345 (D.N.J. 1991)). Since the public interest always supports the enforcement of civil rights and the prevention of discrimination, and the Plaintiffs have shown a high likelihood of success on the merits of its claims, the public interest overwhelmingly supports granting a preliminary injunction in this case.

## CONCLUSION

Plaintiffs seek to practice their religious beliefs, educate their children according to their religious beliefs, and be free from harassment and being "surveilled" based on their religion. Plaintiffs respectfully request that this Court grant its Motion, and specifically request the following relief pursuant to Federal Rule of Civil Procedure 65:

A.    A Preliminary Order enjoining each of the Defendants from enforcement and application of Township of Jackson Ordinances 03-17, 04-17 and 20-17;

B.    A Preliminary Order enjoining each of the Defendants, from monitoring, targeting, harassing and interfering with constitutionally protected rights of the Orthodox Jewish residents of the Township of Jackson;

C.    An Order granting such other, further and different relief as this Court deems just, proper and equitable.

Dated: September 6, 2019                           Respectfully Submitted,

30

**STORZER & ASSOCIATES, P.C.**
Sieglinde K. Rath (SR7208)
Roman P. Storzer, *admitted pro hac vice*
Robert L. Greene, *admitted pro hac vice*
1025 Connecticut Ave., N.W. Suite 1000
Washington, D.C. 20036
Tel: 202.857.9766
Fax: 202.315.3996
*Counsel for Plaintiffs*

**WILENTZ, GOLDMAN & SPITZER, P.A.**
Donna M. Jennings (DJ7790)
90 Woodbridge Center Drive
Post Office Box 10
Woodbridge, New Jersey 07095
*Co-Counsel for Plaintiff WR Property LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of September, 2019, the foregoing document

was electronically filed via the Court's ECF system with notices to the following:

> Howard B. Mankoff, Esquire
> Marshall Dennehey Warner Coleman & Goggin
> 425 Eagle Rock Avenue, Suite 302
> Roseland, New Jersey 07068
> (973) 618-4118
> hmankoff@mdwcg.com
>
> Pauline F. Tutelo, Esquire
> Marshall Dennehey Warner Coleman & Goggin
> 425 Eagle Rock Avenue, Suite 302
> Roseland, New Jersey 07068
> (973)618-4100
> pftutelo@mdwcg.com

**STORZER & ASSOCIATES, P.C.**
/s/ Sieglinde K. Rath
Sieglinde K. Rath
Roman P. Storzer, *admitted pro hac vice*
Robert L. Greene, *admitted pro hac vice*
9433 Common Brook Road, Suite 208
Owings Mills, MD 21117