SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - OCEAN COUNTY
DOCKET NO.  L-2891-14 PW

- - - - - - - - - - - - - - - - -:
OROS BAIS YAAKOV HIGH SCHOOL, :
a nonprofit corporation of    :
the State of New Jersey       :   DEPOSITION UPON
                              :   ORAL EXAMINATION
          Plaintiff,          :
                              :        of
     vs.                      :
                              :   JEFFREY MICHAEL
TOWNSHIP OF JACKSON, N.J.,     :        PURPURO
ad JACKSON TOWNSHIP ZONING    :
BOARD OF ADJUSTMENT,          :
                              :
          Defendants.    :
- - - - - - - - - - - - - - - -:


Toms River, New Jersey
Tuesday, November 13, 2018


          DEPOSITION of JEFFREY MICHAEL PURPURO in

the above-entitled action by and before PATRICIA J.

RUSSONIELLO, a Certified Court Reporter and Notary

Public of the State of New Jersey, at the office of

GILMORE & MONAHAN, P.C., 10 Allen Street, commencing

at 11:11 a.m.

44

```
 1    only employees for the past three years other than

 2    yourself in your department?

 3         A.    Yes.

 4         Q.    Okay.  Are you aware of people in

 5    Jackson Township using their homes as synagogues?

 6         A.    I am not aware.

 7         Q.    Okay.  So that has not been an issue in

 8    Jackson Township?

 9         A.    It's not been an issue because it's not

10    been prove -- it's not been an issue.

11         Q.    Okay.  Do you know if there have been

12    any enforcement actions maintained against anyone in

13    Jackson Township for using their home as a synagogue?

14         A.    I did write a viola -- or a Summons and

15    we did go to Court and it was my -- it was my charge

16    that because there was no one living -- it was my --

17    it was my interpretation through daily investigation,

18    so to speak, that there was no one living in the house

19    but on weekends it was being used as a place of

20    assembly.

21         Q.    Okay.  And did that interpretation that

22    you made result in the violation notice?

23         A.    Yes.

24         Q.    All right.  Where was that property?

25    What was the address?
```

45

```
 1          A.      146 South New Prospect.

 2          Q.      Okay.

 3          A.      In Jackson, of course.

 4          Q.      And when was that?

 5          A.      What the -- what the process is is that

 6   we do -- let's go with -- only because I can't give

 7   you an exact date.  I would say at this point two

 8   years ago I would say the process was started.

 9          Q.      Okay.

10          A.      September, October of 2016.

11          Q.      All right.  Who directed you to conduct

12   an investigation of that property?

13          A.      No one.

14          Q.      Well, how did you learn that there might

15   be an issue with that property?

16          A.      Well, the E-mails I would receive from

17   perhaps Hope Drew may have been -- may have been one

18   to alert me to a situation that they may be using the

19   house as a -- she called it a place of assembly -- she

20   called it a house of worship.  I wasn't getting

21   involved with the worship part.  I'm just calling it

22   an assembly use so I would say some of the residents

23   alerted me.

24          Q.      Okay.  Any other residents you recall?

25          A.      No.
```

```
 1          Q.     All right.  And with respect to that
 2   property did you go out and do a personal observation?
 3          A.     Yes.
 4          Q.     Okay.  Was that on a weekend?
 5          A.     No.
 6          Q.     Okay.  So when did you go out and view
 7   that property?  How many times?
 8          A.     I would say I -- approximately 30 days --
 9   30 business days during the -- you know, during that
10   time period twice a day to see, you know, if there was
11   someone living there, knocked on the front door,
12   walked the property.  You know, it's my -- it's my --
13   it's always my MO, so to speak, that if I'm going to
14   write a violation or a Summons I'm going to have
15   enough information to back me up.
16          Q.     Okay.  Did you ever speak to an owner of
17   that property or someone residing there?
18          A.     I spoke to some -- well, I spoke to
19   someone who said he was a resident.  I have never
20   spoken to the owner.
21          Q.     All right.  And what was the -- and what
22   information did you have that resulted in you writing
23   a violation?
24          A.     My daily observations that there was no
25   one living in the house along with reports from Code
```

1   Enforcement who do do site visits on weekends and

2   based on no one living there during the week, based on

3   my daily visits noting that no one was living there

4   during the week and reports back to Code Enforcement

5   saying that Friday and Saturday there are people

6   assembling at the property, that was enough for me to

7   at least write the violation.

8          Q.     Okay.  Did you have a number of

9   individuals that someone observed on the weekend days

10  that -- that gave the basis for the violation?

11         A.     Yes.  There may have been -- not a point

12  of how many people but perhaps 40 to 50 vehicles on

13  the driveway and on the -- on the lawn and so it was

14  more of a vehicle -- car count than a...

15         Q.     Okay.  And was the use there that you --

16  that you violated them with respect to assembly or

17  house of worship?

18         A.     Assembly.

19         Q.     Assembly.

20                And was -- did the individuals who were

21  assembling there were they Orthodox Jewish?

22         A.     Yes.

23         Q.     Okay.  And what was the result of that

24  violation notice?

25         A.     And, of course, because now that I think

1   about it -- maybe I shouldn't even be talking about it

2   but I wrote the Summons.  It went to Court.  The Judge

3   sided with my violation.  It's since been appealed and

4   it's still pending.

5         Q.    Okay.  And you undertook to monitor that

6   house on the 30 business days on your own without any

7   direction from anybody on the Township Council or

8   administration to do so?

9         A.    No.  That was on my own accord.  I mean,

10  that was -- that's part of my -- my duty.

11        Q.    Okay.  Did you discuss this particular

12  matter with anyone on the Township Council or in the

13  administration?

14        A.    Council -- Township Council, no.

15  Administration just that I was conducting site visits

16  in case anyone ever questioned what we were doing

17  about it, so to speak.

18        Q.    Okay.  Is -- how about with other -- did

19  you discuss this with other residents other than those

20  you've identified as having made the complaint to you?

21        A.    Did I discuss what?

22        Q.    Discuss the fact that this use was not

23  in conformance with the code of Jackson Township?

24        A.    I would say no.  I would have no reason

25  to discuss that with -- with anyone other than either,

78

1    reason to go any further with that investigation.

2          Q.     Okay.  When did the complaints start

3    regarding the schuls in the Township?

4          A.     I hate to say this is a guess but this

5    is a guess.  I could go back to the E-mails and, you

6    know -- three years ago?

7          Q.     Okay.  And what is the nature of the

8    complaints that you're receiving?

9          A.     That folks are using a residence as a

10   place of worship or a schul.

11         Q.     Okay.  And do you recall specifically

12   what individuals have made those complaints with you?

13         A.     Again, if we went through the E-mails

14   I'm sure it's going to be, you know, the -- I believe

15   there was that Chris Hope or Hope Drew.

16                This Kissenberth -- Kissenberth may have

17   been one of them.  Number 44 on the list.

18                Perhaps that Kelly Kanis.

19                I can't pinpoint exactly which one was

20   complaining about what so if I went through the

21   E-mails I could probably give you a better answer.

22         Q.     Okay.  And what do you do when you

23   receive a complaint about an alleged schul that's

24   operating illegally in the Township?

25         A.     If it is the initial complaint I will do

79

```
 1   my -- my site visit.  You know, I'll do some -- I'll

 2   do some investigating through Housing Department to see

 3   if there was a rental CO issued and if indeed, you

 4   know, someone was living there.  If that's the case I --

 5   I don't get involved.

 6        Q.    Okay.  And what's your understanding of

 7   the law regarding schuls in Jackson Township?

 8        A.    Well, that's seemingly a little broad.

 9        Q.    Are they permitted?

10        A.    Well, I don't have the book in front of

11   me so I couldn't -- there are -- there are zones that

12   permit houses of worship as either permitted use,

13   perhaps some zones permitted as a conditional use so

14   without the book in front of me I -- I couldn't tell

15   you for sure where they're permitted but there are

16   zones that do permit them.

17        Q.    Okay.  And are those the only two uses

18   under which a schul would fall in the Township?

19        A.    Again, my book doesn't -- won't have the

20   term "schul" in there.  It will have, you know,

21   churches or places of worship.

22              If that's what the perception of a schul

23   is, a place of worship, then, you know, there are

24   zones that do permit -- that do permit -- does permit

25   that use.
```

80

1        Q.     Okay.  So what -- is a schul a house of

2    worship --

3        A.     That's my understanding.

4        Q.     -- in your -- in your opinion?

5               Would that be your interpretation for

6    Jackson Township?

7               MS. TUTELO:  Objection to form.  You can

8    answer.

9        A.     Yeah.  I don't have the definition of

10   either in front of me but that's my perception, yes.

11       Q.     Okay.  I'm trying to find out where a

12   schul would fall in terms of enforcement for you in --

13   as far as a definition of what it is under the code.

14       A.     If it came to that I would ask an

15   Applicant because it would be an application that,

16   "Okay.  What's your interpretation of -- of this use?"

17   If it fits under perhaps house of worship, then we

18   would find the zone where it's permitted and get you

19   in front of the right Board.

20       Q.     How many properties have you yourself

21   investigated with respect to a proposed -- I'm

22   sorry -- not proposed -- with respect to an alleged

23   schul operating on a property in Jackson Township?

24       A.     Maybe five.

25       Q.     Okay.  And have you --

1          A.      Ten.  Let's go with ten to be safe.

2          Q.      Okay.  Have you issued any citations?

3          A.      Just the one on that 146 South New

4     Prospect.

5          Q.      Okay.  And tell me in terms of your

6     investigation exactly what you do when you get one of

7     these complaints.

8          A.      Well, because I'm not going to get in

9     the way of someone using their house as an assembly

10    use, prayer sessions, football game, whatever it

11    happens to be, if someone's living there, you know,

12    that's my first criteria; to see if someone's living

13    there.  If someone's living there I'm done because

14    then I'm dealing with, you know, someone having people

15    over for whatever reason and the residential nature of

16    that home is still being complied with so -- the

17    wording is a little strange but that's the gist of,

18    you know, what I do.

19              Once I find that there's someone living

20    there, then I'm done.

21         Q.      What about monitoring of these

22    properties in terms of doing a visual inspection?  Do

23    you engage in that?

24         A.      Yes.

25         Q.      Okay.  And how often would you monitor,

93

1    I have to turn this back on you.

2                What's your interpretation of a modular

3    building?

4                MS. RATH:  Well, let's mark this.

5                (Exhibit P-211 marked for identification.)

6         Q.    Okay.  And you've been handed P-211.

7                Were you aware that the Mayor, Michael

8    Reina, had a concern regarding trailers in Jackson

9    Township?

10        A.    What type of trailers?

11        Q.    Trailers that "have become a

12   increasingly popular way of getting congregations of

13   different faith-based groups, students and employees

14   into small spaces to accommodate needs."

15                Were you aware that the Mayor had a

16   concern of that nature?

17        A.    No, I was not aware.

18        Q.    Did he ever communicate that to you?

19        A.    Did he ever convey that to me that he

20   was concerned?

21        Q.    Right.

22        A.    Not that I recall.

23        Q.    Okay.  But he did send you a particular

24   trailer to review or investigate at 88 Thompson Bridge

25   Road?

94

1      A.      Yes.

2      Q.      Okay.  And did you do that

3  investigation?

4      A.      Yes.

5      Q.      Okay.  And what was your determination?

6      A.      That it was a camper that was on site

7  that the folks were living in while they renovated

8  their house.

9      Q.      Okay.  So was there any violation issued

10  with respect to that trailer?

11      A.      No.  Because the idea that the trailer

12  was there for them to live in while they were

13  renovating their house, the approval for that trailer

14  was issued by administration so I had no concerns.

15      Q.      Okay.  Have you seen -- do you have any

16  idea what the Mayor meant by "congregations of

17  different faiths"?

18      A.      No.

19      Q.      Okay.  Have you seen the use of trailers

20  in Jackson Township by religious groups?

21      A.      Let's clear up trailer.

22      Q.      Okay.

23      A.      Now, there is an office trailer that's

24  being used at a church on Harmony Road that they got

25  approvals for from the Board of Adjustment but they're

```
 1              Q.      Now, Mr. Purpuro, I don't want to

 2   mispronounce the word.  I believe it's Sukkots (sic)?

 3   Are you familiar with that term?

 4              A.      Yes.

 5              Q.      Okay.  What term do you use?

 6              A.      Sukkah.

 7              Q.      Sukkah.  Okay.  Sukkah.  Okay.

 8                      Have you received complaints regarding

 9   sukkahs in the Township of Jackson?

10              A.      Yes.

11              Q.      Okay.  And who have those complaints

12   come from?

13              A.      I don't recall.

14              Q.      Okay.  When did the complaints start?

15              A.      I would say three years ago.

16              Q.      Okay.  And what's this issue about?

17   What are the complaints about?

18              A.      More so the placement and the appearance

19   of the structure.

20              Q.      Okay.  And when you say "structure" what

21   are you referring to?

22              A.      The sukkah.

23              Q.      Okay.  And what do you understand a

24   sukkah to be?

25              A.      It is a structure that folks put up
```

```
 1    during a certain time of the year so -- for them to

 2    observe -- as -- as part of a religious belief.

 3         Q.    Okay.  And those would be Jewish

 4    individuals?

 5         A.    Yes.

 6         Q.    Okay.  What do you do when you receive a

 7    complaint regarding a sukkah?

 8         A.    I'll investigate to see if we've issued

 9    a permit for one and if not I have a standard form

10    that I send that it's the most informal way of gaining

11    compliance for fence, pool, sukkah; whatever it

12    happens to be.

13         Q.    Okay.  As part of the documents you

14    produced here today did you produce documents relating

15    to the sukkah complaints?

16         A.    I would say no mainly because I was just

17    printing out the permits that I issued and I don't

18    even recall ever sending a -- one of those informal

19    complaints out so the answer's no.

20         Q.    Okay.  Have you ever violated any

21    Township resident -- issued a notice of violation with

22    respect to a sukkah?

23         A.    I would say no and I didn't look through

24    my different programs to look for violations but even

25    then it would have been difficult to pinpoint the
```

```
 1    reasoning for doing a violation.  I just had a

 2    difficult time getting the key words for the permits

 3    so I would say I did not issue a violation.

 4         Q.    Okay.  Were you ever directed by a

 5    Township official to investigate an issue of a sukkah

 6    on a property?

 7         A.    Yes.

 8         Q.    Who?

 9         A.    I -- if or when a complaint may have

10    come in it may have been directed to the Mayor's

11    office or administration, it would have been forwarded

12    to me to investigate so I can't tell you exactly who

13    it was.  Administration.  It may have been the Mayor.

14         Q.    Okay.  Did anybody contact you in any

15    other fashion from the administration or Council

16    regarding investigating an alleged sukkah or -- I'm

17    sorry -- a sukkah in the Township?

18         A.    Anyone other than?

19         Q.    Other than it coming in by the way you

20    just indicated?

21         A.    I don't recall one way or the other.

22         Q.    Okay.  Do you recall any particular

23    official involved in formulating the issue of whether

24    sukkahs were illegal or legal in the Township of

25    Jackson?
```

```
 1          A.      That a permit's required for a

 2   structure?

 3          Q.      Yes.  Yes.

 4          A.      Yes.

 5          Q.      How about with respect to sukkahs?  Is

 6   there anything individually separate --

 7          A.      No.

 8          Q.      -- for that?

 9                  And how long can they be up?

10          A.      They can -- zoning requirements don't

11   require so theoretically they can be up forever.

12          Q.      Okay.  And if we turn to Page 2, the

13   first page of this document you have in front of you,

14   417, you sent an E-mail to the Mayor regarding these

15   sukkah structures and not anyone else on the Council.

16                  Do you know why you would have responded

17   to the Mayor individually?

18          A.      No, but only to the -- mainly because --

19   well, only because if it's something that -- not to

20   say he's not aware of everything that goes on in our

21   office.  Just wanted to keep -- somebody wants to be

22   kept current on the current issues in town.

23          Q.      Okay.  And when it indicates, "attached

24   are three violations that were recently written" did

25   you write those three violations?
```

```
 1          A.      Well, I must have and I can't say for

 2   sure what the addresses were and what even prompted

 3   them but looking at the subject apparently ones were

 4   written.

 5          Q.      Okay.  Isn't it true that it's based

 6   upon receipt or you receive certain complaints from

 7   Township residents regarding these sukkahs?

 8          A.      Yes.  Certainly it's a big town.  It's

 9   tough to see everything that's going on everywhere so

10   when we do get a complaint we do investigate.

11          Q.      Okay.  Have there been any violations

12   issued this year for sukkahs?

13          A.      No.

14          Q.      Okay.

15          A.      Not by me.

16          Q.      Okay.  Do you know if there were any at

17   all by the Township?

18          A.      I don't know.

19          Q.      Okay.  And with respect to sukkahs this

20   year were you asked to investigate any properties?

21          A.      No.

22          Q.      Okay.  And would you not agree that this

23   issue concerns the Orthodox Jewish community only?

24                  MS. TUTELO:  Objection to form.  You can

25   answer.
```

103

```
 1          A.      The subject of sukkahs?  Would I --

 2          Q.      Yes.

 3          A.      Would I -- I would agree that sukkahs

 4   pertain to the Jewish community.

 5          Q.      Have you ever received complaints about

 6   tarps around pools in Jackson Township?

 7          A.      Yes.

 8          Q.      And what's this issue about?

 9          A.      What's this issue about?

10          Q.      Yes.

11          A.      It's about folks who put tarps around

12   their pool.  I mean, they're -- they're put up so the

13   women can swim in the pool without anyone seeing them.

14          Q.      And by "folks" you're referring to the

15   Orthodox Jewish community?

16          A.      In these instances, yes.

17          Q.      Okay.  When did the complaints start?

18          A.      I would say probably two years ago.

19          Q.      Are they still ongoing?

20          A.      Well, certainly none of the tarps are up

21   now because of the time of year.

22          Q.      This past summer did you have

23   complaints?

24          A.      Yes.

25          Q.      Okay.  Were -- who do you receive the
```

104

1    complaints from?

2         A.    In these instances there was one that

3    came in from a woman who lived on the same road as one

4    of the alleged violators and we -- as we speak we have

5    two applications in front of the Board of Adjustment

6    for folks who put tarps up that are of a material

7    that's not permitted and at a height that's not

8    permitted.

9         Q.    Okay.  And how many properties have you

10   investigated with respect to this issue?

11        A.    Five.

12        Q.    Okay.  And were you ever directed by a

13   Township official to investigate these issues?

14        A.    No.

15        Q.    And what's your understanding of the law

16   regarding the use of these tarps?

17        A.    Well, my understanding which was

18   substantiated by the Board of Adjustment, an Applicant

19   went in front of the Board for interpretation of the

20   material being used.  The Board determined that using

21   a tarp as a barrier or a fence was prohibited by the

22   ordinance so my understanding is that using a tarp as

23   a fence is not permitted.

24        Q.    Okay.  All right.  Is that the

25   Virchlizer (phonetic) property?

1          A.      Yes.

2          Q.      Okay.  And are you using that property's

3   determination regarding interpretation as the baseline

4   for other complaints that come in?

5          A.      Yes.

6          Q.      Okay.  And have you issued violations

7   regarding to these tarps?

8          A.      I would say that since that application

9   was concluded I used my informal method to gain

10  compliance by sending that form letter out saying, you

11  know, "The tarp material is not permitted.  Either

12  remove it or go for a variance."

13         Q.      Do we have a copy of the letters that

14  you've sent out in the production we have?

15         A.      I don't think that was part of your

16  request for information.

17         Q.      Okay.  And there have been three matters

18  that have proceeded before the Board with respect to

19  these tarps.  Is that correct?

20         A.      One was that the interpretation --

21         Q.      Mm'mm.

22         A.      -- on White Road.

23                 There were -- there was one recently

24  heard by the Board of Adjustment where the Applicant

25  came in for a -- for the ten-foot tarp.

```
 1                   He then amended his application to put

 2  up a -- an eight-foot fence in place of the tarp

 3  material.

 4          Q.    Okay.  And what happened to the other

 5  two?

 6          A.    They're pending.  One is going to be

 7  heard next month at the next Zoning Board meeting

 8  and -- actually there are two that are -- that are

 9  pending in front of the Board.

10          Q.    Do you know the names of those Applicants?

11          A.    I believe one is Gruskin.

12          Q.    Okay.

13          A.    I brought my agendas to show you how

14  busy we were because getting this information was a

15  chore so I can pull --

16          Q.    Thank you.

17          A.    -- I can pull the agenda --

18          Q.    No --

19          A.    -- to see what the names are.

20          Q.    -- only if you recall.

21          A.    I think it's Gruskin on Arizona --

22          Q.    Okay.

23          A.    -- Lane -- Road.

24          Q.    And then the other one you don't remember?

25          A.    No.
```

```
 1          Q.      All right.  Okay.

 2                  What's the Spray Park in Jackson

 3      Township?

 4          A.      It's a park that the Township created

 5      that is used ideally in the summer months that -- like

 6      a little recreational area where water is sprayed and

 7      there's fountains and things that are enjoyed by young

 8      people.

 9          Q.      Okay.  And where is it located?

10          A.      It is located in -- what's the actual

11      address?

12                  It's the -- what do they call it?  What

13      do they call it?  It's like a --

14          Q.      Is it by the Justice Center?

15          A.      Yeah.  Justice Complex.  That's it.

16          Q.      Okay.  All right.

17          A.      Where there's, you know, a hockey rink,

18      baseball fields, soccer fields; that kind of thing.

19          Q.      Okay.  And you were --

20                  MS. RATH:  I'm sorry.  Let's mark.

21                  (Exhibits P-215, P-216 and P-217 marked

22      for identification.)

23          Q.      Mr. Purpuro, you sought approval for the

24      Spray Park.  Is that correct?

25          A.      Say that again?
```

```
 1        A.      Yes.

 2        Q.      Okay.  From who?

 3        A.      Once again when I did the E-mails with

 4   the key words it was more than likely the same people

 5   who were part of your list but once again --

 6        Q.      The list that was in my subpoena?

 7        A.      Yes.  And if you see the -- you know,

 8   the E-mails pertaining to whatever number that is --

 9   number 56 -- those were the people who would have

10   complained.

11        Q.      Okay.  And were there complaints

12   targeted toward the use -- I'm sorry -- did the

13   complaints concern the use of portable toilets in the

14   Township by the Orthodox Jewish community?

15        A.      They were specific to addresses that

16   were of concerns and more than likely pertaining to

17   the Jewish community, yes.

18        Q.      Okay.  And how many properties did you

19   investigate with respect to the portable toilet use

20   issue?

21        A.      At that point it was more of a code

22   enforcement issue more than a zoning issue.

23        Q.      Okay.

24        A.      So I didn't really -- I only took the

25   properties and some of the photos that were taken with
```

1    those E-mails and really turned it over to Code

2    Enforcement.

3         Q.    Okay.  So you didn't go out yourself and

4    investigate any property?

5         A.    Correct.

6         Q.    All right.

7         A.    As I recall.

8         Q.    Okay.  And do you remember how many

9    properties you turned over for investigation to code

10   compliance?

11        A.    The popular answer seems to be five but

12   I would say no more than five.

13        Q.    Okay.  Were you ever directed by a

14   Township official to investigate the use of a portable

15   toilet at a property when it wasn't permitted?

16        A.    I don't recall.

17        Q.    Okay.  And are -- okay.

18              Do you know if any citations have been

19   issued with respect to these portable toilet use?

20        A.    I'm not aware if they were or they

21   weren't.

22        Q.    Okay.  Have you received any complaints

23   regarding illegal pools in Jackson Township?

24        A.    Not illegal pools, no.

25        Q.    Okay.  Pools that are -- maybe are being

113

1    used for commercial purpose as opposed to an

2    individual residential use?

3           A.     Yes.

4           Q.     Okay.  And where were those pools?  Let

5    me back up.

6                  How many have you received in terms of

7    complaints?

8           A.     No more than ten so between five and ten.

9           Q.     Okay.  Again, did those pools, were they

10   on property owned by Orthodox Jewish residents?

11          A.     Yes.

12          Q.     And when did those complaints start?

13          A.     As I recall I would say last summer

14   would have been the -- when I may have gotten any --

15   may have gotten communications that there were pools

16   that were being rented.

17          Q.     Okay.

18          A.     Actually, it's two summers ago.

19          Q.     Okay.  Did you receive any complaints

20   this past summer?

21          A.     Yes.

22          Q.     All right.  And did you personally

23   investigate any properties?

24          A.     I did.

25          Q.     Okay.  And would that have been the ten

1    in total at most you indicated?

2         A.    I may have visited probably two or three

3    sites and as I recall there was one on the end of

4    Chelsea Road where I spoke to the homeowner and he did

5    tell me he was renting his pool out and I said, "Well,

6    you can't do it," and, you know, he gave me the -- you

7    know, the okay that, you know, he didn't know and he

8    stopped doing it and follow-up revealed that there's

9    been no activity at that particular address.

10        Q.    Okay.  Did you issue any citations or

11   violation notices for any of these properties?

12        A.    I would say no because I had no real

13   proof.

14        Q.    Okay.  Were you ever directed by a

15   Township official to investigate an issue of an

16   illegal pool?

17        A.    Not that I recall.

18        Q.    Okay.  Do you recall receiving one of

19   these complaints an individual using the term

20   "ghetto"?

21        A.    There are some E-mails that have that

22   term -- that term for sure --

23        Q.    Okay.

24        A.    -- and either one of those key names

25   would have brought up what -- I think specifically

```
 1                  CERTIFICATE    OF    OFFICER

 2

 3

 4

 5                  I, PATRICIA J. RUSSONIELLO, a

 6   Certified Court Reporter and a Notary Public of the

 7   State of New Jersey, do hereby certify that prior to

 8   the commencement of the examination the witness was

 9   duly sworn by me.

10                  I DO FURTHER CERTIFY that the

11   following is a true and accurate transcript of the

12   testimony as taken stenographically by and before me

13   at the date, time and place aforementioned.

14                  I DO FURTHER CERTIFY that I am

15   neither a relative nor employee, nor attorney or

16   counsel to any parties involved; that I am neither

17   related to nor employed by any such attorney or

18   counsel, and that I am not financially interested in

19   the action.

20

21

22

23
     \\PATRICIA J. RUSSONIELLO
24   NOTARY PUBLIC OF THE STATE OF NEW JERSEY
     My Commission Expires: 4/20/2020
25   C.C.R. License No. XI00517
```