Donna M. Jennings, Esq. (Atty. ID #017281995)
WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys at Law
90 Woodbridge Center Drive
Post office Box 10
Woodbridge, N.J. 07095
732.855.6039

Robert L. Greene, Esq. (*admitted pro hac vice*)
Storzer and Associates, P.C.
1025 Connecticut Ave, NW
Suite 1000
Washington, D.C. 20036
202.857.9766

*Attorneys for Plaintiff Oros Bais Yaakov High School*

| | |
|---|---|
| OROS BAIS YAAKOV HIGH SCHOOL, a nonprofit corporation of the State of New Jersey<br><br>                      Plaintiff,<br><br>v.<br><br>TOWNSHIP OF JACKSON, N.J., and JACKSON TOWNSHIP ZONING BOARD OF ADJUSTMENT,<br><br>                      Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>OCEAN COUNTY<br><br>Civil Action<br>Docket No. PW-L-2981-14<br><br>**AMENDED COMPLAINT**<br><br>**(In Lieu of Prerogative Writ)** |

## AMENDED COMPLAINT

Plaintiff, Oros Bais Yaakov High School, an Orthodox Jewish girls' high school with

offices located at 1995 Rutgers Boulevard, Lakewood, New Jersey, by way of Complaint in lieu

1

#8901236.1

of prerogative writ against defendants Zoning Board of Adjustment for the Township of Jackson and the Township of Jackson, New Jersey, says:

## NATURE OF ACTION

1.  Plaintiff files this action to redress violations of its civil rights caused by the Defendants' discriminatory and intentional conduct that have prohibited and continue to prohibit Plaintiff, Oros Bais Yaakov High School ("Plaintiff" or the "School"), from building and operating a high school for girls on real property located in Jackson Township, New Jersey in violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc *et seq.* ("RLUIPA") and the First and Fourteenth Amendments to the United States Constitution.

2.  The Defendants have prohibited Plaintiff's land use based on its religious nature. Furthermore, such decisions were motivated by animus toward the Orthodox Jewish community, and were directly responsive to significant community hostility toward the Orthodox Jewish community.

3.  The Defendants' laws and actions have wrongfully prohibited Plaintiff's religious land use in the R-1 residential zone, treated Plaintiff's religious educational facility on less than equal terms as other secular assembly and institutional uses, and discriminated against the Plaintiff based on their religious denomination.

4.  Further, the Defendant Township's land use regulations treat religious schools on less than equal terms as various nonreligious assembly and institutional uses in the NC

2

#8901236.1

Neighborhood Commercial zoning district, where Plaintiff's adjacent property is located and upon which a parochial school is also prohibited but public schools, libraries, and museums, among other uses are permitted by right.

## PARTIES

5.  Plaintiff Oros Bais Yaakov High School is an Orthodox Jewish girls' high school with administrative offices are located at 1995 Rutgers Boulevard, Lakewood, New Jersey.

6.  Defendant Zoning Board of Adjustment for the Township of Jackson (the "Board") is a municipal agency organized pursuant to N.J.S.A. 40:55-69 with its principal place of business at 95 West Veterans Highway, in the Township of Jackson, in the State of New Jersey.

7.  Defendant Township of Jackson is a municipal corporation located in Ocean County, New Jersey, with an address of 95 West Veterans Highway, in the Township of Jackson, in the State of New Jersey.

## FACTUAL ALLEGATIONS

### Oros Bais Yaakov High School

8.  The Plaintiff presently owns and operates a high school with offices at 1995 Rutgers Boulevard in Lakewood Township, New Jersey.

9.  Approximately 340 girls attend the School at present.

10. The School has operated since September 2008.

3

#8901236.1

11. The Plaintiff School is presently located in Lakewood Township.

12. The School began a search for property in 2012 in the area near its location upon which it could construct a new high school.

13. On or about June 26, 2013, the School identified and became the contract purchaser of property located at 38 Cross Street, an approximately 7.5 acre parcel identified as Block 21401, Lot 6, Jackson Township, New Jersey (the "Property").

14. Plaintiff is also the contract purchaser of adjacent property located at 28 Cross Street, an approximately 7.5-acre parcel identified as Block 21401, Lot 5, Jackson Township, New Jersey (the "NC-zoned Property").

15. Ultimately, the only properties suitable for the School's use were the subject Property and the NC-zoned Property.

<u>The Subject Properties and the Land Use Code of Jackson Township</u>

16. The Property was previously improved with four structures; a one story single family residence, a small detached garage to its rear and two chicken coops. The residence was occupied and the former chicken coop was being used as a repair shop for lawn and construction equipment. These improvements have since been removed.

17. The Property contained vehicles, construction equipment, paint cans, construction debris and other refuse that has been dumped throughout the site, which have since been removed.

18. The Property is located in the "R-1" residential zoning district.

4

#8901236.1

19.   The Property had formerly been located in the "R-3" residential zoning district until October 2010 as discussed below.

20.   The NC-zoned Property is located in the "Neighborhood Commercial" zoning district.

21.   The NC-zoned Property is currently improved with two homes.

22.   The Property is suited for use as an Orthodox Jewish high school for girls.

23.   The NC-zoned Property would also be suited for use as an Orthodox Jewish high school for girls.

24.   The Plaintiff proposes to construct a two-story, 35,000 square foot high school at the Property.

25.   The Plaintiff's proposed building would be a substantial improvement to the neighborhood with an attractive design.

26.   The high school, which would be set back from the road, would be in character with the surrounding neighborhood which consists of residential, institutional and nearby commercial land uses.

27.   Immediately adjacent to the subject property, on its northern border, is a parcel zoned "Neighborhood Commercial."

28.   Public schools are a permitted use in the Neighborhood Commercial zoning district.

29.   There are three private high schools in the nearby area and five future private high schools proposed near the site.

30.   Cross Street is a heavily used county road with traffic signals which traverses both Jackson and Lakewood Townships.

5

31. Located within a few hundred feet of the Property are various institutional and commercial land uses, including the Jackson Moose Lodge, Beis Medrash Lutzk, the Lakewood Estonian House, a strip mall with restaurants, the Jackson Dance Center, the Kiddie Academy of Jackson, a Wawa station, a bank, and a fitness studio, the Christa McAuliffe Middle School, and others.

32. The School would have a maximum of 400 students in grades nine through twelve.

33. Ninety-seven percent of students from the School have gone on to higher education and the graduation rate for the School's last graduating class was 100% (67 out of 67 students).

34. Students at the School study subjects that allow them to go into a range of professional fields including medicine, law, business administration, accounting, and therapy.  In doing so, they benefit not only the local community of Jackson, but more broadly Ocean County, the state of New Jersey, and the United States of America.

35. Students who are of an age where they can obtain a driver's license are not permitted to drive to the School, as doing so would violate the School's rules.

36. All students would be required to arrive to School by bus, the provision of which is guaranteed by state law.

37. The School would be open from 8:30 a.m. to 5:00 p.m., Monday through Friday, and the lighting within the parking area would be turned off after 8:00 p.m.  The school year would run from September until June.

6

38.     The Property would not be used for any catering events, music concerts, art shows or similar activities.  The only additional event to be held on the Property would be parent-teacher conferences which would occur no more than twice each year and would be scheduled over a four-hour time period to stagger the arrival and exit of attendees. Furthermore, outside of the school year there would be no events, summer camps or activities of any kind.

39.     The School would have 16 classrooms and 25 employees, including 20 teachers.

40.     There would be no commercial cooking facility at the School; only a warming kitchen.

41.     Lunch would be provided by the School and brought in by an outside caterer.

42.     The use of the Property is subject to the laws and regulations of Jackson Township and the State of New Jersey.

43.     Jackson Township regulates zoning within its borders through the Land Use and Development Regulations codified at Chapter 244 of the Township Code (hereinafter the "Land Use Code").

44.     Section 244-3 of the Land Use Code, entitled "Intent; purpose" provides in pertinent part, that "It is the intent and purpose of this chapter to establish a pattern for the uses of land and of buildings and structures thereon based on the land use element of the Master Plan."

45.     The Township's Land Use Code contains three different "school" uses: "Public schools," "Private schools," and "Parochial schools."

46.     "Parochial schools" are a religious land use.

7

47.   The Township of Jackson adopted a Master Plan in 2009.

48.   Based upon the 2009 Master Plan, upon information and belief, schools then existing within Jackson Township were moved to a newly created zoning district, the Public Facilities and Education Zone, regardless of where they were located in the Township.

49.   There was no indication in the 2009 Master Plan as to how future schools in the Township would be zoned.

50.   Upon information and belief, there are no empty parcels of land in the Public Facilities and Education Zone in Jackson Township.

51.   Prior to placing schools within the Township into the PFE zone, private and parochial schools were permitted in most of Jackson Township.

52.   In New Jersey, Master Plans include a "Land Use Plan" element.

53.   As part of the Jackson Township Master Plan, recommendations were included for its Land Use Plan element.

54.   One of the Master Plan recommendations was the creation of a new "R-1" Residential Zone within the Township.

55.   In furtherance of the Master Plan recommendations, the Township adopted Ordinance No. 30-10 on or about October 26, 2010 which created a new "R-1" Residential Zone within the Township.

56.   Pursuant to the Master Plan, the "R-1" residential zone was characterized as:

> Low Density Residential.  (R-1). Planning district established to replace R-3 zoning district within proposed sewer service area; one acre density selected to reflect prior development pattern and to ensure the efficient use of

8

infrastructure; clustering recommended for larger tracts without density incentive; . . . .

57. Permitted principal uses in the "R-1" residential zone include community residences for the developmentally disabled, community shelters for victims of domestic violence and detached single-family dwelling units.

58. Conditional uses in the "R-1" zone include child care centers, nursery schools and daycare centers; churches and place of worship, home occupations, home professional offices and public utilities.

59. Parochial schools are prohibited in the R-1 zoning district.

60. Prior to adoption of Ordinance No. 30-10, the Property was located in the "R-3" residential zone.

61. The R-3 zoning district permits one unit per three acres.

62. The R-2 zoning district permits one unit per two acres.

63. The R-5 zoning district permits one unit per five acres.

64. The R-3 zone, as well as the R-2 and R-5 Residential Zones, provide for the same permitted principal uses as the R-1 zone, but also permit municipal parks, playgrounds and other such municipal buildings and uses as are deemed appropriate by the Township Committee; federal, state, county and other public buildings and grounds, including public schools, parks, playgrounds or other public recreational uses or areas.

65. The R-2, R-3 and R-5 zoning districts also permit "Private or parochial schools not operated for profit; except, however, that public and private colleges or universities shall not be permitted."

9

66. Conditional uses permitted in the R-2, R-3 and R-5 zoning districts include the same as the R-1 zone, but also include cemeteries and mausoleums, farmers markets, health care facilities, hospitals, life care facilities, public utilities, quasi-public and private club recreational areas and veterinary clinics and hospitals.

67. The Township's other Residential zones include the R-20, R-15, R-9 and R-30 zoning districts.

68. The R-20, R-15 and R-9 zoning districts provide for the same permitted principal uses as the R-1 zone, but in addition permit municipal parks, playgrounds and other such municipal buildings and uses as are deemed appropriate by the Township Committee; federal, state, county and other public buildings and grounds, including public schools, parks, playgrounds or other public recreational uses or areas; essential services and family daycares, mirroring the permitted uses of the R-3, R-2 and R-5 zones with the exception of family daycares in lieu of farming activities.

69. Conditional uses permitted in the R-20, R-15 and R-9 zones include the same as the R-1 zone, but in addition include quasi-public and private club recreation areas.

70. The R-20, R-15 and R-9 zoning districts permit "Private or parochial schools not operated for profit; except, however, that public and private colleges or universities shall not be permitted."

71. The R-20 zoning district permits one unit per 20,000 square feet.

72. The R-15 zoning district permits one unit per 15,000 square feet.

73. The R-9 zoning district permits one unit per 9,000 square feet.

10

74. The R-30 zoning district permits one unit per 30,000 square feet and does not permit schools.

75. All residential zoning districts (except for the R-30 district), including both lower density and higher density zoning districts than the R-1 district, permitted schools as a principal permitted use prior to the creation of the R-1 zoning district.

76. All residential zoning districts (except for the R-30 district), including both lower density and higher density zoning districts than the R-1 district, currently continue to permit schools as a principal permitted use.

77. The R-1 zoning district in which the Property is located was created as a "low density" zoning district.

78. The R-3 zone, where the Property had been previously located prior to the 2010 Land Use Code amendment, permitted only one unit on three acres, and was thus a lower density district than the R-1 zone.

79. The 2010 amendment <u>increased</u> the permitted density of the Property.

80. No downzoning occurred from the 2010 rezoning.

81. At least three zones, the R-9, R-15 and R-20 zones in the Township, permit parochial schools on much smaller parcels than the Property.

82. The rezoning of property within the Township to the R-1 zoning district occurred predominantly near the Township's border with Lakewood Township.

83. Many Orthodox Jews live in Lakewood Township.

11

84.   Many Orthodox Jews live in Jackson Township near the border of Lakewood Township; in and around the areas rezoned to R-1.

85.   A large development called West Gate was developed in the late 1990s on the western edge of Lakewood Township, adjacent to the area in Jackson Township where the Property is located and where much of the R-3 zoned property was rezoned R-1 in 2010.

86.   Nearly all of the residents of the West Gate development are Orthodox Jews.

87.   Orthodox Jews generally seek religious schooling for their children, which requires the development of private schools.

88.   The exclusion of "private or parochial schools" in the R-1 zone has a discriminatory impact on Orthodox Jewish religious education land uses.

89.   The rezoning of property in Jackson Township to R-1 has a discriminatory impact upon Orthodox Jews by preventing religious education land uses near their community, which is predominantly centered in Lakewood Township.

90.   Upon information and belief, Defendants were not previously concerned about schools existing in the R-1 zoning district (or its predecessor zoning district(s)) prior to 2009-2010.

91.   Defendants were not previously concerned about schools existing in the vicinity of the Property.

92.   Two of the most recently developed public schools in the Township are the Elms Elementary School located on Goetz Lane and the Jackson Liberty High School located on North Hope Chapel Road.

#8901236.1

93.   Elms Elementary was completed in 2004 and houses over 830 students and 55 full-time teaching staff.

94.   Elms Elementary is a nonreligious assembly and institutional land use.

95.   Liberty High was completed in 2007 and has approximately 1,400 students and 90 full-time teaching staff.

96.   Liberty High is a nonreligious assembly and institutional land use.

97.   Both Elms Elementary and Liberty High impose a significantly more intense use of land than the Plaintiff's proposed facility.

98.   Liberty High's property is located approximately 1500 feet from the Property.

99.   At the time of their construction, both schools were in the R-1 zoning district and they are now classified as in the PFE zoning district.

100.  Upon information and belief, Liberty High and Elms Elementary did not experience the level of public hostility that resulted from the Plaintiff's use variance application, as described below.

101.  Upon information and belief, the Defendants did not oppose the construction and use of Liberty High and Elms Elementary.

102.  Similarly, there are two religious private schools that were located in the R-1 Zone (or its equivalent at the time) at the time of their construction.

103.  St. Aloysius School is located on Aldrich Road in Jackson Township.

104.  Jesus Harvest Time Academy is located on Freehold Road in Jackson Township.

105.  Both St. Aloysuis School and Jesus Harvest Time Academy are Christian schools.

13

106.   Both St. Aloysuis School and Jesus Harvest Time Academy were granted significant zoning relief to build in the R-1 Zone.

107.   Upon information and belief, St. Aloysuis and Jesus Harvest Time Academy did not experience the level of public hostility that resulted from the Plaintiff's use variance application, as described below.

108.   Upon information and belief, the Defendants did not oppose the construction and use of St. Aloysuis and Jesus Harvest Time Academy.

109.   St Aloysius opened in 1994 and now contains 300 students in grades kindergarten through 8.

110.   The Jesus Harvest Time Academy contains Kindergarten through the twelfth grade and was constructed circa 1990.

111.   The Neighborhood Commercial zone permits various land uses, including several nonreligious assembly and institutional land uses.

112.   Permitted principal uses in the Neighborhood Commercial zone are:

> Antique shop.
> Appliance store.
> Art/graphic/photo supply store.
> Artist/photo studio.
> Bakery.
> Bank and financial institution.
> Barbershop or beauty/hair salon.
> Bookstore.
> Business office.
> Candy store.
> Clothing/dry goods store.
> Convenience store.
> Delicatessen.
> Dry cleaners.

14

Municipal parks, playgrounds and other such municipal buildings and uses as are deemed appropriate and necessary by the Township Committee.

Federal, state, county and other public buildings and grounds, including public schools, parks, playgrounds or other public recreational uses or areas.

Florist shop.

Gift shop.

Hardware, paint or wallpaper store.

Household supply store.

Ice cream store.

Jewelry store.

Liquor store.

Luncheonette.

Pharmacy.

Professional office.

Repair/service shop for household or personal goods.

Restaurants; however drive-through restaurants and drive-in restaurants are not permitted.

Self-service laundry.

Shoe repair shop.

Stationery, tobacco, newspaper or periodical store.

Tailor/dressmaking shop.

Variety/notion store.

Combination of two or more of the above permitted uses in one principal building.

Other uses similar to those listed above.

Raising of horses and other livestock.

Essential services.

Art gallery.

Library.

Museum.

113. "Public schools" are a permitted use in the NC zoning district.

114. "Public schools" are a nonreligious assembly and institutional use.

115. Art galleries, Libraries and Museums, all nonreligious assembly and institutional uses, were added as principal permitted uses to the NC zoning district on May 27, 2003 by Ordinance No. 12-03.

15

116. "Child-care centers, nursery schools and day-care centers" are conditional uses permitted in the NC zoning district.

117. Parochial schools are prohibited in the NC zoning district.

118. The School's proposed use is prohibited on its NC-zoned property.

119. Under § 244-197(N)(l) of the Code of the Township of Jackson (the "Code"), the required number of parking spaces for a high school is "1 for each 3 students based on design capacity."

<u>The School's Land Use Application</u>

120. On August 16, 2013, Plaintiff applied to the Board to permit the construction of its high school on the Property.

121. An applicant seeking to use property for a use not permitted within that zoning district may apply to the municipality's zoning board of adjustment for a "D-1" use variance pursuant to the Municipal Land Use Law ("MLUL"), N.J.S.A. 40:55D-70d.

122. The School's application was for a use variance pursuant to N.J.S.A. 40:55D-70(d)(l) to allow it to construct a two-story new high school building of approximately 35,000 square feet that would cover less than six percent of the Property, and relocate there. The Plaintiff also sought a design waiver for the proposed number of parking spaces at the Property (together, the "Application").

123. Under New Jersey law, the applicant must demonstrate that the proposed use meets the "positive" and "negative" criteria to support the variance request.

16

124.   A "D" variance requires a supermajority or five affirmative votes for approval.

125.   The only other variances sought were for a ground sign for the high school as they are not permitted in the R-1 residential zone and for the number of parking spaces provided.

126.   For a planned student population at the School of 400 students, this equates to 133 spaces.

127.   Due to the uncontroverted evidence before the Board that no students would be allowed to drive to school and all students would be required to travel to school by bus, the Plaintiff sought a design waiver under N.J.S.A. 40:55D-5l(b) to provide fewer parking spaces than required.

128.   Specifically, the School sought approval for 51 parking spaces where 133 are required.

129.   In all other respects, the Application complied with the bulk requirements for the R-1 residential zone.

130.   Five hearings were held on OBY's application before the Board on October 2, 2013, November 20, 2013, February 5, 2014, April 2, 2014 and June 18, 2014.

131.   Over the course of the hearings on the Application, the Plaintiff's witnesses gave extensive testimony as to the mechanics of its proposal, the inherent benefits of the School, and the steps that had been taken to obviate any potential detriment to the surrounding community.

132.   Rabbi Ephraim Birnbaum, the School's principal, testified on numerous occasions during the hearings that no more than four hundred girls would attend the high school and that such a cap on enrollment could be made a condition of the Board's approval.

17

133. Despite the minimal impact and inherently beneficial nature of the School's proposed use, there was a huge outcry from local residents against the possibility of the School locating in Jackson Township.

134. The residents' opposition to the School's proposed use was a substantial motivating factor for the Board's decision.

135. Such opposition did not occur with respect to Liberty High, Elms Elementary, or the two private Christian schools described above.

136. Upon information and belief, the primary motivation of those objecting to the School's proposed use was animus directed against the ultra-Orthodox Jewish population centered in Lakewood Township.

137. An objector, Barbara Orsini, founded an organization named the "Jackson Citizens Defense Fund," and was represented by counsel, Ron Gasiorowski, at the hearings.

138. Several other Township residents who objected to the School's use testified during the Board hearings.

139. Hostility of Township residents toward the ultra-Orthodox Jewish community was demonstrated during the hearings themselves, and by Jackson Township residents, including those who participated in the hearings, on social media.

140. For example, social media statements made by Jackson Township residents who had themselves testified at hearings on the School's Application include:

    a. "The Hasidim totally control Lakewood and have no other culture in mind but their own. They only care about themselves."

18

b. "Let's face this thought, they will possibly claim discrimination!! Bottom ,line here jackson - it is not an inherent use, that will benefit the community.   The community of Jackson non religious if not orthodox will not be. Able to attend the school. The benefit the school?will get is tax exempt, your tax dollars paying for books, possibly busing,of some orthodox girls from Jackson , nurse,possible crossing guards, and the pool, it will be a mitvah [sic],where the married orthodox women will go, to be cleansed between their ovulation time frame. cycle,,now down the road, and they will of course. Purchase your home, !"

c. "the ORTHODOX WILL NOT ASSIMILATE INTO A. COMMUNITY, OTHER THAN THEIR OWN. THIS IS ACCEPTED BY MANY RESIDENTS IN LAKEWOOD WHO UNDERSTAND THEIR RELIGION. IN LAKEWOOD, MANY OF THE HOMES WERE PURCHASED FOR A PRICE, ONE BY ONE UNTIL THE NEIGHBORHOOD, WAS FOR THE ORTHODOX TO BUILD ,-A NEWER COMMUNITY,-TO ESTABLISH SHULS, -SCHOOL AND BUSINESSES,"

d. "And bringing up the other 'private schools' that students attend; he failed to mention they all follow the NJCCS and get a real diploma when they graduate. We need ratables, not non-profit schools who will drain us of our tax money. I agree with Middletown....I hope they win!"

19

e. "I don't see any houses in Jackson turned into a religious schools. They talk about us being against them because of religion ... Lakewood needs to look at themselves, they are the ones segregating themselves from everyone else ....."

f. "Estee ,is a biggie in real estate!ifyou build it,theywill come!this is what Lakewood is all about."

g. "THAT'S WHY Lakewood is going BROKE - because NO TAXES are being paid on each and every one of those homes that are either religious schools or yeshivas."

h. "There is a big difference between Hasidic Jews of Lakewood and as an examples myself."

i. And too, it is our tax dollars that pay for the upkeep of the school facilities. Perhaps if Lakewood upgraded & actually cared for ALL children in Lakewood, they would have a nice track to walk on. Again, take take take and not give back"

j. "We here in Jackson must keep very diligent to what could happen in Jackson. For we do NOT want Jackson to turn into another Lakewood."

k. "Personally, the Lakewood Orthodox Jewish Community has NO business at a Jackson Zoning Board Meeting. This is OUR Town's Meeting Not Theirs."

l. "On Sunday's I am Christian I celebrate sabath and do not work. But I turn on lights and drive . I classify work differently then Jews people ..."

m. "Look at what has happened in Lakewood: a culturally diverse town that has been taken over by a group of people that have intentionally driven out any citizens or

20

businesses that are different than them. They do not respect the laws of that town, and have created and live by their own set of laws and justice. Is it really anti-Semitic of me to not want that in Jackson? . . . Have we gone so far PC that we can't even speak out against this without being called racist/anti-Semitic?"

    n. "On Cross Street between all the building on the Lakewood side and what the hope is to build the proposed buildings almost the entire way of Cross Street would be filled with Synagogues or Day Schools for Jewish Children."

141.    Such statements demonstrate that Jackson Township residents testifying at Board hearings were motivated by factors other than legitimate land use concerns, namely, hostility toward the ultra-Orthodox Jewish community.

142.    Other examples of statements made by Jackson Township residents on the "Jackson Township Zoning Board Watchdog" and "Jackson Community Watchdog News" include:

    a. "Hasidim and the UltraOrthodox (as opposed to New or Modern Orthodox) are fundamentalists. As such, they are a 'cancer' on secular society."

    b. "They are a cancer. Look at Lakewood."

    c. "This is about a cult that somehow has bought our government! You can't even begin to fathom to what degree!!!! This is corruption at its worst! And it unfortunately has alot [sic] to do with this specific sect of Jews. The ultra orthodox community as a whole are extremely dangerous because they do not

21

care about any other community or what happens to anyone else. I don't call them 'Jewish'."

d.   "NOTHING that is going on in these communities is beneficial to anyone other than the hasidic community."

e.   "Ifs not a community divided. The Hasidim choose to have their own isolationist community separate from the goyim"

f.   "Orthodox/Hasidic are taught to procreate and that there way is the chosen way by God - ifs a fanaticism that ruined Lakewood (thank you Sen. Singer) and is coming here quite quickly."

g.   "There are thousands of Hasidic young men and women bound by the chains of Hasidim."

h.   "We've watched them take over Lakewood, what's to stop them from taking over Jackson .. they give little to no regard to us non Hasidics and they wont stop making babies they've out grown Lakewood where do you propose they branch out to??"

i.   "They are a God forbidden cult not religious at all just want to take over USA at our expense. Did you read the scoop today how they praise christy"

j.   "Don't they understand they're being anti Christian (if that's a thing) by not wanting to assimilate."

143.   Such statements demonstrate substantial bias and hostility toward ultra-Orthodox Jews in Jackson Township.

144. These individuals were part of an organized effort to prevent the School from locating in Jackson Township, with coordinated funding, planning and strategy.

145. Thousands of people "follow" the "Jackson Township Zoning Board Watchdog" and "Jackson Community Watchdog News" Facebook groups.

146. The examples of comments listed above are the less hostile statements made by Jackson Township residents, as editors of the Jackson Township Zoning Board Watchdog Facebook page have stated:

   a. "The blatantly hateful comments are deleted from this page, but people do need a place to usefully vent, . . . ."

   b. "Please, please remember to keep the comments free from ' them versus us ' content!! It can't be emphasized too often. This page is monitored by many people. Some of them are looking for reasons to sue us in an appeal.. . .it would be so disheartening for this page to be used as fodder! Thanks, and don't get mad if we scrub the page of comments. We still love you all …"

   c. "okay … cool it with the comments ~ that are just plain anti semitic. not helpful at all"

147. There was a concerted effort by Jackson Township residents to not discuss their hostility toward the ultra-Orthodox Jewish population at the Board's hearings, but to focus on "zoning" issues.  Statements published by Jackson Township residents include:

   a. "I agree that we as a town should show solidarity but caution that we not give the impression of be antisemitic."

23

b. "my suggestion is to speak on facts and zoning related items and don't give Ray Shea anymore ammunition to use in an inevitable lawsuit against the township for denying this application, claiming religious persecution. Be smart and stick to the problem …"

c. "They would know that this surely would be used against Jackson in court."

148. Upon information and belief, a group calling itself the Coalition of Jackson Americans distributed an eight-page publication consisting of anti-Semitic statements and placing them in residents' mailboxes.

149. An ongoing theme described in the statements of Jackson Township residents is fear of the Lakewood Township Orthodox Jewish community encroaching into Jackson. Examples of such statements include:

a. "Watch out Jackson. Stand tall, dont sell, or we will be living in the next lakewood."

b. "this is awful .... I really can't stand living in Jackson anymore because they are starting to take over this town ...... They are going to ruin Jackson just like Lakewood !!!!!!

c. "Look at what has happened to Lakewood in the last 25-30 years! The new school is just the beginning! After that individual neighborhoods will be targeted for hostile take-overs! One or two houses will be bought, those homes will be filled with multiple immigrant families, illegals, sec 8 housing exct. Anything to make the rest of the neighborhood owners to sell/run-out of the neighborhood! The

24

#8901236.1

public school system of Jackson will become over-run with the children of these above mentioned new residents."

    d.   "We've watched them take over Lakewood, whats to stop them from taking over Jackson .. they give little to no regard to us non Hasidics and they wont stop making babies they've out grown Lakewood where do you propose they branch out to??"

    e.   "They have already destroyed one once great town. Would hate to see them destroy another"

150.    A Change.org Petition entitled "Deny Zoning Variance proposed by Oros Bais Yaakov High School" was started three years ago and was signed by 1,862 supporters and was started by "Citizens of Jackson."

151.    Statements from the Change.org petition included:

    a.   "Building this school opens the flood gates for the Lakewood Orthodox to move into and ultimately make Jackson their own town."

    b.   "Because I am a Jackson resident. have been my whole life and I feel that the Jewish population has already taken over the entire town of Lakewood."

    c.   "because of the 100+ Hasidic schools that overcrowd Lakewoods 24 SQ. mi.and serve only the Hasidic community and heavily impact the financial budgets of Lakewood. they plan on doing the same to Jackson."

    d.   "Because I seen how they destroyed Lakewood NJ"

25

e. "we dont need another scholl also one we wouldnt attend just cause lakewood is going bankrupt and to the dogs doesnt mean Jackson should"

152. During the course of the hearings, the Plaintiff presented four expert witnesses, a planner, a traffic engineer, an architect and an engineer, as well as one lay witness, Rabbi Ephraim Birnbaum.

153. The first Board hearing on the Application was held on October 2, 2013. The hearing room was completely full and could not accommodate the public in attendance for the application. Individuals had to stand in the hallway.

154. A parochial school is recognized in New Jersey as an inherently beneficial use.

155. Board members were directly responsive to the questions and statements made by Jackson residents hostile toward to the School.

156. In addition to adopting and being responsive to the hostility of local Jackson Township residents, Board members personally demonstrated hostility toward the School and its religious characteristics from the outset of the Board hearings.

157. During Plaintiff's counsel Ray Shea's opening statement, Board Member Carl F. Book, Jr. questioned whether the school proposed was an inherently beneficial use, stating: "I have not seen that in brief form before us, and I don't believe counsel is directing us that we have to take it that way."

158. When the Board attorney, Sean Gertner, responded "correct" to Board Member Book, the audience burst into applause and had to be "admonished" by Mr. Gertner who stated: "[Y]ou can't have outbursts."

26

159.    Beginning in the first hearing on the School's Application, Board members engaged in

        questioning that was irrelevant to the Application, including the issue of financing of

        student transportation.

160.    The following statements were made at the first hearing on the Application:

        BOARD MEMBER SCHULMAN:  I notice there was an article today that the
        Lakewood transportation system is broke.

        CHAIRMAN:  Joe, I am going to have to ask you to retract that question.  I am
        not going to allow that question.

161.    This statement reflected similar statements made by Jackson Township residents at the

        hearings, for example the following:

        a.  "According to the Asbury Park Press today, Lakewood has no money, Lakewood

            has no money for busing. Lakewood Board of Education, they do not have the

            money."

        b.  "[G]iven the tenuous circumstances in Lakewood right now with funding of

            busing, can you guarantee they are going to deliver to you five buses only and not

            one full size bus, two minivans, a couple of cars?"

        c.  "Lakewood is already bankrupt in their school system and busing."

162.    In response to a statement made by the School's counsel Mr. Shea regarding local

        schools, an unidentified audience member yelled out "Build it in Lakewood."

163.    Board Member Burrows asked "[W]ould you say its proximity to Lakewood is a unique

        feature of this piece of property?"  This statement demonstrated responsiveness to

        Jackson residents' concern about the Lakewood community.

27

#8901236.1

164.  Board members also applied heightened scrutiny to the School's Application.

165.  For example, Board Member Schulman stated in response to the Plaintiff's planner's trip generation numbers "[T]hat is hypothetical.  Reality is going to be totally different. I know it and you know it."

166.  Upon information and belief, the Board has not treated other applicants in a similar manner but has accepted generally accepted traffic study methodologies.

167.  Board Member Cook questioned why the Board could not consider the tax-exempt status of the applicant as a factor and whether non-Jewish girls would be permitted to attend the school.

168.  Again, Cook's statement was directly responsive to statements by Jackson Township residents at the hearings, for example the following:

   a.  "This would take a currently revenue-developing property and burden us with tax exempt."

   b.  "Quite frankly, I resent the fact that you can claim a 501C-3 tax exempt status, and therefore paying no ratables whatsoever, . . . ."

   c.  "What's the tax burden for the taxpayers of Jackson?"

169.  Board Member Book also questioned why the Board could not consider whether non-Jewish girls would be permitted to attend the school.

170.  Book's statements is irrelevant to the Board's consideration of a use variance.

171.  Upon information and belief, Board members did not express such concern for applicants for Christian schools.

28

172. Statements by Jackson Township residents made during the first hearing included: "There is a saying in Lakewood--I grew up with it since 1972--if you build it, they will come." This statement was followed by applause.

173. The resident's use of the word "they" was meant to refer to ultra-Orthodox Jews.

174. Such statement further demonstrated hostility toward the ultra-Orthodox Jewish population of Lakewood Township.

175. Another Jackson Township resident stated during the first hearing: "[T]heir teachers are not accredited; they are teaching based on what knowledge? They go, the women teaching in these high schools--and this private schools--like go over to Israel for a year and come back and start teaching."

176. This statement demonstrated hostility toward ultra-Orthodox Jews.

177. The majority of the teachers currently working at the School are accredited by the State of New Jersey.

178. The second Board hearing on the Application was held November 20, 2013 and had to be held at the Jackson Memorial High School due to the large crowd, which exceeded 1,000 people.

179. Once again, Board members questioned the School's witness, Rabbi Birnbaum, on entirely irrelevant subjects such as:

   a.   "This school is accredited by the New Jersey Department of Education, correct?"

   b.   "What is your graduation rate?"

29

   c.  "What is the percentage that go on to college?"

180. Upon information and belief, the Board has not asked such questions of non-Jewish applicants.

181. Board members made other statements demonstrating hostility toward the Lakewood community, such as:

   a.  "Are you familiar with the zoning in Lakewood in regards to whether a private all girls high school is a permitted use in a residential zone?"

   b.  "[W]ill you tell the Board where you searched, what towns?"

182. The objector's attorney, Ron Gasiorowski, similarly questioned the Plaintiff's traffic engineer as follows: "[D]o you know how many orthodox Jewish high schools there are in Lakewood?'

183. Michael Kelly, the former Board Chairman, commented: "I had a permanent, catastrophic accident in Lakewood by one of those women who drives those vans."

184. After Kelly was admonished not to use the words "they" and "them" by the current Board Chairman, he continued: "I am asking you to go to the county and the county will move it to Lakewood where it should be, and the county will help them out."

185. The third Board hearing on the Application was held on February 5, 2014.

186. Mr. Gasiorowski again questioned the Plaintiff's witness, Rabbi Birnbaum, on irrelevant issues such as:

#8901236.1

a.    "Now with regard to your being a teacher, or in fact being an administrator, with regard to this being a private school, you are not a teacher who is certified as a teacher by the State of New Jersey, are you?"

b.    "Now, of those 16 teachers which you have and the 20 which you mentioned, are any of those teachers accredited by the State of New Jersey as being teachers?"

c.    "Now, do you recall during the years of 2010 and 2011 filing tax returns?"

d.    "My understanding in reading about that school was that the specific purpose of the formation of that school was to basically isolate young Jewish women so they would not in fact be influenced by the secular schools that they were attending with regard to the ways of the young women who were secular rather than religious. Is that also the goal of your school?"

e.    "Are there any non-Jewish girls presently attending school at the present time, or have there even been?"

f.    "Are there any African-American students in your school?"

g.    "Any Latina girls in your school?"

h.    "Are they Jewish?"

i.    "[A]re any there teachers on your staff other than men, any women on your teaching staff?"

j.    "What type of physical exercise would you do in the pool?"

31

#8901236.1

k.   "Would you agree with me that this Board has a right and the ability to look at your school in its totality to determine whether or not the quality of life afforded to those students is in accordance with what would the standard practices carried out in various schools throughout the state, more particularly in Jackson?"

l.   "I take it that sometime in your life you have been inside a public high school, have you not?"

m.   "Do you know whether, with regard to their athletic facilities, that they have showers and lockers to accommodate the sanitary and well-being of the student?"

n.   "I take it for a significant part of the class day that there are courses which are given or classes which are given that deal with religious studies, the teaching of the Tora and the like?

o.   Now, if there is a seven hour school day, how many hours per day are assigned to those studies?"

p.   "Can you identify for me any other property you looked at either in Brick, Howell, or Lakewood that you negotiated with to purchase, or were there any?"

187.   Gasiorowski's questioning during the third hearing again demonstrated hostility toward the School based on its ultra-Orthodox Jewish faith.

32

188. The Board permitted Gasiorowski's questioning.  Mr. Shea objected to these questions and the Board's attorney Gertner directed the Rabbi to answer, stating: "The issue of its relevance can be weighed by the Board once we have an answer."

189. The fourth Board hearing on the Application was held on April 2, 2014.

190. The objector's attorney questioned the Board's planner, Ian Borden, regarding "whether a student would have to adhere to all of the customs and traditions of the Orthodox Jewish culture?"

191. Such questioning demonstrates hostility toward the Orthodox Jewish faith.

192. After the objector's "educational consultant," Richard Farber, testified about the Plaintiff's school, the audience burst into applause and the Chairman of the Board had to admonish the crowd:  "Ladies and Gentlemen, I expect you to conduct yourselves in a civil manner.  There will be no further outbursts, clapping, or any signs of any emotion at this meeting.  I will not tolerate it.  I will clear the room if it's necessary."

193. The Board members then began questioning Mr. Farber regarding various matters irrelevant to a use variance application, including:

    a.    The difference between accredited and nonaccredited schools;

    b.    How colleges view these schools;

    c.    Whether lack of a foreign language is a component at variance with college admission requirements; and

    d.    Whether lack of a chemistry lab or biology lab affects college entrance.

33

194. Such questioning by Board members demonstrated hostility toward the Orthodox Jewish nature of the School.

195. Following summations by the applicant and the Objector's attorney, the Board's own Planner, Stuart Wiser, was asked by the Board Chairman to comment on the Application.

196. Wiser testified at length about matters irrelevant to a use variance application, again demonstrating hostility toward the Orthodox Jewish nature of the School.

197. Wiser stated: "Our office did some research and found that the New Jersey state requirements to graduate from public schools are three years of lab sciences, one year of language, four years of English, three years of math—algebra I, geometry—and three years of social studies. We know from the rabbi's testimony that there is not going to be foreign languages, and there are not going to be biology and chemistry labs. So the question I have with respect to what is the community being served is, is this school going to serve, going to rise to the level to serve the community that the legislature intended when it defined 'schools' as an inherently beneficial use?"

198. Wiser's statement was met with applause from the audience.

199. Wiser further stated: "We did some research on college admissions, and while we make room for the fact that not all colleges will have the same admissions standards, we looked at several New Jersey colleges . . . . And I personally just simply will have a hard time reconciling the rabbi's statement that the graduates of this school will go into medical, legal, and others professional careers given the requirements, at least of the schools in New Jersey that we have looked at."

34

200.   Wiser further stated: "We also don't know what will be taught here.  We have nothing on the record as to his curriculum."

201.   Wiser further stated: "I am reminded of---I think it was the October meeting—where one of the members of the public came up and . . . asked would a school for strippers be an inherently beneficial use.  Certainly it is not that, and I don't mean to identify that, but the fact of the matter is that the legislature, in detailing or adding 'schools' to inherently beneficial use in the definition in the MLUL never defined what 'school' is."

202.   Upon information and belief, the Board has never elicited such testimony from non-Jewish applicants.

203.   Board Member Schulman then made the following statements:

   a.   "[T]hat is a private school and is exclusively for the use of the Orthodox community; there will be no other children of other religions admitted to that school without being able to pass a strict religious component, . . . ."

   b.   "And I want to relate something that I experience during my time living in Lakewood, . . . .  I attended a meeting at the municipal courtroom in Lakewood during which the titular head of the Orthodox community in Lakewood, Rabbi Schenkolewski, stated several times that 'the Orthodox community will never assimilate; therefore, they stand alone.'"

   c.   "[A]nd I think that the community of Jackson cannot expect the Orthodox residents in Jackson to assimilate into the Jackson community as a whole in the same way that they will not do so in Lakewood."

#8901236.1

204. Schulman's statements demonstrate hostility and animus toward the ultra-Orthodox Jewish community.

205. On June 18, 2014, Board member Sheldon Hofstein made a motion to deny the Application.

206. While seconding a motion to deny the applicant, Board member Suttles stated: "One of the reasons I have is, nobody has actually proved to me that this is a school for anything. The environment that is described would probably be achieved if we let four hundred girl scouts in the building, only they wouldn't have to sell cookies."

207. Board member Suttles' statement that the proposed use is not "a school for anything" demonstrates hostility toward the Orthodox Jewish nature of the School.

208. The Board then voted unanimously to deny Plaintiff's application in its entirety.

209. On September 3, 2014, the Board adopted Resolution No. 2014-35 memorializing the denial of the School's application (the "Resolution").

210. The Board Resolution contained several findings of fact and law regarding the School's application that were unsupported by the evidence before it.

211. The Board Resolution contained statements that were contrary to New Jersey law.

212. The Board incorrectly referred to the relief requested in relation to parking as a variance, rather than a design waiver.

213. The Board refused to determine that the School's proposed use would constitute an inherently beneficial use, and therefore that it satisfied the "Positive Criteria" required for a use variance.

36

214. During the hearings, the Board engaged in substantial and erroneous debate on this issue and with respect to same, and substantially relied on the testimony of the objectors' Planner in making its determination on the inherently beneficial quality of the proposed use.

215. The Board erroneously determined that it had discretion to determine whether a parochial school was indeed an inherently beneficial use, stating that this conclusion was bolstered by the fact that there is no definition of "school" in the Municipal Land Use Law ("MLUL").

216. The Board acted contrary to law in finding that even if the School's use of the Property was presumed to be inherently beneficial, it was a rebuttable presumption.

217. The Board's Resolution states: "The Board questioned the extent to which, though a private, not-for-profit educational institution, it [the School] would be open to the public and be available for general public benefit."

218. Furthermore, the Board found that because the School was "not a school any of us are familiar with," because, for example, it did not have traditional science laboratories, locker rooms or communal showers, it was not a "school" as that term is understood by the MLUL.

219. The Board's findings regarding the "inherently beneficial" nature of the Plaintiff's proposed use was directly responsive to questions and statements made by Jackson Township residents to the Board during its hearings, including the following:

#8901236.1

a. "[W]hen you say that putting a school in is perfectly acceptable and meets the criteria of a benefit, I would argue that not every school is considered beneficial. And on a light-hearted note, if I put up a school of strippers down the street, I don't think that is inherently beneficial to the community. Thank you. (Applause.)"

b. "Just to say that a school is a benefit is not enough. I would suggest that if those ordinances and rules were read a little deeper, there would be a better understanding. Having a school that perhaps comes under state standards in education certainly would not mean it is a benefit. Just because it's a school doesn't mean it's a benefit."

c. "Also there is talk ad nauseum of the inherent benefit of a school. Any school is inherently beneficial to its students, regardless of location. . . . I don't see any of the benefits of this school. There is only one student from Jackson. There's no chance of any cultural contribution, and more than likely no more than a few job positions, and a loss of a rateable…"

d. "I would rather see the money go to something that's going to protect our town rather than something that's not going to be inherently beneficial."

220. The Resolution included a finding that there remained significant concern over the increase in "effluent" to be generated at the site as compared to that which would be generated by uses as of right that were more in line with the existing character of the neighborhood.

38

221. Such conclusion regarding "effluent" was pretextual.

222. Upon information and belief, the Board has not denied similar applications on the basis of concern over the increase in effluent.

223. Upon information and belief, the Defendants have permitted other land uses to be developed in Jackson Township that would have a greater negative impact from "effluent."

224. The Board conclusion regarding concern over effluent was unsupported.

225. During the course of the hearings, the School's planner, Ian Borden, testified as to the capacity and sufficiency of the proposed septic system to be used on the Property. This would consist of three 1,500 gallon septic tanks, a pressure-dosing system, a 3,200 square foot disposal bed and a MicroFAST water treatment system.

226. The system is based on an estimate that the School would produce 4,250 gallons of effluent per day.  This conservative figure is derived from and complies with State DEP regulations.  The size of the Property is approximately 7.5 acres, which is significantly larger than the R-1 requirements for a septic system of the type proposed.

227. The record before the Board demonstrated that any septic system to be used on the Property would have to comply with DEP regulations and be granted an NJPDES permit.

228. The record also established that many other sites in Jackson (including several schools) use septic systems that require NJPDES permits.

39

229. The record also included uncontested evidence that there are 18 NJPDES permits in Jackson for sites with larger septic systems than that proposed by the School, many of which are adjacent to the R-1 Zone.

230. The Board's erroneous findings and conclusions regarding "effluent" created by the Plaintiff's proposed use was directly responsive to questions and statements made by hostile Jackson Township residents during the Board's hearings, including the following:

    a. "This school will be using a septic system, which can be very unreliable with a school with this many students and administrators.  If this system backs up just once, it can affect all of those wells in the residential areas that the school backs up to."

    b. "The effluent plant, like I spoke of, four thousand gallons would take a matter of two hours for two motors running to saturate the ground.  Is anybody monitoring it?  Any alarms going off?  Anybody going to be there Friday night or Saturday morning, on site to check these things out?  or is it just going to saturate the area and then you have a ten or 12 day period when the facility can't be used.  What do we do in that situation?"

    c. "In addition, a septic system where I believe Evan Hill, back on November 20, stated that 1300 gallons of effluent is what would be permitted based on zoning law.  If I am misconstruing that, my point being 4,000 gallons a day is a huge detriment to the quality of that septic system.  Septic systems are clearly not a recommendation for schools."

40

    d.  "I am also a little upset about the septic and well implications. And that is a big reason, in my mind, for denial. I just don't trust the plans that theoretically everything should work."

    e.  "My well is one of the closest wells to the septic system. Who is going to test my well on a periodic basis to make sure that it's not impacted by something in that system? Who is going to guarantee that if something is impacted from the school, that I am not going to have to pay for it?"

231.  The Board's Resolution further stated "the Board believed that . . . water . . . concerns could not be mitigated so to alleviate those concerns."

232.  However, the Board made no findings of fact or conclusion of law concerning "water concerns."

233.  Nevertheless, any concern regarding "water supply" was pretextual.

234.  Upon information and belief, the Board has not denied prior applications on the basis of concern over the increase in water supply.

235.  Upon information and belief, the Defendants have permitted other land uses to be developed in Jackson Township that would have a greater negative impact on water supply.

236.  The Board conclusion regarding concern over water supply was unsupported.

237.  Regarding the integrity of its neighbors' water supply, the School presented evidence that it would drill down to 500 feet into the next confined aquifer.

41

#8901236.1

238. The Board's concerns regarding "water supply" created by the Plaintiff's proposed use was directly responsive to questions and statements made by hostile Jackson Township residents during the Board's hearings, including the following:

   a. "I have a well.  The amount of water that is going to be going into this property is at least ten times more than what seven homes would put in.  That is a huge amount of water going in there.  This site is at the top of a hill.  All that water is going to be heading downhill towards all our wells. There is at least 20 wells that would be potentially impacted."

   b. "Since I live on Kevin Court, will this impact my own well if there is alll these people using all the water and aquifer; how is that going to impact that?  Has anybody done a study on whether there are pine snakes or any other animals on that property endangered?"

239. The Resolution included a finding that there remained concern over the traffic to be generated at the site, and that the Board stated that it was not convinced that the underlying assumptions upon which the School's expert based his conclusions could be reasonably enforced.

240. Such conclusion regarding traffic was pretextual.

241. Upon information and belief, the Board has not denied prior school applications on the basis of concern over the increase in traffic.

242. Upon information and belief, the Defendants have permitted other land uses to be developed in Jackson Township that would have a greater traffic impact.

42

243.   The Board conclusion regarding concern over traffic was unsupported.

244.   The Plaintiff s traffic expert, Mr. John Rea, testified that the Property's driveway exiting out onto Cross Street would operate at an acceptable "C" Level of Service, well within accepted traffic engineering parameters.

245.   The evidence before the Board further established that the School's proposed internal circulation was designed in accordance with proper traffic engineering principles.  Mr. Rea confirmed that the design provided more than adequate stacking for buses.  In addition, the Property's turning radius was designed so as to sufficiently accommodate any emergency vehicles.

246.   The evidence before the Board also established that the Property is especially well--suited for the High School because it is located on a county road in close proximity to where a majority of the students reside.

247.   Rabbi Ephraim Birnbaum testified on numerous occasions that no more than four hundred girls would attend the School and that the School would consent to such a cap on enrollment being made a condition of the Board's approval.

248.   Rabbi Birnbaum testified that there would be no more than 27 members of staff working on-site at the High School and that such a cap on staff could be made a condition of the Board's approval.

249.   In addition, the School's students would be required to come to the School by government-provided busing.

43

250. On the basis of these conditions, even the Board's traffic engineer concluded that the Plaintiff had provided measures to promote and provide traffic safety.

251. The Board's planning expert stated that these conditions could alleviate the Board's concerns and recognized that these conditions could in fact be policed by code enforcement officials.

252. To further mitigate any negative impacts of the proposed high school, the Plaintiff also agreed to widen the part of Cross Street leading onto the Property, in accordance with Ocean County standards for county roads.

253. In its Resolution, however, the Board stated that these conditions could not be enforced. The Board's denial of the requested relief on the basis of its unspecified concerns regarding the enforceability of the conditions proffered by the Plaintiff was arbitrary, capricious and unreasonable.

254. Upon information and belief, the Board has imposed similar conditions upon the approval of other applications for use variances.

255. The Board's findings regarding "traffic" impacts of the Plaintiff's proposed use was directly responsive to questions and statements made by hostile Jackson Township residents during the Board's hearings, including the following:

   a. "It is clear that there will be a impact on traffic in this area.  It's assumed by Mr. Rea that each bus coming in will be a full bus.  If those buses aren't full, if they have to go to different parts of this town, ten buses is certainly not adequate."

44

b. "The other thing that I have is about traffic. Now, I work in Lakewood.  I take Cross Street every single day, back and forth.  The traffic light on 528 and Hope Chapel is backed up all the way almost to Liberty, as we speak, on any given day, at any given time--that is including Saturdays as well as Sunday.  If that's going to go through, what is going to happen to the traffic to our roads, which are 75 percent county and the five percent is state, and the rest is development?"

c. "My mother lived in Lakewood three miles from my house.  It used to take me ten minutes to get there.  Now I saw at least three new schools being built. It now takes me 45 minutes to dive seven miles, and if we add another school it's going to be ridiculous."

d. "They are so disingenuous about ten school buses.  Okay, let them say ten buses. There will be 25 minivans that will be running back and forth.  They are not going to have events?  Mr. Chairman, what about graduation or other events that they are going to have there?  All those minivans are going to be stacked all over the place there, and nobody stops.  So the traffic is the main thing.  They can't absorb the traffic"

256. Regarding the provision of parking at the Property, on multiple occasions counsel for the Plaintiff outlined the three options that had been put before the Board:

a. The first option was to grant the Plaintiff a design waiver to reduce the number of spaces required to 81.  In light of the fact that none of the students would be permitted to drive to school, the Plaintiff likened its

45

position to that of an elementary school. Accordingly, the Plaintiff originally sought a waiver to include 51 spaces, in line with the Code requirements for elementary schools. However, this was later voluntarily increased to 81 spaces.

b.    The second option was to have the Plaintiff landbank the remaining 53 spaces as would be required by the Code.

c.    Finally, the third option was to refuse to grant a design waiver and require the Plaintiff to provide all 134 spaces.

257.    Despite repeated invitations to do so, the Board failed to state which option it preferred, including the option that would not require a design waiver.

258.    Plaintiff also established that, at present, the Property is in a dilapidated condition. An expert assessment highlighted numerous issues with the existing state of the Property, including, but not limited to, possible underground tanks, possible abandoned septic systems and abandoned buildings. Plaintiff observed that it should be required to remediate these problems as a condition of any approval.

259.    The Plaintiff's planner testified that the site plan was designed to respect the bulk standards of the neighborhood and incorporated residential design elements, honoring the developmental pattern of the neighborhood. Consequently, the proposal makes a conscious effort to protect the character of the established neighborhoods.

46

260.   Thus, the Board's denial insofar as it was predicated on a finding that a school is incompatible with the rural nature of the R-1 Zone was arbitrary, capricious and unreasonable.

261.   Additionally, the Plaintiff took numerous steps to mitigate any impact of its proposed high school use on the surrounding neighborhood including but not limited to:

   a.   Volunteering to accept approval on the condition that:

      i.   No more than 400 students would be permitted to attend the School;

      ii.   The School would remain closed from July to September; and

      iii.   All students would be required to take a bus to school and not permitted to drive to school (which is the Plaintiff's strictly-enforced policy in any event);

   b.   Setting the high school four hundred feet back from the Galassi Court rear property line to minimize disturbance to the neighboring properties, far in excess of the fifty-foot buffer that is required;

   c.   Orienting the building so that the side yards are much larger than would be required by law to keep the design in line with the character of surrounding properties;

   d.   Offering to include a water treatment system, although not required by the Ocean County Health Department;

   e.   Voluntarily opting to drill down 500 feet, rather than 80-125 feet, into the

47

next confined aquifer to eliminate concerns about drawdown from the school's well to the surrounding property owners;

f.    Adding a six-foot solid fence along the property line;

g.    Decreasing the height and area of the proposed school sign;

h.    Agreeing to provide curbing, pedestrian access and landscaping for the driveway; and

i.    Offering the Board three options as to how many parking spaces would be required on the Property including providing the number required by the Code.

262.    In making its determination, the Board relied in great part on the testimony of objecting Jackson Township residents, the arguments of their counsel and testimony of their experts.

263.    The Board had an obligation to, if it identified any negative impacts, determine whether these detrimental effects can be reduced by imposing reasonable conditions on the use.

264.    The Board failed to determine whether any detrimental effects could be reduced by imposing reasonable conditions on the use.

265.    The Board erred in failing to correctly utilize the four step analysis for inherently beneficial uses as established in Sica v. Board of Adjustment of the Township of Wall, 927 N.J. 152 (1992), in determining the School's application.

48

266.    In denying the School's Application, the Defendant Board was knowingly responsive to Jackson Township residents who were hostile toward the ultra-Orthodox Jewish population.

267.    The Board was motivated to deny the School's Application based on the hostility of local Jackson Township residents.

268.    By denying the Application, the Board gave effect to the private biases of Jackson Township residents.

269.    Further demonstrating the Board's hostility and responsiveness to anti-Semitic bias of Jackson Township residents was the Board's reference to the Plaintiff's proposed use of a pool on the Property.

270.    The Board's Resolution includes the following statement: "**WHEREAS,** the Board also questioned the use of the pool."

271.    While the source of the Board's concern about the pool is not evident from the Resolution, the hearing transcripts and other public comments demonstrate that it stems from bias.

272.    A Jackson resident stated at the hearings: "Also talked about was the swimming pool. I have spoken to friends. They don't believe it's going to be a swimming pool. They believe it's going to be used for religious ritual."

273.    Upon information and belief, that resident was referring to a *mikveh*, or a bath used for the purpose of ritual immersion in Judaism.

274.    Comments regarding the same by Jackson Township residents on Facebook include:

49

a. "The pool in question is most likely going to be used for when the students are menstruating."

b. "They're talking about a pool for this proposed high school for girls, and questioning why one is needed if it won't be used during the summer. They mentioned it would be enclosed, so I'm going to assume it will be a mikveh."

c. "What?????!!!!!! They menstruate in a pool???????? I hope I misunderstood that. If that's on purpose, that's disgusting."

d. "I believe in orthodox tradition girls are segregated while menstruating because they are 'unclean' until they have their ritual bath."

e. "That pool sounds dirty and just plain gross .. just clean up at home."

f. "Maybe they're trying to downplay the religious angle of their argument like this school will benefit Jackson residents."

g. "When we all know that the purpose of this school is to make Jackson more attractive for Brooklyn residents hoping to move, LOL."

h. "Ewwwww"

i. "Whether you understand the "ritual" or not does not make it any less gross."

j. "It will provide no benefit to jackson residents. Only to lakewood residents that want to move to jackson. Anyone have a number on the orthodox population in jackson?"

275. The Board treated the School differently and worse than two Christian schools and other, larger nonreligious public schools.

#8901236.1

276. The Township's Code discriminates against religious land uses on its face with respect to the NC zoning district.

277. The Township's land use regulations on their face treat religious land use on less than equal terms as nonreligious assembly and institutional land use.

278. "Parochial schools" are a religious assembly and institutional land use.

279. "Public schools," "parks," "playgrounds," "libraries," and "museums," among other nonreligious assembly and institutional land uses are permitted by right in the NC zoning district.

280. "Parochial schools" are prohibited in the NC zoning district.

281. In order to locate a parochial school in the NC zoning district, a property owner would be required to obtain a use variance for such use

282. Requiring a use variance to develop a parochial school in the NC zone is being treated on less than equal terms as a public school, park, playground, library or museum, which are permitted by right.

283. There is no stated purpose of the NC zoning district in the Township's Land Use Code.

284. Parochial schools are similarly situated with the permitted uses within the NC zoning district as to the regulatory purpose of the NC zoning district.

285. The Defendants' actions described above all took place under color of state law.

## COUNT I
**Action in lieu of prerogative writ**
**New Jersey Municipal Land Use Law**
**N.J.S.A. § 40:55D-1 *et seq.***

286.   Paragraphs 1 through 285 are incorporated by reference as if set forth fully herein.

287.   With regard to the Board's denial of the High School's Application, the Board's decision was arbitrary, capricious and/or unreasonable.

**Positive Criteria**

288.   As for the Positive Criteria, the Board erroneously determined that it had discretion to determine whether a parochial school was an inherently beneficial use when that question has been determined by case law and enshrined in the MLUL which states that schools (whether public or private) are inherently beneficial uses.

289.   In finding that the School was not presumptively an inherently beneficial use, the Board made a fundamental error of law rendering its decision arbitrary, capricious and unreasonable.

**Negative Criteria**

290.   As for the Negative Criteria, the Plaintiff established through competent and credible fact and expert evidence that granting the variance would not result in substantial detriment to the public good and would not impair the intent and purpose of the Code or the Jackson Master Plan.

291.   As detailed above, several schools are already located in the R-1 Zone. Nevertheless, they function well, make positive contributions to the community and have caused no substantial detriment to the surrounding property or the Jackson Master Plan simply by virtue of their location in the R-1 Zone.

#8901236.1

292. Moreover, conditional uses permitted m the R-1 Zone under the Code include child care centers, nurseries and houses of worship. A high school whose students are not permitted to drive to school does not represent a significant departure from these types of establishment.

293. The Plaintiff took numerous steps to mitigate the impact of the School on the surrounding neighborhood.

294. The proposal would protect the character of the established neighborhoods.

295. The Board's denial insofar as it was predicated on a finding that a school is incompatible with the rural nature of the R-1 Zone was arbitrary, capricious and unreasonable.

296. The fact that the Plaintiff s septic system was designed to conform to DEP standards and required an NJPDES permit should have precluded any finding that the proposed wastewater disposal system would result in substantial detriment to the public good. The Board's denial of the requested relief in relation to its "significant concern over the increase in effluence" was erroneous and thus, arbitrary, capricious and unreasonable.

297. Additionally, given that the proposed septic system was designed to DEP standards and required an NJPDES permit, the Board's reliance on the purported 'zero tolerance' policy towards schools on septic systems in neighboring Lakewood Township was arbitrary, capricious and unreasonable as well.

298. The Board's denial, insofar as it was predicated on unspecified traffic concerns, was arbitrary, capricious and unreasonable for the reasons stated above.

299.   The School is located approximately three hundred feet from the Lakewood Township border. Given its close proximity to Lakewood, where the majority of its students would come from, the Board's concerns about "urban sprawl" are clearly unfounded, and the Board's denial of the requested relief on that basis was arbitrary, capricious and unreasonable as well.

300.   Building the School would further the public good and the purpose of the MLUL would be advanced by a deviation from the Code, which already permits the conditional uses of child-care centers, nursery schools, day-care centers and places of worship in the R-1 Zone, in that it facilitates the establishment of a school - which necessarily promotes public morals and general welfare.

**The Balancing Test**

301.   In refusing to conclusively accept that the School was an inherently beneficial use and therefore satisfied the Positive Criteria, the Board failed to engage in the balancing test mandated by law, and that too was arbitrary, capricious and unreasonable.

302.   The fourth step in the *Sica* test requires the Board to weigh the Positive Criteria against the Negative Criteria in order to determine whether, on balance, the grant of the use variance would cause substantial detriment to the public good. Self-evidently, in order to do this the Board must first establish not only whether both the Positive Criteria and Negative Criteria have been satisfied, but the underlying strength of the Plaintiff s case for each.

54

303.   Applying this, the potential detrimental effects of the School on the surrounding area - all of which could be mitigated through conditions of approval in any event - were required to be assessed relative to the public interest served by the School. In refusing to acknowledge that the Plaintiff had satisfied the Positive Criteria, it was impossible for the Board to fairly conduct the necessary balancing. That too was arbitrary, capricious and unreasonable.

## Parking Design Waiver

304.   The Board also erred in its decision to deny the design waiver for the parking requirements.

305.   As none of the students would be permitted to drive to school and all students would be required to come to school by bus, there would clearly be no benefit in requiring the Plaintiff to provide all 134 spaces. Denial of the design waiver was arbitrary, capricious and unreasonable as well.

WHEREFORE, Plaintiff Oros Bais Yaakov High School demands judgment in its favor and against the Board as follows:

a.   The Board's denial of the School's Application be declared in violation of the MLUL, and therefore, null and void and of no effect;

b.   The Board's denial was arbitrary, capricious and/or unreasonable, and therefore, be reversed; and

c.   Awarding the School such other relief as this Court deems equitable and just.

55

## COUNT II
### Violation of Religious Land Use and Institutionalized
### Persons Act of 2000 – "Nondiscrimination"
### 42 U.S.C. § 2000cc(b)(2)

306.   Paragraphs 1 through 305 are incorporated by reference as if set forth fully herein.

307.   Defendants have deprived and continue to deprive the Plaintiff of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that discriminates against it on the basis of religion and religious denomination.

## COUNT III
### Violation of Religious Land Use and Institutionalized
### Persons Act of 2000 — "Equal terms"
### 42 U.S.C. § 2000cc(b)(1)

308.   Paragraphs 1 through 307 are incorporated by reference as if fully set forth herein.

309.   Defendants have deprived and continue to deprive the Plaintiff of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that religious land uses them on terms that are less than equal to nonreligious assembly and institutional land uses.

## COUNT IV
### Violation of Free Exercise Clause
### United States Constitution, First Amendment

310.   Paragraphs 1 through 309 are incorporated by reference as if fully set forth herein.

#8901236.1

311. Defendants have deprived and continue to deprive the Plaintiff of its right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by discriminating against it and against religious land uses in a manner that is not the least restrictive means of achieving a compelling governmental interest.

## COUNT V
**Violation of Equal Protection Clause**
**United States Constitution, Fourteenth Amendment**

312. Paragraphs 1 through 311 are incorporated by reference as if fully set forth herein.

313. Defendants have deprived and continue to deprive the Plaintiff of its right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating it and against religious land uses in the imposition and implementation of their land use regulations.

## PRAYER FOR RELIEF ON COUNTS II-V

WHEREFORE, OROS BAIS YAAKOV HIGH SCHOOL respectfully requests that this Court grant the following relief:

a. A declaration that the Township of Jackson's land use ordinances, to the extent that they discriminate against the Plaintiff's land use, are void, invalid and unconstitutional on their face and as applied to the Plaintiff on the ground that they violate the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth

57

Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act;

b.  A declaration that the denial of the Plaintiff's variance application to the Board to permit it to use the Property for religious education is void, invalid and unconstitutional on the ground that it violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act;

c.  An order reversing the decision of the Jackson Township Zoning Board of Adjustment and an order declaring that the Plaintiff's application for a use variance and other relief to use the Property for purposes of religious education is hereby approved;

d.  An order directing the Jackson Township Zoning Board of Adjustment to reverse its denial of the Plaintiff's application for a use variance and other variance relief and approve the application to permit the Plaintiff's use of the Property for purposes of religious education as applied for;

e.  An order directing the Defendants to permit the School's proposed use on its NC-zoned Property, and process all applications, certifications, or other approvals necessary for such use as if the School's use were permitted.

f.  Preliminary and permanent orders enjoining the Defendants, their officers, employees, agents, successors and all others acting in concert with them from

#8901236.1

applying their laws in a manner that violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act, or undertaking any and all action in furtherance of these acts;

g. An award of compensatory damages against Defendants in favor of the Plaintiff as the Court deems just for the loss of its rights under the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act incurred by the School and caused by the Defendants' laws and actions;

h. An award to the Plaintiff of full costs and attorneys' fees arising out of Defendants' actions and land use decisions and out of this litigation; and

i. Such other and further relief as this Court may deem just and appropriate.

WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys for Plaintiff
Oros Bais Yaakov High School

DATED:    June 14, 2017                 By:_____
                                        DONNA M. JENNINGS, ESQ.

59

#8901236.1

## CERTIFICATION

Pursuant to R. 4:5-1

Pursuant to R. 4:5-1, I hereby certify that this matter is not the subject of any other action pending in any other court or any pending arbitration proceeding and that no such action or arbitration proceeding is contemplated at this time.  I do not know of any other party who should be joined in this matter.

WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys for Plaintiff
Oros Bais Yaakov High School

DATED:      June 14, 2017                      By:_____
DONNA M. JENNINGS, ESQ.

## CERTIFICATION

Pursuant to R. 4:25-4

Pursuant to R. 4:25-4, DONNA M. JENNINGS, ESQ., is hereby designated as trial counsel for Plaintiff in this matter.

WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys for Plaintiff
Oros Bais Yaakov High School

DATED:      June 14, 2017                      By:_____
DONNA M. JENNINGS, ESQ.

60

#8901236.1

## CERTIFICATION

Pursuant to R. 4:69-4

Pursuant to R. 4:69-4, I hereby certify that all transcripts have been filed with the Court.

WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys for Plaintiff
Oros Bais Yaakov High School

DATED:      June 14, 2017                    By:_____
                                                  DONNA M. JENNINGS, ESQ.

61

#8901236.1