# EXHIBIT B

# 𝔖𝔲𝔭𝔢𝔯𝔦𝔬𝔯 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔑𝔢𝔴 𝔍𝔢𝔯𝔰𝔢𝔶

CHAMBERS OF
JUDGE MARLENE LYNCH FORD
ASSIGNMENT JUDGE



OCEAN COUNTY COURT HOUSE
P.O. BOX 2191
TOMS RIVER, NJ 08754-2191
732-929-2176

October 19, 2015

Steven I. Pfeffer, Esq.
Levin, Shea & Pfeffer, P.A.
2105 W. County Line Road, #3
Jackson, New Jersey 08527

Sean D. Gertner, Esq.
Gertner, Mandel & Peslak, LLC
P. O. Box 499
Lakewood, New Jersey 08701

**RE: Oros Bais Yaakov High School v. The Zoning Board of Adjustment for the Township of Jackson**
Docket No. OCN-L-2981-14

Dear Counsel:

The following shall set forth the court's decision.

## Summary

The matter before the court is an action in lieu of prerogative writs brought by plaintiff, Oros Bais Yaakov High School (High School), challenging defendant's, the Zoning Board of Adjustment for the Township of Jackson (Board's), denial of plaintiff's application for a use variance pursuant to N.J.S.A. 40:55D-70d(1) to permit construction of a high school on a 7.5 acre parcel of land in an R-1 residential zone, and a design waiver pursuant to N.J.S.A. 40:55D-51(b) to reduce the number of parking spaces required.

1

Plaintiff filed three counts against defendant. By an order entered by the court on February 12, 2015, Counts two and three were bifurcated. Accordingly, this trial only addresses Count one, which alleges that the Board's decision denying the application was arbitrary, capricious and unreasonable pursuant to the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163. Plaintiff seeks a judgment invalidating and reversing the Board's denial.

### Background

Plaintiff is the contract purchaser of property (Property) identified as Block 21401, Lot 6 on the current Tax Map of Jackson Township. Defendant, the Board, is a municipal agency organized pursuant to N.J.S.A. 40:55D-69 in the Township of Jackson, New Jersey. The site is approximately 7.5 acres in size and is located at 38 Cross Street within Jackson Township's R-1 residential zone (R-1 zone). This zone does not list schools as permitted, accessory, or conditional uses.

On or about August 16, 2013, plaintiff submitted an application to the Board for a use variance pursuant to N.J.S.A. 40:55D-70d(1) to allow it to construct a new high school building on the Property and a design waiver pursuant to N.J.S.A. 40:55D-51(b) to provide 81 parking spaces rather than 134 spaces required under § 244-197(N)(1) of the Code of the Township of Jackson (Code). Plaintiff proposed to service the school by an onsite potable well and a septic system. The applicant further proposed egress and ingress at Cross Street.

The Board held five hearings on October 2, 2013, November 20, 2013, February 5, 2014, April 2, 2014, and June 18, 2014. During the discussions at the hearings, plaintiff proposed the following conditions intended to mitigate the impact of the school:

    i.    No more than 400 students would be permitted to attend the High School;
    ii.    The High School would remain closed from July to September;
    iii.    All students would be required to take the bus to school and not permitted to drive to school;

2

     iv.   Setting the High School four hundred feet back from the Galassi Court rear property line, instead of the fifty-foot buffer that is required;

     v.   Orienting the building so that the side yards are larger than would be required by law;

     vi.   Including a water treatment system, which is not required by the Ocean County Health Department;

     vii.   Drilling a well down 500 feet – rather than 80-125 feet – into the next confined aquifer;

     viii.   Providing curbing, pedestrian access and landscaping for the driveway; and

     ix.   Offering the Board three options as to the number of parking spaces required on the Property including providing the number required by the Code.

On September 3, 2014, the Board denied the requested use variance relief and parking design waiver and memorialized the decision in Resolution 2014-35. The Resolution recited the testimony at the hearings and explained the Board's concerns about the application.

The school proposed by the application is a private girls' high school for 400 girls from grades nine through twelve. Almost all the students are residents of Lakewood. The school is not accredited. Nevertheless, it provides a mix of secular and religious education and the study subjects allow the graduated to enter a range of professional fields, including law, medicine, business administration, accounting, and therapy. Plaintiff testified that the graduation rate for the school's last graduating class was 100%, 51 out of 51 students.

Dr. Richard Farber, an education expert from the objector, testified that many private schools in the state are not accredited. He also testified that the recommended site size for a high school in New Jersey by the American Society of Planning Officials is twenty (20) acres, plus one acre for each 100 students and the smallest plot for a four-hundred-student school is ten acres with appropriate zoning. Plaintiff testified that after searching for a school site for over two years, they chose this property because this property was much cheaper than other properties they looked.

Andrew Thomas, a planner from the objector, testified that there were already at least three similar private high schools for girls in the nearby area in Lakewood and there were five school projects proposed along Cross Street in Lakewood that have been approved or are under construction, which would educate approximately 492 additional students. He also opined that building this school in Jackson would contribute to urban sprawl in Jackson because the overall population density of Jackson is 548 persons per square mile while Lakewood had 3,713 persons per square mile according to the 2010 census.

As to traffic impact, plaintiff testified that the maximum student population would be 420 and most students would arrive by buses. Moreover, plaintiff testified that students may not obtain a driver's license as a condition of entrance to the school. Plaintiff, however, stated that pick-up and drop-off would be permitted. Plaintiff's traffic engineer assumed that there would be twenty trips daily for ten school buses, twenty-five administrative staff would be on site during a typical day, and the hours of operation are essentially eight to five, Monday through Friday with no activities on weekends, and no activity during the summer. Based on such assumption, plaintiff's traffic engineer concluded that the proposed school driveway would operate at an acceptable "C" level of service during the morning peak hours and at a "D" level of service during the afternoon peak hours, which should not create a negative impact on Cross Street or at the Cross Street intersection. On the other hand, the Board's traffic expert was concerned that if plaintiff built 134 parking spaces in accordance with the Jackson ordinance requirements and that the parking spaces were used, there would be a higher traffic generation from the site. Plaintiff's expert responded that it was unnecessary to provide 134 spaces and the best option would be to land bank 53 spaces.

4

Regarding school busing, plaintiff testified that the vast majority of the students come from Lakewood and state law mandates Lakewood, the municipality where a child resides, be responsible for the cost of transporting the child to the school. Members of the Board expressed concern that school busing could be reduced due to budget deficits in the Lakewood Township School District. Plaintiff responded that the school could not open without the provision of busing because the state mandates the transportation of out of district students to a private school.

In terms of the impact on adjacent residential homes, the Board was concerned about the increase of effluent from the school as compared to the residential uses as of right. The Board Engineer testified that the septic system would produce over 4,000 gallons of effluent a day versus 1,300 gallons produced by its intended use. The increase was approximately 300%. Plaintiff's expert offered that the waste water management system would use pressure dosing and not rely upon gravity to create flow and it would consist of three 1500 gallon septic tanks, a pressure-dosing system, and a 3200 square feet bed for everything to be distributed. Nevertheless, the Board found that plaintiff did not provide any supporting soil tests, reports, studies, and like information to demonstrate that the property is suitable to accommodate the proposed onsite disposal of wastewater generated by the project.

Moreover, plaintiff's expert opined that plaintiff sought to minimize disturbance to the neighboring properties by situating the building more than 400 feet from the Galassi Court neighborhood, as well as supplementing the buffer with plantings and landscaping to the south. Furthermore, plaintiff would offer to drill 500 feet for water, rather than 90 feet most local well were drilled, in order to eliminate concerns about drawdown from the school's well to the surrounding property owners. As to the Board's concerns of the use of the pool, plaintiff testified

5

that the proposed enclosed pool would only be used during the school year and plaintiff was willing to include restrictions on use of the pool not only in the resolution but as a deed restriction as well.

In the Resolution, the Board not only questioned the credibility of plaintiff's testimony in general, but also was concerned about the long-term viability of the school. If the school failed, there would be an edifice in a residential zone, which would engender additional requests to expand its use to insure viability of the structure. Moreover, the Board was concerned that they could not create or fashion enforceable conditions on plaintiff that could be controlled or monitored that would alleviate some of the negative criteria.

The Resolution stated that the Board "focused upon the four-part Sica balancing test" and set forth the Board's findings as follows:

> The Board noted that as Mr. Thomas testified, though one could look at special reasons such as the general notion of promoting public health, safety, morals, and general welfare, the Applicant failed to show that the granting of the variance would ensure that development would not conflict with the development and the general welfare of neighboring municipalities, the county, and state as a whole, nor would promote the establishment of appropriate population densities and concentrations that would contribute to the well-being of persons, neighbors, communities, and regions, and preservation of the environment. Thus, the Board found that the Applicant had not proved by a perponderance [sic] of the evidence presented, that the granting of the variance, even if it could impose reasonable conditions, would not substantially impair the intent and purpose of the zone plan and zoning ordinance. Thus, the Board believed that the use was intense for the neighborhood and itsw [sic] existing character and that water, septic, traffic safety and design concerns could not be mitigated so to alleviate those concerns. The Board further agreed that granting the application would encourage urban sprawl into a well-settled residential neighborhood such that it would substantially undermine the existing characteristics of the neighborhood and the zone plan.

At the end, the Resolution set forth the Board's findings of fact and law for the denial of the application as follows:

> 1. The Applicant is the contract purchaser of the subject property and has a proprietary interest in this application; and

6

2. The subject property is located at 38 Cross Street and is designated as Block 21401, Lot 6 in the R-1 zone; and

3. The Applicant could not prove that the public interest at stake in this instance was of such import that was to require the Board to approve the application as submitted with the amendments proffered during testimony; and

4. Even if the Board accepted an argument that the school as proposed was inherently beneficial, the Applicant was unsuccessful in providing evidence to the Board supporting the granting of the use and other variance(s) requested;

5. There remained significant concern over the increase in effluent to be generated at the site as compared to that which would be generated by uses as of right that were more in line with the existing character of the neighborhood;

6. There remained significant concern over the actual traffic to be generated at the site, and the Board was not convinced that all the underlying assumptions upon which the Applicant's expert based his conclusions, could be reasonably enforced;

7. There remained significant concern that the granting of the use variance would ultimately benefit Jackson Township, or for that matter Lakewood Township, the Board finding credence in the objector's planning testimony.

On October 15, 2014, plaintiff filed a complaint in lieu of prerogative writs challenging the Board's denial of their application by alleging three counts (1) the Board's decision on the application was arbitrary, capricious and unreasonable; (2) the Board's decision to deny plaintiff's request to develop a parochial school in the R-1 zone but to permit development of secular schools in the R-1 zone violated the Equal Terms Clause, 42 U.S.C.A. § 2000cc-(b)(1); (3) the Board's unequal treatment of plaintiff's application also violated the "Nondiscrimination" provision of Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C.A. § 2000cc-(b)(2). By the court order dated February 12, 2015, Counts two and three of plaintiff's complaint were bifurcated. Accordingly, this trial only addresses Count one. At issue is even if the school as proposed qualified as an inherently beneficial use, whether the school satisfies the negative criteria requirement for D variance namely whether granting D variance would result in substantial detriment to the public good and substantial impairment of the zone plan and zoning ordinance.

7

**Findings**

**Standard of Review**

The court's role in reviewing determinations of local planning boards or zoning boards is clearly defined by case law. Such boards are independent administrative bodies acting in a quasi-judicial manner. Dolan v. De Capua, 16 N.J. 599, 612 (1954). The board's powers are statutorily derived. See Duffcon Concrete Prods., Inc. v. Cresskill, 1 N.J. 509, 515–16 (1949). Accordingly, a trial court must view the actions of a board as presumptively correct. Rexon v. Bd. of Adjustment of Haddonfield, 10 N.J. 1, 7 (1952). The boards, because of their peculiar knowledge of local conditions, must be allowed wide latitude in their delegated discretion. Ward v. Scott, 16 N.J. 16, 23 (1954). The burden of proof rests with the challenging party and the standard of review is whether the decision can be found to be arbitrary, capricious or unreasonable. Kramer v. Bd. of Adjustment of Sea Girt, 45 N.J. 268 (1965). Judicial review is intended to determine the validity of the board's actions, not to substitute the court's judgment therefor. Peoples Trust Co. v. Hasbrouck Heights Bd. of Adjustment, 60 N.J. Super. 569, 573 (App. Div. 1959); Rowatti v. Gonchar, 101 N.J. 46, 51–52 (1985). "Courts give greater deference to variance denials than to grants of variances, since variances tend to impair sound zoning." Medical Ctr. at Princeton v. Twp. of Princeton Zoning Bd. of Adjustment, 343 N.J. Super. 177, 198–99 (App. Div. 2001) (citing Cerdel Constr. Co. v. Twp. Comm. of East Hanover, 86 N.J. 303, 307 (1981); Mahler v. Bd. of Adjustment of Fair Lawn, 94 N.J. Super. 173, 186 (App. Div., 1967), aff'd, 55 N.J. 1 (1969)).

**Variance pursuant to N.J.S.A. 40:55D-70d(1)**

For N.J.S.A. 40:55D-70(d) variance, there is strong legislative policy favoring planning by ordinance rather than by variance. An applicant has the burden of proving "special reasons" in

order to obtain relief under subsection (d). The permissible variances under N.J.S.A. 40:55D-70(d) include:

> (1) a use or principal structure in a district restricted against such use or principal structure, (2) an expansion of a nonconforming use, (3) deviation from a specification or standard...pertaining solely to a conditional use, (4) an increase in the permitted floor area ratio...(5) an increase in the permitted density...except as applied to the required lot area for a lot or lots for detached one or two dwelling unit buildings, which lot or lots either an isolated undersized lot or lots resulting from a minor subdivision or (6) a height of a principal structure which exceeds by 10 feet or 10% the maximum height permitted in the district for a principal structure.

> [N.J.S.A. 40:55D-70(d).]

The New Jersey Supreme Court set forth a standard for "d" variances in Kohl v. Mayor and Council of Fair Lawn, 50 N.J. 268 (1967) that, in addition to the special reason, there must also be a finding that the use is peculiarly fitting to the particular location for which the variance is sought. This rule was upheld and enhanced twenty years later in Medici v. BPR Co., 107 N.J. 1 (1987), when the Court stated that the variance approval also required:

> an enhanced quality of proof, as well as clear and specific findings by the board of adjustment, that the grant of a use variance is not inconsistent with the intent and purpose of the master plan and zoning ordinance. Such proofs and findings must satisfactorily reconcile the grant of a use variance with the ordinance's continued omission of the proposed use from those permitted in the zone, and thereby provide a more substantive basis for the typically conclusory determination that the variance "will not substantially impair the intent and purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70(d).

> [Medici, supra, 107 N.J. at 4.]

Pursuant to N.J.S.A. 40:55D-70(d), a Board of Adjustment has the authority to grant such a variance and permit the development of a nonconforming use on a zoned parcel of land "in particular cases and for special reasons." In order to obtain a use variance under N.J.S.A. 40:55D-70(d), applicants have the burden of showing both positive and negative criteria.

Regarding the positive criteria requirement, it has been well recognized by case law that there are three categories of circumstances in which the "special reasons" required for a use variance may be found: (1) where the nonconforming use will inherently serve the public good, such as a school or hospital, or public housing facility, see Sica v. Bd. of Adjustment of Twp. of Wall, 127 N.J. 152, 159–60 (1992); (2) where the use would serve the general welfare because the "proposed site is particularly suitable for the proposed use," Smart SMR v. Fair Lawn Bd. of Adjustment, 159 N.J. 309, 334–36 (1998); or (3) where the property owner would suffer "undue hardship" if compelled to use the property in conformity with the permitted uses in the zone, see Medici, supra, 107 N.J. at 17 n.9.

As to the negative criteria requirement, applicants must provide the Board with an enhanced quality of proof and clear and specific findings "that the variance will not 'substantially impair the intent and purpose of the zone plan and zoning ordinance,' N.J.S.A. 40:55D-70(d) [and] must reconcile the proposed use variance with the zoning ordinance's omission of the use from those permitted in the zoning district." Medici, supra, 107 N.J. at 21. In Sica, the Court noted that "[j]ust because an institution is thought to be a good thing for the community is no reason to exempt it completely from restrictions designed to alleviate any baneful physical impact it may nonetheless exert in the interest of another aspect of the public good equally worthy of protection." Sica, supra, 127 N.J. at 162, (quoting, Roman Catholic Diocese of Newark v. Borough of Ho-Ho-Kus, 47 N.J. 211, 221 (1966)).

Nonetheless, the Sica Court noted that a too-strict reading of the negative criteria "can result in the denial of many deserving inherently beneficial uses, which 'should have the right to locate on any appropriate site where the physical impact of their operations can be alleviated to a reasonable extent by the imposition of suitable conditions and restrictions.'" Sica, supra, 127 N.J.

at 162. The Court suggested that "reasonable restrictions may be a more temperate response than a complete rejection of needed regional facilities." Ibid. In Roman Catholic Diocese of Newark, the Court described the problem posed by an unrestricted ban on such facilities:

> Regional or, for that matter, local institutions generally recognized as serving the public welfare are too important to be prevented from locating on available, appropriate sites, subject to reasonable qualifications and safeguards, by the imposition of exclusionary or unnecessarily onerous municipal legislation enacted for the sake of preserving the established or proposed character of a community or some portion of it . . . or to further some other equally indefensible parochial interest. And, of course, if one municipality can so act, all can, with the result that needed and desirable institutions end up with no suitable place to locate.
>
> [Roman Catholic Diocese, supra, 47 N.J. at 222.]

The Sica Court also found that when determining whether to grant a use variance, courts must still balance the positive and negative criteria because "although N.J.S.A. 40:55D-70d does not expressly require a balancing of the positive and negative criteria, the need for balancing is implicit in the statutory requirement that a grant of a variance must be 'without substantial detriment to the public good.'" Sica, supra, 127 N.J. at 164 (quoting, Medici, supra, 107 N.J. at 22). Not every detriment will support the denial of a use variance under the legislative scheme, "only one that is substantial will suffice." Ibid.

> The facts of each case will demonstrate the extent to which an inherently beneficial use compensates for its adverse effect on the neighborhood. Any non-residential use is bound to produce some adverse effect. When the impact of that effect is significant, the balance may tip toward denial. Because of an inherently beneficial use's satisfaction of positive criteria, a minimal effect, however, would support a finding that the detriment is not substantial.
>
> [Ibid.].

In Sica, the Court suggested the following four-part test to balance the positive and negative criteria:

> First, the board should identify the public interest at stake. . . .

11

Second, the Board should identify the detrimental effect that will ensue from the grant of the variance. Certain effects, such as an increase in traffic, or 'some tendency to impair residential character, utility or value,' will usually attend any nonresidential use in a residential zone. When minimal, such an effect need not outweigh an inherently beneficial use that satisfies the positive criteria.

Third, in some situations, the local board may reduce the detrimental effect by imposing reasonable conditions on the use. If so, the weight accorded the adverse effect should be reduced by the anticipated effect of those restrictions.

Fourth, the Board should then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good.

[Sica, supra, 127 N.J. at 165–66].

The Court stated that this balancing makes it more difficult for municipalities to exclude inherently beneficial uses, but permits their exclusion when the negative impact is significant and preserves the right of the municipality to impose appropriate conditions on such uses. Sica, supra, 127 N.J. at 166.

**Positive Criteria**

Here, the Board did not decide on the positive criteria requirement, although the Board, in its brief, stated that "it accepted the Plaintiff's argument that the school as proposed was an inherently beneficial use." Nonetheless, the Board found that there was no need for another similar private high school in this specific location because there were already approximately seven other such schools along this road alone.

After reviewing the record, the court finds that the school constitutes an inherently beneficial use that satisfies the positive criteria. Because the proposed use of the property is "for general school purposes" and this school would "provide an accepted equivalent for public schooling," it is "presumptively in furtherance of the general welfare." Trinity Evangelical Lutheran Church v. Bd. of Adjustment, 72 N.J. Super. 425, 430 (App. Div. 1962). The fact that

12

the school will mainly serve children of Lakewood rather than Jackson "constitutes no infirmity in a zoning sense." Ibid. Nonetheless, the court finds the record adequately supports the Board's finding there is no need for this school in this specific location as there are already at least three similar private high schools for girls in the nearby area in Lakewood and five school projects proposed along Cross Street in Lakewood that have been approved or are under construction. These schools would educate approximately 492 additional students. This subject property, therefore, does not possess any special characteristic that makes it particularly suitable for the proposed use.

**Negative Criteria**

The Board submits that even assuming that the school qualified as an inherently beneficial use, the application does not satisfy the Sica balancing test, weighing the negative and positive criteria. The Board determined that granting the variance would result in substantial detriment to the public good and substantial impairment of the zone plan and zoning ordinance, which concerns could not be reasonably mitigated.

The Board first and foremost found that the granting of the use variance would substantially undermine the Master Plan in that the proposed use is not compatible and out of character with the existing rural residential character of the R-1 zone. The Master Plan states that "[e]xcept in unique circumstances, land development ordinances should recognize the neighborhoods that have been created and seek to enhance those residential communities. In other words, the extent of non-conformance with land use ordinances should be minimized."

As to the Low Density Residential (R-1) Planning District, the Master Plan states as follows:

> The intent of the Low Density Residential (R-1) planning district is to recognize the extensive existing low density single family residential development

13

in the Township and to permit continued development at this intensity on lots that have access to public sewage. The objective of the planning district is to make the existing residential development conform with the Land Use Plan and to enable limited in-fill development of the same nature and intensity that connects to public infrastructure.

. . .

The intent of the R-1 planning district is to recognize the extent of the low-density single family residential development in the Township and to allow for its continuation and maintenance in conformance with the Land Use Plan.

In other words, the objective of the Master Plan for R-1 zone is to limit the development in order to maintain and protect the existing low density residential character of the neighborhoods by excluding schools from articulated permitted uses. On the other hand, the Master Plan created the Public Facilities and Education (PFE) zone to designate lands for public facility and educational uses. The Township rezoned all schools located within its borders as a PFE zone. Any school, public or private, remaining in the R-1 zoning district instead of PFE zone is a pre-existing non-conforming use. For example, at the time of the construction of Liberty High School and Elms School, schools were permitted uses in the R-1 zoning district. When the Board approved a preliminary and final major site plan for St. Aloysius School, a private parochial school located in an R-1 zone, to extend an existing school, schools were conditional uses in the R-1 zoning district.

Moreover, after the new Master Plan was adopted, private or parochial schools not operated for profit remain permitted in the R-2, R-3, and R-5 residential zones, but not in R-1 zone. The change in the Master Plan to exclude schools from the permitted uses of R-1 zoning district demonstrates that the drafters of Township's Master Plan sought to protect R-1 zone's existing low density residential character.

Additionally, the Board accepted the testimony of Dr. Farber, who opined that the property is too small for a high school. He testified that the recommended site size for a high

14

school in New Jersey by the American Society of Planning Officials is 20 acres, plus one acre for each 100 students, with a minimum of ten (10) acres for 400 students. The Board suggested plaintiff purchase the adjacent 7.5 acre lot to mitigate the negative impact, but plaintiff chose not to do so. The Board, in their Resolution, also found that the ratio of students to acres of the pre-existing schools in the R-1 zone are substantially larger than what was proposed here. Furthermore, the Board determined the following negative impacts on the public good: the school would generate more effluent than what other permitted uses in the R-1 zone would generate; the school would increase traffic; the school would create urban sprawl; the school would generate increase of use of water affecting the neighboring property.

In response to the Board's concern about the effluent, plaintiff claims that the proposed septic system was designed to conform to the New Jersey Department of Environmental Protection (NJDEP) standards and a New Jersey Pollutant Discharge Elimination System (NJPDES) permit should ensure that the proposed wastewater disposal system would not result in substantial detriment to the public good. Dowel Assocs. v. Harmony Twp. Land Use Bd., 403 N.J. Super. 1, 29, 35 (App. Div. 2008) (holding that NJDEP has the exclusive jurisdiction and required expertise to evaluate the location, design, construction, and operation of a septic system and a granted permit protects the interests of the Township and its citizens). As to the traffic concern, plaintiff argues that plaintiff volunteered to subject itself to three conditions in order to mitigate the impact of the school: (1) capping the enrollment at 400 students; (2) placing a cap on the number of staff permitted on site; (3) requiring students to come to school by bussing. Plaintiff asserts that the conditions are enforceable and when the conditions are put in place, the traffic would operate at an acceptable "C" Level of Service. In terms of the Board's concern on

urban sprawl, plaintiff claims that there would be no urban sprawl for Jackson when the majority of students come from Lakewood.

The Board, however, did not find credible the testimony of plaintiff's expert related to the enforceability of conditions designed to mitigate prospective detrimental effects that would be created by the proposed use. For example, the Board found that parking and traffic problems will become exacerbated if this school continues to expand and grow in the future. The Board was unconvinced that the underlying assumptions upon which plaintiff's traffic engineer based his conclusions could be reasonably enforced. The Board claims that plaintiff failed to adequately address the enforcement mechanism to control the number of students enrolling at the school, the uses of the site in the summer, assemblies, and limitations on student vehicles. Finally, the Board determined that the negative impact of granting the variance and waivers would outweigh the inherently beneficial use as an educational center, when weighing the need for the proposed school against the substantial detriment it found would be causing to surrounding residential properties in the R-1 zone.

Here, by reviewing the Board's findings of fact and reasoning in light of the statute and case law, the court finds that the record supports the Board's determination that granting the application would substantially undermine the existing characteristics of the rural residential neighborhood and the zone plan. The court further finds that the Board's conclusion that mitigating conditions proposed by plaintiff are not sufficient to tip the balance in applicant's favor, and are not likely enforceable is reasonable and supported by the record. For the application at dispute, the Board conducted five hearings, considered the testimony of various experts and witnesses, and reviewed the documentation submitted by plaintiff, an objector, and the public. Thereafter, the Board articulated the basis of its determination in the Resolution.

16

The court finds that the Board successfully conducted the Sica balancing test by weighing the positive and negative criteria in order to determine that on balance the grant of the variance would cause a substantial detriment to the public good. First, the Board identified the public interest at stake by conceding that the school as proposed constituted an inherently beneficial use.

Second, the Board identified the detrimental effect that will ensue from the grant of the variance. It argues that the non-permitted use of school would substantially undermine the articulated purpose of the Master Plan for an R-1 zoning district. The Master Plan states that "[t]he intent of the Low Density Residential (R-1) planning district is to recognize the extensive existing low density single family residential development in the Township and to permit continued development at this intensity on lots that have access to public sewage. The objective of the planning district is to make the existing residential development conform with the Land Use Plan and to enable limited in-fill development of the same nature and intensity that connects to public infrastructure." A school of the intensity, size, scale, and scope as proposed would create densities of scale and scope beyond what is permitted and intended by the Master Plan and the existing low density residential character of the R-1 zone. Moreover, the school would have an adverse impact on the residential neighborhood, including increase of traffic and noise, intensification of water usage, a change in the neighborhood characteristics and reliance upon a septic system in the absence of sanitary sewer. Furthermore, the Board was concerned about the long-term viability of the school. If the school failed and was closed, or relocated, the unused building would engender additional requests to expand its use to insure continued utility of the structure.

17

Based on the record, the court finds that the conclusions of the Board were reasonable in that the granting of the variance would not "promote the establishment of appropriate population densities and concentrations," rather that it would "substantially impair the intent and purpose of the zone plan and zoning ordinance." The Board's determination that "the use was intense for the neighborhood and itsw [sic] existing character," and that the application would "encourage urban sprawl into a well-settled residential neighborhood such that it would substantially undermine the existing characteristics of the neighborhood and the zone plan," are amply supported by the record and within the presumptively valid exercise of discretion by the Board.

Third, the Board determined that the detrimental effect cannot be mitigated by imposing reasonable conditions on the use. For example, the Board was not convinced that the underlying assumptions upon which plaintiff's traffic engineer based his conclusions could be reasonably enforced because plaintiff failed to adequately address the enforcement mechanisms to control the number of students enrolling at the school, restrict the uses of the site in the summer, limit student vehicles in order to reduce the adverse effect, and besides school bus, pick-up and drop off of students would be permitted. Moreover, the Board's traffic expert was concerned that if plaintiff built 134 parking spaces in accordance with the Jackson ordinance requirements and that the parking spaces were used, there would be a higher traffic generation from the site. Furthermore, the Board believed that the number of part-time employees may have an effect upon trip generation. As to the waste disposal system, the Board pointed out that showers and sinks have not been included in the application, which could change the requirements of the septic system. Accordingly, the court finds that the Board articulated legitimate reasons why the conditions proposed by plaintiff would not mitigate the detrimental effect imposed by the grant of this application.

Fourth, the Board weighed the positive and negative criteria and determined that the inherently beneficial use of a school does not outweigh the negative impacts that this project would have on the surrounding area. The negative impacts the Board found far outweigh the positive impacts. The Board could reasonably conclude the need for this school in this specific location is minimal, as there are already at least three existing private high schools in Lakewood in close proximity to this site, and five school projects proposed along Cross Street in Lakewood that have been approved or are under construction. The Board also considered the proposed use would cause substantial detriment to the objectives of the Master Plan and the public good in the neighborhood. In weighing the need for this school against the detriment caused to adjacent residential properties, the Board found that even though the school is an inherently beneficial use, the detriment caused to the Master Plan and adjacent residential properties outweighed the need for this school in this specific location. Given the broad latitude rendered to the Board, this conclusion is not arbitrary, capricious, or unreasonable. Consequently, the court finds that "on balance, the grant of the variance would cause a substantial detriment to the public good" and the application failed the negative criteria requirement for a variance pursuant to N.J.S.A. 40:55D-70d(1). Sica, supra, 127 N.J. at 165–66.

**Credibility**

Plaintiff argues that the Board unreasonably rejected the testimony of plaintiff's professionals as not credible or not supported by the evidence, and gave greater weight and credibility to the testimony of the objector's planner as well as the report and the testimony of its own professionals. For example, the Board questioned plaintiff's testimony regarding the use of the proposed pool. Plaintiff testified that the outdoor pool with an undescribed enclosure would not be used during the summer, but only during the academic year of September through June.

19

The Board questioned the very limited opportunity for use of the pool. Even though plaintiff offered to include the use restrictions not only in the Resolution but also as a deed restriction, the Board doubted that a deed restriction would be sufficient to limit the use of the pool in the future. According to the Board, such a deed restriction would either create a situation where the pool would have to be removed or that plaintiff would seek to lift the restriction in the future.

Moreover, the Board found that it could not justifiably rely upon the testimony of plaintiff's traffic expert. Instead, the Board believed its own expert's skepticism regarding the underlying assumptions upon which plaintiff's traffic engineer based his conclusions and whether these assumptions could be reasonably enforced. For example, plaintiff's traffic engineer based his conclusions on the assumption that school busing is the only means of delivery of students. The Board, however, heard other testimony that pick-up and drop-off of students would be permitted and that the number of part-time employees who drove to and from the school would have impact on trip generation.

Zoning boards have the choice of accepting or rejecting the testimony of witnesses, and where reasonably made, such decision will be conclusive on appeal. Kramer v. Bd. Of Adjustment, Sea Girt, 45 N.J. 268, 296 (1965); Omnipoint v. Bd. Of Adjustment, 337 N.J. Super. 398, 418 (App. Div. 2001), cert. denied, 169 N.J. 607 (2001). A board is not bound by the testimony of any expert. El Shaer v. Planning Bd., 249 N.J. Super. 323, 329 (App. Div. 1991), cert. denied, 127 N.J. 546 (1991). Boards are entitled to weigh the testimony of experts who give their opinions and ascribe such weight to those opinions as they deem appropriate under the circumstances of the case. "While a board may reject expert testimony, it may not do so unreasonably, based only upon bare allegations or unsubstantiated beliefs." New York SMSA v.

Bd. of Adjustment, 370 N.J. Super. 319, 338 (App. Div. 2004). The Appellate Division in Klug

v. Bridgewater Twp. Planning Bd., 407 N.J. Super. 1 (App. Div. 2009) explained:

> [A] planning board is not required to accept the testimony of any expert. El Shaer
> v. Planning Bd., 249 N.J. Super. 323, 330, 592, A.2d 565 (App. Div. 1991). certif.
> denied, 127 N.J. 546, 606 A.2d 360 (1992). If the testimony of different experts
> conflicts, it is within the Board's discretion to decide which expert's testimony it
> will accept. Hughes v. Monmouth University, 394 N.J. Super. 207, 232, 925, A.2d
> 750 (Law Div. 2006), aff'd, 394 N.J. Super. 193, 925, A.2d 741 (App. Div.), certify.
> denied, 192 N.J. 599, 934 A.2d 640(2007).
>
> [Klug, supra, 407 N.J. Super. at 13.]

In the instant case, based on the record and the testimony presented, the court finds that

the Board's decision to accept or reject the testimony of different witnesses was reasonable and

therefore conclusive. The Board is not bound by the testimony of plaintiff's experts. Because the

testimony of different experts conflicted, the Board is entitled to weigh the testimony of experts

who give their opinions and "decide which expert's testimony it will accept." Klug, supra, 407

N.J. Super. at 13. Under the circumstances of this case, the Board ascribed more weight to those

opinions of the objector's planner and its own professionals than to plaintiff's experts, based on

the Board's peculiar knowledge of local conditions and the discrepancy of the testimony in the

record rather than bare allegations or unsubstantiated beliefs. As such, the court finds that the

Board acted reasonably in rejecting the testimony of plaintiff's professionals as not credible and

giving more weight and credibility to the testimony of the objector's planner as well as the report

and the testimony of its own professionals than to plaintiff's expert and witnesses.

**Bias Comments**

Plaintiff argues that the comments from the Board members, John Suttles and Joseph

Schulman, as well as the Board's planner at the hearing were biased. Nevertheless, there is no

evidence that bias played any part in the determination of the Board or that the Board relied on testimony tainted by bias in making its determination memorialized in the Resolution.

"Such remarks at best reflect the beliefs of the speaker and cannot be assumed to represent the findings of an entire Board. Moreover, because such remarks represent informal verbalizations of the speaker's transitory thoughts, they cannot be equated to deliberative findings of fact. It is the resolution, and not board members' deliberations, that provides the statutorily required findings of fact and conclusions." New York SMSA, L.P., v. Bd. of Adjustment of Twp. of Weehawken, 370 N.J. Super. 319, 333–34 (App. Div. 2004).

The court finds plaintiff's bias argument without merit. Under the MLUL, it is the Board's resolution that reflects the deliberative and specific findings of fact and conclusions of law and, therefore, constitutes the official record of the Board's deliberations and ultimate denial of plaintiff's application. See N.J.S.A. 40:55D-10(g). The Resolution and the findings contained therein do not suggest or indicate that the Board members' deliberations were influenced by any testimony that was tainted by prejudice or bias. Therefore, the record does not support a finding that the Board treated plaintiff's proofs and expert evidence with improper partiality.

In sum, the court finds that the Board's resolution set forth adequate findings of fact and reasoning, which was entitled to the court's deference and permitted the court to make a full and thorough assessment of the hearings below. Judicial review is intended to determine the validity of the board's actions, not to substitute the board's well-reasoned determination with the court's judgment. Here, the Board's decision that plaintiff's application failed to meet the negative criteria required for the N.J.S.A. 40:55D-70d(1) variance was supported by substantial and competent evidence in the record before it and reflected a correct application of the relevant principles of land use law. Lang v. Zoning Bd. of Adjustment, 160 N.J. 41, 59 (1999). As the

22

court finds that the application failed the negative criteria requirement for the use variance, the court needs not address the parking design waiver requests. The court, therefore, finds that the Board's decision was not arbitrary, capricious or unreasonable. Furthermore, the court finds that the resolution of the Board was not the product of bias or a pre-disposition to deny plaintiff's application. As a result, as to Count one in plaintiff's complaint, the court enters judgment in favor of the Board. Mr. Gertner is to prepare the order that comports with the court's ruling with each party to pay its own attorney's fees and costs.

Respectfully submitted,

MARLENE LYNCH FORD, A.J.S.C.

MLF/yzh

23

# EXHIBIT C

Superior Court of New Jersey
Ocean County Court House
Order Prepared by the Court

```
┌──────────────────────────┐
│   F I L E D              │
│                          │
│      MAR 2 0 2019        │
│                          │
│  JUDGE COLLINS CHAMBERS  │
└──────────────────────────┘
```

---

**STATE OF NEW JERSEY**

v.

**WSNP, LLC**
Defendant

    :
    :
    :
    :
    :
    :
    :
    :
    :
    :

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - CRIMINAL PART
OCEAN COUNTY

Brick Township Municipal Court
No. 18-09

```
┌──────────────────────────┐
│   RECEIVED & FILED       │
│                          │
│      MAR 2 0 2019        │
│                          │
│     DEPUTY CLERK         │
│  SUPERIOR CT. OCEAN CO.  │
└──────────────────────────┘
```

**ORDER**

    **THIS MATTER** having come before the Court for de novo review on a municipal appeal of the above-named defendant, and the Court having considered the record below and submissions by the parties, and oral argument, and for good cause having been shown;

    **IT IS**, on this 20th day of March, 2019:

    **ORDERED** that the Defendant's appeal seeking to vacate the municipal court's decision and to remand the matteer is **DENIED**.

_____
MICHAEL T. COLLINS, J.S.C.

```
┌──────────────────────────┐
│   RECEIVED               │
│                          │
│      MAR 27 2019         │
└──────────────────────────┘
```

GILMORE & MONAHAN

**STATE OF NEW JERSEY,**                    :

v.



**WSNP, LLC,**

                    Defendant.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - CRIMINAL PART
OCEAN COUNTY

Brick Township Municipal Court
No. 18-09



**DECISION**

This matter was brought before the Court by Adam Pfeffer, Esq., on behalf of Defendant,

WSNP, LLC, and Michael S. Nagurka, Esq., representing the State.

## PRELIMINARY STATEMENT

WSNP ("Defendant") leased the property located at 146 South New Prospect

Ave. ("Property") in Jackson to Yoseph Ingber ("Ingber") on June 1st, 2017. The location of the

Property was zoned "residential" by the zoning regulations of Jackson. Once he moved in, Ingber

"invited" people to his home for religious services, specifically the Sabbath, on Fridays and

Saturdays.

Jeffrey Purpuro ("Purpuro") in his capacity as the Jackson Zoning Officer began an

investigation into the Property on June 28th, 2017. Purpuro investigated for 33 days, visiting the

Property approximately 33 times for inspection. On July 21st, 2017 with Defendant's knowledge,

Purpuro was finally able to investigate the interior of the Property. Purpuro found numerous

folding chairs and tables, but there was no dining table and the kitchen appeared unused. Purpuro

reported that there was no vehicle at the Property during most of his inspections. Purpuro also

reported that there was bedroom furniture and reported that he believed two bedrooms may have

been used.

RECEIVED

MAR 27 2019

1

GILMORE & MONAHAN

On July 31st, 2017 Defendant was issued a summons for violating of Jackson municipal ordinance 224-2.A(3) ("Ordinance"). Specifically, Defendant was charged with changing the use of the Property to a place of assembly without first obtaining approval from the Jackson planning board. A trial was held in Brick Township Municipal Court on June 4th, 2018. Both parties agreed during a pre-trial conference that if it were determined Ingber was, in fact, residing at the Property, then the charge would not stand. However, the State contended that from the time the ticket was written up to and throughout the trial that Ingber was not in fact residing at the Property.

Purpuro testified for the State at trial. Along with the previously mentioned observations, Purpuro testified that the folding chairs and tables found would not normally be used in a single family home. Purpuro observed no couch or furniture (beyond the limited furniture in the bedroom), a podium on the back porch, and a light in the attic that "had been on for weeks on end." Purpuro testified that in his ten years of investigating homes, he had never seen one like this. He testified that, beyond the two unmade beds and possibly a dresser in the two bedrooms, "in the rest of the house absolutely no evidence that anyone had-was ever living there."

James Arehill ("Arehill"), a neighbor, drove by the Property on a regular basis and testified to seeing anywhere from 40 to 50 people assemble at the address on the weekends and that at least 8 to 15 cars were parked at the property on the weekend. But during the week, Arehill stated he never saw any people or cars at the Property.

The property manager Yhuda Tomor ("Tomor") revealed during cross-examination of that he visited the Property many times, usually on Saturdays; that he was not an employee of WSNP; he was not paid by WSNP; he filled out the paperwork for the township when Ingber

began renting the Property and he did not meet Ingber before he began renting. Ingber also testified that Meyer Katz, the owner of Defendant, had visited the Property many times.

In upholding the conviction for the ordinance violation, the court stated it had to determine the primary use of the Property, not merely whether Ingber was residing there. The court found both Tomor and Ingber's testimony to be evasive and not credible. The court ultimately concluded the Property was being used as a place of assembly relying on the routine assembly of people at the Property on Friday evenings and Saturday mornings. The court explicitly stated it need not determine exactly what type of assembly was occurring at the Property, only that the Property was being used primarily as a place of assembly.

The court found that there can be multiple uses of a single property and that the finding of the Property being used for a residential purpose does not mean the Property could not also be used as a place of assembly. Therefore, the court found the Property was used as a place of assembly and accordingly found Defendant guilty for failure to seek and to obtain approval to change the use of the Property.

## ARGUMENTS

Defendant argues that controlling case law mandates incidental religious activity at a residence does not convert the residential use of that Property, therefore, holding services at the Property did not violate any ordinance. Defendant makes arguments stating that the ordinance seeks to prevent gatherings for religious purposes in violation of the US and New Jersey Constitutions. Defendant essentially argues the ordinance directly prohibits prayer and other religious services from being performed at the Property.

Defendant also argues the zoning ordinance is unconstitutionally vague because it does not use or define "place of assembly." Defendant argues that because an individual person would

3

not know from the ordinance what a "place of assembly" is or when it applies, application of the ordinance is arbitrary and capricious. Defendant argues the conviction must be vacated because the ordinance does not provide explicit standards for determining when a property is considered a "place of assembly."

Defendant submits the municipal court erred by expanding the narrow scope of the issues before it and the agreed-upon issue was whether Ingber was residing at the Property or not. Defendant argues the Brick court improperly analyzed whether the Property was being primary used as a place of assembly. In the alternative, Defendant also argues that even if the Brick court were authorized to determine the primary use of the Property, the State failed to prove beyond a reasonable doubt that the Property was being used as a place of assembly and not as a residence.

The State argues the municipal court properly interpreted the ordinance in upholding Defendant's conviction. The State argues the Jackson zoning ordinances clearly dictate that use of a residence in an R-1 zone is a conditional use which will be permitted so long as the proper application is made before the Jackson planning board. See §244-42, §244-47. The State argues this case is straightforward as Defendant failed to apply to the planning board before converting the primary use of the Property to a place of assembly. The State argues the Brick court properly assessed the testimony of the witnesses which established a factual basis supporting use of the Property as a place of assembly rather than simple residence.

The State also argues the present matter is distinguishable from cases cited by Defendant in its argument that the ordinance violated religious rights of Defendant and Ingber. The State argues Farhi v. Comm'rs of Deal, 204 N.J. Super. 575 (Law Div. 1985) does not control this case because incidental use of a Property for religious services was not the issue before the Brick court. The State argues Defendant's use was significant and regular, resulting in traffic

congestion as over fifty people congregated at the Property every weekend. Additionally, the State argues the fact that over fifty people per weekend congregating at the Property distinguishes this case from State v. Cameron, 100 N.J. 586 (1985), where twenty-five or so people would meet at a minister's home. The State submits that the number of people congregating at the Property establishes the Property's primary use is a place of worship. See Welch v. Chai Ctr. For Living Judaism, Inc. 2016 N.J. Super. Unpub. LEXIS 1906 (August 15, 2016). In Welch, the Appellate Division upheld a deed that prohibited a residence from being used as a shul to host social gatherings and to conduct religious services because the use was "dissimilar to the humble Property of the minister which was subject to review in Cameron." The State argues the Property is primarily a place of worship where Ingber may or may not reside, rather than a residence similar to the Cameron residence where a few individuals met routinely for religious services at a private residence.

## ANALYSIS

### A. Credibility of Witnesses

The Court feels compelled to first make findings regarding the testimony of the witnesses. Purpuro provided testimony for the State which established that the interior of the Property had an unusually high number of folding tables and chairs for a single family home; there was a podium on the back porch; the kitchen appeared unused and the only evidence of someone living in the Property was two unmade beds and a dresser. It was Purpuro's opinion, as a zoning enforcement officer with at least ten years' experience, that no one was or ever had resided in the Property. Additionally the State's other witness reported seeing no activity at the Property during the week, but a large number of people and cars there on Fridays and Saturdays. The Court finds the State's witnesses' testimony to be credible.

5

On the other hand, the Court finds the testimony of the witnesses for Defendant to be incredible. Defendant's witnesses routinely avoided directly answering questions, revised those answers when challenged and on occasion contradicted themselves. On some occasions it appeared Defendant's witnesses were fabricating facts as they testified. Specifically when Ingber was asked if Meyer Katz had ever visited the Property during the alleged assemblies, he testified as follows:

> "Q- Have you seen Mr. Katz for assembly?
> A- Yes
> Q- And how many times--
> A- Oh. Katz? Yeah.
> Q- And how many times would you say Mr. Katz has come for assembly?
> A- He's actually-- Meyer Katz? He's actually not there. No, he doesn't come.
> Q- So you did just say--
> A- I didn't see him to meet--and again, he comes. I do not, like--he does come, but I don't know how often.
> Q- But he has come.
> A- Yeah. He comes. He comes."

### B. Findings

The Court finds the Jackson zoning ordinances clearly list the permitted principle uses for a residence in the R-1 zone. §244-47(A). R1 Residential Zone. Those uses are community residence for the developmentally disabled, community shelters for victims of domestic violence and detached single-family dwelling units. Id. But the ordinance does not explicitly limited R-1 to just those three uses. Section (C) lists conditional uses of residences in R-1 zones, which include churches and places of worship. §244-47(C)(2).

In order to use R-1 residences for one of these conditional uses, the owner of the property must follow the procedural requirements of §244-108 and §244-115. Anyone seeking to use their property for one of the listed conditional uses must submit an application to the Jackson Planning Board for review. §244-108. The numerous procedural requirements listed are intended to insure

a balance between arising uses, activities, or structures that may be necessary in the residential zone with the desire to maintain the overall general welfare of the area. Id.

The Court finds these ordinances are not vague. Defendant argues the ordinances are vague because the municipal court found the property was improperly used as a place of assembly but the ordinances do not use the term "place of assembly". This argument is not persuasive because the facts clearly establish religious activities were occurring at the Property and places of worship are clearly listed under the conditional uses section.

There is no genuine dispute that religious activities occurred on a regular basis at the Property. Defendant admits religious activities routinely occurred at the Property when arguing that the ordinances violate Defendant's right of free expression of religion. The only dispute is over the primary use of the property. This Court finds that there was sufficient credible evidence to support the conclusion that the Property was being used primarily as a place of worship.

Defendant readily admitted individuals routinely gathered at the Property on the weekend for religious activities; Purpuro observed items, specifically a large amount of folding tables, chairs and a podium, routinely used to host large gatherings of people; a large volume of cars and people were observed at the Property on Fridays and Saturdays, but not during the week and Purpuro testified that based on his experience he concluded no one lived at the Property. These facts clearly support a finding that the Property was primarily used as a place of worship rather than a residence. Consequently Defendant's vagueness argument lacks merit because the language of the ordinance is clear that Defendant needed to make an application to the planning board before changing the primary use of the Property to a place of worship.

Finally, contrary to Defendant's argument, the Court finds that the ordinances allow for conditional uses of residences as places of worship and do not prohibit religious services from

7

being conducted on a property within the R-1 zones. The Court also finds it irrelevant whether

Ingber resided at the Property because the ordinances do not prohibit multiple uses of one

property.  Defendant was only required to submit an application to the Jackson planning board in

order to convert the primary use of the Property from a single family dwelling to a place of

worship. Defendant did not make this application prior to changing the primary use of the

Property. Accordingly, Defendant's appeal seeking to vacate the municipal court's ruling which

upheld Defendant's conviction under the ordinance is **DENIED.**

MICHAEL T. COLLINS, J.S.C.

8

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AGUDATH ISRAEL OF AMERICA, and WR PROPERTY LLC,**<br><br>    **Plaintiffs,**<br><br><br>**v.**<br><br>**TOWNSHIP OF JACKSON, NEW JERSEY,**<br><br>    **Defendant.** | **Civil Case No.**<br><br>**3:17--cv-03226-MAS-DEA**<br><br>**SCHEDULING ORDER** |

This matter, having come before the Court during a scheduling conference on July 17, 2019, and the Court having conferred with counsel concerning, and good cause appearing for the entry of the within Order:

IT IS on this _19ᵗʰ_ day of July, 2019,

**ORDERED THAT:**

1. Defendants Answer to the Second Amended Complaint shall be filed no later than July 18, 2019.

2. Any outstanding discovery requests shall be responded to by the parties no later than September 16, 2019.

3. The Parties must serve supplemental written discovery requests by September 1, 2019 and respond to supplemental discovery no later than October 15, 2019.

4. Each party shall be permitted to conduct 30 depositions. Each party is permitted to exceed the one-day/seven-hour limitation for their 30(b)(6) deposition; the amount of time to be determined by the parties who will confer beforehand on such limitations.

#10753812.1(168915.001)

5.  The parties shall file the ESI plan no later than July 25, 2019.

6.  Fact discovery, including depositions, is to be completed by March 15, 2020.

7.  Expert discovery, including depositions is to be completed by August 15, 2020:

    a.  To the extent that both Plaintiffs and Defendant have the burden of persuasion on separate elements of Plaintiffs/RLUIPA claims, *see* 42 U.S.C § 200cc-2(b), the parties shall serve expert reports concerning those issues on which they have the burden of persuasion simultaneously on May 15, 2020; rebuttal expert reports shall be served on July 1, 2020.  With respect to Plaintiffs' other claims, Plaintiffs shall serve their expert reports by May 15, 2020 and Defendant shall serve its response reports by July 1, 2020.  Rule 26(e)(2) supplementation of disclosures and responses shall be served by July 15, 2010.

    b.  Expert depositions shall not begin until after expert reports are served on May 15, 2010.

8.  Requests for Admissions shall be served by September 19, 2020.

9.  Dispositive motions are to be filed by December 1, 2020.

10. The Court will conduct a telephonic status conference during the pendency of the matter, to be held on October 21, 2019 at 9:30 am.  Counsel for Plaintiff to initiate.  During the call, the Court may set a schedule for the remainder of discovery and/or motion practice.

DOUGLAS E. ARPERT
United States Magistrate Judge

#10753812.1(168915.001)