**WILENTZ, GOLDMAN & SPITZER, P.A.**
Donna M. Jennings (DJ7790)
90 Woodbridge Center Drive
Post Office Box 10
Woodbridge, New Jersey 07095
*Co-Counsel for Plaintiff WR Property LLC*

**STORZER & ASSOCIATES, P.C.**
Sieglinde K. Rath (048131991)
Roman Storzer, *admitted pro hac vice*
1025 Connecticut Ave., N.W. Suite 1000
Washington, D.C. 20036
Tel: (202) 857-9766
*Counsel for Plaintiffs*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AGUDATH ISRAEL OF AMERICA, a New York non-profit corporation, and WR PROPERTY LLC, a New Jersey limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>TOWNSHIP OF JACKSON, NEW JERSEY, MICHAEL REINA, ROBERT NIXON, HELENE SCHLEGEL, JEFFREY PURPORO, WILLIAM CAMPBELL, and KENNETH PIESLAK,<br><br>Defendants. | **Civil No. 3:17-cv-03226** |

### NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiffs, Agudath Israel of America and WR Property LLC, hereby provides notice about two new decisions that were decided subsequent to the close of briefing on that Motion, and new evidence obtained through discovery conducted pertinent to Plaintiffs' Motion for Preliminary Injunction pending before this Court (ECF No. 55).

1

I.  NEW DECISIONS RELEVANT TO PLAINTIFFS' MOTION.

 A.  *431 East Palisade Avenue Real Estate, LLC v. City of Englewood.*

This Court's decision in *431 East Palisade Avenue Real Estate, LLC v. City of Englewood*, Civil No. 2:19-cv-14515-BRM-JAD, 2019 WL 5078865 (D.N.J. Oct. 10, 2019), is relevant to the preliminary injunction motion because it involved similar claims of discrimination by a municipality with respect to implementation of land use regulations. In that case, the plaintiffs sought to construct a facility for assisted living and memory care on property within an *eruv*, but in a residential district, where they were prohibited. In determining that the plaintiffs were likely to prevail on the merits of their facial claim that the City's ordinances discriminate, the Court held:

> The Court does not doubt that the creation of a health-care village for seniors may be a rational, even a desirable or laudable, goal for the City. However, the Court is persuaded that creating a Master Plan in which assisted-living centers are a permitted use in only one district, and not a primarily residential district at that, in order to create a "sense of a health care village" for seniors the City's Zoning Ordinances does have "the effect of limiting the ability of [handicapped and elderly individuals requiring congregant care] to live in the residence of their choice in the community." (citation omitted)

*Id.* at at *10.

In applying the burden shifting framework of *Mt. Holly Citizens in Action, Inc. v. Twp. of Mount Holly*, 2009 WL 3584894, at *3 (D.N.J. 2009), the Court noted that the Defendants "did not provide a nondiscriminatory reason for this disparate treatment." *Id.* at *11. This omission was one of the factors leading to the Court's conclusion that plaintiffs were likely to prevail on the merits of their claims, which is the first factor supporting the granting of a preliminary injunction. *Id.* at *12. Similar to the case at bar, the Defendants have offered no reason for the enactment of the challenged Ordinances. (ECF No. 58.)

Regarding the second factor, the Court found that "the erosion of residential housing opportunities for handicapped residents in the City" constituted the threat of irreparable harm because "[a]lleged discrimination in violation of the FHA is presumed to be irreparable harm." *Id.* (internal quotation marks removed). Similarly, here, Plaintiffs allege that residential housing opportunities for the Jewish population in Jackson have been eroded in violation of the FHA. The Court's opinion regarding the final two factors further support Plaintiffs' position. *Id.* at *13.

B.   *Congregation Rabbinical College of Tartikov v. Village of Pomona.*

Another recent decision of note is the Second Circuit's opinion in *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019). In *Tartikov*, Orthodox Jews sought to build a school to educate rabbinical judges in the Village of Pomona. After a multi-year battle waged in both the Village and the courts, the Second Circuit examined certain Ordinances that had been enacted in response to the development of the school, specifically "Dormitory" and "Wetlands" laws. *Id.* at 119. The Second Circuit found that the circumstances surrounding adoption of the Ordinances, including village residents' anti-Semitic sentiment and the correlating adoption of that sentiment by the public officials who voted for the same, supported an inference of discrimination. As succinctly put by the court:

> It is reasonable to conclude that Trustee Lamer's reminder that TRC opposed the amendments permitted an inference, supported by the other evidence we have cited, that the board was using facially neutral laws to discriminate against the one entity it knew was hoping to build a school in Pomona.
>
> The board members were present for the hearing and heard the villagers' comments.

*Id.* at 121.

> It is impossible for us to glean precisely how the board weighed the villagers' comments. . . . Some of those comments were susceptible to an inference of religious animus and hostility toward the group that would be affected negatively by the 2007 Dormitory Law. Viewing the record as a whole, including "the series of events" leading up to the adoption of the 2007 Dormitory Law, the "context in which the decision[s]" regarding the law were made, and "statements made by the decisionmaking body and community members," we cannot say that the district court clearly erred in finding that religious animus was a "significant factor in the position taken by . . . those to whom the decision-makers were knowingly responsive."

*Id.* at 122 (footnotes omitted).

The evidence regarding religious animus and adoption of the same by decision makers is much more extreme in this action than that which was before the court in *Tartikov*. The Plaintiffs submit that the opinion in *Tartikov* further supports Plaintiffs' request for a preliminary injunction with respect to the challenged ordinances.

## II.  NEW EVIDENCE SUPPORTING PLAINTIFFS' MOTION.

### A.  The Deposition of Ken Bressi.

On October 30, 2019, the Plaintiff in *Oros Bais Yaakov High School ("Oros") v. Twp. of Jackson*, Docket No. OCN-L-2981-14, pending in the Superior Court of New Jersey, Law Division, Ocean County, conducted the deposition of Jackson Township Councilman Kenneth Bressi. (*See* Declaration of Donna M. Jennings March 10, 2020, ¶ 4, **Exhibit A** ("Jennings Decl.").

Mr. Bressi, who has been on the Jackson Township Council for ten years and during the time when the challenged Ordinances 03-17, 04-17 (the "School Ordinances") and 20-17 (the "Eruv Ordinance") were enacted, testified to the following issues highly relevant to the Plaintiffs' Preliminary Injunction Motion pending before this Court (ECF No. 55):

4

A. There is hate in Jackson Township directed toward stopping "the Jews from moving into town." Jennings Decl. ¶ 3 (**Exh. A.**) at 21:2–24.

B. Mr. Bressi testified as follows:

> Q. So Mr. Nixon spoke to you about ways of stopping the Orthodox Jewish community from moving into Jackson Township?
>
> A. "We have to do stuff to stop it."
>
> Q. And just for the record was that a yes to that question?
>
> A. Yes.
>
> Q. And the same with Mayor Reina?
>
> A. Yes.
>
> Q. And the same with Mr. Calogero?
>
> A. Yes.

*Id.* at 41:14-24.

C. Jackson Township Mayor Michael Reina, Councilman Barry Calogero, and former Councilman Robert Nixon are directly responsive to the local group "Jackson Strong," known for its hostility toward the Orthodox Jewish community,[1] and "basically would not make a move without getting approval by them or if they want something done, they will do it for them." *Id.* at 38:8-20.

D. Jackson Strong "got involved very heavily . . . especially originally on the [*eruv*] wire situation." *Id.* at 38:2-3. Various Jackson Township residents raised the issue of *eruvs* with the Township. *Id.* at 206:24-207:5. There were no complaints prior to the ordinance being passed about anything in the right-of-way other than *eruvs*. *Id.* at 207:6-9.

E. Richard Egan[2] refers to the Orthodox community most of the time as "the beards" or "the hats." *Id.* at 57:14-18, 126:9-18. Mr. Egan stated to Mr. Bressi: "'Corporal, you got to understand. You got to raise money, raise money so you can fight them till they run out of money, until the laws change. You can't let them move into town.'" *Id.* at 125:11-14.

---

[1] See Jennings Decl. ¶ 11 **Exh. H.**

[2] Egan, a former Jackson Township Planning Board member, recently resigned that position because of his much publicized attendance at a secret meeting of CUPON, the so-called "Citizens United to Protect Our Neighborhoods," organized for the purpose of opposing Orthodox Jewish development. (Dkt. #55-2 ¶ 4, Exh. B.)

F.     Mr. Egan has also stated to Mr. Bressi, "'You better find ways to raise money to fight them to keep fighting until the laws change and we can do something or just wear them out.'" *Id.* at 126:5-7. Mr. Bressi has also testified with respect to Mr. Egan, "Whatever Jackson Strong wanted, they get. Whatever Rich Egan wants, Rich Egan gets <u>from the Mayor</u>." *Id.* at 38:18-20 (emphasis added).

G.     Mr. Bressi testified: "Mike [Reina] runs a very good camouflage. He wants something done, he goes to Rich Egan to carry it out." *Id.* at 39:16-18.

H.     Mr. Bressi further testified: "Mike Reina does nothing without Rich Egan. Jackson Strong, Elenor Hannum from their group." *Id.* at 22:4-6.

I.     Mr. Bressi testified that he has heard Mr. Reina say that he will "never let them have wires in this town," referring to *eruv* wires. *Id.* at 125:19-23. Reina was also behind Ordinance 20-17, the Eruv ordinance. *Id.* at 206:11-17.

J.     With respect to Defendant Nixon, Mr. Bressi testified: "[W]hen he got involved with the Orthodox stuff and everything else, I was surprised to see his attitude especially being pulled by his nose by Jackson Strong and -- and Mike Reina." *Id.* at 40:10-13. He further testified that Nixon's attitude is "Stopping Jews." *Id.* at 40:14-16.

K.     Defendants Mayor Reina, Council President Robert Nixon and Council member Barry Calogero "spoke to [Bressi] about ways of stopping the Orthodox Jewish community from moving into Jackson Township . . . ." *Id.* at 41:14–24.

L.     Prior to the adoption of Ordinance 20-17 regarding encroachments in the right-of-way, Bressi never heard a complaint about basketball hoops or anything else in the right-of-way. *Id.* at 44:3–10.

M.     Based upon his conversations with Defendant Reina, it was his understanding that Ordinance 20-17 was directed at the Orthodox Jewish community. *Id.* at 44:20-23.

N.     Prior to enactment of Ordinance 20-17, Defendant Reina "brought up he's going to ban dorms." When questioned by Mr. Bressi why was he doing that, he stated "'I'm going to prove to them that they can't do it in my town.'" Mr. Bressi stated that the term "them" referred to the Orthodox Jewish community. *Id.* at 45:16-46:9.

O.     Mr. Bressi also testified that the motivation for these ordinances was to keep Orthodox Jews from moving into Jackson, and Reina stated to him "'I'm going to redefine this and says exactly the same thing it showed them they can't have dorms in our town.'" *Id.* at 129:25-130:8.

P.     Prior to enactment of the School and Dormitory Ordinances, 03-17 and 04-17, there had never been a problem with schools and dormitories in Jackson Township. *Id.* at 46:6-14, 130:15-19.

Q. The School Ordinances, 03-17 and 04-17, were "driven" by Defendants Reina and Nixon and there were no schools or dormitories in the Township causing any problems. *Id.* at 48:14-49:25.

R. "They" and "them" are terms used at Township Council and Planning Board meetings to refer to the Orthodox Jewish community with statements like "'Are they going to convert that to a church?' 'Are they going to convert that to a school?' 'Are they going to do' this." *Id.* at 57:5-12.

S. Mr. Bressi has heard Defendant Reina make negative statements about the Orthodox Jewish community referring to Orthodox Jews as "'them'" or "'they.'" *Id.* at 114:18-24.

T. Mr. Bressi has also heard negative statements about the Orthodox Jewish community from Defendant Nixon and Mr. Calogero. *Id.* at 114:25-115:3.

U. Regarding the proposed settlement in this matter, which the Township refused to vote upon, Mr. Bressi testified that Reina believes that Mr. Bressi is too favorable to the Orthodox Jewish community, and Reina stated that Mr. Bressi had "sold out to the Jews in town" and that Mr. Bressi was "the Jew lover." *Id.* at 118:18-20.

V. Defendant Reina presented the schools ordinances to the Township Council and "pushed these to the Council President." *Id.* at 131:7–10.

W. Mr. Bressi testified as follows:

> A. Mr. Nixon was the closest to them at Jackson Strong.
>
> Q. And how do you know that?
>
> A. Just general conversations that we heard -- I heard him talking and stuff, and that one time he want -- I forget what we wanted to amend on this and Rob Nixon went crazy because they would not accept it meaning Jackson Strong.
>
> Q. So you discussed with Rob Nixon his connection with Jackson Strong and their interests in the no-knock ordinance?
>
> A. Yeah. And I got just pushed away because, you know, naturally Rob denied it but there's no two ways about it. Rob Nixon, Barry Calogero and Mike Reina feed everything from Jackson Strong to us.

*Id.* at 147:19-148:8.

X. With respect to the trailer ordinance (Ordinance 21-16), Mr. Bressi testified that it was enacted "Predominantly to make sure that Jewish people didn't put trailers for schools or -- or buildings or anything else." Defendants Reina, Calogero and Nixon were involved with this Ordinance. *Id.* at 188:8-17.

7

Y.      Defendant Reina was concerned that Orthodox Jews and (Nixon and Calogero, in particular) Orthodox Jews from Lakewood Township, would be using Jackson's Spray Park. *Id.* at 223:23-224:6; 224:17-23.

Z.      Mr. Calogero stated to Mr. Bressi: "'The first dorm built in this town for them I -- I leave this town.'" "'Them'" referred to the Orthodox Jewish community. *Id.* at 241:17-242:7.

B.      <u>The Deposition of Phil Stilton.</u>

On January 29, 2020, the Plaintiff conducted the deposition of Phil Stilton, a local journalist, in this action. Jennings Decl. ¶ 5 **Exh. C**. Mr. Stilton, hired to assist with the campaign of Michael Reina and two other Council members (*Id.* at 24:1-25:9) and residing in the Jackson Township community, testified as follows:

A.      The latest campaign for Mayor Michael Reina "turned into who is with the Jew, . . ." *Id.* at 38:5-39:1.

B.      Defendant and former Councilman Robert Nixon, in relation to the Orthodox Jewish community, discussed with him "the possibility for over development, having schools, the fear of having schools all over town where they shouldn't be. *Id.* at 44:21-45:1.

D.      Defendant Nixon also discussed with Mr. Stilton ordinances to address blockbusting or Orthodox Jewish realtors "doing a lot of door to door knockings." *Id.* at 45:3-16.

E.      After the most recent election, Mr. Stilton met with Defendants Reina and Nixon at the Lakehurst Diner and discussed issues relating to the Orthodox Jewish community, including "blockbusting," eruvs and schools. *Id.* at 46:4-47:12.

F.      Defendants Reina and Nixon explained to Mr. Stilton at the meeting that there was an effort to legislate schools and eruvs because of the "potential of what is going to happen in town, you know, before it happened." *Id.* at 47:13-22.

G.      Mr. Stilton testified that he had spoken to Mr. Reina about the monitoring of the homes in the Township, and Mr. Reina said "most of that was Rob Nixon." *Id.* at 61:13-21.

H.      Mr. Stilton has heard former Township Planning Board Member Richard Egan refer to the Orthodox Jewish community as "beards." *Id.* at 109:24-110:10.

I.  Mr. Stilton was told by Defendants Nixon, Schlegel and Reina "to enforce the eruv violations. They had to blanket everything." *Id*. at 133:9-23.

J.  Mr. Stilton testified that: "A lot of ordinances that Rob Nixon proposed came from e-mails from the same, you know, group of people, which were I believe members of Jackson Strong." *Id*. at 140:17-20.

C.  The CUPON meetings.

As set forth in Plaintiffs' initial briefing, Sheldon Hofstein, the former Township Zoning Board of Adjustment Chairman, Richard Egan, a former Township Planning Board Member and Joseph Sullivan, a former Township Zoning Board of Adjustment Member, attended a meeting of Citizens United to Protect Our Neighborhoods ("CUPON") on August 15, 2019. Dkt. #60-1 ¶ 4, Exh. B.[3] These three officials were forced to resign from their official positions following their attendance at this meeting. *Id*. A subsequent CUPON meeting was held on October 2, 2019. Jennings Decl. ¶ 6. Plaintiffs have obtained a transcript of this meeting. *Id*. at ¶ 7 (**Exh. D**). At these meetings, residents engaged in the following discussions:

---

[3] The local CUPON group was formed in opposition to development that would likely serve the Orthodox Jewish community in Jackson Township. CUPON is an entity originally formed in Rockland County, New York to oppose Orthodox Jewish development in that area. *See Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, No. 7:20-cv-01399-NSR (S.D.N.Y., Complaint filed Feb. 18, 2020) (Jennings Decl. ¶ 4 **Exh. B**). Eight towns in Ocean County, New Jersey are planning to form their own "CUPON" group. *See* Jennings Decl. ¶ 8 **Exh. E** at 24:12-25:13. On October 28, 2019, a nonprofit corporation called "CUPON Jackson Manchester" filed for formation with the State of New Jersey with a business purpose listed as "neighborhood protection." The First Board of Trustees listed in the Certificate of Formation for CUPON Jackson Manchester are Sheldon Hofstein, Elenor Hannum and Cathy Giancola, all residents of Jackson Township. *Id* at ¶ 9 **Exh. F**. CUPON was successful, in addition to the influence of Rise Up Ocean County, a group recently removed from Facebook (*Id*. at ¶ 10 **Exh. G**), in having the fully conforming application before the Township Planning Board of a developer, whose principal is an Orthodox Jew, and which intended to develop an affordable housing project in the Township that would likely provide housing for Orthodox Jewish individuals, from being approved. The denial is now the subject of another lawsuit filed in this Court against the Township, *Jackson Trails, LLC v. Township of Jackson, et al.*, No. 3:20-cv-01150 (D.N.J. filed Feb. 3, 2020).

A. ELENOR HANNUM: So some of us over many years, Chris, me, and some other people, we have pushed. The No Knock kind of was pushed because we really pushed that. Um -- we pushed for not allowing port-a-potties on the front lawn. Every time we have requested these things at council, or we have sent e-mails to -- um -- the council requesting that this be heard and discussed -- um -- there are people who are OPRA'ing our e-mails -- *Id.* at 80:7-16.

B. RICHARD EGAN: Pristine forest, never touched by man. If they lock in two big projects, they'll have a voting block for a school election where they'll get people -- their people on the school board. You think you see for sale signs now in Jackson, wait --

UNIDENTIFIED MALE VOICE: In -- (Multiple voices speaking simultaneously).

UNIDENTIFIED MALE VOICE: There is an agenda. That is -- that is already -- I mean this agenda --

RICHARD EGAN: It is tried and true.

RICHARD EGAN: This is how you destroy a town. *Id.* at 90:3-19.

D. UNIDENTIFIED FEMALE VOICE: So during the day from Monday to Friday where in these towns do you need us going around (inaudible)?

JOE SULLIVAN: Well, Friday nights would be the days that you're looking for illegal houses of worship.

UNIDENTIFIED FEMALE VOICE: Yes.

UNIDENTIFIED FEMALE VOICE: Yes.

JOE SULLIVAN: Because they have to walk to them.

UNIDENTIFIED FEMALE VOICE: Right. *Id.* at 132:10-20.

E. ROSERIO HARRERO: Listen. A while ago, there was a lawsuit. And I saw how they had all of these reports with them, all of what the residents and the e-mails were saying. And they used that stuff conveniently and selectively --

RICHARD EGAN: Yes.

ROSERIO HARRERO: -- to use it to their advantage. So this is why people have pulled back.

UNIDENTIFIED FEMALE VOICE: Yes.

ROSERIO HARRERO: And that's why I'm saying. Unless you're saying something very neutral and very generic, if you're going to say something sensitive, you know, you put it -- they're going to twist it around.

JOE SULLIVAN: I would say you -- yeah. I would say -- I would say --

UNIDENTIFIED FEMALE VOICE: That's why they don't answer.

JOE SULLIVAN: I would say not to put anything sensitive in writing because --

UNIDENTIFIED FEMALE VOICE: Right.

UNIDENTIFIED FEMALE VOICE: Yeah.

UNIDENTIFIED MALE VOICE: So if you feel it is sensitive, then don't.

ELENOR HANNUM: Yeah. So basically if you send an e-mail to any one of our elected officials --

UNIDENTIFIED MALE VOICE: Anybody can read it.

ELENOR HANNUM: Then very businesslike. This is what I'm looking for. This is what I'm asking you to do. I am a taxpayer and your constituent. And just leave it like that. It is not those --

ROSERIO HARRERO: So we're talking about documenting a paper trail. So are you are going to --

UNIDENTIFIED FEMALE VOICE: Do it carefully. *Id.* at 83:17-85:16.

    D.    <u>The Declaration of Mordechai Burnstein.</u>

Mr. Burnstein has stated under oath that he was told by Township Council member Kenneth Bressi that Scott Martin, a former Township Council member, told Bressi that he was threatened by Mr. Reina in order to secure his vote for Township Ordinances No. 03-17 and 04-17. Declaration of Mordechai Burnstein dated February 21, 2020 ¶ 6-8 ("Burnstein Decl.").

Dated: March 19, 2020

**WILENTZ, GOLDMAN & SPITZER, P.A.**
/s/ Donna M. Jennings
Donna M. Jennings (DJ7790)
90 Woodbridge Center Drive
Post Office Box 10
Woodbridge, New Jersey 07095
*Co-Counsel for Plaintiff WR Property LLC*

**STORZER & ASSOCIATES, P.C.**
/s/ Sieglinde K. Rath
Sieglinde K. Rath (048131991)
9433 Common Brook Road,
Suite 208
Owings Mills, MD 21117
(202) 857-9766

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of March, 2020, the foregoing document together with the Declaration of Donna M. Jennings, Esq. dated March 19, 2020 and Declaration of Mordechai Burnstein dated February 21, 2020 were electronically filed via the Court's ECF system with notices to the following:

> Howard B. Mankoff, Esquire
> Marshall Dennehey Warner Coleman & Goggin
> 425 Eagle Rock Avenue, Suite 302
> Roseland, New Jersey 07068
> (973) 618-4118
> hmankoff@mdwcg.com
>
> Pauline F. Tutelo, Esquire
> Marshall Dennehey Warner Coleman & Goggin
> 425 Eagle Rock Avenue, Suite 302
> Roseland, New Jersey 07068
> (973) 618-4100
> pftutelo@mdwcg.com

> **WILENTZ, GOLDMAN & SPITZER, P.A.**
> /s/ Donna M. Jennings
> Donna M. Jennings (DJ7790)
> 90 Woodbridge Center Drive
> Post Office Box 10
> Woodbridge, New Jersey 07095
> *Co-Counsel for Plaintiff WR Property LLC*