WILENTZ, GOLDMAN & SPITZER, P.A.
Donna M. Jennings (DJ7790)
90 Woodbridge Center Drive
Post Office Box 10
Woodbridge, New Jersey 07095
*Co-Counsel for Plaintiff WR Property LLC*

STORZER & ASSOCIATES, P.C.
Sieglinde K. Rath (048131991)
Roman Storzer, *admitted pro hac vice*
1025 Connecticut Ave., N.W. Suite 1000
Washington, D.C. 20036
Tel: (202) 857-9766
*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| AGUDATH ISRAEL OF AMERICA, a New York non-profit corporation, and WR PROPERTY LLC, a New Jersey limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>TOWNSHIP OF JACKSON, NEW JERSEY, MICHAEL REINA, ROBERT NIXON, HELENE SCHLEGEL, JEFFREY PURPORO, WILLIAM CAMPBELL, and KENNETH PIESLAK,<br>Defendants. | **Civil No. 3:17-cv-03226** |

## DECLARATION OF DONNA M. JENNINGS

Donna M. Jennings declares as follows, pursuant to 28 U.S.C. § 1746:

1.  I am a shareholder at Wilentz, Goldman & Spitzer, P.A., attorneys for the Plaintiff, WR Property LLC and make this declaration in that capacity.

2.  I respectfully submit this Declaration in support of the Notice of Supplemental Authority being filed contemporaneously with same.

3.  Attached hereto as **Exhibit A** are true and correct copies of excerpts of the transcript from the deposition of Kenneth Bressi conducted on October 30, 2019 in the matter of *Oros Bais Yaakov High School ("Oros") v. Township of Jackson, NJ, et al.,* Docket No. OCN-L-2981-14 pending in the Superior Court of New Jersey, Law Division, Ocean County.

4.  Attached hereto as **Exhibit B** is a true and correct copy of excerpts from the Complaint filed on February 18, 2020 in the matter of *Ateres Bais Yaakov Academy of Rockland v. Town of Clarkstown, George Hoehmannh, CUPON Inc., Citizens United to Protect our Neighborhoods of Greater Nanuet Inc.* Civil No. 7:20-cv-01399-NSR now pending in the United States District Court for the Southern District of New York.

5.  Attached hereto as **Exhibit C** are true and correct copies of excerpts of the transcript from the deposition of Phil Stilton conducted on January 29, 2020 in this action.

6.  Upon information and belief, a Citizens United to Protect our Neighborhoods ("CUPON") meeting was held in Jackson Township on October 2, 2019.

7.  Attached hereto as **Exhibit D** are true and correct copies of excerpts of the transcript from the CUPON meeting held on October 2, 2019.

8.  Attached hereto as **Exhibit E** are true and correct copies of excerpts of the transcript from the CUPON meeting held on August 15, 2019.

9.  Attached hereto as **Exhibit F** is a true and correct copy of the Certificate of Formation for

CUPON Jackson Manchester.

10.  Attached hereto as **Exhibit G** is a true and correct copy of an article published by

Asbury Park Press on February 5, 2020 titled "Rise Up Ocean County: Facebook kills

page accused of anti-Semitism — for real this time."

11.  Attached hereto as **Exhibit H** are true and correct copies of Facebook posts made by the

Facebook group "Jackson NJ Strong."

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on March 19, 2020.

        **WILENTZ, GOLDMAN & SPITZER, P.A.**
        /s/ Donna M. Jennings
        Donna M. Jennings (DJ7790)
        90 Woodbridge Center Drive
        Post Office Box 10
        Woodbridge, New Jersey 07095
        *Co-Counsel for Plaintiff WR Property LLC*

# EXHIBIT A

1

                    SUPERIOR COURT OF NEW JERSEY
                    LAW DIVISION - OCEAN COUNTY
                    DOCKET NO.  L-2891-14 PW
- - - - - - - - - - - - - - - - :
OROS BAIS YAAKOV HIGH SCHOOL, :
a nonprofit corporation of    :
the State of New Jersey       :  DEPOSITION UPON
                              :  ORAL EXAMINATION
            Plaintiff,        :
                              :         of
      vs.                     :
                              :  KENNETH JOHN BRESSI
TOWNSHIP OF JACKSON, N.J.,     :
ad JACKSON TOWNSHIP ZONING    :
BOARD OF ADJUSTMENT,          :
                              :
            Defendants.       :
- - - - - - - - - - - - - - - - :

              Lakewood, New Jersey
              Wednesday, October 30, 2019


         DEPOSITION of KENNETH JOHN BRESSI in the

above-entitled action by and before PATRICIA J.

RUSSONIELLO, a Certified Court Reporter and Notary

Public of the State of New Jersey, at the offices of

1770 West County Line Road, commencing at 9:33 a.m.




HUDSON COURT REPORTING & VIDEO          1-800-310-1769

21

1    Q.    And why do you say that?

2    A.    They have created such a panic and hate

3  in the town that I blame them -- my opinion.  I'm not

4  the law -- for a lot of the problems we have in the

5  town today.

6    Q.    And can you describe that hate, please?

7    A.    That hate, it started with some people

8  in Evergreen Court and then into this Jackson Strong

9  Web site and combine that with Rich Egan.

10        MR. STORZER:  Go off the record.

11        (Discussion off the record.)

12        (Last answer read back by the reporter.)

13    A.    And Sheldon Hofstein.

14    Q.    Okay.  And hate directed towards who or

15  what, Mr. Bressi?

16    A.    That's actually a two-part answer I

17  think.  I know how I would -- like two-part answers.

18        One is -- I think a majority of it

19  started as hatred towards what happened in Lakewood,

20  with the congestion and the two-way streets becoming

21  one streets, building houses, opening each other's

22  windows just about, and -- and that nomenclature, and

23  from that and part of that was from to stop the Jews

24  from moving into the town.

25    Q.    And to your knowledge who are the

PL22802

 1    individuals that you're aware of that were part of

 2    that original movement?

 3          A.     The original movement in many ways is

 4    Mike Reina.  Rich Egan -- naturally Mike Reina does

 5    nothing without Rich Egan.  Jackson Strong, Elenor

 6    Hannum from their group.

 7          Q.     Okay.  You said Evergreen...

 8          A.     Evergreen Court.

 9          Q.     Evergreen Court.  That's a road?

10          A.     A street in Jackson Township.

11          Q.     And is that where certain residents

12    lived that were part of this movement?

13          A.     They live there and I remember when they

14    started the biggest movement against the eruv wires

15    and yet they have none on their block.  It was on the

16    other side of town.

17          Q.     Mm'mm.

18          A.     So...

19          Q.     Have these -- you -- you mentioned

20    Elenor Hannum?

21          A.     Yes, ma'am -- yes.

22          Q.     Have you spoken with her?

23          A.     Years ago I spoke to her and she thanked

24    me.  I helped her with her problem with her

25    neighbor --

38

1      A.      Jackson Strong I know that they're --

2  they got involved very heavily with Elenor Hannum

3  especially originally on the wire situation.

4      Q.      "The wire" meaning the eruv?

5      A.      Eruv -- eruv.  I never say it right.  So

6  eruv wires; whatever they are.

7      Q.      Mm'mm.

8      A.      And I know Barry Calogero, Rob Nixon and

9  Mike basically would not make a move without getting

10  approval by them or if they want something done, they

11  will do it for them.

12     Q.      And what do you mean by that specifically?

13     A.      There are some times there was

14  discussions and -- like with the No Knock Ordinance

15  and the change wanted to be made on it by one Council

16  person who's not on the Council no more and they would

17  go berserk basic because Jackson Strong didn't want it.

18             Whatever Jackson Strong wanted, they

19  get.  Whatever Rich Egan wants, Rich Egan gets from

20  the Mayor.

21     Q.      And how do you know that?

22     A.      Conversations.  I know Rich Egan a long

23  time.

24             One time Rich Egan was friendly with me.

25     Q.      Conversations with Mr. Egan?

PL22819

1          A.      Well, it was obvious through everybody

2    knew it.   Nobody in town would deny that.

3          Q.      Okay.   But did you speak to Mr. Egan

4    about this --

5          A.      No.

6          Q.      -- these kinds of issues specifically?

7          A.      No.

8          Q.      What about Mr. Reina?

9          A.      There were some I spoke to him

10   specifically.

11         Q.      I'm sorry?

12         A.      I spoke to on some specifically.

13         Q.      And he would tell you that he spoke with

14   Mr. Egan?

15         A.      No, but the languages that came from

16   Egan were relayed from him.   Mike runs a very good

17   camouflage.   He wants something done, he goes to Rich

18   Egan to carry it out.

19         Q.      Okay.

20         A.      And that's general knowledge amongst a

21   lot of people.

22         Q.      And what about Mr. Nixon?

23         A.      Mr. Nixon --

24              MR. MANKOFF:   Wait.   Wait.   I object to

25   the form of that question just because I don't know

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

PL22820

1   what it is.

2         Q.      If you could answer the question.

3         A.      Yeah, I can.

4                 I think -- I always thought Mr. Nixon or

5   his background in -- in the State and the stuff and

6   understanding of law and lobbying with the State and

7   his involvement in Government would be an excellent,

8   excellent Council person.

9         Q.      Mm'mm.

10        A.      When he got involved with the Orthodox

11  stuff and everything else, I was surprised to see his

12  attitude especially being pulled by his nose by

13  Jackson Strong and -- and Mike Reina.

14        Q.      And what do you understand his attitude

15  to be?

16        A.      Stopping Jews.

17        Q.      And you've heard him make statements to

18  that effect?

19        A.      Not quite that language but meaning the

20  same thing.

21        Q.      What --

22        A.      Trying to think exactly.

23        Q.      What kind of statements do you recall

24  him making?

25        A.      "We have to stop this."

41

1          Generally my (sic) answer to the public

2     or anybody in the Council, "We have to stop them from

3     moving into town."

4          I felt like saying, "They're already in

5     town so you have to throw them out first," but I didn't.

6          I said I would go up to what the laws

7     allowed and that's it.

8          Q.     Mm'mm.

9          A.     And "If you don't want them to buy the

10    property, you buy the property."

11         That's my -- very standard answer I use.

12         And the efforts to try to find ways to

13    stop them started getting out of line.

14         Q.     So Mr. Nixon spoke to you about ways of

15    stopping the Orthodox Jewish community from moving

16    into Jackson Township?

17         A.     "We have to do stuff to stop it."

18         Q.     And just for the record was that a yes

19    to that question?

20         A.     Yes.

21         Q.     And the same with Mayor Reina?

22         A.     Yes.

23         Q.     And the same with Mr. Calogero?

24         A.     Yes.

25         Q.     And did those individuals find various

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

PL22822

1  hoops from this one in place that other people say to

2  take the hoops down, too, so...

3       Q.     But prior to the -- prior to the new law

4  did you ever hear any --

5       A.     No.

6       Q.     -- body complaining about basketball

7  hoops?

8       A.     No.

9       Q.     Anything else in the right-of-way?

10       A.     No.  Only --

11       Q.     Just the wires --

12       A.     Only during --

13       Q.     -- right?

14       A.     -- snow removal.

15              The town did to -- for many years during

16  snow removal to remove all the hoops and stuff from

17  the right-of-ways because --

18       Q.     Sure.

19       A.     -- the plow trucks.

20       Q.     And based on your conversations with Mr.

21  Reina was it your understanding that the basis for

22  this law was directed at the Orthodox Jewish community?

23       A.     Yes.

24       Q.     Did you have conversations with Mr.

25  Nixon about the -- about the eruv issue?

PL22825

1      A.      No.

2      Q.      Any conversations with Mr. Calogero?

3      A.      No.

4      Q.      Okay.  Who drafted the new law regarding

5   the right -- the right-of-way?

6      A.      I would have to say if -- I'd have to

7   confirm with Jean Cipriani.

8      Q.      Jean Cipriani.  Okay.

9      A.      And there was one other issue that he

10  brought up.  You asked a --

11     Q.      Mm'mm.

12     A.      -- couple of them.

13     Q.      Yeah.

14     A.      About the dorms.

15     Q.      Mm'mm.

16     A.      I've been on Land Use like I say many

17  years, and he brought up he's going to ban dorms.

18             I said, "Mike, why are you doing that?

19  They're silent in the Master Plan which means they

20  have to go -- you can't build them.  You got to go in

21  front of the Zoning Board.  Why you doing this?"

22             Quote, "I'm going to prove to them that

23  they can't do it in my town."

24     Q.      And who is "them"?

25     A.      You tell me who "them" is.

46

1      Q.     Is it the Orthodox Jewish community?

2      A.     Yes.

3      Q.     Was that in 2017?  2016?

4      A.     I'm not going to try to remember the

5  year.

6      Q.     But prior to the enactment of the two

7  ordinances related to --

8      A.     Yes.

9      Q.     -- schools and dormitories?

10             Was there ever a problem with dormitories

11  in Jackson Township?

12      A.     Prior to this?

13      Q.     Yes.

14      A.     No.

15      Q.     Are you even aware of any dormitories in

16  Jackson Township other than I suppose Six Flags?

17      A.     Well, I guess that's a question if

18  they're dormitories or not but...

19      Q.     Sure.  Any others?

20      A.     No.

21      Q.     Are you aware of members of the public

22  being opposed to Jewish schools and dormitories in

23  Jackson Township?

24      A.     Yes.

25      Q.     And do you believe that that is one of

PL22827

48

1        A.      I would have to -- I would think the
2    Township attorney, Jean Cipriani.
3        Q.      And did she do so at the request of
4    Mayor Reina?
5        A.      She works for the Mayor, yes.
6        Q.      Did you have any conversations with Mr.
7    Nixon about the -- about the schools ordinances?  I'm
8    just going to call them the schools ordinances.
9        A.      No.
10       Q.      Mr. Calogero?
11       A.      No.
12       Q.      Anybody else on the Council?
13       A.      No.
14       Q.      Was that driven by Mayor Reina; the
15   school -- schools ordinances to your knowledge?
16       A.      In my opinion is yes by Mayor Reina and
17   Mr. Nixon.
18       Q.      Okay.  Do you have any other knowledge
19   about the schools ordinances?
20       A.      No.
21       Q.      Was the -- the Township Council was
22   aware of the issue of Orthodox Jewish schools having
23   dormitories at that time, correct?
24       A.      You said Council meeting attorneys or --
25   or Council members?

PL22829

49

1        Q.      The Township Council.

2        A.      Yes.

3        Q.      And would that be because of issues in

4   other townships nearby?

5        A.      I would say predominantly, yes.

6        Q.      And was there also -- was the Council

7   aware of the Oros Bais Yaakov application for the

8   Zoning Board at that time?

9        A.      They -- we -- we knew there was one

10  there.  Like I say, I wouldn't read it, do it.

11  Nothing with it.

12               I don't know what the others did.

13       Q.      Certainly.

14               There were -- at that point there were

15  no Orthodox Jewish schools in Jackson Township.  Is

16  that correct?

17       A.      Correct.

18       Q.      Are there today?

19       A.      No.  That I know of.

20       Q.      So there was no school causing any

21  actual problem anywhere?

22       A.      No.

23       Q.      And no dormitories causing any problem

24  anywhere?

25       A.      Not at the time.

PL22830

57

1          Q.        -- in Council meetings?

2          A.        Council meetings and very often Planning

3    Board.

4          Q.        Planning Board meetings?

5                    And the "they" or "them" refers to the

6    Orthodox Jewish --

7          A.        Yes.

8          Q.        -- community?

9          A.        Yeah.  "Are they going to convert that

10   to a church?"  "Are they going to convert that to a

11   school?"  "Are they going to do" this.  "Are they" --

12   and the "they" "thems" now.

13         Q.        Right.

14         A.        Rich Egan is very simple.  Rich Egan

15   calls them most of the time "the beards" or "the hats,"

16   but most of the time he calls them "the beards."

17         Q.        You've heard Mr. Egan say that?

18         A.        Many times.

19         Q.        Many times.

20                   Did you hear about a resolution to

21   condemn Rise Up Ocean County?

22         A.        Oh, yes.

23         Q.        And can you tell us what that was about?

24         A.        Asked to put a resolution up against it

25   by I forget what organization.

PL22838

114

1    area?

2         A.    Yes.

3         Q.    The Holman Elementary School?

4         A.    Yes.

5         Q.    Is that in a residential area?

6         A.    Yes.

7         Q.    The Rosenhauer Elementary School?

8         A.    Yes.

9         Q.    Is that in a residential area?

10        A.    Yes.

11        Q.    The Goetz Middle School?

12        A.    Yes.

13        Q.    Is that in a residential area?

14        A.    Yes.

15        Q.    Do you believe that those locations are

16   inappropriate for those schools?

17        A.    No.

18        Q.    Now, you've talked a little bit about

19   Mayor Reina previously, correct?

20        A.    Yes.

21        Q.    And you have heard him specifically make

22   statements that are about the Orthodox Jewish

23   community that are negative?

24        A.    Referring to "them" or "they," yes.

25        Q.    And you have heard negative statements

PL22895

1   about the Orthodox Jewish community from I believe you

2   said Mr. Rob Nixon and Barry Calogero?

3        A.     Yes.

4        Q.     Any other Council members?

5        A.     Out of the current Council members --

6        Q.     Or prior Council members?

7        A.     Prior Council members is Ann Scott

8   (phonetic), then.  No.  No.

9               The current ones lately have been

10  showing signs of trying to side with Jackson Strong

11  and stuff.

12       Q.     And who would that -- who would you

13  include in that?

14       A.     Alex Sauickie and Andy -- Andrew Kern.

15       Q.     Andrew Kern.

16              And your understanding is that they are

17  siding with Jackson Strong lately?

18       A.     It seems -- that's the appearance I've

19  had from the specific statements which I can't mention

20  because where they were made.

21       Q.     Okay.  But you have heard specific

22  statements made by Mr. Reina, Calogero and Nixon?

23       A.     Yes.

24       Q.     Have you heard negative statements made

25  about the Orthodox Jewish community by members of the

PL22896

118

1    Q.    Have you heard anything negative from

2    Miss Schlegel?

3    A.    No.

4    Q.    Mr. Pieslak?

5    A.    I really never ever speak to Mr. Pieslak.

6    Q.    Okay.  Mr. Purporo?

7    A.    Don't talk to him either.

8          You got to remember in this form of

9    Government that's Administration and if I get caught

10   talking to them the Mayor gets all upset.

11   Q.    Has the Mayor been upset with you in the

12   past?

13   A.    Yes.

14   Q.    Does the Mayor believe that you are too

15   favorable to the Orthodox Jewish community?

16         MR. MANKOFF:  Objection as to form.  You

17   can answer it.

18   A.    Well, he stated after the possible

19   settlement that was done that I sold out to the Jews

20   in town.  I'm the Jew lover.

21   Q.    He said that to you?

22   A.    To other people, yes, and it got back to

23   me, yes.

24   Q.    Who told you that?

25   A.    Friends of mine.  That's pretty public.

125

1    reason to believe?  Yes.

2         Q.     Okay.  And what reason do you have to

3    believe?

4         A.     The moves he makes and the things he says

5    to me later.

6         Q.     What kinds of things does he say to you?

7         A.     Like "I'll never let them have wires in

8    this town."

9              Rich Egan saying to me personally, "You

10   got" -- he used to call me Corporal.

11             "Corporal, you got to understand.  You

12   got to raise money, raise money so you can fight them

13   till they run out of money, until the laws change.

14   You can't let them move into town."

15             And these remarks come from Mike to Rich

16   and Rich relays them to other people.

17             And Richard Egan can be a very

18   intimidating person.

19        Q.     So Mayor Reina has said he'll "never let

20   them have wires in this town"?

21        A.     Yes.

22        Q.     And you've heard him say that?

23        A.     Yes.

24        Q.     And Rich Egan has made such comments as

25   well?

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

PL22906

126

1      A.      Not the wires.  He made the same --

2      Q.      About "them" -- "them" moving --

3      A.      Right.

4      Q.      -- into town?

5      A.      And "You better find ways to raise money

6   to fight them to keep fighting until the laws change

7   and we can do something or just wear them out."

8      Q.      Okay.

9      A.      And it's "them" or "the hats"; whichever

10  you want to call them.

11     Q.      "The hats"?

12     A.      Yeah.

13     Q.      Referring to the Orthodox --

14     A.      Or the --

15     Q.      -- Jewish --

16     A.      -- "beards."  I'm sorry.  "The beards."

17  "The beards."  "The beards."  He refers to the Orthodox

18  Jewish community as "the beards."

19     Q.      All right.

20             MR. STORZER:  It is noon right now.  I

21  am going to have a couple more hours but I would like

22  to take a lunch break if that works for everybody

23  else, and then how about we reconvene at one o'clock?

24             Thank you, Mr. Bressi.

25             Off the record.

PL22907

129

1        Q.      And what did the Mayor say during that

2  conversation?

3        A.      He approves to them they can't have

4  dorms.

5        Q.      He what?

6        A.      It will prove to them they can't have

7  dorms.

8        Q.      "Prove to them" meaning the Orthodox

9  Jewish community?

10       A.      That's the best that I can, you know,

11  say.

12       Q.      And the Master Plan doesn't say anything

13  about schools being in the residential districts

14  either, does it?

15       A.      No.

16       Q.      So there's no support for the ordinance

17  as they relate to schools in the Master Plan?

18       A.      If they're silent, there's no support

19  for it.

20       Q.      And did you state that you believed that

21  Jean Cipriani drafted these ordinances?

22       A.      I say I believe she did.  She was the

23  Township attorney and normally her or her staff or

24  whoever.

25       Q.      Okay.  And I believe you also testified

PL22910

130

1   that the motivation for these ordinances was to keep

2   Orthodox Jews from moving into Jackson?

3          A.     As the Mayor stated to me, "I'm going to

4   redefine this and says exactly the same thing it

5   showed them they can't have dorms in our town."

6          Q.     And for the record the answer to my

7   question?

8          A.     Yes.

9          Q.     And there were -- were there any issues

10  with any existing schools in Jackson Township?

11          MR. MANKOFF:   Objection as to form.  You

12  can answer it.

13          Q.     I mean -- let me rephrase that.  Let me

14  strike that question.  Ask a better one.

15          Was the Township Council concerned about

16  any problems arising from any existing schools in

17  Jackson Township as a basis for considering these

18  ordinances?

19          A.     No.

20          Q.     There were two Council meetings where

21  these ordinances were considered.  Is that correct?

22          A.     Normally it's the first and second

23  reading, yes.

24          Q.     Okay.  And you were in attendance at

25  both of those meetings?

PL22911

1  A.  Best of my recollection, yes.

2  Q.  Was Mayor Reina the driving force behind

3 getting these ordinances considered by the Council?

4  A.  What do you mean "considered by the

5 Council"?

6  Q.  Were these ordinances -- strike that.

7    Was Mayor Reina the one that presented

8 these ordinances to the Council?

9  A.  Best of my knowledge he's the one that

10 pushed these to the Council President, yes.

11  Q.  Are you familiar with the Trophy Park

12 Development?

13  A.  Yes.

14  Q.  And there's some question as to whether

15 certain facilities there are considered -- will be

16 considered --

17  A.  Can I give you --

18  Q.  -- dormitories or not?

19  A.  -- the history on that?

20    Can I give you the history of --

21  Q.  Of --

22  A.  -- that.

23  Q.  -- course.  Yeah.

24  A.  Application come forward the first

25 night.  His application couldn't be heard because he

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

PL22912

1              (Exhibit KB-11 marked for identification.)

2         Q.    Mr. Bressi, you've been handed Exhibit

3   KB-11 which again appears to be another E-mail from

4   Kelly Kanis.  Do you see that?

5         A.    Yes.

6         Q.    And you again are listed as a recipient?

7         A.    Yes.

8         Q.    Is this an E-mail you would have

9   received?

10        A.    Yes.

11        Q.    If you look at the first paragraph of

12  the E-mail it begins, "Thank you for sending out the

13  no-knock in the tax bill.  Thanks, Rob Nixon, for

14  making that happen."

15              Do you see that?

16        A.    Yeah.  Yes.

17        Q.    Why do you think she's referring to Mr.

18  Nixon in that paragraph?

19        A.    Mr. Nixon was the closest to them at

20  Jackson Strong.

21        Q.    And how do you know that?

22        A.    Just general conversations that we

23  heard -- I heard him talking and stuff, and that one

24  time he want -- I forget what we wanted to amend on

25  this and Rob Nixon went crazy because they would not

1    accept it meaning Jackson Strong.

2        Q.    So you discussed with Rob Nixon his

3    connection with Jackson Strong and their interests in

4    the no-knock ordinance?

5        A.    Yeah.  And I got just pushed away

6    because, you know, naturally Rob denied it but there's

7    no two ways about it.  Rob Nixon, Barry Calogero and

8    Mike Reina feed everything from Jackson Strong to us.

9            There's just no denying it.

10       Q.    Okay.  Do you see at the bottom of that

11   paragraph where it says, "so many neighborhoods could

12   have been saved"?

13       A.    Yes.

14       Q.    What do you think Kelly Kanis is

15   referring to by saying that "so many neighborhoods

16   could have been saved"?

17       A.    The Orthodox --

18            MR. MANKOFF:  Objection.  Calls for the

19   witness to speculate.

20       Q.    Pardon?

21            MR. MANKOFF:  Objection to form.  Go

22   ahead.

23       A.    The Orthodox moving in; that as long as

24   an Orthodox person moves in, their concern the

25   neighborhood is shot.

1      A.      Correct.

2      Q.      And, again, I -- this might seem a

3  little repetitive but just so the record is clear I

4  want to ask my question again which is what the eruv

5  ordinance did was change a situation where you could

6  request permission to put an eruv up in the right-of-

7  way to a situation where you could no longer request

8  permission to put an eruv up in the right-of-way.  Is

9  that correct?

10      A.      Right.

11      Q.      Okay.  And do you know who was the first

12  person that raised this issue for the eruv -- for that

13  ordinance?

14              MR. MANKOFF:  Objection as to form.  You

15  can answer it.

16      A.      As I explained before that was the

17  Mayor.

18      Q.      The Mayor.

19      A.      He -- we talked about it for a couple of

20  weeks.  He wasn't going to apply it because basketball

21  courts, hockey, everything else.  I was in Bermuda

22  when he applied it, came back and learned that he

23  applied it.

24      Q.      And do you understand that various

25  Jackson Township residents raised this issue with the

207

1   Township?

2         A.      Yes.

3         Q.      And they raised it in the context of

4   eruvs?

5         A.      Correct.

6         Q.      And are you aware of any complaints

7   prior to the ordinance being passed about anything

8   other than eruvs?

9         A.      No.

10                MR. STORZER:  Can you mark this.

11                (Exhibit KB-30 marked for identification.)

12                MR. STORZER:  Off the record.

13                (Discussion off the record.)

14                (Resumes at 3:38 p.m.)

15   BY MR. STORZER:

16         Q.      Mr. Bressi, you've been handed what's

17   been marked as KB-30 I believe.

18         A.      Yes.

19         Q.      And is this is an E-mail from Christina

20   Kisseberth.  You see that?

21         A.      Yes.

22         Q.      To various recipients including yourself?

23         A.      Yes.

24         Q.      Do you have any reason to believe you

25   did not receive this E-mail?

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

PL22988

1    Orthodox Jewish community?

2         A.    Yes.

3         Q.    And you said this was to your knowledge

4    Barry Calogero's idea?

5         A.    Well, up till the last night I thought --

6    and a couple months ago -- it was Barry Calogero's

7    idea.  I learned last night according to Alex and

8    Barry it was originally Alex Sauickie's idea.

9         Q.    Okay.  Are you familiar with a

10   controversy about the use of the Spray Park by

11   Orthodox Jews in Jackson?

12        A.    There is a controversy about -- probably

13   two years ago that I think -- and they wanted to try

14   to limit it to just Jackson residents which you cannot

15   do and then they just -- I think they put a limit that

16   you couldn't come up with buses or vans like that --

17        Q.    And then what were --

18        A.    -- Friday.

19        Q.    When you -- if there was a concern whose

20   concern was that?

21        A.    That came from -- predominantly from

22   Barry Calogero and Rob Nixon.

23        Q.    And were Mr. Calogero and Mr. Nixon

24   concerned about people from any particular town coming

25   to use the Spray Park?

PL23004

224

1   A.   Yes.

2   Q.   And which town would that be?

3   A.   Lakewood.

4   Q.   So these were Orthodox Jews that they

5   were concerned about?

6   A.   Yes.

7   Q.   Have you heard about the issue of modesty

8   and wearing of clothes at the Spray Park?

9   A.   No.

10   Q.   Okay.  Mr. Bressi, have you heard

11   complaints about the use of portable toilets in

12   Jackson Township?

13   A.   Yes.  One time at 146 New Prospect.

14   Q.   Okay.

15   A.   I believe it was checked into and there

16   was no violation to it I believe.

17   Q.   With respect to the Spray Park that --

18   Mr. Bressi, did you understand Mayor Reina to be

19   concerned about access as well?

20   A.   Yes.

21   Q.   And he was concerned that Orthodox Jews

22   from Lakewood Township would be using the Spray Park?

23   A.   Yes.

24   MR. MANKOFF:  Objection as to form.  You

25   can answer.

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

PL23005

241

1   ordinance is placed on the Council's agenda?

2          A.      Council President.

3          Q.      And who is the Council president?

4          A.      Rob Nixon.

5          Q.      And how long has he been the Council

6   President?

7          A.      Since January 1st -- well, January 7th.

8   Whenever they re --

9          Q.      January 7th?

10          A.      -- reorganized.  Yes.

11          Q.      And so was it his decision not to place

12   any draft ordinances related to schools and dormitories

13   on the Council agenda?

14          A.      He makes the agenda.

15          Q.      So that's a yes?

16          A.      Yes.

17          Q.      Did Mr. Calogero ever have any

18   discussions with you about a potential settlement in

19   that --

20          A.      He --

21          Q.      -- case?

22          A.      He mentioned it to me once.  I was in

23   the WaWa again on a Sunday morning and I said --

24                  MR. MANKOFF:  You need to stay in on

25   Sunday mornings.

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

PL23022

```
 1                    THE WITNESS:  I go to church.

 2          A.        And I saw him and I said, "Did you check

 3   everything out?"

 4                    And he says, "The first dorm built in

 5   this town for them I -- I leave this town."

 6          Q.        And by "them" he was referring to?

 7          A.        The Orthodox.

 8          Q.        Have you ever heard any Township officials

 9   refer or speak about mikvahs?

10          A.        Oh, yeah.

11          Q.        Who -- who -- who has spoken about

12   mikvahs?

13          A.        Well, just in mediation I heard the

14   term.

15          Q.        Putting aside the mediation discussions.

16          A.        Jackson Strong's heard about it and had

17   comments about it and Rich Egan calls them -- I forget

18   the nickname Rich Egan gives them.  God forbid.

19   Something -- dirty baths or holy baths or whatever he

20   wants to call them.  Something of that nature.

21          Q.        When did he say -- say that?

22          A.        I don't know.  Several times.

23          Q.        In the context of an official meeting or

24   outside?

25          A.        Outside in the hallways.  His -- his
```

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

PL23023

250

1                     CERTIFICATE       OF       OFFICER

2

3

4

5                     I, PATRICIA J. RUSSONIELLO, a

6    Certified Court Reporter and a Notary Public of the

7    State of New Jersey, do hereby certify that prior to

8    the commencement of the examination the witness was

9    duly sworn by me.

10                    I DO FURTHER CERTIFY that the

11   following is a true and accurate transcript of the

12   testimony as taken stenographically by and before me

13   at the date, time and place aforementioned.

14                    I DO FURTHER CERTIFY that I am

15   neither a relative nor employee, nor attorney or

16   counsel to any parties involved; that I am neither

17   related to nor employed by any such attorney or

18   counsel, and that I am not financially interested in

19   the action.

20

21

22

23

     \\PATRICIA J. RUSSONIELLO

24   NOTARY PUBLIC OF THE STATE OF NEW JERSEY

     My Commission Expires: 4/20/2020

25   C.C.R. License No. XI00517

**New York**
**212-273-9911**
**Hudson Court Reporting & Video**
**1-800-310-1769**
**New Jersey**
**732-906-2078**

PL23031

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ATERES BAIS YAAKOV ACADEMY OF
ROCKLAND,

     Plaintiff,

v.                           Civil Action No. _____

TOWN OF CLARKSTOWN, GEORGE
HOEHMANN, CUPON INC., CITIZENS        **COMPLAINT AND JURY DEMAND**
UNITED TO PROTECT OUR
NEIGHBORHOODS OF GREATER
NANUET INC.,

     Defendants.


     Plaintiff Ateres Bais Yaakov Academy of Rockland ("ABY"), by and through its

undersigned counsel, respectfully alleges as follows:

## I.   PRELIMINARY STATEMENT

1.      This is an action to redress violations of ABY's constitutional and civil rights under the First and Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. sections 1983 and 1985, the New York Constitution, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and New York State law caused by the Town of Clarkstown's (the "Town" or "Clarkstown") calculated and discriminatory efforts to prevent a registered Orthodox Jewish school from closing on its purchase of a Baptist school and church – the Grace Baptist Church (the "Property" or "GBC"). As set forth in detail below, in interfering with and depriving ABY of its right to freely exercise religion in Clarkstown, the Town acted in coordination with a citizens' group called "Citizens United to Protect Our Neighborhood," or CUPON of Greater Nanuet ("CUPON"), which was formed for the express purpose of preventing ABY from operating its school.

2.      In early January 2019, in reaction to ABY's pending permit application following its entry into a contract for the purchase of the Property, Clarkstown Supervisor George Hoehmann, other Clarkstown officials and members of a Rockland County political party, members of CUPON, and CUPON's counsel met to concoct a plan to prevent ABY's purchase of the Property.

3.      In parallel to the manufactured public pressure from CUPON, the Town denied ABY's permit application through a blatant misapplication of its zoning laws – a misapplication the Town has *effectively conceded* due to its subsequent attempt (and failure) to amend its zoning code to align with its desired misapplication. These efforts directly caused ABY to lose its financing for the purchase of the Property.

4

PL23573

4.      Furthermore, Clarkstown's Zoning Board of Appeals (the "ZBA") refused to hear ABY's appeal of the Clarkstown Building Department's (the "Building Department") erroneous decision denying ABY's request for a building permit and, in the alternative, its application for an area variance. The ZBA's decision was arbitrary and capricious, unsupported by law and fact, and failed to provide any accommodation, let alone a reasonable accommodation, for the free exercise of religion, as required by New York law and the First Amendment.

5.      The Town and ZBA knew all they needed was time to come up with a permanent solution, so the ZBA continued repelling ABY's efforts to secure a decision on the merits, and the Town kept delaying responding to ABY's demands for information and documents under New York's Freedom of Information Law ("FOIL").

6.      Following its knowing interference with and evisceration of ABY's contract to purchase the Property and months of delay, the Town purchased the Property *for itself*. For the Town, this is but the latest example in a demonstrable pattern of wreaking havoc on religious property applicants to prevent their engagement in the Clarkstown community. Ultimately, the Town's purchase of the Property capped its coordinated effort with CUPON to prevent Orthodox Jewish girls from going to school in Clarkstown under the façade of zoning code compliance, concerns for overdevelopment, parking, and traffic.

7.      Even now, Clarkstown has no idea what it wants to do with the Property, demonstrating that its primary purpose was to keep ABY out of the Town. It considered buying the Property "for general municipal purposes," approved $4.6 million in bonds to purchase the Property "for general municipal purposes," and finally authorized the purchase of the Property "for general municipal purposes." And after closing, it established a "Vision Committee" to figure out to do with this $4.6 million piece of property. Tellingly, despite its purported concerns

PL23574

about "parking" in connection with ABY's purchase of the Property, all the ideas floated have entailed the Town using the Property for parking.

8.     The administrative actions taken by the Town and its agents, including its Building Department and ZBA, against ABY, and its subsequent purchase of the Property, were all knowingly conducted with the intent to deprive ABY of its constitutional and civil rights to the free exercise of religion. The Town has thus violated the U.S. Constitution, federal civil rights statutes, RLUIPA, and New York State law. Furthermore, the Town, Defendant Hoehmann, and Defendant CUPON (collectively, the "Defendants") have conspired to deprive ABY of its constitutionally protected free exercise and equal protection rights and have tortiously interfered with ABY's contract to, and ability to, purchase the Property.

9.     The Town's unjustifiable delays and obstruction have put severe financial stress on ABY. In order for ABY to continue to exist and fulfill its mission to give young Orthodox Jewish girls a rigorous secular and religious education, it seeks compensatory and punitive damages, and attorneys' fees for Defendants' egregious violations of federal and New York State law. In addition, ABY seeks injunctive relief in the form of an order compelling the Town both to turn over the Property to ABY for the same price it paid and to grant it the building permit or variance it should have awarded a year ago.

## II.     PARTIES AND KEY PEOPLE AND ORGANIZATIONS

10.     Plaintiff ABY is a New York State chartered education corporation providing both secular and Orthodox Jewish religious instruction to girls in grades pre-K through 12 since 2000. Previously, ABY was located at 236 Cherry Lane in the Village of Airmont. ABY currently occupies temporary quarters in the Village of New Hempstead (the "New Hempstead Property"). Those quarters are made up of two modular buildings comprised of manufactured modules. ABY's permit to remain at that site, having already been extended, expires at the

PL23575

sworn French Affidavit describing the history of the Property, and an opinion letter from ABY's land use counsel regarding the applicable law.

63.     On January 10, 2019, CUPON held a meeting at a public school operated by the Nanuet UFSD, at which Supervisor Hoehmann both attended and offered closing remarks. At this meeting, CUPON's counsel engaged in an in-depth training session advising CUPON members and Town representatives – including Supervisor Hoehmann – on how to appear "facially neutral" – in other words, how to mask the organization's underlying discriminatory motives. Counsel for CUPON exhorted its members, for example, that they had "adversaries," not "enemies," and that they should not operate on the basis of "hate." But, he told the crowd, "[i]f you can't get that hate out of your heart, then please keep your mouth shut."[24] On information and belief, counsel advised the attendees to focus their complaints on innocuous topics like traffic and avoid overt complaints that it was Orthodox Jews that wanted to purchase and operate the Property for the benefit of young female students.

64.     The next day, in a post on its official Facebook page, the Rockland County committee of a major political party summarized the CUPON meeting as a "respectful and professional 2 hour presentation that focused on how the community can protect themselves from a **_hostile invasion_**." *See* Ex. O (emphasis added). As if that xenophobic smear needed elaboration, a commenter doubled down on the hatred:

- Let's all be honest and verbal about the term **"hostile invasion."** (Which is **maybe a bit harsh, but not by alot**.)

- The residents of Nanuet and Orangetown do not want to see our towns . . . **over come with Yeshivas**, and the private homes that are not taxed because they are all **yeshivas**, not responsible for taxes, but we pay for their bussing and more, **for Hasidics to infiltrate our local governments** at the town, . . . seeing what we have all worked so

---

[24] A video of Stephen Mogel, Esq's presentation was posted to CUPON of Greater Nanuet's Facebook page at https://www.facebook.com/CTWTDWYTK/videos/2222326208086174, at 3:10.

PL23592

Because ABY was unable to close by the time of the essence date set by GBC, the contract was terminated.[28] GBC simultaneously filed a letter with the ZBA "revok[ing] any consent to land use applications" relating to the Property. Ex. Z.

93. That same day, Supervisor Hoehmann publicly stated that "the [T]own has interest in the property and will evaluate its options in the coming weeks."[29]

94. On May 30, 2019, CUPON announced on its official Facebook page an upcoming meeting in which Supervisor Hoehmann would "stop by and may be able to update [CUPON] on Town activities." *See* Ex. AA. Upon information and belief, throughout the process of ABY's Building Permit Application and subsequent appeal, Supervisor Hoehmann attended numerous CUPON meetings like this one and actively coordinated with CUPON concerning the latest developments, all in a calculated plot to prevent ABY's purchase of the Property and pave the way for the Town's eventual purchase.

95. On June 4, 2019, Supervisor Hoehmann left no doubt about the Town's intentions: "I am excited about the prospects for the acquisition of Grace Baptist Church. . . . All options are on the table and I look forward to the involvement of the school district and potentially the private sector to create something unique for the benefit of all residents."[30]

96. On June 6, 2019, ABY filed a FOIL demand, requesting documents the Town had in its possession pertaining to the Property and the Town's interest in purchasing the same. Ex. BB. The events related to this aspect of the Town's dilatory tactics are discussed below in

---

[28] On May 16, 2019, ABY received a letter from GBC terminating the contract. Ex. Y.

[29] Robert Brum, *Nanuet: Grace Baptist Church terminates sale to Ateres Bais Yaacov*, ROCKLAND/WESTCHESTER JOURNAL NEWS (MAY 16, 2019), https://www.lohud.com/story/news/local/rockland/nanuet/2019/05/16/grace-baptist-church-terminates-sale-yeshiva-nanuet/3665127002.

[30] Robert Brum, *Nanuet: Town, school district exploring Grace Baptist Church purchase*, ROCKLAND/WESTCHESTER JOURNAL NEWS (June 4, 2019), https://www.lohud.com/story/news/local/rockland/nanuet/2019/06/04/nanuet-town-school-district-exploring-grace-baptist-church-purchase/1342961001.

PL23604

issued by the Town with respect thereto (including a list of applications that were not ultimately heard at a meeting of the Zoning Board of Appeals due to incomplete submissions or applications otherwise terminated) and

(C) requirements of the Clarkstown Zoning Board of Appeal for applicants to submit a survey (or other supporting documentation not required by the Zoning Code) together with applications.

Ex. BB.

116. On July 5, 2019, the Town responded to requests (A)(1), (A)(2), and (A)(4), stating that "[n]o records exist." Ex. KK. As shown below, this was a lie. *See infra* ¶¶ 121–127.

117. On July 22, 2019, ABY submitted an appeal to Supervisor Hoehmann, stating that it found the Town's denial of responsive records "difficult to believe" based on published news articles discussing the Town's interest in purchasing the Property. Ex. LL; *see supra* ¶¶ 93, 95; *infra* ¶ 126. Supervisor Hoehmann failed to timely rule on the appeal.

118. After the Town continued stonewalling, ABY submitted another FOIL demand on October 13, 2019, this time requesting the purchase and sale agreement between GBC and the Town and related documents. Ex. MM.

119. On November 13, 2019, the Town provided ABY with a mere 12 pages of documents related to the sale, including the purchase offer for the Property signed by Supervisor Hoehmann on September 25, 2019. Ex. NN.

120. On December 4, 2019, ***nearly six months*** after ABY's initial FOIL demand seeking documents related to the Town's interest in purchasing the Property, and five months since it claimed that "no records exist," the Town finally provided ABY with some additional documents. Ex. OO. The response included three emails concerning the Property sent by Paul Adler, GBC's real estate broker, on June 5, 2019 and June 6, 2019 to various Town representatives. These emails demonstrate that the Town indeed had multiple records related to

42

its interest in purchasing the Property, which were directly responsive to ABY's June 6, 2019 FOIL demand. They demonstrate, among other things, that the Town was actually engaged in active conversations with GBC about the Property during and around the time of the June 6, 2019 FOIL demand, and yet unlawfully withheld those records from ABY for *six months*. Troublingly, had ABY not submitted an additional FOIL demand and filed for Article 78 relief (discussed in Section L below), the Town would have likely continued to withhold these documents.

121.   The first document is a June 5, 2019 email from Paul Adler to Supervisor Hoehmann, Paul Schofield (Deputy Town Attorney), and Susan Resnick (Town employee), attaching, among other things, the cancelled contract between ABY and GBC. Mr. Adler states that "these documents will be helpful to your appraiser in determining the market value," and references (i) ABY's proposed purchase price, (ii) the amount that would be increased if the parsonage adjacent to the Property would have been included in the sale, and (iii) the resulting "firm sales price of $4.9m." Ex. PP.

122.   The second email, also from June 5, 2019, is another email from Mr. Adler to Mr. Schofield and Supervisor Hoehmann, among other recipients, attaching a "Title Report" for the Property intended for Schofield's "review and use." Ex. QQ.

123.   The third email, from June 6, 2019, is from Mr. Adler to Supervisor Hoehmann, Mr. Schofield, and Ms. Resnick, and discusses "an effort to assist the Town of Clarkstown & Nanuet School District in their due diligence deliberations," and attaches "an inspection report for the Grace Baptist Church . . . which might be helpful and instructive." Ex. RR.

124.   Each of these emails falls squarely under requests (A)(1) and (A)(2) of ABY's June 6, 2019 FOIL demand, as they are records of communications between Town

PL23612

representatives and Mr. Adler, who is *explicitly* referenced in the FOIL demand, and relates to the sale and purchase of the Property, including the Town's interest in and efforts towards purchasing the Property for itself. *See* Ex. BB.[38]

125.    Nor can these records possibly constitute the entirety of responsive documents. On their face, these emails reference and were a part of larger conversations and exchanges between representatives of the Town and GBC regarding the Town's proposed purchase of the Property that, to date, ***still have not been provided to ABY***. For example, when Mr. Adler discusses the "market price for the assemblage" as compared to the value of ABY's contract with GBC, he is clearly justifying an increase in the purchase price from the ABY contract that the Town must have previously questioned or attempted to negotiate down. Ex. PP. And, when Mr. Adler references assisting the Town in its "due diligence deliberations," the only reasonable inference is that such deliberations, or communications related to those deliberations, already occurred. Ex. RR.

126.    Finally, the minutes of the November 27, 2018 Town Board meeting explicitly state that, as far back as November 26, 2018, the Town had already expressed interest in the Property. Ex. G. On that day, Supervisor Hoehmann met with GBC and the Nanuet School

---

[38] Furthermore, the Town should have documents that respond to section (B) of ABY's June 6, 2019 demand despite the Town's disingenuous response that "[t]he Town of Clarkstown does not maintain records in the manner and categories as contemplated by [y]our request." Ex. KK. In May 2017, St. Peter's Syro-Malankara Catholic Church of Rockland submitted a proposal to construct a two-story building in the Town. *See supra* ¶¶ 42–43; D'Onofrio, *supra* note 11. Additionally, in February 2018, Ramah Day Camp in Nyack submitted an application seeking permission to use its summer staff house year-round. *See Jewish Theological Ctr. & Ramah Day Camp in Nyack v. Town of Clarkstown*, No. 032265/2019, slip op. (N.Y. Sup. Ct., Rockland Cty. Jan. 7, 2020). All documents pertaining to these submissions fall under section (B) of ABY's FOIL demand and also should have been produced. Notably, these examples are only the ones ABY has been able to find from the outside, and from what ABY understands, these applications were both rejected by the Town. There also appeared to be potential buyers from the Chung Tai Chan Monastery and Concilio Iglesia Dios Pentecostal, *see* Exs. QQ & RR (title report and inspection report prepared for each entity), but no records related to either were produced. Notably, the Town appears to have scared off at least two earlier potential buyers with its incorrect assertions regarding what the property can be used for. *See* Ex. G (referring to two prior buyers who "backed out" after meeting with the Town "to learn about potential usage of the property").

PL23613

District about a potential sale of the Property. As those minutes attest, "[t]he Town was interested in the land and solicited a qualified appraiser of the property." *Id*. The appraisal in 2018, and any other documents related to the Town's interest at that time – which surely exist – are also responsive to ABY's June 6, 2019 FOIL demand and must be provided by the Town.

127.  At bottom, these emails and minutes provide "incontrovertible documentary evidence" that the Town unlawfully withheld documents responsive to ABY's June 6, 2019 FOIL demand. They also directly refute the Town's cavalier insistence that "[n]o records exist." Ex. KK. If there really are no other documents responsive to ABY's FOIL demand (beyond the documents that the Town belatedly produced), then there is a serious and substantial question as to whether the Town destroyed documents despite a duty to preserve them in light of ABY's pending appeal to the ZBA during that time. Even though by this time ABY's contract had been cancelled, its remedies in state court were very much alive and were being hindered by the Town and its discriminatory conduct.

## J.    ABY FILES AN ARTICLE 78 PETITION AND DECLARATORY JUDGMENT COMPLAINT

128.  On August 8, 2019, ABY filed a Verified Article 78 Petition and Declaratory Judgment Complaint against the Town, the ZBA, and the Building Department in the Supreme Court of New York, County of Rockland (the "Article 78 Proceeding"). Ex. SS. In the Article 78 Proceeding, ABY asked the state court for an order (1) compelling the ZBA to hear ABY's appeal of the Building Department's erroneous decision denying ABY's request for a building permit and, in the alternative, its application for an area variance; (2) directing the ZBA, upon that hearing, to find that a variance from Town Code § 290-20.I(7) is not required for use of a "school of general instruction" or, in the alternative, directing the ZBA to grant ABY's application for an area variance; (3) alternatively, annulling and setting aside the Building

PL23614

175.    The Town and Defendant Hoehmann have deprived and continue to deprive ABY of its right to freedom of religion and equal protection of the laws.

176.    The Town and Defendant Hoehmann intended to interfere with ABY's civil rights, and were at all times aware that they were acting in violation of federal laws.

177.    Defendant Hoehmann acted out of discriminatory motive and intent, or at least was recklessly and callously indifferent to ABY's federally protected rights.

## THIRD COUNT – SECTION 1985

### Against All Defendants

178.    ABY incorporates by reference the allegations set forth in ¶¶ 1–177 of this Complaint as if fully set forth herein.

179.    The Defendants have engaged in a conspiracy to deprive ABY of equal protection of laws or equal privileges and immunities, and acted in furtherance of the conspiracy out of invidious, discriminatory animus toward ABY based on its status as a Jewish institution in violation of 42 U.S.C. § 1985.

180.    As evidenced by CUPON's social media posts, and on further information and belief, Defendant Hoehmann continued to meet and coordinate with Defendant CUPON on multiple occasions throughout ABY's application process and subsequent appeal to concoct the "perfect storm" of administrative mayhem from the Town and purportedly independent outside pressure from CUPON to achieve the discriminatory goal of keeping Orthodox Jews – specifically ABY – from joining their community.

181.    Defendants' actions have injured ABY with respect to its free exercise of religion as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

PL23626

## FOURTH COUNT – NEW YORK CONSTITUTION

### Against the Town and Defendant Hoehmann

182.    ABY incorporates by reference the allegations set forth in ¶¶ 1–181 of this Complaint as if fully set forth herein.

183.    The Town and Defendant Hoehmann, by their acts, have acted under color of law and have conspired and continue to conspire, in breach of ABY's rights to protect its interests under the law in violation of Article I, § 3 (freedom of worship; religious liberty), Article I, § 9 (right to assemble) and Article I, § 11 (equal protection of laws; discrimination in civil rights prohibited) of the New York State Constitution.

## FIFTH COUNT – TORTIOUS INTERFERENCE WITH CONTRACT

### Against All Defendants

184.    ABY incorporates by reference the allegations set forth in ¶¶ 1–183 of this Complaint as if fully set forth herein.

185.    ABY entered into a valid contract with GBC to purchase the Property.

186.    No Defendant was a party to that contract.

187.    Through oversight and participation in the administrative zoning process concerning ABY's permit application, the Town and Defendant Hoehmann had specific knowledge of ABY's contract to purchase the Property. Defendant CUPON was founded for the very purpose of opposing ABY's contract to purchase the Property, so it, too, had specific knowledge of the contract.

188.    Defendants intentionally, without justification or excuse, took actions to prevent ABY from executing its obligations under the contract to purchase the Property, including but not limited to organizing and conspiring to prevent the sale, denying ABY's permit application and its variance application, and refusing to consider ABY's appeal, thereby causing a breach.

PL23627

5.      An award of permanent injunctive relief compelling the Building Inspector to grant ABY's building permit or compelling the ZBA to hear ABY's appeal and grant it a variance;

6.      An award of permanent injunctive relief preventing the Town and Defendant Hoehmann from illegally and unconstitutionally applying the laws, practices and policies of the Town to ABY's proposed use of the Property, including but not limited to enjoining the Town and Defendant Hoehmann from applying the Town's laws, practices and policies in a manner that substantially burdens ABY's religious exercise, or from applying those laws, practices and policies in a discriminatory manner, and otherwise enjoining Defendant from preventing ABY's exercise of constitutional and statutory rights;

7.      An award of the full costs and attorneys' fees arising out of Defendants' actions and land use decisions alleged in connection with this action, as available under RLUIPA and sections 1983 and 1985, as permitted by 42 U.S.C. § 1988; and

8.      Such other and further relief as this Court may deem just and appropriate;

9.      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedures, ABY demands a trial jury in this action on all issues so triable.


Dated: February 18, 2020                            Respectfully submitted,

                                                    /s/ Yehudah L. Buchweitz
                                                    Yehudah L. Buchweitz
                                                    Robert G. Sugarman
                                                    David Yolkut
                                                    Kevin M. Simmons (*pro hac vice pending*)
                                                    WEIL, GOTSHAL & MANGES LLP
                                                    767 Fifth Avenue
                                                    New York, New York 10153
                                                    (212) 310-8000

PL23629

# EXHIBIT C

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

3:17-cv-03226-MAS-DEA


--------------------------------x

AGUDATH ISRAEL OF AMERICA

AND WR PROPERTY, LLC,


        Plaintiffs,


        vs.


TOWNSHIP OF JACKSON,


        Defendant.

--------------------------------x




        DEPOSITION OF:  PHIL STILTON

        DATE:  WEDNESDAY, JANUARY 29, 2020




**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

PL22567

1          Q.       Mr. Stilton, you've been handed

2    what's been marked as Plaintiff's Exhibit 6.

3    Is this another document that you provided in

4    response to the subpoena?

5          A.       Yes.

6          Q.       What is this document?

7          A.       This is a campaign flier that the

8    Jackson -- I have to choose my words here -- that I

9    was asked to produce on behalf of the campaign for

10   the Jackson Republican Club.

11               The candidates were Mike Reina.   I

12   can't remember who he was running with.   Reina,

13   Sauickie and Kern.

14         Q.       And who asked you to produce this

15   document?

16         A.       I was hired to do advertising for the

17   campaign by George Gilmore.

18               The Jackson Republican Club didn't

19   want to use our magazine for advertising.

20   Mr. Gilmore and the mayor had asked me if I would

21   make an exception, because I guess he was down in

22   the polls, and their campaign wasn't doing that

23   well, and then you know, this is one of the ones

24   that we produced out of that.

25         Q.       So Mr. Gilmore and Mr. Reina asked

PL22590

1    you to produce campaign materials for this campaign?

2         A.      Yes.

3         Q.      And this campaign being for

4    Mr. Reina, Sauickie and Kern?

5         A.      Yes.

6         Q.      When was this?

7         A.      This would probably be in September

8    of 2018.

9         Q.      September of 2018.

10               And did they -- was there a corporate

11   entity that you managed that was hired, or was it

12   you, yourself, personally?

13        A.      Yes.  Yes, our company, it's

14   Stilton Company LLC.  We do marketing, media

15   advertising, along with our news publication

16   service.

17               We do a lot of political campaign

18   advertising because we have a very -- we have a

19   large conservative audience, probably one of the

20   largest in the state.  We reach about 8 million

21   people statewide, and in Jackson, because that is

22   where we are based out of.  We have such a high

23   concentration of readership in Jackson.

24               Our magazine goes to every home in

25   town, and on social media, about 20,000 residents

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

PL22591

38

1    because I know for a fact that the man is not

2    Orthodox.  He is not Jewish, you know, but I can see

3    that it can tend to try to sway people to think

4    that.

5         Q.      Why was that -- why was that relevant

6    politically in Jackson Township, the whole Lakewood

7    issue?

8         A.      Because like I said, I believe that

9    campaign turned into who is with the Jew, and it

10   became who had more information and who could tie

11   the other person closer to the Lakewood community

12   and the Jewish community.

13        Q.      Why would that be relevant in the

14   campaign?

15        A.      It is a political issue.  It has been

16   proven in a lot of towns where this is happening

17   that, you know, we saw it in a few other towns

18   recently, or a few other elections, where the person

19   who was sympathetic to the Jewish community would

20   get a lot of outrage from some online groups, and

21   you know, people who might like somebody, you know.

22   For instance when they sent out the postcards with

23   the mayor, the mayor had told me that, you know, he

24   has people who he has been friends with for years

25   cursing him out because he sold the town out to the

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

PL22604

1    Lakewood developers.

2              So you know, it is just another form

3    of campaign advertising and manipulation of the

4    voting base or to try to sway the voting base one

5    way or the other.

6         Q.       Okay.  Is it safe to say that being

7    associated with the Orthodox Jewish community would

8    be harmful to any politician running for office in

9    Jackson Township?

10        A.       Yes.

11                 MR. MANKOFF:  Objection as to form.

12                 MR. STORZER:  There may be objections

13   from time to time from defense counsel, but you can

14   still go for it and answer the questions.

15                 THE WITNESS:  What was the question?

16                 MR. STORZER:  You already answered

17   it, I believe.

18                 THE WITNESS:  I am sorry, could we

19   stop for one second?

20                 MR. STORZER:  Yes, absolutely.

21                 THE WITNESS:  When you're saying

22   defense counsel, I didn't realize that this whole

23   time.

24                 MR. STORZER:  I am sorry, I

25   believe -- in any case, Mr. Mankoff is representing

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

PL22605

44

1  said, no, that is really what is happening in our

2  town.

3        Q.        You have seen these kinds of posting?

4        A.        Yeah, I have seen those, but I don't

5  have any communications with her.  She is not a fan

6  of mine.

7        Q.        Robert Nixon?

8        A.        Not anti Jewish.  Rob Nixon as a

9  councilman, in the discussions I have had with him

10 or heard him, was more again worried about what

11 might happen to Jackson and reacted in the way that

12 he reacted.

13              I don't believe that was anti-Semitic

14 or anti-Jewish.  It was just a defensive reaction

15 about what he felt might happen.

16       Q.        Again, I'm not going to put you in a

17 position where I am going to ask you to guess what

18 is in his head or what his motivations are.

19       A.        Right, right.

20       Q.        Just what he has talked to you about.

21              So what kinds of issues has he spoken

22 to you about regarding the Orthodox Jewish

23 community?

24       A.        You know, the possibility for over

25 development, having schools, the fear of having

PL22610

45

1    schools all over town where they shouldn't be.

2             Q.        Mm-hmm.

3             A.        You know, early on it was

4    blockbusting.

5             Q.        By blockbusting, you mean Orthodox

6    Jews --

7             A.        Orthodox Realtors.  I guess early on

8    the Realtors were doing a lot of door-to-door

9    knockings.  It was very aggressive.

10            Q.        Mm-hmm.

11            A.        So he said, you know, they

12   communicated with me that they wanted to get the

13   message out that we were doing ordinances to stop

14   blockbusting, and can you help us get the word out,

15   to show they are doing something to address the --

16   at the time, he called it a quality of life issue.

17            Q.        So Mr. Nixon reached out to you

18   specifically?

19            A.        No.  We had a meeting.

20            Q.        Oh, you had a meeting?

21            A.        Yeah, yeah.  While this was going on,

22   while there were some disagreements, the mayor had

23   tried to make peace, and he set up a meeting with

24   myself, him and Rob, and we discussed some of the

25   issues, and you know, why they were doing certain

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

PL22611

46

1    things and how they felt certain things I was doing

2    was making them look bad, and there was no real

3    resolution from the meeting, though.

4          Q.     When was this meeting?

5          A.     I don't even remember.

6          Q.     2000 --

7          A.     It was in 2000 -- I believe it was

8    either the winter or 2018 or '19.  It was after the

9    election.

10         Q.     And where was this meeting?

11         A.     At the Lakehurst Diner.

12         Q.     You, Mr. Reina and Mr. Nixon?

13         A.     Yes.

14         Q.     And the issues they brought up were

15    the dormitories?

16         A.     No, not dormitories.

17         Q.     The blockbusting?

18         A.     Yeah.  It was -- basically, it was a

19    meeting where they kind of -- where Rob defended

20    himself against stories that we did that, you know,

21    they have this thing where when they do something on

22    the council and we report it, they blame us for

23    reporting what they are doing if it doesn't come out

24    exactly the way they want it.

25          So he was pretty much defending his

**New York**
**212-273-9911**    Hudson Court Reporting & Video
1-800-310-1769    **New Jersey**
**732-906-2078**

PL22612

47

```
 1    positions on a lot of things he did, trying to

 2    explain, you know, that I had it wrong, or I didn't

 3    quite see what he was trying to get at.

 4         Q.      And these were issues related to the

 5    Orthodox Jewish community?

 6         A.      For the most part.  We discussed a

 7    lot of different things.

 8         Q.      Other than blockbusting, what other

 9    issues?

10         A.      Eruvs.

11         Q.      Eruvs, okay.

12         A.      And schools.

13         Q.      And what did Mr. Nixon and Mr. Reina

14    say about schools?

15         A.      Well, they were mad that in the media

16    it was being portrayed that they put a ban on

17    schools and a ban on eruvs when they were trying to

18    explain that it wasn't quite a ban.

19                 It was to legislate it.  It wasn't a

20    ban.  It was an effort to legislate, you know, the

21    potential of what is going to happen in town, you

22    know, before it happened.

23         Q.      And what were they concerned about

24    happening to the town?

25         A.      Well, they were more concerned about
```

PL22613

61

1   token, he feels that he gets beat up because if a

2   resident does complain about an eruv or whatever, he

3   feels as mayor it's his obligation to look into it.

4         So he expressed some frustration with

5   the media too with that, where when because he is

6   doing an obligation for another resident, he will

7   get beat up because he is the one kind of viewed as

8   facilitating it.

9        Q.     Are you aware of the issue, the

10  township monitoring places where Orthodox Jews

11  gather to pray?

12       A.     Just from reading the OPRA request.

13       Q.     Have you ever spoken about that with

14  Mr. Reina?

15       A.     I told him that it was wrong, and he

16  agreed.

17       Q.     What else did he say about that?

18       A.     He said that most of that was

19  Rob Nixon.

20       Q.     Rob Nixon?

21       A.     Yeah.

22       Q.     What was Rob Nixon doing?

23       A.     I guess just from the, you know, from

24  the OPRA request, you know, that he -- I don't want

25  to -- I mean, I would really just defer to the OPRA

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

PL22627

1     Q.      You heard --

2     A.      Not fighting the Orthodox community.

3     Q.      What comments have you heard?

4     A.      I mean just, like I said, the things

5   on the coupon, media that they -- that were

6   released.

7     Q.      Nothing in person that you overheard

8   yourself?

9     A.      Not fighting the community, no.

10    Q.      Anything related to the Orthodox

11  community?

12    A.      I just know he is not a fan.

13    Q.      How do you know that?

14    A.      From comments he has made, you know,

15  in those meetings.

16    Q.      That you have heard yourself,

17  personally?

18    A.      Yeah.  Some of the stuff said in

19  Ken Bressi's deposition, you know, his -- you know,

20  I have come to know Rich over the years.  He is kind

21  of a -- he is a New Yorker.  So he speaks his mind

22  sometimes, and you know, some of the comments in

23  there I did hear once our twice.

24    Q.      Like which?

25    A.      The beard comment.

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

PL22675

110

1      Q.      The beard comment?

2      A.      Yeah.  Which, you know, even though

3   it is not right, it is not just -- with him, it is

4   just not related to that.  That is just the way he

5   is with everybody.  He is a very coarse guy in

6   person, you know, not afraid to speak what is on his

7   mind.

8      Q.      Who else have you heard use the

9   phrase "beards" referring to the Orthodox community?

10      A.      Nobody.  It must be a New York thing.

11      Q.      Okay.  Now, he was appointed to the

12   planning board by Mr. Reina, right?

13      A.      I don't know exactly how the

14   appointments were, whether it is council or the

15   mayor.

16      Q.      Do you know what Mr. Egan's

17   relationship is with Mr. Reina?

18      A.      I believe they are friends, but I am

19   not 100 percent sure.

20      Q.      Are you aware of any interest by

21   Jackson Township in publishing a township newspaper?

22      A.      I have been told.

23      Q.      Who has told you that?

24      A.      The mayor mentioned it.

25      Q.      Do you know why they would do this?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

PL22676

133

1      Q.      Is that something that you wrote?

2      A.      That wasn't directed at her, though.

3      Q.      Is that something that you wrote?

4      A.      Absolutely, yeah.

5      Q.      Why did you write that?

6      A.      Because at the time the town was

7   giving people tickets for basketball hoops, brush in

8   the street.

9              Also, the eruvs, they were going

10  crazy with -- it actually wasn't really meant to

11  anything Jewish.  It was really meant to be, you

12  know, they are acting like the Gestapo going door to

13  door and giving people violations, you know, telling

14  kids -- giving parents violations for their kid's

15  basketball hoop or, you know, and what I was told

16  later on was that was because, I guess, to enforce

17  the eruv violations.  They had to blanket

18  everything.

19              I was very opposed to that.

20      Q.      Just to be clear, who told you that?

21  Was it Mr. Reina?

22      A.      I believe it was actually Rob Nixon,

23  Reina and Schlegal.

24      Q.      Just so the record is clear, I don't

25  want to skip over this fact, they told you that they

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

PL22699

1          A.        Yes.

2          Q.        You referred to the rampant

3    anti-Semites you have all cultured; do you see that?

4          A.        Yes.

5          Q.        Who are the rampant anti-Semites?

6          A.        Jackson Strong.

7          Q.        When you say, "you have all

8    cultured," what do you mean by that?

9          A.        When this first started, we had

10   talked about, you know, going down the middle of

11   everything, not catering to one side or the other.

12               A lot of people had that discussion.

13   In the media, we had that discussion between

14   different media outlets, and it seems, you know,

15   Rob Nixon became close -- you know, and again, it's

16   from the OPRA requests.

17               A lot of ordinances that Rob Nixon

18   proposed came from e-mails from the same, you know,

19   group of people, which were I believe members of

20   Jackson Strong.

21         Q.        And that you believe were

22   anti-Semitic?

23         A.        Again, looking back I don't know if I

24   would use the word anti-Semitic now, but I believe

25   they are driven by fear to act that way.

178

```
 1                      CERTIFICATE

 2

 3          I, GERALDINE ADINOLFI, a Certified Court

 4    Reporter of the State of New Jersey, do hereby

 5    certify that the witness was duly sworn by me.

 6          I FURTHER CERTIFY that the foregoing is a

 7    true and accurate transcript of the testimony as

 8    taken stenographically by and before me at the time,

 9    place and on the date hereinbefore set forth.

10          I FURTHER CERTIFY that I am neither a

11    relative nor employee nor attorney nor counsel of

12    any of the parties in this action and that I am

13    neither a relative nor employee of such attorney or

14    counsel, and that I am not financially interested in

15    the action.

16

17    _____

18    Certified Court Reporter

19    License No. 30XI00228000

20

21

22    Dated:  February 5, 2020

23

24

25
```

PL22744

# EXHIBIT D

# EVANS REPORTING

Coast-To-Coast Coverage • Unsurpassed Excellence

---

Audio Transcription

October 2, 2019

---

Cupon Matter

vs.

PL23398

Audio Transcription 10/2/2019

Page 78

1           UNIDENTIFIED MALE VOICE:  It is.

2           UNIDENTIFIED FEMALE VOICE:  Now, has

3    this been asked already?

4           UNIDENTIFIED FEMALE VOICE:  No.  Not

5    yet.

6           UNIDENTIFIED MALE VOICE:  This

7    consortium hasn't been.  Even the (sounds like)

8    light and dark session yesterday (inaudible).

9           UNIDENTIFIED FEMALE VOICE:  And I'm

10   just going to move on to my third point.  There

11   have been several veiled threats made against

12   residents who speak their mind -- um -- if they

13   don't like something.  Or they're taking

14   e-mails and putting them up on Facebook to make

15   you look bad or going on the Lakewood Scoop to

16   change the perception of what our objective is.

17          Um -- as a taxpayer, you have a right,

18   your First Amendment right to say what you want

19   to say if you disagree with something as long

20   as it is in a non-biased manner and not

21   discriminatory.

PL23476

Audio Transcription 10/2/2019

```
                                        Page 81
1               UNIDENTIFIED FEMALE VOICE:  Yes.
2               UNIDENTIFIED MALE VOICE:  If you ever
3       communicate with an elected official in any
4       way, shape, or form in writing, someone can
5       OPRA that letter.  And it is a public -- it is
6       a public record.
7               UNIDENTIFIED MALE VOICE:  Lately, the
8       request now, certain people -- from certain
9       people, certain groups, have been dangerous and
10      subject sensitive.  Not mass OPRAs where just
11      give me everything.  They seem to have some way
12      of knowing exactly what they're looking for.
13              UNIDENTIFIED MALE VOICE:  What they ask
14      for.
15              UNIDENTIFIED MALE VOICE:  How much to
16      ask for.  So that could only come from someone
17      telling them.
18              UNIDENTIFIED FEMALE VOICE:  Somebody on
19      the inside.
20              UNIDENTIFIED MALE VOICE:  On the
21      inside.
```

PL23479

Audio Transcription 10/2/2019

Page 82

1          UNIDENTIFIED MALE VOICE:  And we do

2     know that someone has a history of doing that

3     on the inside.

4          UNIDENTIFIED MALE VOICE:  But he swears

5     he is innocent.  He is innocent.  My guy is an

6     attorney.

7          UNIDENTIFIED MALE VOICE:  Does everyone

8     have a copy of the evidence?

9          UNIDENTIFIED FEMALE VOICE:  Would it be

10    better just to call the official and go through

11    for the official instead of writing so there is

12    no documentation?

13         UNIDENTIFIED FEMALE VOICE:  I would say

14    make a paper trail.

15         UNIDENTIFIED MALE VOICE:  They can get

16    the call.

17         UNIDENTIFIED FEMALE VOICE:  I would say

18    you should e-mail and make a paper trail.

19         UNIDENTIFIED MALE VOICE:  I would say

20    there is nothing -- don't be afraid to

21    communicate --

Coast to coast coverage
Unsurpassed excellence

Evans Reporting Service
800-256-8410

Over 25 years
award-winning service

PL23480

Audio Transcription 10/2/2019

Page 83

1          UNIDENTIFIED FEMALE VOICE:  Don't be

2     afraid.

3          UNIDENTIFIED MALE VOICE:  -- with your

4     elected officials in writing.

5          UNIDENTIFIED MALE VOICE:  I shot an

6     e-mail, and they never answered back.

7          UNIDENTIFIED MALE VOICE:  That is

8     something.  They avoid their e-mails because

9     of --

10          UNIDENTIFIED FEMALE VOICE:  They're

11     scared.

12          UNIDENTIFIED MALE VOICE:  -- these

13     lawsuits.

14          UNIDENTIFIED MALE VOICE:  To clarify,

15     some of them -- one of them is so petrified, he

16     won't even answer text messages.

17          UNIDENTIFIED FEMALE VOICE:  Listen.  A

18     while ago, there was a lawsuit.  And I saw how

19     they had all of these reports with them, all of

20     what the residents and the e-mails were saying.

21     And they used that stuff conveniently and

Coast to coast coverage
Unsurpassed excellence                    Evans Reporting Service                    Over 25 years
                                          800-256-8410                    award-winning service

PL23481

Audio Transcription 10/2/2019

Page 88

1          UNIDENTIFIED FEMALE VOICE:  Yes.  So

2     we're keeping him separate.

3          UNIDENTIFIED MALE VOICE:  I could

4     explain it this way.  The people like Lakewood

5     Scoop will try to portray this as a religious

6     rights issue.

7          UNIDENTIFIED FEMALE VOICE:  And it is

8     not.

9          UNIDENTIFIED MALE VOICE:  When, in

10     realty, this is huge developers versus the

11     little guy.  These are huge developers that see

12     a mint in building these homes.  And they don't

13     care what it does to a town.  It is money.

14          UNIDENTIFIED FEMALE VOICE:  They see

15     the land.  We have 100 buyers per square

16     mile -- square miles here.  They see the land.

17          UNIDENTIFIED MALE VOICE:  I just see

18     the beginning of -- um -- of something.  You're

19     looking at that project as, you know, changing

20     the course of the future for the town.

21          UNIDENTIFIED MALE VOICE:  Yes.

PL23486

Audio Transcription 10/2/2019

Page 130

1    be 6,000 square feet.

2              UNIDENTIFIED FEMALE VOICE:  So was it a

3    duplex, or was it supposed to be a home?

4              UNIDENTIFIED FEMALE VOICE:  So that was

5    one of the things that have to be addressed.

6              UNIDENTIFIED FEMALE VOICE:  No, it was

7    supposed to be a one-family home.

8              UNIDENTIFIED FEMALE VOICE:  It is

9    happening on Reel Road right now.

10             UNIDENTIFIED FEMALE VOICE:  That is a

11   residential area for single-family homes.

12             (Multiple voices speaking

13   simultaneously).

14             UNIDENTIFIED FEMALE VOICE:  -- because

15   you can look at it and see some single-family

16   homes.

17             UNIDENTIFIED MALE VOICE:  -- of what is

18   coming just go into Royal Grove and look at one

19   of the houses being built and approach somebody

20   and say you want to buy it and see what

21   happens.  Royal Grove.  Because I have heard

PL23528

Page 150

```
 1              UNIDENTIFIED FEMALE VOICE:  My maiden

 2     name was Shot if anybody is -- was born here.

 3              UNIDENTIFIED FEMALE VOICE:  Where do

 4     you teach?

 5              UNIDENTIFIED FEMALE VOICE:  East

 6     Brunswick High School.

 7              UNIDENTIFIED MALE VOICE:  I think we --

 8              UNIDENTIFIED FEMALE VOICE:  October --

 9     October 7th, okay.

10              UNIDENTIFIED FEMALE VOICE:  I'll try.

11              UNIDENTIFIED FEMALE VOICE:  Yes, Monday

12     at 7:30.

13              UNIDENTIFIED FEMALE VOICE:  I'll try to

14     round up some people.

15              UNIDENTIFIED FEMALE VOICE:  Municipal

16     building.  We need to pack that room.  Tell all

17     your friends.

18              UNIDENTIFIED FEMALE VOICE:  If we get

19     200 people, we'll delay them by two months.

20              UNIDENTIFIED FEMALE VOICE:  Yeah.

21              (Multiple voices speaking
```

# EXHIBIT E

# EVANS REPORTING

### Coast-To-Coast Coverage · Unsurpassed Excellence

## CD Transcription- II

## August 15, 2019

## Cupon Matter

vs.

PL23260

Case 3:17-cv-03226-MAS-DEA   Document 74-1   Filed 03/19/20   Page 76 of 88 PageID: 2082

Page 22

```
 1              UNIDENTIFIED MALE VOICE:  Part of

 2      the -- the -- no?  Part of the (inaudible).

 3              UNIDENTIFIED MALE VOICE:  So what is he

 4      doing?

 5              UNIDENTIFIED MALE VOICE:  I guess he is

 6      a concerned resident of Jackson ready to fight

 7      to the last --

 8              UNIDENTIFIED MALE VOICE:  (Inaudible)

 9      how are you?

10              UNIDENTIFIED FEMALE VOICE:  Fine.  How

11      are you?  Good to see you.  I want to ask you a

12      question later.

13              UNIDENTIFIED MALE VOICE:  You want to

14      ask me a question?  The answer is no.

15              UNIDENTIFIED FEMALE VOICE:  Then, I'll

16      ask you anyway.

17              UNIDENTIFIED MALE VOICE:  Go to the

18      bodega.

19              UNIDENTIFIED FEMALE VOICE:

20      (Inaudible).

21              UNIDENTIFIED MALE VOICE:  Go to the
```

PL23282

Page 23

1    bodega.

2          UNIDENTIFIED MALE VOICE:  You can

3    always try.

4          UNIDENTIFIED FEMALE VOICE:  That's

5    right.  Hey, listen, you know you cannot give

6    up, you know what I mean.  Right?  Don't you

7    agree?

8          UNIDENTIFIED MALE VOICE:  Yep.

9          UNIDENTIFIED FEMALE VOICE:  You cannot

10   give up.

11         UNIDENTIFIED MALE VOICE:  I always

12   agree.  Yep.

13         UNIDENTIFIED MALE VOICE:  I agree.

14         UNIDENTIFIED FEMALE VOICE:  We'll see.

15   We shall see.

16         UNIDENTIFIED MALE VOICE:  I didn't see

17   you until you came up before the board the

18   other day.

19         UNIDENTIFIED FEMALE VOICE:  Yeah, I

20   wanted to ask you about that.

21         UNIDENTIFIED FEMALE VOICE:  Excuse me

PL23283

Page 120

1  (inaudible) radium (inaudible) the soil they

2  tried to (inaudible) mill.

3    UNIDENTIFIED FEMALE VOICE:

4  (Inaudible).

5    (Background noise).

6   (Whereupon, the recording ended.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

PL23380

# EXHIBIT F

NEW JERSEY DEPARTMENT OF THE TREASURY
DIVISION OF REVENUE AND ENTERPRISE SERVICES

**CERTIFICATE OF INC, (NON PROFIT)**

**CUPON JACKSON MANCHESTER A NJ NONPROFIT CORPORATION**
**0450431205**

The above-named DOMESTIC NON-PROFIT CORPORATION was duly filed in accordance with New Jersey State Law on 10/28/2019 and was assigned identification number 0450431205. Following are the articles that constitute its original certificate.

1. **Name:**
   CUPON JACKSON MANCHESTER A NJ NONPROFIT CORPORATION

2. **Registered Agent:**
   JOHN FLORENTINO

3. **Registered Office:**
   928 ARNOLD AVE
   POINT PLEASANT, NEW JERSEY 08742

4. **Business Purpose:**
   NEIGHBORHOOD PROTECTION +

5. **Duration:**
   PERPETUAL

6. **Effective Date of this Filing Is:**
   10/28/2019

7. **Qualification as set forth herein:**
   AS SET FORTH IN THE BYLAWS

8. **Rights and Limitations of members if not previously addressed:**
   AS SET FORTH IN THE BYLAWS

9. **Method of electing Trustees as set forth herein:**
   AS SET FORTH IN THE BYLAWS

10. **Asset Distribution:**
    AS SET FORTH IN THE BYLAWS

11. **First Board of Trustees:**
    ELENOR HANNUM
    129 N COUNTY LINE ROAD STE 165
    JACKSON, NEW JERSEY 08527


    SHELDON HOFSTEIN
    129 N COUNTY LINE ROAD STE 165
    JACKSON, NEW JERSEY 08527


    CATHY GIANCOLA
    129 N COUNTY LINE ROAD STE 165
    JACKSON, NEW JERSEY 08527

12. **Incorporators:**
    ELENOR HANNUM
    129 N COUNTY LINE ROAD STE 165
    JACKSON, NEW JERSEY 08527

Continued on next page ...

Page 1 of 2

PL23080

NEW JERSEY DEPARTMENT OF THE TREASURY
DIVISION OF REVENUE AND ENTERPRISE SERVICES

**CERTIFICATE OF INC, (NON PROFIT)**

**CUPON JACKSON MANCHESTER A NJ NONPROFIT CORPORATION**
**0450431205**

**13.  Main Business Address:**
    129 N COUNTY LINE ROAD STE 165
    JACKSON, NEW JERSEY 08527

**Signatures:**
    ELENOR HANNUM
    INCORPORATOR

*IN TESTIMONY WHEREOF, I have
hereunto set my hand and
affixed my Official Seal
28th day of October, 2019*

*Elizabeth Maher Muoio
State Treasurer*

Certificate Number : 4089506267
Verify this certificate online at
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

PL23081

# EXHIBIT G

# Rise Up Ocean County: Facebook kills page accused of anti-Semitism — for real this time

**Mike Davis and Jean Mikle, Asbury Park Press**   Published 12:10 p.m. ET Feb. 5, 2020 | **Updated 6:19 p.m. ET Feb. 5, 2020**

Rise Up Ocean County, the controversial Facebook page that's been accused of fostering anti-Semitism among its thousands of users, has been deleted from the social media website for "using hate speech."

The page, and its 19,000 likes, was unpublished on Wednesday. Rise Up Ocean County administrators posted Facebook's notification on their separate website: "Your page has been unpublished for using hate speech, which goes against the Facebook Community Standards."

Rise Up Ocean County administrators said they were appealing Facebook's decision, which they decried as "arbitrary and capricious." In their appeal to Facebook, the group wrote that it had come under "heavy scrutiny" by Facebook only after Gov. Phil Murphy and Attorney General Gurbir Grewal pressured the network.

"We have in fact exercised great caution in OUR posts and OUR comments to insure (sic) that at all times we complied with Facebook community standards," the appeal states. "The platform is too valuable to our efforts to risk losing it."

ADVERTISEMENT

The group noted that it polices comments that they deem "inappropriate."

In a joint statement, Murphy and Grewal said they "appreciated that Facebook has now decided that this kind of hateful rhetoric has no place on its platform.

**Civic, political and religious leaders agree:**  Anti-Semitism has no place in Ocean County

[ The trusted place to find the best home service providers. Find local pros. ]

PL23257



The anonymous administrators behind the Rise Up Ocean County Facebook group responded Wednesday night to the freeholder board's resolution earlier in the evening to oppose and condemn its mystery creator(s). *(Photo: Screenshot from Facebook)*

"We've consistently and repeatedly made clear our view that the page appeared to violate Facebook's terms of service," Murphy and Grewal said. "There remains much that should be done to stop the spread of hate on the internet. The Murphy administration will continue to call out hate whenever and wherever we see it, we will persist in demanding meaningful reforms to address the proliferation of hate online, and we will continue working to make New Jersey a safe and inclusive place for all of our residents."

If it seems like déjà vu, it's because Rise Up Ocean County briefly disappeared from the social media giant last month as well.

For about 24 hours, much of Ocean County speculated that Facebook had removed the page. Murphy and Grewal issued a statement commending Facebook for taking "some steps to address anti-Semitic content."

## Get the Now You Know newsletter in your inbox.

**What is happening at the Jersey Shore? We will give you a quick roundup.**

Delivery: Tues & Fri

Your Email                                          →

Shortly after their comments, Rise Up Ocean County appeared once again. Its administrators said they had taken the page down themselves in order to avoid a potential hack.

[ Consider purchasing a digital subscription to the Asbury Park Press and download our mobile apptoday. ]

A spokesman for the Attorney General's Office said Wednesday that Facebook confirmed it removed the page.

Rise Up Ocean County launched in October 2018, with a mission statement that declared "quality of life in Ocean County is under assault. We are organizing to restrict development and preserve our quality of life."

The posts on Rise Up Ocean County's Facebook page have been varied. Some criticize local council members for voting one way or the other on local issues. Others simply comment on land use board hearings in the area.

But the vast majority of the posts argue that Lakewood — and its surrounding area —was growing overdeveloped and overcrowded. And many of those posts specifically criticize members of the area's Orthodox Jewish community.

Anti-Semitic tropes and comments have been mainstays on the page, including a post calling on Toms River residents to "declare war."

*The story continues below the gallery.*

In its appeal, Rise Up Ocean county said its "dialogue regarding (the Orthodox Jewish) community is coincidental.

PL23258

"There is no animosity represented toward that community by our page and no hint of anti-Semitism," the group said. "When 90% of the projected growth comes from a specific segment of society, it is impossible not to include that population in our dialogue."

"As such, discussion about the complex relationship between the Orthodox Jewish world and the secular world is needed if we are ever to find a path forward."

The administrators behind Rise Up Ocean County have never publicly identified themselves. When the group came to local prominence last year, a 45-page dossier outing one alleged creator of the page circulated throughout Lakewood and neighboring towns.

The Asbury Park Press could not confirm the report.

Rise Up Ocean County came under fire last February, when it posted a video parodying the words of "First they came...." the famous poem by German cleric Martin Niemöller about those who stood silent as the Nazis systematically persecuted socialists, union members and Jews during the Holocaust.

"Then they came for me — and there was no one left to speak for me," the poem concludes.

**Meet Dr. Rich Roberts:** GOP mega-donor using his clout to fight 'bigotry against Orthodox Jews' in Jackson

In the video posted by Rise Up Ocean County, the "socialists," "trade unionists" and Jews of Niemöller's poem were replaced with "my house," "my board of education" and "my township and county government, but I did not vote, because I was busy that day."

The post was eventually removed, and Rise Up Ocean County administrators apologized.

After the "First they came..." satire was published, the Simon Wiesenthal Center, a nonprofit group that targets anti-Semitism, hate speech and human rights abuses, petitioned governing bodies to formally denounce the group and website.

The Lakewood Township Committee and Ocean County freeholder board did so. But in Jackson and Toms River, council members refused to formally name Rise Up Ocean County publicly.

"I want to advise any group that makes statements under the protection of their constitutional rights: You need to respect that what you say has consequences that hurts others. And when those words lead to fear, you need to make it right," said Rob Nixon, then the council president in Jackson.

"Regardless of who says what, we're not going to stand for stereotyping. We're not going to stand for hate speech."



*Mike Davis has spent the last decade covering New Jersey local news, marijuana legalization, transportation and basically whatever else is happening. Contact him at 732-643-4223, mdavis@gannettnj.com or @byMikeDavis on Twitter.*

Read or Share this story: https://www.app.com/story/news/local/communitychange/2020/02/05/rise-up-ocean-county-facebook-anti-semitism-lakewood-jackson-orthodox-jews/4667025002/

PL23259

# EXHIBIT H

 Jackson NJ Strong 

**Home**   About   Notes   Photos   Events   Posts   (

 **Jackson NJ Strong**              •••
Wednesday at 11:24 AM · ⚙

If you read nothing else today, please read this.  https://
americanfreepress.net/wave-of-anti-semitism-exaggerated/



AMERICANFREEPRESS.NET
**'Wave of Anti-Semitism' Exaggerated**
Most "anti-Semitic attacks" are shouting matches betwee...

👍😢😮 42                    7 Comments  12 Shares



👍 Like           💬 Comment          ↪ Share



💬 Message               •••

          



https://m.facebook.com

← For the record, the comments mad…

 **Jackson NJ Strong**    •••
13 mins · ⚙

For the record, the comments made by Glory and Porter DO NOT MAKE THEM ANTISEMETIC! This is so out of control. Heaven forbid you speak against the bad behavior coming from this ultra religious group. Why are their rights more important than ours? The track records speak for themselves. People are fed up with the cheating and the selfish ways they live their lives. It's hurting all those around them. Whether it be the welfare fraud, tax evasion, misappropriation of government funds, blockbusting, abuse of the system or the favoritisms they receive from our law makers. We've all had enough, and they, along with the government for turning a blind eye, are solely responsible for creating the animosity against. This country is a melting pot. Built by hard working immigrants. Diverse. Equal rights for all, Special treatment for none! Stop trying to destroy what we are!

www.newsweek.com/orthodox-jews-new-jersey-anti-semitism-republicans-1477618



PL23256