## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

------------------------------------------------------X

AGUDATH ISRAEL OF AMERICA, and WR PROPERTY LLC,

    Plaintiffs,

v.

TOWNSHIP OF JACKSON, NEW JERSEY,

    Defendant.

------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:

**Civil Action No. 3:17--cv-03226-MAS-DEA**

**DECLARATION OF DONNA M. JENNINGS, ESQ.**

DONNA M. JENNINGS, ESQ., of full age, under penalty of perjury, declares as follows:

1. I am a shareholder at Wilentz Goldman & Spitzer, P.A., counsel for Plaintiff WR Property, LLC in this litigation.  I submit this Declaration in further support of Plaintiffs' Notice of Supplemental Authority.

2. A copy of the February 17, 2017 transcript of motion in the matter of Oros Bais Yaakov High School v. The Zoning Board of Adjustment of Jackson and Township of Jackson, Superior Court of New Jersey, Ocean County, Law Division, Docket No. OCN-L-2981-14, is attached hereto as Exhibit A.

3. A copy of the Complaint filed in the United States District Court, District of New Jersey on May 20, 2020, United States of America v. The

<u>Township of Jackson and Jackson Planning Board</u>, No. 3:20-cv-06109, is attached hereto as Exhibit B.

4.     A copy of the Case Information Statement filed in the United States District Court, District of New Jersey on May 20, 2020, <u>United States of America v. The Township of Jackson and Jackson Planning Board</u>, No. 3:30-cv-06109, is attached hereto as Exhibit C.

## **DECLARATION**

I hereby declare under penalty of perjury that the foregoing statements are true and correct pursuant to 28 U.S.C. §1746.


*/s/ Donna M, Jennings*
DONNA M. JENNINGS

Dated:    May __, 2020

-2-

# EXHIBIT A

1

1                SUPERIOR COURT OF NEW JERSEY
           OCEAN COUNTY - LAW DIVISION - CIVIL PART
2              DOCKET NO. OCN-PW-L-2981-14
          A.D.# _____
3

4   OROS BAIS YAAKOV HIGH    )      TRANSCRIPT
    SCHOOL,              )
5                  )       OF
         Plaintiff,   )
6                  )     MOTION
       vs.           )
7                  )
    THE ZONING BOARD OF     )
8   ADJUSTMENT,         )
                  )
9         Defendant.    )

10                PLACE:  Ocean County Courthouse
                        120 Hooper Avenue
11                      Toms River, New Jersey 08753

12               DATE:  February 17, 2017

13   B E F O R E:

14    HON. MARLENE L. FORD, J.S.C.

15   TRANSCRIPT ORDERED BY:

16    DONNA M. JENNINGS, ESQUIRE (Wilentz, Goldman &
    Spitzer)
17   A P P E A R A N C E S:

18    DONNA M. JENNINGS, ESQUIRE (Wilentz, Goldman &
19    Spitzer)
    Attorney for the Plaintiff
20
    ROBERT L. GREENE, ESQUIRE (Storzer and Associates)
21    Attorney for the Plaintiff

22    SEAN D. GERTNER, ESQUIRE
    Attorney for the Defendant, Zoning Board of
23    Adjustment.

24    JEAN CIPRIANI, ESQUIRE (Gilmore & Monahan)
    Attorney for the Defendant, Jackson Township
25

2

1      Transcriber:   Colleen M. Vaughn, C.C.T.
                       SHORE REPORTING SERVICE, P.C.
2                      29 Tobago Avenue
                       Toms River, NJ  08753
3
       Recording Operator:  Valerie Jackey
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                              I N D E X

2    ORAL ARGUMENT                                        Page

3    By:  Ms. Jennings ...............................   4

4    By:  Ms. Cipriani ..............................   7

5    By:  Mr. Gertner ...............................  12

6

7

8    DECISION                                           Page

9     (NONE)

10

11

12   EXHIBITS                                  Ident.   Evid.

13    (NONE)

14

15

16

17

18

19

20

21

22

23

24

25

4

1          THE COURT:  All right.  This is Oros Bais

2     Yaakov High School versus Zoning Board of Adjustment

3     and the Township of Jackson.

4          And your appearances for the record, please.

5          MS. JENNINGS:  Good afternoon, your Honor.

6     Donna Jennings from the law firm of Wilentz, Goldman

7     and Spitzer on behalf of the plaintiff.

8          And Robert Greene of Storzer and Associates

9     for the plaintiff.

10         MS. CIPRIANI:  Jane Cipriani, law firm of

11    Gilmore and Monahan on behalf of the Township of

12    Jackson.

13         MR. GERTNER:  And good afternoon, your Honor.

14    Sean Gertner on behalf of the Zoning Board.

15         THE COURT:  Okay.  Miss Jennings, this is

16    your motion to -- for leave to file an amended

17    complaint against the Township of Jackson.  It's

18    opposed, I believe and we'll hear from you first.

19    Okay?

20         MS. JENNINGS:  Great.  Thank you, your Honor.

21         As indicated in my papers, and I'm not sure

22    you want me to go through everything in my papers, I'm

23    sure you've had an opportunity to review them, and it

24    looks like you had a little bit of a rough afternoon,

25    but in essence one of the first claims that --

1          THE COURT:  It just looks that way because

2     you don't do family law.

3          MS. JENNINGS:  Just looks that way.

4          With respect to the timeliness of the

5     application, I think both under the federal statute

6     and even under the state court rules, the application

7     filed by the plaintiffs is timely.  I've set that

8     forth three different ways in the actual brief.  I

9     don't know if I need to go over either of -- any of

10    those unless you would like me to.

11         Then with respect to whether or not the

12    amendment of plaintiff's complaint would be futile, I

13    also go over that.  I think one of the big

14    misconceptions on the defendant's part is a

15    misunderstanding of actually what the plaintiff is

16    seeking.  We are not seeking substantial relief under

17    RLUIPA.  This is a discrimination claim under the

18    equal terms and the non-discrimination clauses.  So

19    much that are in those briefs don't really address

20    those issues.

21         And so what we have left is we have the

22    claims with respect to the NC zoning, which we allege

23    against the township to bring the township into the

24    case.

25         With respect to the NC zoning, there also is

1    an equal terms claim and it's not the fact as argued

2    by the township, that parochial and private schools

3    are both excluded, so that's okay.  You have to look

4    at what are the other non-religious assemblies that

5    are permitted within the zone.  And when you look at

6    the zoning board, and there are a number of other

7    non-religious assemblies and institutions that are

8    permitted, including parks, playgrounds, libraries,

9    public schools and museums.  And I cite the case with

10   respect to the equal terms provision which I won't

11   read out loud to you, but that's set forth in there as

12   well.

13            And clearly, the plaintiff's attempt to amend

14   the complaint here under RLUIPA's equal terms

15   provision should be granted.  It's not going to be

16   futile.  I think we should have an opportunity to

17   explore that.

18            And with respect to the R1 where all schools

19   are prohibited, we do allege enough in the complaint

20   to demonstrate that there is some type of religious

21   gerrymandering going on within the township's zoning

22   ordinance.

23            And then, finally, what I found lacking in

24   both the briefs was any sort of undue prejudice to the

25   defendants to bring them in now.  It's our position

1    that the township knew or should have known that we

2    were challenging the ordinances and at one point in

3    time they would be brought into the case, but there's

4    no undue harm to them.  They're going to just simply

5    have to defend the case just as if they had been

6    brought in from Day One.

7              So that's really our arguments.  And unless

8    you have a specific question, your Honor, I'll rest on

9    our papers.

10             THE COURT:  Okay.  All right.

11             MS. CIPRIANI:  Thank you, your Honor.

12             It's interesting that the suggestion that the

13   township somehow should have just known that in a case

14   where the complaint was filed, I don't know, a year or

15   so ago, more than that, that some day all of a sudden

16   that the township would be brought in.  It seems that

17   there's a desire to bring the town in at this point by

18   hook or by crook in a context that -- that makes very

19   little sense at this point.

20             The two different zones that are mentioned

21   are really in different postures not only because of

22   the way that they're drafted, but because of the

23   absence of any application affecting the Neighborhood

24   Commercial zone.  So to take the R1 zone first, which

25   is the zone where as I understand it, this application

1    is located and where it was made, the R1 zone does not

2    permit schools of any kind.  It is not facially

3    invalid in any way.  There is case law specifically

4    that says a zoning ordinance barring all schools from

5    a residential district was not discriminatory, which

6    is a Roman Catholic Dioceses Newark case.

7           So, the ordinance is fine.  It's not a

8    challenge even as -- as posed by Miss Jennings just

9    now to the R1 zone and to the ordinance on that zone.

10          There's some suggestion that the overall

11   master plan or that's what I'm taking it as the

12   township evidence is some discriminatory intent.

13   These are ordinances that were an ordinance was passed

14   in 2010 implementing the 2009 Master Plan.  I don't

15   think there's anything that's been suggested that

16   would be or suggest any discriminatory intent in the

17   2009 Master Plan or the implementing ordinances, which

18   are the ones that are at issue here.

19          The R1 zone ordinance doesn't provide basis

20   for challenge, but at least the R1 zone is the one

21   where the school's application -- in which the

22   school's application is based.  So, the problem is the

23   application is based there, that the ordinance at

24   issue that's the zone at issue.  That zoning ordinance

25   is not invalid on its face.

1          There was an application before the zoning

2     board, and I understand that your Honor is hearing

3     that part of the case, which has been going on for a

4     substantial amount of time.  Under the Jackson

5     Holdings case, what happens now is the township comes

6     in, as far as I understand it, the question of the

7     ordinance validity has to go first.  So all of the

8     rest of it stops in terms of the litigation aspect,

9     discovery may be something else, but in terms of going

10    forward, because then the ordinance has -- so the R1

11    ordinance, which is the one that's actually attached

12    to the application, would be somehow challenged.

13    There's nothing on the face of it.  There's nothing

14    that provides for a RLUIPA claim on that ordinance.

15          If there's a suggestion of the

16    gerrymandering, gerrymandering which really makes very

17    little sense given the other uses that are permitted

18    in the other challenged ordinance, which is the

19    Neighborhood Commercial, then that would be a

20    challenge to the master plan as a whole, not to the

21    specific R1 ordinance.

22          As far as the Neighborhood Commercial zone

23    ordinance, that is, you know, it appears that the

24    plaintiff owns property or has an interest in property

25    that is located in the Neighborhood Commercial zone.

1    The Neighborhood Commercial -- but it's not at issue

2    here, the Neighborhood Commercial zone ordinance.  So

3    there's nothing that would prohibit an alteration of

4    that ordinance at any time.

5        The only thing in that ordinance that is at

6    issue really is the fact that in one of the permitted

7    uses in addition to having other governmental uses has

8    public schools and as was clear in our papers and is

9    clear in the law and is clear in the Municipal Land

10   Use Law, the municipality cannot treat public schools

11   differently from private schools, and we are aware of

12   that.

13       There the -- that language, it's really the

14   rule that word would make that ordinance which

15   shouldn't even be at issue because it's not part of

16   the -- the case in chief or at least the initial case

17   into any kind of issue.  There's -- that is, again, it

18   was put in place in 2010 implementing the ordinances.

19   There are other religious uses that are permitted in

20   that zone as to commercial uses -- I'm sorry,

21   conditional uses.  There's nothing there that was

22   provided.

23       As far as the timeliness argument on an

24   action in lieu of prerogative writs and in challenging

25   an ordinance, there the 45 days does apply and then

1    there's this whole suggestion of bringing in the

2    RLUIPA claims, that that somehow should go back, you

3    know, the four years.  Even the ordinances are valid

4    or they are not valid, but in testing the ordinance,

5    the R1 is plainly valid in its place.  There is

6    nothing on the face of that ordinance standing in

7    isolation to give any rise to a RLUIPA claim.  That

8    was the way it was framed as a challenge to the R1

9    zone.

10              As far as the Neighborhood Commercial zone,

11   there is no way in this, you know, this particularly

12   allows schools to the extent that we're going to look

13   at this ordinance, which is non-duplicated as part of

14   this case.  I'm not saying that the plaintiffs

15   couldn't bring a challenge to the ordinance on its own

16   under -- under RLUIPA and I -- I agree.

17              The charm about public schools it's not an

18   enforceable term.  Schools are permitted.  Schools are

19   permitted.  That's, I think really clear in the law

20   and the township definitely recognizes that, but to

21   add that in to this litigation is to not just do a

22   standalone challenge.  These are in different things.

23   It's tying it all to the application that was made

24   that the zoning board heard about this school.

25              And the idea of having separate litigation on

1    the ordinance but attaching it to this case doesn't

2    make sense, because all it does is slow down the

3    application -- the litigation on the school's

4    application, which is before your Honor and has been

5    for, as I said, well over a year in order to make a

6    facial challenge and then there have been giant

7    discovery requests already served, which the township

8    declined to answer since -- until this day is done

9    depending how it goes we're not a party, but the

10   purpose of that can't change the flat language of the

11   R1 ordinance.  And the time in terms of the ordinance

12   being put in place all -- the only relevant time frame

13   is 2009, 2010.

14            MR. GERTNER:  Thank you, your Honor.

15            THE COURT:  All right.

16            MR. GERTNER:  Really just to follow-up on --

17   on my colleague's argument, the Board also recognized

18   during its hearings that with respect to the NC zone,

19   we accepted the township's position.  The Board

20   accepted the township's positions and understood that

21   schools would in fact be allowed in the -- in that

22   zone.

23            But to address the equal terms provision and

24   to some extent from the -- from the Board's -- from

25   the Board's perspective, as my colleague indicated,

1    I'm going to use the term bootstrap, that if you look

2    at the initial pleadings of the plaintiff here, this

3    idea of this religious gerrymandering comes -- stems

4    from, it appears from their papers, statements that

5    the Board had no or the township had no control over.

6    And the court made it very specific findings as I set

7    forth in -- in my answer, in my reply and the cross

8    motion as well, that cross motion is not specifically

9    before you today, indicating that the court made very

10   specific findings about what the Board took into

11   account and what it did not take into account.

12            And I would respectfully argue, your Honor,

13   that the idea that the Jackson Township and its boards

14   that are there to enforce both planning and ultimately

15   the opportunity to grant the variances, the idea that

16   there's some gerrymandering going on vis-a-vis what's

17   occurring in neighborhood -- in neighborhoods that

18   surround these two zones but are not in this township,

19   really comes down to there's a slippery slope that

20   could occur.  And I would like -- I would respectfully

21   suggest that the court at least think about this, that

22   we have an issue here of home rule.  There is a

23   township line that has to mean something.  It can't

24   mean nothing.  If the -- and this court, particularly,

25   I find having served in the three branches of

1    government at certain levels, I feel understands the

2    differences in what a court should be doing.  There's

3    the legislature versus the executive branch.  If the

4    legislature wants municipalities and wants to lose

5    certain powers over its zoning, over their zoning, and

6    look at more regional approaches or empower county

7    planning -- planning boards to look at some

8    regional -- regional idea, it's -- there's no

9    precedent cited to allow this Board to do that -- to

10    do that.

11         The fact that this particular R1 zone abuts a

12    different municipality should have no bearing on its

13    facial -- facial validity as argued by, you know, as

14    argued by the -- by the township.

15         They also cite the -- the issue of the --

16    whether or not the school was inherently beneficial or

17    not.  And they try again, plaintiff again tries to

18    gerrymander those arguments into the idea that the

19    township and the whole process was tainted by this and

20    not given the opportunity to -- for equal terms.

21         Again, your Honor, I went through in my

22    brief, I won't point it out specifically, the number

23    of times this court already made a finding that there

24    was no bias or prejudice on behalf of the Board in

25    making those -- those determinations, such that the

1   Board as a separate entity supports the municipality's

2   position that at this point in the litigation there's

3   no basis to permit this amendment, that the complaint

4   should move -- should move forward, and in fact, the

5   Board summary judgment motion be heard separately and

6   distinctly in March or wherever we -- we should set

7   that.

8          THE COURT:  Okay.  Miss Jennings.

9          MS. JENNINGS:  Do you want me to respond or

10  no?

11         THE COURT:  Yeah.

12         MS. JENNINGS:  Okay.  So first with respect

13  to the arguments on the NC zone, I'm a little confused

14  by -- because the NC zone specifically only permits

15  public schools and when you look at the definition

16  section in the ordinance, a public school is a

17  non-religious assembly, institutional use and they

18  have separate definitions for parochial schools.  So I

19  don't understand how we can make arguments that

20  parochial schools are now permitted in the NC zone.

21  So I'm definitely confused there.

22         With respect to this bootstrapping argument,

23  I don't see what's wrong with making the arguments.

24  We have all the players here.  It's the same people.

25  You have the township, the zoning board, the same

1    plaintiffs.  Why create more work for the courts and

2    have another complaint filed?  I think that would go

3    against judicial economy.

4          I'm a little concerned about the comment that

5    Mr. Gertner made about a town should have a right to

6    have a township line, because having been involved in

7    the Ocean Township yeshiva case, it reminds me of the

8    comments that the Ocean Township was making, you know,

9    keep Lakewood out.  And when you say we need to have a

10   township line, I hear those same things in my mind.

11   It reminds me of that.

12         And we also under the state laws, we have

13   rules that you cannot zone your town without respect

14   to considering the towns around you.  You can't create

15   a Chinese wall around your own town.  I don't have the

16   cases off the top of my head, but there are definitely

17   case that use those exact words.

18         So, for instance, you certainly couldn't stop

19   a road just because you don't want people traversing

20   in and out.  That violates people's right.  It doesn't

21   make any sense for everybody to end everything at

22   their towns.

23         And then with regard to the issue that the

24   Board supports the township's position that your Honor

25   has already ruled with regard to the bias, when we

1    look at the R1 and we look at the gerrymandering, I

2    think we've alleged enough in the complaint something

3    suspect is going on in Jackson.  This property was

4    originally zoned R3 as was the Jackson Township High

5    School, some of the other high schools.  They're all

6    in the same zone and things were changed, and we're

7    wondering and I think we have a right to explore what

8    may or may not be going on in the township.  And I

9    just respectfully request that we get an opportunity

10   to explore these issues.  Thank you.

11          MS. CIPRIANI:  That description talking about

12   things that people are saying that are troubling,

13   there's some things going on in the Township of

14   Jackson, Miss Jennings is going to use this case to

15   find out about that.  That's not what this case is

16   about.  The ordinances that are --

17          THE COURT:  Well, under the -- I mean, in my

18   decision on the -- on the zoning issue I said there

19   wasn't in -- in making that -- that decision in that

20   isolated case, that there wasn't evidence of any bias.

21   And I don't think that there was in terms of making

22   that ruling in the context of a zoning application.

23   Right?  But does that finding -- can that -- does that

24   finding -- it's not my intent to have the finding

25   spill over into the other claims that were preserved

1    specifically under this.  I just wanted that to be

2    clear.

3           MS. CIPRIANI:  Yeah.  And as far as, I mean,

4    obviously that has no impact --

5           THE COURT:  Because there may be other --

6    other indicia of -- of unconstitutional or illegal

7    intent that, you know, might -- might be present in

8    terms of either the development of the ordinance or --

9    or otherwise.

10          MS. CIPRIANI:  Well, the -- the -- the thing

11   that is of interest in that is as I said, this

12   ordinance was developed in 2010 in response to the

13   master plan changes and this change of the zone from

14   R3, I mean, as your Honor hears a lot of cases out of

15   Jackson, there are a lot of zoning changes made at

16   that time and a lot of people who for a wide variety

17   of reasons, wish that their zone hadn't changed.  That

18   is not evidence of anything other than the simple

19   master plan development.

20          The citations in Miss Jennings' brief to

21   comments that were made were either things that the

22   township had no control over, but as far as I can tell

23   all things took place in 2016.  So the suggestion that

24   there's proof of gerrymandering or some sort of

25   improper intent in 2009, 2010, because somebody made a

19

1    comment in a newspaper in 2016, there is no relevance

2    and no connection between those things.

3             To the extent that that can ever be used for

4    proof of anything, it certainly can't be used for

5    proof of the township's motivation in altering its

6    master plan and doing ordinances to implement that

7    master plan seven years before.

8             THE COURT:  Okay.  Miss Jennings, anything

9    else you want to say?

10            MS. JENNINGS:  No.  Thank you, your Honor.

11            THE COURT:  Okay.  Anything else?

12            MR. GERTNER:  Your Honor, just briefly just

13   to follow-up, that that's the argument with regard to

14   the -- to the bootstrapping.  The fact is the argument

15   cited are -- are six years after the implementation of

16   that master plan, it was -- it was based on that that

17   the zoning board made its determination.

18            MS. CIPRIANI:  And I'm sorry, your Honor,

19   just one more thing.  And Miss Jennings had raised the

20   issue of how the town can say, well, it says public

21   schools in the NC ordinance.  So how would that apply

22   to private schools?  Because the law in N.J.S.A.

23   40:55D-66 specifically says that we can't make that

24   distinction.

25            THE COURT:  You can't make a distinction

20

1    between public and private schools.

2            MS. CIPRIANI:  So that's an unenforceable

3    distinction.

4            MS. JENNINGS:  So they've admitted they've

5    adopted an ordinance that violates the law.

6            MS. CIPRIANI:  We've admitted that there's

7    an -- that the ordinance on -- in the NC zone, it

8    could not be enforced to make a distinction between

9    public and private schools.  The ordinance as it

10   stands has to be used to apply to public and private

11   schools.

12           MR. GERTNER:  And, your Honor, on flipping

13   through it, if I may, on that point, there's other

14   sections in the code where the Board looked to and I

15   have it in my brief.  I'm having trouble finding it

16   right now where based on the law and the sections of

17   the ordinance, it is -- it is clear, that everyone

18   understood that public and private schools would be --

19   were to be treated the same.

20           THE COURT:  Okay.  All right.  Thank you.

21           I'm going to take this argument under

22   consideration and I'll let you know my decision in a

23   couple of days.  Okay?  Thank you.

24           MR. GERTNER:  Yeah.  We're probably going to

25   ask the same question.

21

1      MS. JENNINGS:  Yeah.  If we could have a

2  little bit of a case management conference?

3      THE COURT:  Oh, sure.

4      MS. JENNINGS:  Because you had -- okay.

5  Thank you.

6      THE COURT:  I think I said yes to that.  I

7  just have to --

8      MS. JENNINGS:  Okay.  Well, I guess we're not

9  going to have your decision, so that's a little --

10  'cause we did an amended case management order dated

11  November 4, 2016 and we had propounded discovery on

12  the defendant zoning board and we have yet to receive

13  any discovery which was due January 31st.  I've asked

14  Sean several times, was he doing -- going to ask for

15  an extension, was he going to submit something?  I

16  received nothing.

17      THE COURT:  Okay.

18      MR. GERTNER:  Your Honor, I could -- I need

19  another 30 days to get, if that would be possible.  If

20  that's -- if that's okay with you.

21      MS. JENNINGS:  Well, I'm not going to object

22  at this time.  If you need the 30 days we'll allow --

23  do you really need 30 days?  I mean, you've had them

24  for 60 days.

25      THE COURT:  I'm going to make it 30 days

22

1    because it's obviously if I rule that you could amend

2    your complaint to join the township then I have to

3    afford some time for them to respond also.

4                    MS. JENNINGS:  Right.

5                    THE COURT:  They have your discovery request;

6    right?

7                    MS. JENNINGS:  Yes.  You both have the

8    discovery request?

9                    MS. CIPRIANI:  I remember you E-mailed it to

10   me early on and I'm sure I could find it again.

11                   MS. JENNINGS:  Well, I was kind enough to

12   bring two extra copies with me.

13                   THE COURT:  Good for you.

14                   MS. JENNINGS:  So you both are being served

15   today.

16                   MS. CIPRIANI:  I'll be glad to hold that in

17   abeyance until I get the court's decision.

18                   MR. GERTNER:  Thank you.  And I'll even say

19   thank you, so...

20                   MS. JENNINGS:  There you go.

21                   MR. GERTNER:  Thank you.

22                   MS. CIPRIANI:  See, we're so much nicer than

23   the last litigants.

24                   THE COURT:  Okay.  So at this point in time,

25   30 days to respond to discovery.

23

1          MR. GERTNER:  And, I guess, your Honor,

2     depending on -- and I'm saying, I'm mumbling through

3     asking a question and not making a point.  So the

4     return date for --

5          MR. GREENE:  There was a cross motion for

6     summary judgment.

7          MR. GERTNER:  -- for summary judgment.

8     Should we set that now or should we wait to see what

9     your Honor rules with regard to the amendments?

10         THE COURT:  I'll -- I'll address that in my

11    decision.

12         MR. GERTNER:  Okay.

13         MR. GREENE:  Thank you.

14         MR. GERTNER:  Thank you, Judge.

15         THE COURT:  Okay.  Anything else?  Any other

16    issues?  All right.

17         MS. JENNINGS:  I just think that obviously

18    once you make the decision we'll have the case

19    management conference 'cause now everything in your

20    order from November 4 --

21         THE COURT:  Is stale.

22         MS. JENNINGS:  -- is stale.

23         THE COURT:  Okay.

24         MS. JENNINGS:  Thank you, your Honor.

25         THE COURT:  Thank you.

24

1          MR. GERTNER:  Thank you, your Honor.

2          MS. CIPRIANI:  Thank you.

3                  (CourtSmart ends)

4                    *     *     *

5

6          C E R T I F I C A T I O N

7

8          I, COLLEEN M. VAUGHN, the assigned

9     transcriber, do hereby certify the foregoing

10    transcript of proceedings on CourtSmart is prepared in

11    full compliance with the current Transcript Format for

12    Judicial Proceedings and is a true and accurate

13    non-compressed transcript of the proceedings as

14    recorded.

15

16

17    /s/ COLLEEN M. VAUGHN, C.C.T.        AOC No. 599

18

19    SHORE REPORTING SERVICE, P.C.        February 22, 2017

20    Agency Name                          Date

21

22

23

24

25

# EXHIBIT B

WILLIAM P. BARR
ATTORNEY GENERAL

CRAIG CARPENITO
United States Attorney
KELLY HORAN FLORIO
Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, NJ 07102
Tel: (973) 645-2824

ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division
SAMEENA SHINA MAJEED
Chief
TAMAR HAGLER
Deputy Chief
RYAN G. LEE
BETH FRANK
Trial Attorneys
United States Department of Justice
Civil Rights Division
Housing & Civil Enforcement Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Phone: (202) 305-8196
Beth.Frank@usdoj.gov

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> Plaintiff, <br><br> v. <br><br> **TOWNSHIP OF JACKSON and JACKSON PLANNING BOARD**, <br><br> Defendants. | Civil Action No. <br><br><br> **COMPLAINT** |

The United States of America, by its undersigned attorneys, files this Complaint and alleges:

## Introduction

1.  The United States brings this civil action against the Township of Jackson ("Jackson" or "Township") and the Township of Jackson Planning Board ("Planning Board") (collectively, the "Defendants") under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq. and the Fair Housing Act, 42 U.S.C. §§ 3601 et seq. ("FHA") stemming from the Defendants' enactment and application of zoning ordinances that intentionally target religious schools and housing associated with such schools so that it will be impossible or nearly impossible for religious schools, including religious boarding schools utilized by members of the Orthodox Jewish community ("Orthodox community") to operate in the Township.

## Nature of the Action

2.  In 2017, the Township passed Ordinance 03-17 and Ordinance 04-17 ("2017 Ordinances").  Ordinance 03-17 removed public, private, and parochial[1] schools as a permitted use in a number of Jackson's zoning districts.

3. Ordinance 03-17 and Ordinance 04-17 both expressly prohibit dormitories throughout Jackson, making it impossible for religious boarding schools to establish in the Township.

---

[1] For the purposes of the Complaint, the term "parochial schools" is interchangeable with the term "religious schools."

4.  These Ordinances were enacted against the backdrop of widespread animus toward the Orthodox community moving into Jackson and intentionally target the needs of the Orthodox community to establish religious schools and religious schools with associated dormitory housing within the Township.

5. As a result of the 2017 Ordinances, religious schools and religious schools with housing cannot establish in the Township.

6.  The Defendants specifically violated RLUIPA by: (a) treating parochial schools on less than equal terms than nonreligious assemblies in enacting and in applying the 2017 Ordinances, 42 U.S.C. § 2000cc(b)(1); and (b) discriminating against the Orthodox community on the basis of religion or religious denomination by enacting and applying the 2017 Ordinances, 42 U.S.C. § 2000cc(b)(2).

7.  The Defendants violated the FHA by intentionally discriminating against the Orthodox community in enacting and applying the 2017 Ordinances in an effort to make residential housing unavailable in the Township on the basis of religion, 42 U.S.C. § 3604(a).

## Jurisdiction and Venue

8.  The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, 42 U.S.C. § 2000cc-2(f), and 42 U.S.C. § 3614(a).

9.  Pursuant to 42 U.S.C. § 2000cc-2(f), the United States is authorized to commence suit against a local government for injunctive or declaratory relief to enforce compliance with RLUIPA.

10. Pursuant to 42 U.S.C. § 3614(a), the United States is authorized to commence suit against a person or persons for preventative relief, damages, and civil penalties.

11. Venue is proper under 28 U.S.C. § 1391(b) because the actions giving rise to this action occurred in the District of New Jersey.

## Parties

12. Defendant Jackson is a municipality in Ocean County, New Jersey.

13. Jackson occupies almost 100 square miles in Ocean County, including sections of the New Jersey Pine Barrens.  Jackson is also the site of Six Flags Great Adventure & Safari Park, the second-largest theme park in the world, as well as Six Flags Hurricane Harbor, its companion water park.

14. According to the 2010 Census, Jackson has approximately 55,000 residents.  Jewish residents make up approximately 4% of Jackson's population.

15. The area immediately surrounding Jackson has experienced a recent increase in the Orthodox Jewish population.

16. Jackson's municipal government consists of a Mayor elected to a four-year term and a five-member Township Council with members elected to four-year terms on a staggered basis.

17. Michael Reina is the current Mayor of Jackson, and has served as Mayor since December 2008.

18. Kenneth J. Bressi is a current member of the Township Council, and he has served on the Council since 2009.  Mr. Bressi also has been the Township Council's appointee to the Township Planning Board since 2006, and has served on

various Planning and Land Use Boards and Zoning Boards at various times since 1988.

19. Barry Calogero is a former member of the Township Council. He served on the Council from 2012 through May 13, 2020.

20. Robert A. Nixon is a former member of the Township Council. He served on the Council from 2012 through November 26, 2019.

21. Ann Updegrave is a former member of the Township Council, and served on the Council from 2006 to December 31, 2018.

22. Scott Martin is a former member of the Township Council, and served on the Council from 2006 to December 31, 2018.

23. The Township has the authority to regulate and restrict the use of land and structures within its borders.

24. Defendant Planning Board consists of nine members and two alternates. The members must include the Mayor, at least one other Township Official, a member of the Environmental Commission, and citizens of Jackson appointed by the Mayor. It has responsibility for, among other things, managing the Township's Master Plan and planning objectives, administering subdivision and site plan review, and granting variances related to subdivision plats.

25. For purposes of RLUIPA, the Township and the Planning Board each constitute a "government." 42 U.S.C. §§ 2000cc-5(4)(A)(i), (ii).

26. Defendant Jackson is responsible for the acts and omissions of its agents and agencies, including the Planning Board.

## Facts

### *The Orthodox Community in Jackson*

27. Approximately 500 Orthodox Jewish families live in Jackson Township.

28. The Orthodox community in and around Jackson Township is composed of multiple local subgroups, each with its own leaders and varying interpretations of religious doctrine and law.

29. As a general rule, the Orthodox community believes that a central element of its religious exercise is to educate its children in Orthodox Jewish schools, where they can learn the traditions and beliefs of their faith.

30. For the Orthodox community, religious life includes a focus on religious education to ensure the future of its subgroup and local community.  By attending religious schools, or yeshivas, the Orthodox community believes that young male students will receive training necessary to become active adult community members and religious leaders.

31. Members of the Orthodox community active in the Jackson area believe that yeshiva students must be removed from the distractions of secular life to concentrate on their studies in a community of religious practitioners and scholars and that they study day and night with a focus that can only be achieved by residing at the school.

32. Members of the Orthodox community active in the Jackson area require that yeshiva teachers closely supervise students' moral and spiritual development and believe that this can only be achieved in a full-time, residential environment.

33. There are currently no Orthodox Jewish religious schools in Jackson.

34. Without access to local yeshivas, members of the Jackson area's Orthodox community will be significantly inhibited in exercising their religious beliefs and unable to develop future community members and community leaders.

### *Jackson's Zoning Map and Zoning Districts*

35. The Jackson zoning map enumerates 45 zoning districts:  28 districts outside the Pinelands Area and 17 within the Pinelands Area, much of which is in the southern portion of Jackson and is zoned as preservation area or military.  A zoning map is included as Exhibit A to this Complaint.

36. The northern section of Jackson contains a large number of residential zones.  According to the zoning map, residential zoning districts comprise the majority of the Township.

37. The zoning map shows a number of Public Facility and Education "planning districts" ("PFE districts"), which are adjacent to residential zones and contain most of the Township's schools.  The Township's Zoning Code says nothing about PFE districts.

38. The Township's zoning map and Township's Zoning Code are "land use regulation[s]" under RLUIPA, 42 U.S.C. § 2000cc-5(5).

### *Jackson's Zoning for Schools Before 2017*

39. Before 2017, the Township's Zoning Code allowed private, parochial (religious), and public schools as permitted by-right uses in a variety of zoning districts, including residential zones R-2, R-3, R-5, R-9, R-15, R-20; multi-family

7

zones classified as MF, and in all Planned Mixed Unit Residential Development
("PMURD") zones.

40. Before 2017, the Township's Zoning Code allowed public schools, but not
private or parochial schools, in the LC (Limited Commercial) and NC (Neighborhood
Commercial) zoning districts.

41. Before 2017, public schools, but not private or parochial schools, were
allowed as permitted by-right uses in the PV (Pinelands Village), RD-1 (Rural
Development), and RG-2 and RG-3 (Rural Growth) zones.

42. Before 2017, the Township had ten public schools, a vocational technical
school, a private day school, and two parochial schools (Jesus Harvest Time
Academy and St. Aloysius School).

43. St. Aloysius, which closed in June 2019, was located in the LC zone, and
the other schools are located in either the PFE zone or the PV zone.

44. In June 2014, Jackson's Zoning Board of Appeals ("ZBA") rejected plans
for an all-girls Orthodox Jewish high school.  As a result of this action, the school
sued Jackson in New Jersey state court alleging RLUIPA claims.  See Oros Bais
Yaakov High Sch. v. Twp. of Jackson & Jackson Twp. Zoning Bd. of Adjustment,
No.OCN-L-2891-14 (N.J. Super. filed Oct. 15, 2014).  That litigation is currently
pending.

### *Jackson's Zoning for Schools After 2017:*
### *Ordinance 03-17*

45. In 2017, the Township enacted Ordinance 03-17 which restricted where
public and private schools, including parochial schools, could locate.

46. Ordinance 03-17 amended the Township Zoning Code to remove all schools, whether public or private, from the R-2, R-3, R-5, R-9, R-15, R-20, and MF zoning districts.

47. Ordinance 03-17 states that any use not "expressly permitted" in any zoning district is "expressly prohibited."

48. As a result of Ordinance 03-17, the Township Zoning Code only allows private schools, including parochial schools, to locate in the PMURD zone.

49. The Township's zoning maps shows that only one small PMURD zoning district exists in the Township.

50. Under Ordinance 03-17, public schools are still allowed as permitted by-right uses in the PV, RD-1, RG-2, RG-3, LC and NC zones.

51. The Township has not demonstrated, through statements in its codes, master plan, or elsewhere, that allowing private schools, including parochial schools, in the PV-RD-1, RG-2, RG-3, LC or NC zones would impair any zoning goals for the Township, that the presence of private schools in these districts would adversely impact any regulatory land use goals for those zoning districts, or that private schools, including parochial schools, would have zoning impacts such as traffic, parking, or noise that are different from or greater than the zoning impacts created by a public school.

52. Ordinances 03-17 and 04-17 are "land use regulation[s]" under RLUIPA, 42 U.S.C. § 2000cc-5(5).

### *Jackson's Zoning for Dormitories Before 2017*

53. Before 2017, in the R-2, R-3, and R-5 zones, "other customary accessory uses, buildings and structures, which are clearly incidental to the principal use and building" were permitted as accessory uses.

54. Dormitories are customary uses, buildings and structures that are incidental to the principal use of a school.

55. Before 2017, Jackson contained dormitories associated with a Six Flags theme park.  These dormitories currently are located in the Township's CR (Commercial Residential) zone.

### *Jackson's Zoning for Dormitories After 2017: Ordinances 03-17 and 04-17*

56. Ordinance 03-17 broadly prohibited the establishment of dormitories in the Township and expressly banned them for religious or educational uses.

57. Ordinance 03-17 defines "dormitory" as "[a]ny building, or portion thereof, designed or converted to contain living quarters which are provided as residences or for overnight sleeping for individuals or groups, operated as an accessory use to a school, college, university, boarding school, convent, monastery, non-profit educational institution, religious order, or other."

58. Ordinance 03-17 then broadly prohibits the establishment of dormitories throughout the Township in the "Prohibited Uses" section:

> A. All uses not expressly permitted in any given district are expressly prohibited in such district.  No structure or addition thereto shall be built, moved or remodeled and no land shall be used, occupied, reoccupied, designed or improved for use or occupancy except for a use that is expressly permitted within the zone.

B. The following shall be prohibited as principal or accessory uses or structures in all zoning districts within the Township of Jackson:

(1) Dormitories

59. At the same time the Township enacted Ordinance 03-17, it also enacted Ordinance 04-17, which repeats verbatim the language of Ordinance 03-17 concerning dormitories in Jackson.

60. On January 30, 2019, the Township Planning Board approved a general development plan and site plan for a large complex near Six Flags Theme Park called Adventure Crossing that includes associated housing for a medical research center focused on multiple sclerosis. According to the meeting minutes, approximately 60 "special needs" units located directly above the research facility were approved so that researchers can work close to the population they will serve.

61. The Planning Board did not apply the "dormitory ban" under Ordinances 03-17 or 04-17 to Adventure Crossing's 60 special needs units.

62. On February 4, 2019, the Township Planning Board approved the general development plan proposed by Trophy Park, LLC, which is a multipurpose athletic complex with a commercial area to include restaurants, retail buildings and a hotel. The sports complex at the park will also feature "team suites" for visiting sports teams that would serve up to 1,800 children a week during the summer.

63. The team suites will serve as overnight sleeping quarters operating as an accessory to the sports complex. The team suites consist of 60 two-story buildings

11

with one team per floor and one single bed for each athlete, and a nearby dining hall where teams would eat according to a managed meal plan.

64. The Township Planning Board did not apply the "dormitory ban" under Ordinances 03-17 or 04-17 to Trophy Park's team suites.

65. During the course of two meetings on December 3, 2018 and February 4, 2019, Planning Board members questioned whether the proposed team suites were prohibited dormitories under Ordinances 03-17 and 04-17. The Planning Board determined that the team suites were not dormitories on two grounds: (1) the suites would not be used for academic or religious purposes; and (2) an athlete's stay at a team suite would be for less than 30 days.

66. Dormitories are "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602.

### *Jackson's Zoning for Multi-Family Housing 2017 to Present*

67. In June 2017, the Township enacted ordinances that established three multi-family affordable housing zoning districts: MF-AH-6, MF-AH-7, and MF-AH-8. MF-AH-6 permits multi-family housing for up to six units. MF-AH-7 and MF-AH-8 zones permit multi-family construction projects containing approximately 200 units.

68. The ordinances establishing the MF-AH-6, MF-AH-7, and MF-AH-8 added new zones to already-existing multi-family housing zoning districts.

12

69. The MF-AH-7 and MF-AH-8 zoning districts allow large-scale multi-family housing up to 400 total units that would have a similar if not greater zoning and land use impact on the Township than dormitories.

### *Animus Toward Orthodox Community and Discriminatory Motives Behind Ordinances 03-17 and 04-17*

70. Jackson shares part of its eastern border with Lakewood, NJ.  Since 2000, Lakewood's Orthodox Jewish population has grown greatly and members of the Orthodox community have moved into surrounding towns, including Jackson, bringing with them the community's culture and traditions, including dress, social rules, and religious requirements unique to it.

71. The relatively recent and rapid expansion of the Orthodox community into Jackson has resulted in tension between Orthodox and non-Orthodox residents.

72. Residents of Jackson, as well as other townships neighboring Lakewood, have expressed hostile views toward the Orthodox community and have expressed concerns that the Orthodox community will continue to increase and change the Township's culture.

73. Jackson officials have responded to the concerns expressed by non-Orthodox residents by making statements demonstrating that they are aware of and support residents' animus against the Orthodox community and by taking actions to adversely impact the ability of the Orthodox community to locate in the Township.

74. In August 2015, Township officials, in response to complaints that the Orthodox community from Lakewood was attempting to solicit Jackson residents to

sell their homes to Orthodox families, enacted Ordinance 18-15, known as the "No-Knock Ordinance," that established a registry upon which residents could place their names to restrict solicitors from canvassing directly at their homes.

75. In October 2015, then-Jackson Mayor Michael Reina, at a "Meet the Mayor" event urged residents not to sell their properties in order to preserve the character of the Township.

76. The No-Knock Ordinance was adopted in response to citizen complaints received by the Township, which included complaints about Orthodox Jews asking individuals to sell their homes.

77. In 2016, Jackson's Division of Code Enforcement, under the leadership of then-Council President Nixon, began investigating whether Orthodox community members were violating the Township Zoning Code's capacity and place-of-worship provisions by holding prayer group meetings on Friday nights in residential homes.

78. The level of resources the Division of Code Enforcement was expending on these investigations led Jackson's Business Administrator, Helene Schlegel, to write Mayor Reina and Council President Nixon to complain about the "valuable time and money checking every complaint that comes in" at the expense of "the other issues [that] are life threatening and safety issues that are affecting many of Jackson's youth and families" and stating that "we have to address all the issues in the Township, not just this issue."

79. Mayor Reina stated that he was aware of anti-Orthodox sentiment in the Township and received emails and comments from individuals that were anti-Semitic and who expressed hostility to the Orthodox community.

80. Opposition from non-Orthodox residents to the increased presence of the Orthodox community in Jackson has led a number of social media groups to express animus and hostility toward the local Orthodox community and the growth of the Orthodox population in Jackson.

81. These social media groups regularly post or have posted information about Jackson's Townships Council, ZBA, and Planning Board meetings and encourage residents to contact Township officials to express their views on these issues before, during, and after the enactment of the 2017 Ordinances.

82. Members of the Township Council actively followed these social media sites and were influenced by them and took official action in response to them.

### Jackson Targets the Orthodox Community
### Through Ordinances 03-17 and 04-17

83. The 2017 Ordinances were enacted in response to the growth of the Orthodox community and the complaints Township officials received from residents about the Orthodox community.

84. Township officials introduced the 2017 Ordinances at the February 14, 2017 Council meeting without providing any justification behind the Ordinances and unanimously approved them.

85. On February 28, 2017, the scheduled second reading of the 2017 Ordinances was heavily attended and a number of residents made comments in

15

support of the Ordinances as a way to prevent the Orthodox community from further populating Jackson.

86. On March 6, 2017 Planning Board reviewed and unanimously recommended that the Ordinances be sent to the Township Council for a public hearing on second reading.

87. During the time period of the public meetings concerning the 2017 Ordinances, Jackson residents made comments on social media expressing support of the Ordinances as a way to prevent the Orthodox community from further populating Jackson.

88. On March 14, 2017, the Township Council held a second hearing and public hearing for the 2017 Ordinances that was attended by a standing-room-only crowd where many residents made comments to considerable applause expressing that Jackson needed the 2017 Ordinances to prevent the Orthodox community from further populating Jackson during the meeting.

89. All of the Councilmembers present at the meeting voted to pass the 2017 Ordinances.

90. Former-Councilmember Martin, who voted for the 2017 Ordinances, stated that he was concerned that what had happened in Lakewood, with the construction of schools with dorms, would happen in Jackson. He stated it was his assumption that most of the schools with dorms in Lakewood were built by the Orthodox Jewish community.

91. Councilmember Bressi stated that he and the Township Council were aware of Orthodox Jewish schools having dormitories because of the presence of such schools and dormitories in nearby towns, and that the motivation for the 2017 Ordinance was to keep Orthodox Jews from moving to Jackson.

92. Councilmember Bressi stated that former Councilmember Calogero told him that "The first dorm built in this town for them – I leave this town," meaning by "them" Orthodox Jews.

93. Councilmember Bressi, who represents the Township Council on the Township Planning Board, and Mayor Reina, who sits on the Township Planning Board, both stated that they knew of no reason why a private school should not be allowed in a zoning district that allows a public school.

94. Orthodox families are significantly less likely to move to a location that does not provide religious educational opportunities for their children.

95. Defendant Jackson foresaw and knew the discriminatory impact of the 2017 Ordinances, which effectively ban both religious day schools and yeshivas in Jackson.

96. Agudath Israel of America, Inc. ("Agudath Israel") and W.R. Property, LLC ("W.R.") (collectively "Private Plaintiffs") filed a separate action in 2017 alleging, in part, RLUIPA and Fair Housing Act violations stemming from the same events that form the basis of this Complaint.  See Agudath Israel v. Jackson, No. 17-cv-3226 (D.N.J.) (MAS) (DEA).

17

97. A number of Jackson's Orthodox residents belong to Agudath Israel, a non-profit organization founded to unite a broad array of local Orthodox community members.  Agudath Israel has a branch in New Jersey that advocates for the collective interests of Orthodox community.

98. Before passage of the 2017 Ordinances, W.R. purchased property in Jackson with the intent to construct an Orthodox religious school and identified multiple Orthodox groups interested in constructing one.

99. After Jackson passed the 2017 Ordinances and effectively prevented any religious school or dormitory from locating in Jackson, any application to construct a religious school and dormitory would be futile.

100. Agudath Israel believes that the Orthodox community in Jackson needs to have Orthodox religious schools to serve that population, including religious yeshivas with associated housing.

### *Anti-Orthodox Animus in Jackson by Township Officials and Residents Continues after Enactment of 2017 Ordinances*

101. Hostility toward the Orthodox community by Township officials and residents in Jackson has continued since the enactments of Ordinances 03-17 and 04-17 to the present time.

102. Shortly after enacting Ordinances 03-17 and 04-17, the Township enacted Ordinance 20-17, prohibiting obstructions in rights of way.  The Township enacted this ordinance in response to complaints by residents that the Orthodox community was seeking permits to construct an eruv, which are boundaries often

18

constructed of poles or wires and attached to utility poles. These boundaries designate an area where the Orthodox Jews can perform certain activities on the Sabbath, such as carrying infants and pushing wheelchairs.

103. Ordinance 20-17 prohibited the use of utility poles to construct an eruv, and Jackson has taken enforcement action against members of the Orthodox community, thereby restricting where members of the Orthodox community may go on the Sabbath and other holy days.

104. Mayor Reina signed Ordinance 20-17 into law. Councilmember Bressi stated that Mayor Reina told him, concerning an eruv in Jackson, that he would "never let them have wires in this town."

105. Anti-Semitic incidents have occurred in Jackson since the passage of the 2017 Ordinances:

> a. In November 2017, a tracing of a swastika appeared in the playground sand at Jackson's Woodland Park.
>
> b. In May 2019, a house scheduled for demolition in Jackson was defaced with anti-Semitic graffiti, including swastikas and the word "Hitler."
>
> c. In September 2019, a Jackson resident was charged with harassment and bias intimidation after swerving his car at two Orthodox individuals, forcing them to jump on the curb for safety, while yelling obscenities and insults related to their Jewish religion.

106. The anti-Semitic hostility, and anti-Orthodox statements, continue on social media related to the movement of the Orthodox community into Jackson and nearby areas.

19

107.  The Jackson NJ Strong Facebook group, which was available on Facebook until recently, was one of the social media groups with anti-Orthodox content.  Jackson NJ Strong embraced and encouraged its members to join a newly established Ocean County chapter of Citizens United to Protect Our Neighborhoods ("CUPON"), a group purportedly against development and espousing anti-Semitic views.  In August 2019, three Township officials, ZBA Chairman Sheldon Hofstein, ZBA member Joseph Sullivan, and Planning Board member Richard Egan resigned after reports and videos surfaced documenting their attendance at and participation in a CUPON meeting.

108. Rise Up Ocean County ("RUOC") was started in 2018 and had a public Facebook page with over 14,000 followers as of August 2019 RUOC also maintained a second closed-group Facebook page.  Facebook removed RUOC from its site recently, but the group still maintains an active website and other social media accounts.

109. RUOC's internet platforms contain posts, commentary, and videos about growth issues in Ocean County that include derogatory statements and imagery about Orthodox Jews.

110. On April 8, 2020, another existing Facebook group became Take Back Jackson, NJ and describes itself as "Calling out all the BS that effects [sic] Jackson residents."  This group has approximately 430 members and remains active.  It contains postings and comments similar to, and sometimes excerpted from, RUOC.

20

2020.  The repeal of the Ordinances will not happen at least until there is a second reading.

117. At all times relevant, the Township did not have in place procedures to ensure Township officials were able to satisfy their obligations under RLUIPA or the FHA, including but not limited to, providing RLUIPA or FHA training to Township officials and staff involved in religious land use determinations, and establishing procedures to address complaints concerning denials of rights under RLUIPA or the FHA.

### Count I: RLUIPA – Equal Terms

118. The allegations above are incorporated by reference.

119. The Defendants' enactment and application of the 2017 Ordinances and the Defendants' actions described in this Complaint constitute the imposition or implementation of a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution in violation of RLUIPA, 42 U.S.C. § 2000cc(b)(l).

### Count II: RLUIPA – Nondiscrimination

120. The allegations above are incorporated by reference.

121. The Defendants' enactment and application of the 2017 Ordinances and the Defendants' actions described in this Complaint constitute the imposition or implementation of a land use regulation that discriminates against any assembly or

111. In early 2019, after discussing settlement with the Private Plaintiffs (see paragraph 96, above) for several months, the Township drafted ordinances to counteract Ordinances 03-17 and 04-17. The Township never enacted the draft ordinances. Instead, the Township decided to engage new legal counsel and to move forward with defending against the Private Plaintiffs' lawsuit.

### United States' Notification of Suit Authorization
### And Subsequent Township Action

112. On February 3, 2020, the United States informed the Township that it was authorized to commence a lawsuit against the Township under RLUIPA and the FHA.

113. On May 12, 2020, the Township Council voted to repeal Ordinances 03-17 and 04-17.

114. Residents participating in that meeting opposed repealing Ordinances 03-17 and 04-17.

115. During that meeting, Township officials stated that Ordinances 03-17 and 04-17 were being repealed because they were "redundant," that dormitories would still not be permitted anywhere in the Township after the repeal of the ordinances (*i.e.*, under the Township's pre-amended 2017 Ordinance), and that schools with dormitories would still not be allowed.

116. The Township Council's vote to repeal Ordinances 03-17 and 04-17 is one step in a multi-step process to repeal them. A second reading by the Township Council, where the public will be invited to speak, is scheduled to occur on May 26,

institution on the basis of religion or religious denomination in violation of RLUIPA, 42 U.S.C. § 2000cc(b)(2).

## Count III: FHA

122. The allegations above are incorporated by reference.

123. The Defendants, through the conduct described in this Complaint, have discriminated in the sale or rental, or otherwise made unavailable or denied, dwellings to persons because of religion in violation of 42 U.S.C. § 3604(a).

124. The conduct of the Defendants described in the Complaint constitutes:

    a.  A pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, 42 U.S.C. §§ 3601-3619; and/or

    b.  A denial to a group of persons of rights granted by the Fair Housing Act, 42 U.S.C. §§ 3601-3619, which raises an issue of general public importance.

125. Members of the Orthodox community seeking to reside in Jackson and attend or be close to yeshiva schools, and others, are "aggrieved persons," as defined in 42 U.S.C. § 3602(i), and have suffered damages as a result of the Defendants' conduct described above.

126. The Defendants' conduct described above was intentional, willful, and taken in disregard for the rights of others.

## Prayer for Relief

**WHEREFORE,** the United States prays that this Court enter an order that:

A.  Declares that the Defendants' policies and practices, as alleged herein, violate RLUIPA;

B. Enjoins the Defendants, their officers, employees, agents, successors, and all other persons in concert or participation with them, from:

    i.    Treating the Orthodox community, and any other religious entities and institutions, and their members, on less than equal terms with nonreligious assemblies or institutions; and

    ii.    Discriminating against the Orthodox community, and any other religious entities and institutions, and their members, on the basis of religion or religious denomination;

C.  Requires the Defendants, their officers, employees, agents, successors, and all other persons in concert or participation with them, to:

    i.    Take such actions as may be necessary to prevent the recurrence of such unlawful conduct in the future, including, but not limited to:

        1.  Ensuring that religious assemblies or institutions are not treated on less than equal terms with nonreligious assemblies or institutions;

        2.  Providing RLUIPA training to its personnel;

        3.  Establishing procedures to address complaints of RLUIPA violations; and

        4.  Maintaining records and submitting reports relating to RLUIPA compliance;

24

D.  Declares that the Defendants' policies and practices, as alleged herein, violate the Fair Housing Act;

E.  Declares that the Defendants have engaged in a pattern or practice of discrimination in violation of the Fair Housing Act or have denied rights under the Fair Housing Act to a group of persons raising an issue of general public importance;

F.  Enjoins the Defendants, their officers, employees, agents, successors, and all other persons in active concert or participation with any of them, from discriminating in the sale or rental, or otherwise making unavailable or denying dwellings to renters, because of religion in violation of 42 U.S.C. § 3604(a);

G.  Awards monetary damages under 42 U.S.C. § 3614(d) to aggrieved persons harmed by the Defendants' discriminatory policies and practices; and

H.  Awards such additional relief as the interests of justice may require,

together with the United States' costs and disbursements in this action.

Dated May 20, 2020

                                           Respectfully submitted,

                                           WILLIAM P. BARR
                                           Attorney General

| | |
|---|---|
| CRAIG CARPENITO | ERIC S. DREIBAND |
| United States Attorney | Assistant Attorney General |
| District of New Jersey | Civil Rights Division |
| | |
| /s/ Kelly Horan Florio | |
| KELLY HORAN FLORIO | SAMEENA SHINA MAJEED |
| Assistant United States Attorney | Chief |
| United States Attorney's Office | |
| District of New Jersey | /s/ Beth Frank |
| 970 Broad Street, Suite 700 | TAMAR HAGLER |
| Newark, NJ 07102 | Deputy Chief |
| Phone: (973) 645-2824 | RYAN G. LEE |
| kelly.horan@usdoj.gov | BETH FRANK |
| | Trial Attorneys |
| | United States Department of Justice |
| | Civil Rights Division |
| | 950 Pennsylvania Avenue, NW |
| | Washington, DC 20530 |
| | Phone: (202) 305-8196 |
| | beth.frank@usdoj.gov |



Case 3:20-cv-06109   Document 1-1   Filed 05/20/20   Page 1 of 1 PageID: 27

# EXHIBIT C

JS 44  (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | Township of Jackson, New Jersey and Jackson Planning Board |

| **(b)** County of Residence of First Listed Plaintiff _____ | County of Residence of First Listed Defendant    Ocean |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |

| **(c)**  Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Kelly Horan Florio, Esq.<br>U.S. Attorney's Office, District of New Jersey<br>970 Broad Street, Suite 700, Newark, NJ  07102  (973) 645-2700 | Gregory McGuckin-Dasti,Murphy,McGuckin,Ulaky,Koutsouris,Connors<br>620 West Lacey Road,Box1057,Forked River,NJ08731 609-971-1010<br>Sean Gertner, Gertner & Gertner, 740 Bennetts Mill Road, Jackson Township, NJ<br>08527 732-523-5444 |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
      Plaintiff

☐ 2  U.S. Government
      Defendant

☐ 3  Federal Question
      *(U.S. Government Not a Party)*

☐ 4  Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>    & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>    Student Loans<br>    (Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br>    of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>    Liability<br>☐ 320 Assault, Libel &<br>    Slander<br>☐ 330 Federal Employers'<br>    Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>    Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>    Product Liability<br>☐ 360 Other Personal<br>    Injury<br>☐ 362 Personal Injury -<br>    Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury -<br>    Product Liability<br>☐ 367 Health Care/<br>    Pharmaceutical<br>    Personal Injury<br>    Product Liability<br>☐ 368 Asbestos Personal<br>    Injury Product<br>    Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>    Property Damage<br>☐ 385 Property Damage<br>    Product Liability | ☐ 625 Drug Related Seizure<br>    of Property 21 USC 881<br>☐ 690 Other<br><br>**LABOR**<br>☐ 710 Fair Labor Standards<br>    Act<br>☐ 720 Labor/Management<br>    Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br>    Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br>    Income Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>    28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated<br>    New Drug Application<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC<br>    3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>    Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br>    Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information<br>    Act |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>    Accommodations<br>☐ 445 Amer. w/Disabilities -<br>    Employment<br>☐ 446 Amer. w/Disabilities -<br>    Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br>    Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br>    Conditions of<br>    Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br>    Actions | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff<br>    or Defendant)<br>☐ 871 IRS—Third Party<br>    26 USC 7609 | ☐ 896 Arbitration<br>☐ 899 Administrative Procedure<br>    Act/Review or Appeal of<br>    Agency Decision<br>☐ 950 Constitutionality of<br>    State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1  Original
      Proceeding

☐ 2  Removed from
      State Court

☐ 3  Remanded from
      Appellate Court

☐ 4  Reinstated or
      Reopened

☐ 5  Transferred from
      Another District
      *(specify)*

☐ 6  Multidistrict
      Litigation -
      Transfer

☐ 8  Multidistrict
      Litigation -
      Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. 2000cc et seq.; Fair Housing Act, 42 U.S.C. 3601 et seq.

Brief description of cause:  Unequal treatment of religious vs. non-relgious entities in the enactment and application of land use laws as well as discrimination against the Orthodox Jewish community on the basis of religion.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
    UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*      JUDGE  The Honorable Michael A. Shipp      DOCKET NUMBER  17-cv-3226

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 5/20/2020 | /s/Kelly Horan Florio |

**FOR OFFICE USE ONLY**

RECEIPT # _____      AMOUNT _____      APPLYING IFP _____      JUDGE _____      MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.