**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| WR PROPERTY LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TOWNSHIP OF JACKSON, et al.,<br><br>Defendants. | Civil Action No. 17-3226 (MAS) (DEA)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Plaintiffs WR Property LLC ("WR Property")

and Agudath Israel of America's ("Agudath Israel") (collectively, "Plaintiffs") Motion for

Preliminary Injunction. (ECF No. 55.) Defendants Township of Jackson (the "Township" or

"Jackson Township"), Mayor Michael Reina, former Council President Robert Nixon, Township

Administrator Helene Schlegel, Zoning Enforcement Officer Jeffrey Purpuro, Code Enforcement

Officer William Campbell, and Code Compliance Supervisor Kenneth Pieslak (collectively,

"Defendants") opposed (ECF No. 58), and Plaintiffs replied (ECF No. 60). The parties also

submitted supplemental material in support of their arguments. (ECF Nos. 74, 82, 83, 107, 112,

114, 116, 117.) The Court has carefully considered the parties' submissions and heard oral

argument on March 30, 2021. For the reasons set forth herein, Plaintiffs' Motion for Preliminary

Injunction is granted.

## I.     BACKGROUND[1]

This action involves allegations that Jackson Township enacted land use ordinances as part of an ongoing, discriminatory scheme to discourage members of the Orthodox Jewish community from residing within its boundaries.[2] (Second Am. Compl. ("SAC") ¶¶ 1–2, ECF No. 40.) According to Plaintiffs, the ordinances were intentionally enacted to prevent the construction of Orthodox Jewish schools and eruvim[3] within the Township. (*Id.* ¶¶ 3–5.) In the instant Motion, Plaintiffs seek to preliminarily enjoin enforcement of those ordinances.

Defendants include Jackson Township and several current and former Township officials, including Mayor Reina and former Council President Nixon.[4] (*Id.* ¶¶ 31–38.) Plaintiffs include Agudath Israel and WR Property. Agudath Israel is a national Orthodox Jewish advocacy organization whose members include Orthodox Jewish residents of Jackson Township. (*Id.* ¶¶ 14, 16.) "Jewish education is prominent among the causes for which Agudath Israel advocates." (*Id.* ¶ 15.) WR Property is a developer that owns 4.93 acres of land (the "Property") in Jackson

---

[1] The parties are familiar with the factual and procedural history of this matter and therefore the Court recites only those facts necessary to resolve the instant Motion.

[2] Since the commencement of this action, the United States of America (the "Government") has also filed a lawsuit against the Township, challenging certain ordinances at issue in this case. (*United States v. Jackson Twp.*, No. 20-6109.) The Government's action has been consolidated with this matter for discovery purposes. (ECF No. 90.) For clarity and completeness, the Court will at times cite to facts contained in the Government's complaint and the Township's corresponding answer.

[3] As discussed below, an eruv is a symbolic boundary that permits members of the Orthodox Jewish community to carry out certain activities otherwise forbidden on holy days.

[4] The five-member Township Council that passed the ordinances included Council President Robert Nixon and members Kenneth Bressi, Barry Calogero, Ann Updegrave, and Scott Martin. (Gov't's Compl. ¶¶ 18–22, No. 20-6109, ECF No. 1; Twp.'s Answer ¶¶ 18–22, No. 20-6109, ECF No. 12.) Mayor Reina does not vote on the adoption of ordinances but does sign the ordinances into effect. *See* Jackson Twp. Admin. Code § 3-14.

Township's R-3 rural residential district ("R-3"). (*Id.* ¶¶ 25–27.) WR Property asserts that in 2014, it purchased the Property "for the purpose of developing or marketing it for development of an Orthodox Jewish religious school." (*Id.* ¶ 27; Pfeffer Decl. ¶¶ 4–5, ECF No. 55-101.)

### A.    Religious Beliefs

Plaintiffs note that the Orthodox Jewish community, "sometimes referred to as 'ultra-Orthodox' or *haredi*, is characterized by distinctive dress, customs, religious practices, and educational needs, among other attributes." (SAC ¶ 44.) Relevant here are the Orthodox Jewish community's religious beliefs relating to schools and eruvim.

#### 1.    Schools

The Orthodox Jewish community believes that a central element of their religious exercise is to educate their children in Orthodox Jewish schools where the children can learn the traditions and beliefs of their faith. (*Id.* ¶ 45; Rabbi Schnall Decl. ¶ 9, ECF No. 55-103.) Plaintiffs assert that "there is a very powerful religious obligation in Jewish life to teach children religious studies, as part of a prayer that is recited three times a day by most Orthodox Jews. The practical way of fulfilling that key religious obligation is through the medium of a religious school." (SAC ¶ 52.) Plaintiffs note that "[t]he school must . . . follow Jewish laws such as [the] law of *kashrut* (Kosher dietary laws)." (Gruskin Decl. ¶ 4, ECF No. 55-89.) Plaintiffs also note that certain schools require dormitories. (SAC ¶¶ 45–46, 58.) For example, "[h]igh schools for Orthodox Jewish boys (called *mesivtas*) are most often boarding schools." (*Id.* ¶ 46.) The Orthodox Jewish community believes that *mesivta* students must be removed from the distractions of secular life to "concentrate on their studies, experience a community of dedicated religious practitioners and scholars, and devote their attention to spiritual development with appropriate models and guides as to how to live their lives in accord with the Torah." (*Id.* ¶ 54.)

3

"There are currently no Orthodox Jewish religious schools in the Township." (*Id.* ¶ 59.) Consequently, Orthodox Jewish families send their children to school in Lakewood Township. (*See, e.g.*, Cohen Decl. ¶ 5, ECF No. 88; Gruskin Decl. ¶ 5.) According to those parents, sending their children to school in Lakewood interferes with the children's prayers and studies because the bus ride takes approximately two hours round-trip. (Cohen Decl. ¶¶ 5, 7; Gruskin Decl. ¶¶ 5–6.)

### 2. Eruvim

Plaintiffs explain that "Jewish law prohibits many activities that are classified as 'work' on the Sabbath and holy days." (Rabbi Schnall Decl. ¶ 6.) For instance, Jewish law prohibits carrying or pushing objects from the private domain, i.e., a home, to the public domain on holy days. (*Id.*; SAC ¶ 64.) Thus, for example, Orthodox Jewish families with infants would generally be unable to attend religious services on holy days because they would be prohibited from pushing a stroller or carrying their children to shul.[5] (*See* SAC ¶ 66.)[6] An eruv, however, would enable an Orthodox Jewish family in that scenario to attend religious services. (*See* Rabbi Schnall Decl. ¶ 6.)

"An eruv is an area enclosed by a wire boundary that symbolically extends the private domain of Jewish households into public areas, permitting activities within it that . . . are normally forbidden in public on the Sabbath and holy days, such as pushing a stroller" or carrying an infant. (*Id.* ¶ 6.) An eruv can be constructed by erecting a metal pole or "attaching *lechis*—thin black strips made of the same hard plastic material as, and nearly identical to, the coverings on ordinary ground wires—vertically along utility poles." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309

---

[5] "Shul" means synagogue. https://www.merriam-webster.com/dictionary/shul (last visited May 4, 2021).

[6] Other examples of prohibited activity include pushing "a wheelchair or carrying food, medication, canes, water bottles, house keys, personal identification, books, prayer shawls and/or glasses outside of the[] home[]." (Rabbi Schnall Decl. ¶ 6.)

F.3d 144, 152 (3d Cir. 2002); (SAC ¶ 69.) "Along with preexisting horizontal overhead utility lines, the *lechis* [and/or metal poles] designate an eruv's boundaries." *Tenafly Eruv Ass'n*, 309 F.3d at 152 (citation omitted).

Members of Agudath Israel assert that certain neighborhoods in Jackson Township do not have an eruv seemingly due to the ordinance adopted by the Township. (*See, e.g.*, Mozes Decl. ¶ 5, ECF No. 55-86; Klein Decl. ¶ 6, ECF No. 55-90.) Those individuals assert that, as in the scenario above, their families are unable to attend religious services on the Sabbath. (Mozes Decl. ¶ 6 (noting also that he cannot "carry [his] books to shul," which "hampers [his] ability to pray and study"); Klein Decl. ¶ 7 (same).)

### B.    Plaintiffs' Allegations

Jackson Township is located within Ocean County, New Jersey, and to the west of Lakewood Township, where a large Orthodox Jewish community resides. (SAC ¶¶ 39, 42–43.) Due to "a shortage of available housing in Lakewood," members of the Orthodox Jewish community have increasingly begun moving to surrounding townships, including Jackson Township. (*Id.* ¶ 60.) According to Plaintiffs, the Orthodox Jewish community's relocation efforts have been met with resistance and hostility. (*Id.* ¶¶ 1, 8, 73.)

Plaintiffs assert that many Township residents have expressed their animosity towards the Orthodox Jewish community on social media, through e-mail correspondence with Township officials, and at Township meetings. (*See, e.g.*, *id.* ¶¶ 100, 209, 376.) By way of example, a Township resident wrote to the Township Council regarding the eruvim, stating: "Lakewood looks like a spider web has be[en] dropped on it and I certainly don't want to see it happen to our wonderful town." (*Id.* ¶ 181; *see* Answer ¶ 181, ECF No. 52.) Other examples of comments made by residents include:

5

> Just like the Jim Crow laws labeling "white or black fountains[,"] this is a sign that "Ha[s]idics only" are welcome[.]
>
> Can you imagine driving past Harmony farms with poles & wires labeling it as Orthodox owned & run? What is going to be done, they are 10 steps ahead of us.
>
> Between the Shuls, ERVU [sic] wires and now this, [t]his wonderful neighborhood is going down the gutter so fast. I have emailed so many times with no response. WHAT IS GOING TO BE DONE with this???? People do NOT want to live [b]y this and so many people are leaving and only the Orthodox are moving in because WE [a]ccommodate them[.]

(SAC ¶¶ 181, 267.)

Plaintiffs also note that Township residents formed "Jackson Strong," a group "known for its hostility toward the Orthodox Jewish community[.]" (Pls.' Suppl. Br. 5, ECF No. 74; SAC ¶ 203.) According to Plaintiffs, Township officials share the same animosity and have "act[ed] as part of a common scheme with hostile local residents, to prevent Orthodox Jews from moving to Jackson Township and to subject them to harassment if they do." (SAC ¶¶ 1, 7.)

For instance, Plaintiffs point to a pending state court matter where Jackson Township's Zoning Board denied an application for the development of an Orthodox Jewish high school. (*Id.* ¶¶ 258, 264; *see* Compl. in *Oros Bais Yaakov High Sch. v. Jackson Twp*, No. PW-L-2981-14, ECF No. 55-28.) In that case, the Zoning Board's decision was allegedly motivated by hostility towards the Orthodox Jewish community. (SAC ¶¶ 259–61.) Plaintiffs note that certain Zoning Board members who denied the application have made discriminatory comments about the Orthodox Jewish community on social media. (*Id.* ¶ 263.) For example, in separate posts, former Zoning Board member John Burros referred to the Orthodox Jewish community in Lakewood as the "tsunami of orthodoxy," "scourge of the cockroaches from the east," and the "Lakewood medieval cult." (*Id.*; *see* Answer ¶ 263; Burros Social Media Posts, ECF No. 55-63.) Plaintiffs also indicate

that two other Zoning Board members, Sheldon Hofstein and Joseph Sullivan, recently resigned from their official positions following their attendance at a CUPON[7] meeting; "[t]he local CUPON group was [allegedly] formed in opposition to development that would likely serve the Orthodox Jewish community in Jackson Township." (Pls.' Suppl. Br. 9.) Planning Board member Richard Egan also resigned for the same reason. (*Id.*) According to Councilman Bressi, he has heard Egan refer to members of the Orthodox Jewish community as "the hats" and "the beards" "many times." (Bressi Dep. Tr. 57:14-18, ECF No. 74-1.)

Another alleged example of action targeting the Orthodox Jewish community involves the monitoring of properties allegedly used as shuls. Plaintiffs assert that, in 2016, Township officials began monitoring homes where many Orthodox Jews congregated after residents began complaining about their alleged use as a shul. (SAC ¶¶ 296–97; *see also id.* ¶¶ 286–87 (Council President Nixon informing Mayor Reina and Township Administrator Schlegel via e-mail correspondence that he "received a complaint today that 713 Green Valley Road is being used as a shul . . . ." Township Administrator Schlegel responded "[w]e will monitor these sights and provide a report on Monday.") Examples of complaints sent to Township officials include:

> So with the two houses added up, that's 11 cars. That's just assuming one person per car. Say there are 2 people per car. That's already 22 people! Let's not forget about the 10 plus walkers!! I'm pretty sure that[] goes over 25. I have pictures of 9 Harvest having 9 cars in front & 7 having 6 on other weekends. I can't understand how two houses that are working side by side together do not deserve some kind of warning or violation? They have already asked surrounding neighbors to put up ERUV wires to attach house to house . . . .
>
> [T]here seems to be a home on 24 Winchester that may be using the home as shul. There are way too many cars parked in the driveway,

---

[7] Citizens United to Protect Our Neighborhoods. (Pls.' Suppl. Br. 5 n.2.)

> street[,] and side of the house behind the bushes on Friday night until
> Saturday night. People are walking over as well.

(*See id.* ¶ 297.) The officials also allegedly issued notice violations to certain properties and
provided Mayor Reina and Council President Nixon with reports addressing whether the surveilled
properties were being used as shuls.[8] (*Id.* ¶¶ 272–75.) As with the properties allegedly used as
shuls, Plaintiffs assert that Township officials similarly targeted sukkahs, "a tent-like structure"
erected on property during the eight-day festival of Sukkot, after residents complained about the
structures. (*Id.* ¶¶ 298– 301, 306–07.)

Yet another alleged example of targeted action involves attempts to prevent the sale of
homes to members of the Orthodox Jewish community. In that regard, Plaintiffs point out that the
Township adopted a "no-knock" ordinance that "prohibits individuals from knocking on doors in
the Township unless they are registered with the Township, and prohibits solicitation at premises
that are listed on a '[n]o-[k]nock registry.'" (*Id.* ¶ 219.) According to Plaintiffs, the Township
adopted the ordinance to prevent members of the Orthodox Jewish community from contacting
homeowners regarding the potential sale of their homes. (*Id.* ¶ 221.) Plaintiffs also note that the
Township unsuccessfully filed a complaint with the United States Department of Justice and the
New Jersey Attorney General alleging that the "Orthodox Jews' attempts to buy homes in the
Township constituted so-called 'blockbusting.'" (*Id.* ¶ 211.) And at one Township Council
meeting addressing the purported blockbusting issue, Council President Nixon allegedly "told
Township residents that 'the threat can be eliminated if people held their ground and refused the
offers being made on their properties and remain committed to Jackson Township and their

---

[8] According to a member of Agudath Israel, during a meeting in which the issue of synagogues
and shuls arose Mayor Reina was asked "[i]f these were churches would we be fighting them[,]"
and Mayor Reina responded "[a]bsolutely not." (Schenkolewski ¶ 4, ECF No. 55-95.)

neighbors.'" (*Id.* ¶ 210.) In addition, Plaintiffs indicate that a Township resident posted the following comment on social media regarding a meeting with Mayor Reina: "Meet the Mayor was a success. The [Jackson Strong] signs will be Great Success to let everyone know Don't Sell Jackson Strong! The mayor said the key to keeping Jackson the way we all know and love it is Tell your neighbors DON'T SELL. STAY STRONG!" (*Id.* ¶ 205; *see* Answer ¶ 205; *see* Oct. 2015 Social Media Post, ECF No. 55-110.)

In further support of their Motion, Plaintiffs point to excerpts of Councilman Bressi's deposition testimony. There, Bressi avers that Council President Nixon, Councilman Calogero, and Mayor Reina have spoken to him about "ways of stopping the Orthodox Jewish community from moving into Jackson Township[.]" (Bressi Dep. Tr. 41:14-24.) Bressi also avers that he knows, based on conversations, that Council President Nixon, Councilman Calogero, and Mayor Reina are affiliated with, and have acted to further the objectives of, Jackson Strong. (*Id.* at 38:8-22, 40:10-41:24, 147:19-148:8.) Similarly, Councilwoman Updegrave indicated at her deposition that, "based on some of the things [she's] read," she considered Mayor Reina, Council President Nixon, and Councilman Calogero "anti-Semite[s]." (Updegrave Dep. Tr. 125:23-126:11, ECF No. 55-21.)

Against this backdrop, the Township adopted Ordinances 03-17, 04-17, and 20-17 in 2017. (SAC ¶¶ 3–4.) Ordinances 03-17 and 04-17 were allegedly adopted to prevent the construction of Orthodox Jewish Schools and Ordinance 20-17 was allegedly adopted to prevent the construction of eruvim. (*See id.*)

.

1.      **Ordinances 03-17 and 04-17**

(a)     **The Ordinances**

The Township adopted Ordinances 03-17 and 04-17 in March 2017. (*Id.* ¶ 103.) Though not expressly apparent from the text, the parties do not dispute that Ordinance 03-17 effectively removed schools as a permitted use in most of the Township's residential zones. (*Id.* ¶¶ 78–79; Answer ¶¶ 78–79; *see* Ordinance 03-17, ECF No. 55-26.) As a result of Ordinance 03-17, religious schools now appear to be allowed as a permitted use only in the Planned Mixed Unit Residential Development ("PMURD") zone.[9] (Gov't's Compl. ¶ 48, No. 20-6109; *see* Twp.'s Answer ¶ 48, No. 20-6109; *see* Pls.' Moving Br. 10 n.7, ECF No. 55-1.) The Township's Zoning Code indicates that "[t]he minimum tract area of a PMURD shall be 500 contiguous acres under one ownership or control." Jackson Twp. Land Use & Development Regulations § 244-54(D)(1)(a). Ordinance 03-17 also provides that dormitories are "prohibited as principle or accessory uses or structures in all zoning districts[.]" (Ordinance 03-17 § 8(B).) Likewise, Ordinance 04-17, which has since been repealed, prohibited dormitories throughout the Township. (*See* Ordinance 04-17, ECF No. 55-27.) In response to the adoption of these ordinances, Plaintiffs commenced the instant action in May 2017. (*See* Compl., ECF No. 1.) Shortly thereafter, this matter was referred to mediation and the parties engaged in settlement negotiations but ultimately could not reach an agreement.

---

[9] "The Jackson zoning map enumerates 45 zoning districts: 28 districts outside the Pinelands Area and 17 within the Pinelands Area, much of which is in the southern portion of Jackson and is zoned as preservation area or military." (Gov't's Compl. ¶ 35, No. 20-6109; Twp.'s Answer ¶ 35, No. 20-6109; *see* Jackson Zoning Map, Ex. A to Gov't's Compl., No. 20-6109, ECF No. 1-1.) "The northern section of Jackson contains a large number of residential zones[,]" which "comprise the majority of the Township." (Gov't's Compl. ¶ 36, No. 20-6109; Twp.'s Answer ¶ 36, No. 20-6109.) There is only one PMURD zone. (*see* Jackson Zoning Map.) As noted, WR Property is located in the Township's R-3 zoning district. (SAC ¶¶ 25–26.)

In May 2020, around the same time the Government commenced its action, the Township

adopted Ordinance 06-20, which provides, in relevant part:

> SECTION 1.  Ordinance 04-17 be and hereby is repealed.
>
> SECTION 2.  All Ordinances or parts of Ordinances inconsistent
> herewith are hereby repealed.

(Ordinance 06-20 § 1, ECF No. 112-2.)[10] In supplemental briefing, the parties disputed whether

Ordinance 06-20 repealed Ordinance 03-17 to the extent the latter prohibits dormitories. (Defs.'

Suppl. Br. 3–4, ECF No. 114; Pls.' Reply Suppl. Br. 4, ECF No. 116.) During oral argument,

Plaintiffs maintained that Ordinance 06-20 did not repeal Ordinance 03-17 in any manner. (Oral

Argument Tr. 4:11-20.) Plaintiffs also asserted that, in any event, "[t]he schools can't exist[,] . . .

it's kind of a moot point if the schools can't exist in the first place." (*Id.* at 6:1-15.) In response,

Defendants represented that Ordinance 06-20 did repeal Ordinance 03-17's dormitory provisions.

(*See id.* at 7:8-17.)

### (b)    Proffered Evidence of Discriminatory Purpose

Plaintiffs note that many Orthodox Jewish residents of Jackson Township attended public

meetings held for the ordinances to oppose them and "inform[] the Jackson Township Council of

the significant impact they would have on the Orthodox Jewish community." (*See* SAC ¶¶ 93–95.)

Plaintiffs assert that during some of those meetings, Township residents made anti-Semitic

comments and "indicated that they supported the School Ordinances to prevent Jackson from

becoming like Lakewood." (*Id.* ¶¶ 98–102.) Comments included, for example, "[e]very home [in

Lakewood] comes with a temple, a school for the Jewish[,]" which allegedly received a round of

---

[10] At the time, the Township had also proposed adopting Ordinance 05-20, which would have
repealed Ordinance 03-17. (*See* Ordinance 05-20 § 1, ECF No. 112-1.) Ordinance 05-20, however,
was ultimately not adopted.

applause from residents. (*Id.* ¶ 102 (second alteration in original); *see* Answer ¶ 102.) Regarding Ordinance 03-17, another Township resident stated "'[i]t's a little shortsighted. It seems like you're shooting yourself in the foot to solve a problem here. . . . If the problem is to keep Jews out of Jackson, then you need to . . . .'" before being "silenced by the Council." (SAC ¶ 100 (second and third alterations in original); Answer ¶ 100.)

In addition to the above-cited testimony, Plaintiffs also point to the following excerpts of Bressi and Councilman Martin's deposition testimony. Councilman Martin asserted he was concerned that what had occurred in Lakewood—the amount of schools with dormitories built— would happen in the Township. (Martin Dep. Tr. 47:19-48:2, ECF No. 55-22.) Regarding those schools, Councilman Martin stated it was his understanding that most of them were built by members of the Orthodox Jewish community. (*Id.* at 48:3-14.) For his part, Bressi acknowledged that prior to the adoption of Ordinances 03-17 and 04-17, there were no issues with schools or dormitories existing in the Township. (Bressi Dep. Tr. 46:10-14, 49:20-25.)

Plaintiffs also note that the "Township contains a wide variety of large assembly, institutional and commercial land uses, including . . . Six Flags Great Adventure, the Jackson Premium Outlets, ten public schools, several assisted living facilities, funeral homes, medical facilities, campgrounds, golf clubs, and rehabilitation facilities." (SAC ¶ 137.) Moreover, Plaintiffs emphasize that Six Flags has dormitories. (*Id.* ¶ 130.) According to Plaintiffs, "[t]he Township has no land use concerns about the Six Flags dormitories, nor has it effected any enforcement action against such dormitories." (*Id.* ¶ 131.) And at his deposition in the *Oros* matter, Mayor Reina

asserted that he did not "have any problem" with the proposed development of a sports facility that would include a dormitory.[11] (Reina Dep. Tr. 116:12-117:20, ECF No. 55-4.)

### 2. Ordinance 20-17

#### (a) The Ordinance

A few months after the adoption of Ordinances 03-17 and 04-17, the Township passed Ordinance 20-17 in September 2017. (SAC ¶ 4.) The preamble to Ordinance 20-17 states in part: "in light of the recent spate of enforcement of §[]372-8[12] which prohibits obstruction of the right of way throughout the Township, the Township Council believes it is necessary to avoid confusion and any possibility of uneven treatment of articles in the Township right-of-way." (Ordinance 20-17, ECF No. 55-33.) Ordinance 20-17 provides that "[n]o person shall encumber or obstruct any street or public place with any article or thing whatsoever." (*Id.* § 1.)

In December 2017, the Township adopted Resolution No. 368R-17, which permitted "the placement of eruvim/lechis on poles erected by utilities that have the lawful right to maintain the poles within the public right-of-way in the Township of Jackson provided the utility company consents to such placement and there is compliance with all applicable" laws. (Resolution No. 368R-17, ECF No. 55-73.) The resolution indicates that it was ratified in connection with the aforementioned unsuccessful settlement negotiations. (*See id.*)

---

[11] Mayor Reina's deposition took place while Ordinance 04-17 was in effect. The Court also notes that according to the Government's complaint, "the Township Planning Board approved a general development plan and site plan for a large complex near Six Flags Theme Park called Adventure Crossing that includes associated housing for a medical research center[]" despite the "dormitory ban" that was in effect at the time. (Gov't's Compl. ¶¶ 60–61, No. 20-6109.)

[12] While in effect, Section 372-8 permitted the placement of objects in the public right-of-way with the Township's permission: "[n]o person shall encumber or obstruct any street or public place with any article or thing whatsoever unless permission has been first obtained in writing from the Township Committee[.]" (SAC ¶ 152.)

(b)    **Proffered Evidence of Discriminatory Purpose**

The "recent spate of enforcement of §[]372-8" referenced in Ordinance 20-17 allegedly begin in or about July 2017 after Township residents complained about the existing eruvim in the Township. (SAC ¶¶ 162, 187.) Plaintiffs assert that, that month, the Township increasingly issued violation notices to residents for objects placed in the public right-of-way, including "basketball hoops, advertising signs, real estate signs, for sale signs, poles[,] and eruv wires." (*Id.* ¶¶ 160–62.) According to Plaintiffs, the Township sought to remove the existing eruvim under the pretext of enforcing Section 372-8. (*Id.* ¶¶ 177, 181–82.) In support of that argument, Plaintiffs note that the Township issued approximately twelve violation notices to residents in the first six months of 2017 compared with the approximately 268 violation notices issued between July and August 2017, after Township residents began complaining about the eruvim. (*Id.* ¶¶ 163–64.) Of the 268 violation notices, approximately 213 concerned removal of portable basketball systems, seven concerned removal of eruv markers, three concerned removal of metal poles, and fourteen provided no description. (*Id.* ¶¶ 165–66.)

Plaintiffs also point out that, prior to Ordinance 20-17, the Township indicated that "no [o]rdinance was being violated by the presence of the eruvim." (*Id.* ¶ 154.) In that regard, Plaintiffs point to e-mail correspondence from Code Compliance Supervisor Pieslak and Zoning Enforcement Officer Jeffrey Purpuro. Responding to an apparent complaint from a resident, Pieslak wrote: "We are aware of the group of homes that have installed the poles connected by the wire in Brookwood []and found there to be no violation of any [o]rdinance/[l]aw." (Apr. 6, 2017 E-Mail Correspondence, ECF No. 55-35.) Shortly thereafter, Purpuro wrote: "So if I were to ask for these wires to be removed, I'd have no black and white codes to cite. . . . Bottom line, from a

Planning and Zoning perspective, relative to Chapter 244, as nothing seems to exist on this matter, I have nothing to enforce." (Apr. 24, 2017 EC, ECF No. 55-36.)

Plaintiffs further note that, at his deposition, Mayor Reina acknowledged that Ordinance 20-17 resulted from complaints made by Township residents concerning the eruvim:

> Q. But when they started to put polls [sic] in for eruv's [sic] that is when people complained about it?
>
> Reina. Yes.
>
> Q. And that ultimately resulted in this ordinance, correct?
>
> Reina. I would have to say yes.

(Reina Dep. Tr. 164:5-11.) Moreover, according to Councilman Bressi, Mayor Reina has stated he will "never let them have wires in this town." (Bressi Dep. Tr. 125:19-23.) Finally, Plaintiffs submit photographic evidence showing that, despite Ordinance 20-17, objects still exist in the right-of-way, including portable basketball systems, flags, and signs. (*See* Investigator Bowen Photographs, ECF No. 55-99.)

## II.   LEGAL STANDARD

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted). This remedy should be granted only if Plaintiffs establish that: (1) "they are likely to succeed on the merits of their claims"; (2) "they are likely to suffer irreparable harm without relief"; (3) "the balance of harms favors them"; and (4) "relief is in the public interest." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (citation omitted). Plaintiffs "must meet the threshold for the first two 'most critical' factors"—likely to succeed on the merits and likely to suffer irreparable harm. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). "If these gateway factors are met, a court then considers the remaining two factors and determines

in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

## III.    DISCUSSION

### A.    Likelihood of Success on the Merits

On an application for injunctive relief, "the movant need only make a showing of reasonable probability, not the certainty, of success on the merits." *Atl. City Coin & Slot Serv. Co. v. IGT*, 14 F. Supp. 2d 644, 657 (D.N.J. 1998) (citations omitted). While Plaintiffs contend that they are likely to succeed on the merits of most of their claims, the Court focuses its discussion on the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.[13]

### 1.    Free Exercise Clause

It is axiomatic that the Free Exercise Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, forbids the adoption of laws designed to suppress religious beliefs or practices. *See Tenafly Eruv Ass'n*, 309 F.3d at 165; U.S. Const. Amend. I ("Congress shall make no law . . . prohibiting the free exercise [of religion].") Indeed, the Supreme Court has noted the "principle that government may not enact laws that suppress religious belief or practice is so well understood that few violations are recorded in [its] opinions." *Church of the Lukumi Babalu Aye, Inc., v. City of Hialeah*, 508 U.S. 520, 523 (1993) (citations omitted).

---

[13] Plaintiffs' sixteen-count Second Amended Complaint alleges violations of: (1) the Equal Protection Clause (Counts One and Two); (2) the Free Exercise Clause (Count Three); (3) the Establishment Clause (Count Four); (4) Freedom of Association (Count Five); (5) RLUIPA (Counts Six through Nine); (6) the Fair Housing Act (Counts Ten through Twelve); (7) Property Rights of Citizens (Count Thirteen); (8) New Jersey Law Against Discrimination (Counts Fourteen and Fifteen); and (9) what appears to be the New Jersey Municipal Land Use Law (Count Sixteen; Action in Lieu of Prerogative Writ). (SAC ¶¶ 392–455.) In the instant Motion, Plaintiffs advance an argument for all counts other than Count Sixteen. (*See* Pls.' Moving Br. 19–28.)

"Depending on the nature of the challenged law or government action, a free exercise claim can prompt either strict scrutiny or rational basis review." *Tenafly Eruv Ass'n*, 309 F.3d at 165 (footnote omitted). "If a law is 'neutral' and 'generally applicable,' and burdens religious conduct only incidentally, the Free Exercise Clause offers no protection." *Id.* (citation omitted). Conversely, if the law is not neutral or generally applicable, then "strict scrutiny applies and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest." *Id.* (citing *Lukumi*, 508 U.S. at 532, 542).

### (a)    The Ordinances are Not Neutral

"Although a law targeting religious beliefs as such is never permissible, if the object of a law is to infringe upon or restrict practices because of their religious motivation," then "the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 533 (citations omitted). "There are, of course, many ways of demonstrating that the object or purpose of a law is the suppression of religion or religious conduct." *Id.* "To determine the object of a law, [courts] must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Id.* "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.* Here, there is no dispute that the ordinances are not facially discriminatory. But "[f]acial neutrality is not determinative." *Id.* at 534. As the Supreme Court explained:

> The Free Exercise Clause . . . extends beyond facial discrimination. The Clause forbids subtle departures from neutrality and covert suppression of particular religious beliefs. Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against government hostility which is masked, as well as overt. The Court must survey meticulously the

> circumstances of governmental categories to eliminate, as it were, religious gerrymanders.

*Id.* (internal quotation marks and citation omitted).

Thus, where facial neutrality exists, courts may consider direct and circumstantial evidence in determining whether an ordinance was passed with a discriminatory purpose. *Id.* at 540 (citations omitted) ("In determining if the object of a law is a neutral one under the Free Exercise Clause, we can also find guidance in our equal protection cases"). "Relevant evidence includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment . . . in question[,] and the legislative or administrative history, including contemporaneous statements made by members of the decision[-]making body." *Id.* (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267–68 (1977)).

As discussed above, the Orthodox Jewish community believes that a central element of their religious exercise is to educate their children in Orthodox Jewish schools where the children can learn the traditions and beliefs of their faith (SAC ¶ 45.) Currently, however, there are no Orthodox Jewish schools in the Township and, according to Plaintiffs, Ordinances 03-17 and 04-17 were deliberately enacted to prohibit any such construction. (*Id.* ¶ 5.) Similarly, Plaintiffs allege that the Township adopted Ordinance 20-17 to prohibit the construction of eruvim in order to further discourage the Orthodox Jewish community from moving into the Township. (*Id.* ¶¶ 4, 10.) After review, the Court finds that Plaintiffs presented sufficient evidence in support of their argument that the ordinances were passed with a discriminatory purpose.

That Jackson Township residents expressed hostility towards the Orthodox Jewish community is not disputed. Defendants do not deny that Township residents have written to Township officials with anti-Semitic comments, such as referring to the eruvim in Lakewood as a spider web. (*See, e.g.*, SAC ¶ 181; *see* Answer ¶ 181). Nor do Defendants deny that Township

residents have expressed hostility towards the Orthodox Jewish community at Township meetings. For example, at a Township meeting concerning Ordinance 03-17, a Township resident stated "'[i]t's a little shortsighted. It seems like you're shooting yourself in the foot to solve a problem here. . . . If the problem is to keep Jews out of Jackson, then you need to . . . ." before being "silenced by the Council." (SAC ¶¶ 100–02; Answer ¶¶ 100–02.) And more importantly, Defendants do not deny or address allegations that other Township officials also made anti-Semitic comments, including referring to the Orthodox Jewish community in Lakewood as the "scourge of the cockroaches from the east" and the "Lakewood medieval cult," and referring to the Orthodox Jewish community generally as "the beards." (*See, e.g.*, SAC ¶¶ 122, 263; *see* Answer ¶¶ 122, 263; Bressi Dep. Tr. 57:14-18.) Instead, Defendants maintain that the Township Council's decisions were not motivated by the anti-Semitic animus exhibited by others. (*See, e.g.*, Answer ¶ 181.) But the record suggests otherwise.

For instance, the record contains the deposition testimony of Councilman Bressi, who testified that he knows, based on conversations, that Council President Nixon, Councilman Calogero, and Mayor Reina have acted to further the objectives of Jackson Strong. (Bressi Dep. Tr. 38:8-20; 40:10-13, 147:19-148:8.) Bressi testified that Council President Nixon, Councilman Calogero, and Mayor Reina have spoken to him about "ways of stopping the Orthodox Jewish community from moving into Jackson Township" and that the "motivation for these ordinances was to keep Orthodox Jews from moving into Jackson[.]" (*Id.* at 41:14-24, 129:25-130:8.) According to Bressi, Mayor Reina has stated that he will "never let them have wires in this town." (*Id.* at 125:19-23.) Moreover, Bressi acknowledged that prior to the adoption of Ordinances 03-17 and 04-17, there were no issues with schools or dormitories existing in the Township. (*Id.* at 46:10-14, 49:20-15.) In addition, Council Martin testified he was concerned that what occurred in

Lakewood—the amount of schools with dormitories built—would happen in the Township. (Martin Dep. Tr. 47:19-48:2.) Martin also testified it was his understanding that most of those schools were built by members the Orthodox Jewish community. (*Id.* at 48:3-14.) The Court finds that the testimony in the record, in conjunction with the hostility expressed by Township residents and officials, supports a finding that anti-Semitic animus was a motivating factor in the passage of the ordinances. *See Lukimi*, 508 U.S. at 540–41 (considering evidence of "hostility exhibited by residents, members of the city council, and other city officials toward the Santeria religion and its practice of animal sacrifice" in finding "the ordinances were enacted 'because of,' not merely 'in spite of,' their suppression of Santeria religious practice[]"); *see Al Falah Ctr. v. Twp. of Bridgewater*, No. 11-2397, 2013 WL 12322637, at *7 (D.N.J. Sept. 30, 2013) (noting that the hostility exhibited by residents and a "[d]efendant council member's alleged statement reflecting that Al Falah's existence at the [p]roperty would be very difficult support[ed] a reasonable inference that the animus of the residents was a motivating factor in the ultimate, rather expeditious, enactment of the [o]rdinance"); *Congregation Rabbinical Coll. of Tartikov v. Vill. of Pomona*, 945 F.3d 83, 119–22 (2d Cir. 2019) ("Viewing the record as a whole, including the . . . statements made by the decision making body and community members, we cannot say that the district court clearly erred in finding that religious animus was a significant factor in the position taken by . . . those to whom the decision-makers were knowingly responsive.").[14]

---

[14] The Court is mindful that in *Tartikov*, the Second Circuit ultimately found a violation of the Equal Protection Clause but concluded that the plaintiff lacked standing to pursue Free Exercise claims. 945 F.3d at 110, 119–24. In finding standing to pursue Equal Protection claims, the Second Circuit noted that "discrimination . . . is an actual and concrete injury sufficient to confer standing." *Id.* at 110. As to the Free Exercise claims, the Second Circuit reasoned that any alleged harm was "merely conjectural" because the plaintiff "never submitted a formal proposal for the building project, applied for a permit, or engaged in any other conduct that would implicate or invoke the operation of the challenged zoning laws." *Id.* Here, however, the Court finds that Plaintiffs have alleged a sufficient injury to pursue both Equal Protection and Free Exercise claims. As discussed

In addition, Plaintiffs point out that prior to the adoption of the ordinances, Township officials targeted the Orthodox Jewish community in different ways. For instance, the Township allegedly sought to prevent the sale of homes to members of the Orthodox Jewish community by adopting the "no-knock" ordinance and by filing a "blockbusting" complaint. (SAC ¶¶ 211, 221.) Plaintiffs also note that Township officials monitored and issued notice violations for both the construction of sukkahs and homes allegedly used as shuls in response to complaints made by residents. (SAC ¶¶ 281–82, 298–301, 306–07.) Taken together with other evidence in the record, the series of events leading up to the adoption of the ordinances further support an inference that the Township adopted the ordinances as part of a scheme to discourage members of the Orthodox Jewish community from moving into the Township.

In further support of their Motion, Plaintiffs point out that the Township now prohibits schools despite "contain[ing] a wide variety of large assembly, institutional and commercial land uses, including . . . Six Flags Great Adventure, the Jackson Premium Outlets, ten public schools, several assisted living facilities, funeral homes, medical facilities, campgrounds, golf clubs, and rehabilitation facilities." (SAC ¶ 137.) Moreover, Plaintiffs note that "dormitories exist at Six Flags Great Adventure amusement park, and the Mayor has admitted that he has no problem with

---

above, the Zoning Board and Planning Board at the time included members who have expressed animosity towards the Orthodox Jewish community. To have "subject[ed] Plaintiffs to an additional variance process," with individuals who referred to Orthodox Jews as "the beards" and "cockroaches," "would [have] only s[ought] to amplify the harm." *Congregation Kollel, Inc. v. Twp. of Howell*, No. 16-2457, 2017 WL 637689, at *10 (D.N.J. Feb. 16, 2017) (in the ripeness context, finding that the plaintiffs suffered an "immediate injury" where the defendants were allegedly "motivated by a religious animus to deprive [the p]laintiffs of their right to free exercise of religion by imposing land use regulations that violate multiple sections of RLUIPA. If true, [the d]efendants' alleged discriminatory conduct has caused an immediate and tangible injury; in that, [the p]laintiffs were prevented from erecting a *yeshiva gedola* and *mesivta* on the [subject property].") Thus, while the Second Circuit only found that discrimination constituted an injury in the equal protection context, the Court finds that, under the alleged facts, the same injury applies with equal force to Plaintiffs' Free Exercise claims.

a proposed sports complex project in the Township that included dormitories." (*Id.*) Indeed, at his deposition, Reina testified that he did not "have any problem" with the proposed development of a sports facility that would include a dormitory. (Reina Dep. Tr. 116:12-117-20.)

Defendants do not directly address these assertions in their opposition brief. Instead, Defendants appear to argue that the *Oros* matter establishes that the Township properly adopted the ordinances. (*See* Defs.' Opp'n Br. 5–8, 15 ("The same findings of Judge Ford in *Oros* are controlling and applicable to the determinations in this matter."), ECF No. 58.) Defendants' theory, however, is flawed. In *Oros*, the court did not consider any of the ordinances at issue in this matter. In fact, none of these ordinances existed at the time the *Oros* court issued its initial decision. (*See Oros v. Zoning Bd. of Adjustment for Jackson Twp.*, OCN-L-2981-14 (N.J. Super. Ct. Law Div. Oct. 19, 2015), ECF No. 58-3.) Moreover, the *Oros* court only considered the Township Zoning Board's decision to deny a use variance under the New Jersey Municipal Land Use Law.[15] But the Zoning Board is not a party in this matter. Nevertheless, Plaintiffs presented evidence that Zoning Board members have expressed hostility toward the Orthodox Jewish community. *See* Burros Social Media Posts (Burros referring to the Orthodox Jewish community in Lakewood as the "tsunami of orthodoxy," "scourge of the cockroaches from the east," and "Lakewood medieval cult."); *see* Pls.' Suppl. Br. 9 (noting that three Township officials, including two Zoning Board members, resigned from their official positions following their attendance at a CUPON meeting); Bressi Dep. Tr. 57:14-18 (testifying that Planning Board member Egan has referred to members

---

[15] The *Oros* court did not render a decision on the plaintiff's RLUIPA claims, which are still pending. *See Oros v. Zoning Bd. of Adjustment for Jackson Twp.*, OCN-L-2981-14, at 1, 7, 22–23 (N.J. Super. Ct. Law Div. Oct. 19, 2015).

of the Orthodox Jewish community as "the hats" and "the beards.").)[16] The Court, therefore, finds Defendants' argument that *Oros* is "controlling and applicable" meritless.

As to the eruvim, Defendants point to the fact that of the approximately 268 notice violations of § 372-8 issued in July and August 2017, only seven concerned eruvim while the majority of violations concerned portable basketball systems. (*See* Defs.' Opp'n Br. 4, 13, 19.) Defendants appear to argue that this fact demonstrates that Ordinance 20-17 was properly passed. The Court disagrees. Defendants do not address the disparity in the number of § 372-8 violations issued before and after Township residents complained about the existing eruvim, and they do not dispute that during the first six months of 2017, only twelve violations had been issued. (SAC ¶ 163; Answer ¶ 163.) Nor do Defendants address the e-mail correspondence from Township officials—made just months prior to the adoption of Ordinance 20-17—that indicate the construction of eruvim did not violate any applicable law. (Apr. 6, 2017 E-Mail Correspondence (Pieslak asserting, "[w]e are aware of the group of homes that have installed the poles connected by the wire in Brookwood []and found there to be no violation of any [o]rdinance/[l]aw."); Apr. 24, 2017 E-Mail Correspondence ("Purpuro asserting, "[s]o if I were to ask for these wires to be removed, I'd have no black and white codes to cite. . . . Bottom line, from a Planning and Zoning perspective, relative to Chapter 244, as nothing seems to exist on this matter, I have nothing to enforce.").) In fact, Mayor Reina has acknowledged that Ordinance 20-17 resulted from complaints made by Township residents concerning the eruvim. (Reina Dep. Tr. 164:5-11.) And according to Bressi, Mayor Reina stated he will "never let them have wires in this town." (Bressi Dep. Tr. 125:19-23.) Plaintiffs also submitted photographic evidence—unaddressed by

---

[16] For these reasons, the Court is unpersuaded by Defendants' suggestion that Plaintiffs could have simply sought a variance at the time. (*See* Defs.' Suppl. Br. 2, ECF No. 117.)

Defendants—showing that, despite Ordinance 20-17, objects still exist in the right-of-way, including portable basketball systems, flags, and signs. (*See* Investigator Bowen Photographs.) The Court finds that these facts permit a reasonable inference that Ordinance 20-17 was passed with a discriminatory purpose.

Based on the foregoing, the Court finds that Plaintiffs presented sufficient evidence to support a finding that the ordinances are not neutral and were passed with a discriminatory purpose.

### (b)   Strict Scrutiny

As noted, if a law is not neutral and generally applicable, then "strict scrutiny applies and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest." *Tenafly Eruv Ass'n*, 309 F.3d at 166. "A compelling state interest involves some substantial threat to public safety, peace[,] or order, and includes only interest of the highest order, and the gravest abuses." *Congregation Rabbinical Coll. of Tartikov*, 138 F. Supp. 3d 352, 418 (S.D.N.Y. 2015) (internal quotation marks and citations omitted). "Given this high bar, courts have held that '[a]esthetics,' traffic, and 'community character' are normally not compelling interests." *Id.* (collecting cases).

Here, Defendants fail to offer any compelling government interest, much less claim that the ordinances were narrowly tailored to serve those interests. At oral argument, the Court asked Defendants what government interest is being furthered with respect to Ordinance 03-17. (Oral Argument Tr. 18:23-25.) Defendants offered no immediate response and instead indicated that discovery will show that the ordinances were properly adopted. (*See, e.g., id.* at 19:1-3 ("Well, Your Honor, as discovery is not complete, I can proffer what we intend to provide in the defense."). Defendants similarly point to no compelling government interest that is being furthered by Ordinance 20-17. Furthermore, the Court finds unavailing Defendants' unsupported and

conclusory assertion that they "have a strong interest in maintaining the overall welfare of the area for the public benefit, which is accomplished through the enforcement of its zoning ordinances." (Defs.' Opp'n Br. 32.) On these facts, the Court finds that Plaintiffs have established a reasonable probability of success on the merits of their Free Exercise claim.

### 2.    Equal Protection Clause

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. Courts have recognized an equal protection violation where "a facially neutral statute . . . was adopted with a discriminatory intent and applied with a discriminatory effect." *Tartikov*, 945 F.3d at 110–11; *see Hassan v. City of N.Y.*, 804 F.3d 277, 294 (3d Cir. 2015) ("Plaintiffs could identify a facially neutral policy that the City purposefully 'designed to impose different burdens' on Muslims and that (even if applied evenhandedly) does in fact have the intended adverse effect.").

In determining whether a law was adopted with a discriminatory intent, courts apply the same *Arlington Heights* factors discussed above in connection with Plaintiffs' Free Exercise claim. *Tartikov*, 945 F.3d at 11 ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." (citing *Arlington Heights*, 429 U.S. at 266)). Thus, for the above-stated reasons, the Court finds that Plaintiffs presented sufficient evidence to support a finding that the ordinances were adopted with a discriminatory purpose.

Moreover, the ordinances have the effect of inhibiting the construction of Orthodox Jewish schools and eruvim within the Township. As noted, WR Property owns 4.93 acres of land in the Township's R-3 zone, which it purchased prior to the adoption of the ordinances and "for the purpose of developing or marketing it for development of an Orthodox Jewish religious school."

(SAC ¶¶ 25–27.) Ordinance 03-17, however, effectively removed schools as a permitted use in most of the Township's residential zones. (*Id.* ¶¶ 78–79; Answer ¶¶ 78–79.) As a result of Ordinance 03-17, private schools, including religious schools, now appear to be allowed as a permitted use only in the PMURD zone, which requires the minimum tract area to be "500 contiguous acres under one ownership or control." (Gov't's Compl. ¶ 48, No. 20-6109; *see* Twp.'s Answer ¶ 48, No. 20-6109; Jackson Twp. Land Use & Development Regulations § 244-54(D)(1)(a).) Thus, even with the repeal of Ordinance 04-17, Ordinance 03-17 appears to inhibit the construction of WR Property's proposed Orthodox Jewish school in most, if not all, zoning districts. As for the eruvim, Plaintiffs maintain that Ordinance 20-17 "effectively bans eruv[im] in the Township." (*See* Pls.' Suppl. Br. 2, ECF No. 112.) Plaintiffs have also submitted declarations of Agudath Israel members who aver that there are no eruvim in their neighborhood(s) seemingly due to Ordinance 20-17. (*See* Mozes Decl. ¶ 5; Klein Decl. ¶ 6.) Taken together with the circumstances surrounding the adoption of the ordinance discussed above, Ordinance 20-17 also appears to improperly inhibit the construction of eruvim in the Township. Based on the foregoing, and having already found that Defendants failed to offer any compelling government interest, the Court finds that Plaintiffs have established a reasonable probability of success on the merits of their Equal Protection claim.

### B.    Remaining Preliminary Injunction Prongs

The Court also finds that the remaining preliminary injunction prongs weigh in favor of granting Plaintiffs' Motion. Prong two—irreparable harm—is satisfied because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see Tenafly Eruv Ass'n*, 309 F.3d at 178 ("Limitations on the free exercise of religion inflict irreparable injury.") (collecting cases).

As to prong three, balance of harms, Defendants claim that they "would be greatly harmed by a preliminary injunction as it would prevent the implementation of the subject ordinances which were properly considered and passed pursuant to Township procedures." (Defs.' Opp'n Br. 33.) But Defendants' purported harm, if any, is outweighed by Plaintiffs' constitutional right to free exercise of religion and equal protection. Plaintiffs submitted declarations from Agudath Israel members of Jackson Township who assert that they are negatively affected by the ordinances. According to one individual, there is no eruv in his neighborhood seemingly due to Ordinance 20-17 and, consequently, he and his wife are unable to take their infant son to shul on the Sabbath. (Mozes Decl. ¶¶ 5–6.) That same individual notes that "[i]t is his religious belief that [he] must study with others on the [S]abbath" but that he cannot "carry [his] books to shul," which "hampers [his] ability to pray and study." (*Id.* ¶ 6.) Another individual asserts that his children must attend a school in Lakewood which, among other things, interferes with their prayers because the bus ride takes approximately two hours round-trip. (Cohen Decl. ¶¶ 5–8.) For these reasons, and having already noted that the loss of First Amendment freedoms constitutes irreparable injury, the Court finds that the balance of harms weighs in favor of granting the injunction.

Finally, the Court also finds that the public interest weighs in favor of granting the injunction. The Third Circuit has recognized that "[a]s a practical matter, if a plaintiff demonstrates both likelihood of success on the merits and irreparable harm, it almost always will be the case that the public interest will favor the plaintiff." *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). Moreover, "many courts have held that there is a significant public interest in upholding First Amendment principles." *Am. Freedom Def. Initiative v. SEPTA*, 92 F. Supp. 3d 314, 331–32 (E.D. Pa. 2015) (collecting cases).

## IV.    CONCLUSION

For the above-stated reasons, the Court grants Plaintiffs' Motion for a Preliminary Injunction. Defendants, therefore, are preliminarily enjoined from enforcing Ordinances 03-17 and 20-17 pending a final decision on the merits of Plaintiffs' claims. In the interim, Plaintiffs must follow the applicable application procedures—for obtaining permits and approvals for the construction of schools and eruvim—that were in effect prior to the adoption of Ordinances 03-17 and 20-17. The Court will enter an Order consistent with this Memorandum Opinion.

/s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE